# <u>EXHIBIT A</u>

Jordan L. Lurie (SBN 130013)
Jordan.Lurie@capstonelawyers.com
Tarek H. Zohdy (SBN 247775)
Tarek.Zohdy@capstonelawyers.com
Cody R. Padgett (SBN 275553)
Cody.Padgett@capstonelawyers.com
Karen L. Wallace (SBN 272309)
Karen.Wallace@capstonelawyers.com
Capstone Law APC
1875 Century Park East, Suite 1000
Los Angeles, California 90067
Telephone:  (310) 556-4811
Facsimile:   (310) 943-0396

Attorneys for Plaintiffs Alfred Salas and
Gloria Ortega

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ALFRED SALAS and GLORIA ORTEGA, individually, and on behalf of a class of similarly situated individuals,<br><br>   Plaintiffs,<br><br>  vs.<br><br>TOYOTA MOTOR SALES, U.S.A., INC., a California corporation,<br><br>   Defendant. | Case No.: 2;15-cv-08629 FMO (Ex)<br><br>Hon. Fernando M. Olguin<br><br>**DECLARATION OF TAREK H. ZOHDY IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**<br><br>Date:  January 4, 2018<br>Time:  10:00 a.m.<br>Place:  350 W. 1st Street<br>     Courtroom 6D, 6th Fl. |

# DECLARATION OF TAREK H. ZOHDY

I, Tarek H. Zohdy, declare as follows:

1.     I am an attorney licensed to practice before all courts in the State of California.  I am an associate at Capstone Law APC, counsel of record for Plaintiffs Alfred Salas and Gloria Ortega in this action. I submit this declaration in support of Plaintiffs' opposition to Toyota Motor Sales U.S.A., Inc's ("TMS") Motion for Summary Judgment.  Unless the context indicates otherwise, I have personal knowledge of the following facts, and if called as a witness, I could and would testify competently to them.

2.     Attached hereto as Exhibit "1" is a true and correct copy of Email correspondence titled "RE: Camry charcoal air filters" produced by Defendant and bates stamped Toyota_Salas_00067287.

3.     Attached hereto as Exhibit "2" is a true and correct copy of Plaintiffs' expert Murat Okçuoğlu's Rebuttal Report dated October 6, 2016.

4.     Attached hereto as Exhibit "3" is a true and correct copy of Plaintiff's expert Murat Okçuoğlu's Initial Report dated September 9, 2016.

5.     Attached hereto as Exhibit "4" is a true and correct copy of Excerpts from Deposition of Defendant's expert Robert Kuhn (page 163:5-11).

6.     Attached hereto as Exhibit "5" is a true and correct copy of Defendant's expert Robert Kuhn's Rebuttal Report dated October 7, 2016.

7.     Attached hereto as Exhibit "6" is a true and correct copy of Excerpts from Deposition of Defendant's expert Robert Kuhn (page 151:5-9).

8.     Attached hereto as Exhibit "7" is a true and correct copy of Excerpts from Deposition of Defendant's expert Robert Kuhn (page 98:9-25).

9.     Attached hereto as Exhibit "8" is a true and correct copy of Defendant's expert Robert Kuhn's Initial Report dated September 9, 2016.

10.     Attached hereto as Exhibit "9" is a true and correct copy of Defendant' September 2013, TSB 0142-13, to its dealers in the United States, once again

DECLARATION OF TAREK H. ZOHDY IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION
0003

acknowledging that the HVAC system and its associated parts for the Class Vehicles were defective and malfunctioning.  This TSB was titled "HVAC Odor Maintenance" and applies to all 2004-2014 Camry vehicles.

11.     Attached hereto as Exhibit "10" is a true and correct copy of Defendant's TSB AC002-97 dated May 9, 1997, to its dealers in the United States, and titled "AIR CONDITIONING EVAPORATOR ODOR."

12.     Attached hereto as Exhibit "11" is a true and correct copy of Excerpts from Toyota technician's training manual published in 2005 ("A/C system odors are a common complaint among users, especially after start up" and odors can be caused by "[m]icrobes [i.e., mold] growing on the evaporator surface" that are "small living bacteria . . . carried into the evaporator case [that] grow in the warm, moist environment.")

13.     Attached hereto as Exhibit "12" is a true and correct copy of Defendant's TSB 2009, TSB-0261-09, titled "HVAC Odor," once again acknowledging that the HVAC system and its associated parts for 2007-2010 Camry, Camry HV, and 2004-2008 Prius.

14.     Attached hereto as Exhibit "13" is a true and correct copy of Email Correspondence titled "Re: ACTION REQUIRED AC info for consistent inspection" Produced by Defendant and bates stamped Toyota_Salas_00007942-7943.

15.     Attached hereto as Exhibit "14" is a true and correct copy of Email Correspondence titled "Proposed agenda for HVAC activity" Produced by Defendant and bates stamped Toyota_Salas_00007899.

16.     Attached hereto as Exhibit "15" is a true and correct copy of Email Correspondence titled "RE: Please see the note below from TMS case mgr Lupe Perez" Produced by Defendant and bates stamped Toyota_Salas_000032801-804.

17.     Attached hereto as Exhibit "16" is a true and correct copy of Document

DECLARATION OF TAREK H. ZOHDY IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

titled "Toyota/Lexus/Scion TAS Report" Produced by Defendant and bates stamped Toyota_Salas_00006029.

18.     Attached hereto as Exhibit "17" is a true and correct copy of Excerpts from deposition of Dwayne Kinsey (page 56:18-57:19).

19.     Attached hereto as Exhibit "18" is a true and correct copy of Document titled "Toyota/Lexus/Scion TAS Report" Produced by Defendant and bates stamped Toyota_Salas_00006030.

20.     Attached hereto as Exhibit "19" is a true and correct copy of Document titled "Toyota/Lexus/Scion TAS Report" Produced by Defendant and bates stamped Toyota_Salas_00006032.

21.     Attached hereto as Exhibit "20" is a true and correct copy of Excerpts from deposition of Dwayne Kinsey (page 36:10-12).

22.     Attached hereto as Exhibit "21" is a true and correct copy of Excerpts from a Document (.txt) Produced by Defendant and bates stamped Toyota_Salas_00013764.

23.     Attached hereto as Exhibit "22" is a true and correct copy of Email correspondence titled "Follow up to LL Hearing observation activity this week" Produced by Defendant and bates stamped Toyota_Salas_00095862.

24.     Attached hereto as Exhibit "23" is a true and correct copy of Excerpts from deposition of Gloria Ortega (page 237:21).

25.     Attached hereto as Exhibit "24" is a true and correct copy of Excerpts from Deposition of Alfred Salas (page 164:18-21).

26.     Attached hereto as Exhibit "25" is a true and correct copy of Email correspondence titled "FW: AC Odor Issue Summary" produced by Defendant and bates stamped Toyota_Salas_00058063-64.

27.     Attached hereto as Exhibit "26" is a true and correct copy of Excerpts from Deposition of Stephan Young (page 137:19-24).

28.     Attached hereto as Exhibit "27" is a true and correct copy of Excerpts

DECLARATION OF TAREK H. ZOHDY IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

1   from Deposition of Gloria Ortega (page 24:7-10; 235:19-25).

2          29.    Attached hereto as Exhibit "28" is a true and correct copy of Excerpts

3   from Deposition of Alfred Salas (page 30:3-12).

4          30.    Attached hereto as Exhibit "29" is a true and correct copy of Excerpts

5   from Deposition of Russell Suzuki (page 82-83).

6          31.    Attached hereto as Exhibit "30" is a true and correct copy of Document

7   Produced by Defendant and bates stamped Toyota_Salas_000012799.

8          32.    Attached hereto as Exhibit "31" is a true and correct copy of Email

9   correspondence titled "Re: fw: Parking Fresh field fix" produced by Defendant

10  and bates numbered Toyota_Salas_00052719.

11         33.    Attached hereto as Exhibit "32" is a true and correct copy of Excerpt

12  from Defendant's Responses to Plaintiffs' Requests for Production, Request No.

13  2.

14         34.    Attached hereto as Exhibit "33" is a true and correct copy of Excerpts

15  from Deposition of Alfred Salas (page 31:17-23).

16         35.    Attached hereto as Exhibit "34" is a true and correct copy of the

17  Declaration of Alfred Salas in Support of Motion for Class Certification.

18         36.    Attached hereto as Exhibit "35" is a true and correct copy of the

19  Declaration of Gloria Ortega in Support of Motion for Class Certification.

20         37.    Attached hereto as Exhibit "36" is a true and correct copy of the Capstone

21  Law APC Firm Resume.

22         38.    Attached hereto as Exhibit "37" is a true and correct copy of Plaintiff's

23  Expert Susan Thompson's Supplemental Declaration.

24         39.    Attached hereto as Exhibit "38" is a true and correct copy of Defendant's

25  Expert Jeffrey Hicks Initial Report dated September 9, 2016.

26         40.    Attached hereto as Exhibit "39" is a true and correct copy of Email

27  correspondence titled "RE: A/C odors" produced by Defendant and bates

28  stamped Toyota_Salas_00063910.

DECLARATION OF TAREK H. ZOHDY IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS
CERTIFICATION

41.     Attached hereto as Exhibit "40" is a true and correct copy of Excerpts from deposition of Stephan Young (page 134:14-24).

42.     Attached hereto as Exhibit "41" is a true and correct copy of Defendant's Expert Kevin Keller Initial Report dated September 9, 2016.

43.     Attached hereto as Exhibit "42" is a true and correct copy of Defendant's Expert Wysocki Initial Report dated September 9, 2016.

44.     Attached hereto as Exhibit "43" is a true and correct copy of Excerpts from Deposition of Bruce Strombom (page 93:25-94:2).

45.     Attached hereto as Exhibit "44" is a true and correct copy of Defendant's Expert Bruce Strombom's Sur-Rebuttal Report dated November 7, 2016.

I declare under penalty of perjury under the laws of the United States and the State of California that the foregoing is true and correct.  Executed on November 10, 2017 at Los Angeles, California.


                                        s/ Tarek H. Zohdy
                                        Tarek H. Zohdy

DECLARATION OF TAREK H. ZOHDY IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION
0007

# Exhibit 1

| | |
|---|---|
| **From:** | Shayne K Carter (TMS) |
| **To:** | Ethan Leighton (TMS) |
| **CC:** | Sandy Lobenstein (TMS) |
| **Sent:** | 9/9/2015 7:21:15 PM |
| **Subject:** | RE: Camry charcoal air filters |


I am not at NDM. From a pricing point of view we can price an option code that is added to the
order table. It will be up to PPD and Marketing to decide how to offer it. I am puzzled by the
fact that it's not an Engineering issue. If we acknowledge that the AC smells and there is a
way to make it go away how is that not an Engineering issue. Is that considered a "nice to
have" item, enhancement to the system. I see it as a basic requirement of the system. Sorry
just me venting. For one of the first times, I think I am on SET's side on this one.

Shayne Carter
Corporate Manger Pricing & Cross Carline Planning
Toyota Motor Sales, USA, Inc.
Office: 310-468-2189
Cell: 310-347-5197

From: Ethan Leighton (TMS)
Sent: Wednesday, September 09, 2015 11:07 AM
To: Shayne K Carter (TMS) <Shayne_Carter@Toyota.com>
Cc: Sandy Lobenstein (TMS) <sandy.lobenstein@toyota.com>
Subject: Re: Camry charcoal air filters

Hi Shayne,

The thinking now is instead of forcing all vehicles to accept, create an option much like a
fleet only code and let the regions order as such.
Z will not cover as they don't feel it's an engineering issue.
Only SET is complaining.
Are you at NDM? We could talk more.
Rick is here is I can also talk with him too.

Thanks,

-Ethan

Ethan Leighton
National Product Planning Manager
Product Planning and Development
Desk: 469-292-1150
Mobile: 310-███████

On Sep 9, 2015, at 7:30 AM, Shayne K Carter (TMS)
<Shayne_Carter@Toyota.com<mailto:Shayne_Carter@Toyota.com>> wrote:
Hi Ethan,

I apologize for not following up with you sooner. I had not heard of this request before and
haven't had a chance to discuss with Rick. I am not clear on what the communication channels
have been with CCL in the past but from a pricing point of view I have not received this
request before. I would also agree with Sandy's comment below, if this is a known issue with a
TSB for how to repair, why are we asking to charge customers. I get that the smell doesn't
occur in all climate conditions equally and the countermeasure costs more but it does seem
challenging to explain why to get what a customer should expect as a standard condition for
the air conditioner (no odor) we charge more?
I will ask Ben and John today if they have received this request through any CCL channels.

Do we know if any vehicles we sell have this filter already as standard or is it a service
part only?

Shayne

Highly Confidential                                                    Toyota_Salas_00067287

# Exhibit 2

# Salas *v.* TMS

## HVAC Defects Analysis
## Rebuttal Report

### PREPARED FOR

Tarek Zohdy
Capstone Law, APC
1875 Century Park East, Suite 1000
Los Angeles, California 90067
310.556.4811

October 6, 2016

### PREPARED BY

**Murat Okçuoğlu**
4175 Lago Dr.
Santa Barbara, CA 93110
murat@cox.net
(805)-637-5482

# TABLE OF CONTENTS

I.      INTRODUCTION AND QUALIFICATIONS........................................................................ 3

II.     APPROACH AND METHODOLOGY ................................................................ 6

III.    DEFENSE EXPERT ROBERT M. KUHN'S REPORT ........................................... 7

IV.     DESIGN OF THE SUBJECT HVAC SYSTEM........................................................10

V.      SUMMARY OF OPINIONS AND NOTES .............................................................17

© Murat Okçuoğlu MMXVI - Confidential and Proprietary, for use in Salas matter only

# I.    INTRODUCTION AND QUALIFICATIONS

My name is Murat Okçuoğlu.  I was retained by Capstone Law, APC, ("Counsel"), counsel to the proposed plaintiff class (the "Class") in *Alfred Salas and Gloria Ortega, vs. Toyota Motor Sales, USA INC.*, Case No.: 2;15-cv-08629 FMO (Ex),  (the "Litigation"), to analyze the nature of the alleged HVAC defect in the subject class 2012 -2015 Toyota Camry vehicles.

This report is submitted in response to report prepared by Robert M. Kuhn P.E., dated September 09, 2016

All work contained in this report is my intellectual property and is solely intended for use in the Litigation. This report may contain confidential, proprietary, and protected information, as well as original compilations, approaches, concepts, trade secrets and information that has commercial value.  No one may use, benefit from or disclose this intellectual property without my express permission.

Counsel has requested that I prepare this written report to explain the HVAC system noxious fume and odor emitting issue affecting the subject Toyota vehicles, the nature of the problem and the potential of safety risks posed by such defect and to respond to certain points raised by Mr. Kuhn in his report.

I have read the First Amended Complaint in this Litigation and am so acquainted with the allegations in this case regarding the HVAC system defect at issue.  In preparing this report, I have relied on the documents listed in this report as well as on my own pre-existing knowledge and expertise, as reflected below.

My professional qualifications, in brief, are as follows: For nearly a decade, I was Chief Engineer for McLaren Automotive.  I have over thirty-nine years of active involvement in automotive engineering, vehicle design, vehicle manufacturing and vehicle testing. A true and correct copy of my current CV is attached as Attachment "A," and, as required to be disclosed per Federal Rule of Civil Procedure 26(a)(2)(B)(v)-(vi), my testimonies as an expert at trial or by deposition in the past four years are attached as Attachment "B."  My automotive career includes engineering, designing and testing components and systems for car

© Murat Okçuoğlu MMXVI - Confidential and Proprietary, for use in Salas matter only

manufacturers and car manufacturer suppliers, (OEMs[1] and Tier-1[2] suppliers),
integrating vehicles and systems, including HVAC systems, track and road testing
and dynamic vehicle behavior validation for OEMs as well as designing, preparing
and driving race cars.

In addition to my vast experience in multiple aspects of automotive design
and engineering, I have invented and developed various advanced automotive
technologies and components, including all-wheel drive and traction control
systems. These systems are currently licensed and being used by major SUV and
car manufacturers. During the integration of these systems to individual vehicle
platforms, I had the opportunity and the necessity to work intimately together with
the development teams for seamless vehicle dynamics integration and optimized
handling and stability.

Following an intense 15-year vehicle research and development career and
vehicle handling work with almost all US and European automobile manufacturers.
In the last ten years, I have conducted numerous detailed systems analyses of
catastrophic injury accidents in accordance with established automotive industry
practices and protocols and published standards.

I have worked and consulted with various automotive and defense
manufacturers on vehicle systems engineering and design, including HVAC
systems.

I have worked with and participated in dynamic vehicle testing for safety
improvement and overall vehicle systems evaluation issues with most major
vehicle manufacturers and suppliers at many proving grounds and test tracks,
driving, testing and evaluating vehicles for automobile manufacturers and
automotive component suppliers.

I have published several research papers and articles on advanced
automotive technology and presented my findings in technical conferences, and
academic venues.

---

[1]      OEM refers to "Original Equipment Manufacturer," and industry acronym used to denote
a "Vehicle Manufacturer."
[2]      Tier-1 Supplier is an industry term used to denote first tier supplier of automotive
systems and components to OEMs.

© Murat Okçuoğlu MMXVI - Confidential and Proprietary, for use in Salas matter only

My compensation for my work on this matter is $300/hour. My compensation is not dependent either on the opinions I express or the outcome of this Litigation. A list of the sources I consulted in preparing this report, as required by Federal Rule of Civil Procedure 26(a)(2)(B)(ii) may be found in this report.

# II.   APPROACH AND METHODOLOGY

As part of my assignment, I evaluated the HVAC system of the subject Toyota vehicles' design relevant to this assignment for the purposes of characterizing my opinions and the basis for them. I also disassembled and inspected the HVAC system in plaintiff Salas's vehicle.

I also used well-established vehicle and system field performance evaluation methodology and protocols, similar or identical to methods and protocols used by the automotive trade and industry, including automotive manufacturers, automotive system suppliers and automotive component suppliers. The review of these analyses allowed me to assess and opine whether some aspect of the vehicle's design, construction and performance is defective.

My analysis also includes opinions and proofs based on field data, test results, and Toyota's own findings.  This analysis focuses only on relevant information and the performance of systems operating in accordance with the evidence in this case and the laws of physics, chemistry and biology.

My opinions integrate all currently available, relevant information. While I may conduct additional work to confirm and demonstrate my hypotheses, this report provides information on my current findings, pending receipt of additional information or testimony from other experts. If such materials are provided, additional time to incorporate them into my analyses may be necessary and may result in additional or revised opinions.

## III.  DEFENSE EXPERT ROBERT M. KUHN'S REPORT

I have reviewed Mr. Kuhn's report dated September 9, 2016. Mr. Kuhn's conclusion that *"The HVAC systems of the Subject Vehicles are not defectively designed"* is without basis.

Mr. Kuhn claims that odors are not unusual or unique generally, to subject vehicles in particular. He does not address the fact that the subject vehicles have significantly higher complaints then comparable vehicles or that Toyota's own investigation found subject HVAC systems to be significantly worse than competition in warm and humid environments such as south east states and the state of Florida. He does not consider or mention the severity and frequency of the occurrences, nor does he offer any objective comparison or metrics.

Mr. Kuhn also makes the misleading statement that *"HVAC odors occur as a result of what passes through the HVAC unit during its normal operation, not because of the HVAC unit itself."* (p7) While, obviously if nothing passes through an HVAC system, there will be no odors, HVAC systems should be designed to operate under expected use conditions, including variable weather, without harboring organic matter. The warm, dark, humid crevices inside the subject HVAC system potentially provide ideal habitats for organisms and suitable HVAC design practices are essential to prevent such occurrences. HVAC unit design is directly responsible for what accumulates and breeds inside them.

Mr. Kuhn continues with the misleading statement that *"...odors occurring in an automotive HVAC system are not generated by the HVAC system itself."* (p7) Again, while a HVAC unit in a sterile environment would not generate the odor causing matter, defective HVAC units collect and harbor organic matter, during reasonable, expected use, such that bacteria or fungi breed and release odors, all within the confines of the HVAC system and due to the design of the said HVAC system.

Mr. Kuhn claims all HVAC systems may suffer from odors, dismissing the fact that Toyota's own investigation found the subject HVAC system to be significantly worse than that of its competitors in warm and humid environments such as south east states and the state of Florida. He also neglects to mention that Toyota have acknowledged an odor problem with the subject HVAC system and

© Murat Okçuoğlu MMXVI - Confidential and Proprietary, for use in Salas matter only
*Page 7 of 18*

he ignores that Toyota's own efforts to find a remedy to this problem have not been successful.

Mr. Kuhn attempts to make comparisons with other manufacturers' vehicles based on TSBs, however, he does not offer any comparison with objective criteria nor does he indicate the success rate or rectification level of remedies offered in similar TSB's issued by other manufacturers'.

Mr. Kuhn's design analysis did not include any design details but simply relied on casual observation of subject vehicles' HVAC systems. In addition, Mr. Kuhn did not disassemble any subject HVAC systems in order to evaluate their design and construction. While he did remove the HVAC blower motor and visually inspect the surface of the evaporator core in plaintiffs' vehicles, he offers no opinion as to the HVAC unit's design, it's in adequate drainage, or any propensity to breed bacteria or fungi. Mr. Kuhn claims there are significant design differences between subject vehicle HVAC systems. The subject HVAC systems differ only on remote control and post-treated air ducting details. The subject vehicle HVAC systems in all the class vehicles share the evaporator and housing design where the organic matter is accumulated and cultivated.

While he admits the "*intermittent*" HVAC odors in the subject vehicles, he subjectively dismisses them as "*not strong, offensive or continuous*" without any basis or metric other than his own subjective perception. His assessment of plaintiffs' vehicles is limited to the HVAC systems' performance, based on the presence or absence of odors at the time, rather than any evaluation of the HVAC system design. In fact, he notes perceiving odor in both plaintiffs' vehicles without any further analysis, guessing that the source in plaintiff Ortega's vehicle came from the air fresheners she uses as a countermeasure to the HVAC odor and admitting that the odor he perceived in plaintiff Salas's vehicle came from the HVAC system. He concludes simply that "*the odors that were experienced [in plaintiffs' vehicles] were minimal in occurrence and intensity and easily dissipated using the available control settings,*" without any basis or metric other than his own subjective perception and without offering a source for the HVAC odors he perceived that would preclude a defect.

Mr. Kuhn does not mention that he has tested both vehicles in Southern California at the height of summer, during which environmental conditions were hot and extremely dry, unlike warm and humid conditions of southeast states.

© Murat Okçuoğlu MMXVI - Confidential and Proprietary, for use in Salas matter only

Mr. Kuhn indicated retrieval of atmospheric samples from around plaintiff Salas's vehicle but did not indicate if such samples were collected from around Ortega's vehicle.

Mr. Kuhn makes the misleading statement that: *"The **overall** design of the HVAC systems in the Subject Vehicles is typical of the design of other HVAC systems of similar sized vehicles manufactured by other OEMs."* While it is true that the overall design and the purpose of the subject HVAC systems are typical, the subject HVAC system design is defective in that it allows the inordinate accumulation and breeding of organic matter under certain conditions.

Mr. Kuhn's conclusion that *"The occasional occurrence of odors from the HVAC systems in some of the Subject Vehicles is not unusual or unique and the potential for their occurrence is not indicative of a common design defect within that system",* is not supported by his evidence or analysis and ignores Toyota's own finding of frequent and severe problems, especially in warm and humid climates.

© Murat Okçuoğlu MMXVI - Confidential and Proprietary, for use in Salas matter only

## IV.  DESIGN OF THE SUBJECT HVAC SYSTEM

Plaintiff Salas's vehicle was tested, inspected and disassembled. The testing was done under the typical weather conditions of late summer conditions in southern California with 20 to 30% humidity and 25° to 30° Celsius ambient air temperature, far from subject complaint-causing warm and humid conditions.



The subject 2014 Toyota Camry

The operation of the HVAC system was otherwise unremarkable. The disassembly of the HVAC system was a significant task, necessitating the removal of front seats, steering column, instrument panel, entire dashboard, center console, front carpeting, dashboard support, knee airbags, driver airbag, passenger airbag, disconnecting side curtain airbags and miscellaneous under dash components and ducting.

© Murat Okçuoğlu MMXVI - Confidential and Proprietary, for use in Salas matter only



Upon removal from the vehicle as a unit, the HVAC system was disassembled to reveal internal components and design.



© Murat Okçuoğlu MMXVI - Confidential and Proprietary, for use in Salas matter only
*Page 11 of 18*





The Toyota Camry HVAC system unit inside cabin, mounted under the dash

While the general design of the subject HVAC system is not unusual, it was noted that overall details of the design lack efficient drainage and contain nooks and crevices that can form ideal habitats for biological matter growth. The warm, humid, dark crevices present inside this HVAC system may help harbor organic

matter. The foam material design used around the evaporator also has several
crevices and inherent porosity that may harbor moisture and growth.



Subject evaporator housing drainage section

Specifically, the steps at the bottom of the evaporator housing create
obstacles for efficient drainage and the sharp corners create crevices for
contaminants. The minimal drain slope of the sump section under the evaporator
housing does not allow for efficient drainage of water. Efficient drainage is not
only essential for minimizing moisture but also necessary to help clean and flush
contaminants with the condensed water.



Blower section of the subject HVAC system
5-Amplifier (electronic control circuits) 6-Air filter element 7-blower fan

© Murat Okçuoğlu MMXVI - Confidential and Proprietary, for use in Salas matter only
*Page 13 of 18*

It should be noted that an evaporator generates water through condensation from humid air. The process is continuous during A/C operation. The volume of water is dependent on A/C settings, ambient temperature and air humidity. A Ford exercise found up to 1.9 liters (64 oz.) per hour of water can be collected from the evaporator. A more efficient drainage design in the subject HVAC system would help flush any accumulated matter, preventing organic growth.

In addition, the excessive recirculation of the stale air in the cabin by the specially designed Toyota logic (greenhouse gas logic)  most likely exacerbates the problem of organic growth.



Subject HVAC Evaporator

The subject system has a two row aluminum evaporator effective core approximately 11" wide and 10" high. Under the evaporator, within the plastic HVAC housing is an area designed to collect and drain accumulated moisture. The

© Murat Okçuoğlu MMXVI - Confidential and Proprietary, for use in Salas matter only

*Page 14 of 18*

area has a gentle slope of about 7° to 8°, helping drain moisture collected at the
center and drained through the drain tube. The drain tube outlet is located on the
right side, instead of a more effective vertical orientation. The drain opening in the
sump area is located 3" from the right side and 8" from the left side. It has a
maximum depth of 1", connecting to an Ø 3/8" drain tube. The rubber drain tube
also has a gentle angle instead of a more aggressive and more efficient vertical
orientation. After an 8° slope of 2" long, it makes a 90° elbow to an 18° run of 5".
After another 27° elbow, it turns down 45° for 3" and reaches a 60° elbow. From
there, it follows 55° for 1-¼" to an elbow outlet of 35°. An aggressively sloped
drain tube would have drained better.



Components of the subject HVAC system
1-HVAC unit, 2-drain tube for condensing moisture, 3-cooling evaporator, 4-heating radiator

Potentially aggravating the odor problem is the air flow design. The air flow
is directed towards the center of the evaporator, missing the lower section where
organic matter is most likely to accumulate and breed. The defective airflow design
therefore does not blow directly on the problem area. The problem area is

© Murat Okçuoğlu MMXVI - Confidential and Proprietary, for use in Salas matter only

concealed and protected from direct flow of fresh air, creating a "dead zone", permitting the air in the problem area to remain stale and protect and harbor the growth of organic matter.



Subject evaporator drainage test

© Murat Okçuoğlu MMXVI - Confidential and Proprietary, for use in Salas matter only

# V.   SUMMARY OF OPINIONS AND NOTES

My opinions are that:

A) Toyota's expert Kuhn's inspection and opinions are improper and incomplete in that:

1. Mr. Kuhn did not analyze subject HVAC system design and details or disassemble subject HVAC system while forming his opinion that the subject HVAC system design is not defective.
2. Mr. Kuhn did not use any objective comparison or metrics in his assessment of severity and frequency of subject HVAC system odor problems
3. Mr. Kuhn did not use any objective comparison or metrics in his description of comparable HVAC system odor problems.
4. Mr. Kuhn did not use any objective comparison or metrics in his assessment of subject vehicles' odor problems.
5. Mr. Kuhn admits that the plaintiffs vehicles had odors, but fails to make any attempt to identify or address the source of those odors.
6. Mr. Kuhn's conclusions are not supported by his evidence or analysis.
7. Mr. Kuhn ignores Toyota's own finding of frequent and severe problems, especially in warm and humid climates.

B) The design of the subject HVAC system is defective in that it results in frequent and severe odor problems. Specifically:

1. Unsuitable or inadequate condensation drainage design results in potential accumulation of particle matter and moisture.
2. Inadequate condensation drainage design results in failure to properly flush accumulated matter.
3. Unsuitable housing design provides nooks and crevices suitable for harboring organic matter.
4. Unsuitable or inappropriate housing design causes inadequate airflow directed to problem area of evaporator.
5. Potentially unsuitable evaporator edge seal foam material selection lacks effective hygienic properties.
6. Inappropriate evaporator edge seal foam design provides porosity and crevices suitable for potentially harboring organic matter.

7.  Unsuitable evaporator coating design lacks efficient hygienic properties.
8.  Unsuitable HVAC system control logic design potentially exacerbates odor problem by reducing fresh air.

The bases for my opinions are my investigation and analysis of this issue, my testing and disassembly of the subject vehicle, testing and disassembly of the subject HVAC system, review of the subject HVAC system design, customer complaints, relevant documents, TSBs, field reports, internal Toyota correspondence and engineering reports, my over 35 years of automotive and automotive engineering, design and research experience, my review of exemplar components and vehicles, and my knowledge and experience of the automotive industry and internal engineering practices regarding engineering standards, robust design, HVAC design, safety implications and failure mode effects and analysis.

The opinions expressed in this report are based on the information received and reviewed to date. I reserve my right to amend, revise and finalize my report and opinions when further information becomes available.

I declare the foregoing to all be correct and true to the best of my knowledge.  Executed on the 6th day of October, 2016

_____

Murat Okçuoğlu

© Murat Okçuoğlu MMXVI - Confidential and Proprietary, for use in Salas matter only
*Page 18 of 18*

1

2

## PROOF OF SERVICE

3      I am employed in the State of California, County of Los Angeles.  I am over the age of 18 and not a party to the within suit; my business address is 1875 Century Park East, Suite 1000, Los Angeles, California 90067.

4

5  On October 7, 2016, I served the document described as: **MURAT OKCUOGLU'S HVAC DEFECTS ANALYSIS REBUTTAL REPORT** on the interested parties in this action by sending on the interested parties in this action by sending [  ] the original [or] [✓] a true copy thereof [✓] to interested parties as follows [or] [ ] as stated on the attached service list:

6

7

8                      **PLEASE SEE ATTACHED SERVICE LIST**

9      **BY MAIL** (ENCLOSED IN A SEALED ENVELOPE): I deposited the envelope(s) for mailing in the ordinary course of business at Los Angeles, California.  I am "readily familiar" with this firm's practice of collection and processing correspondence for mailing.  Under that practice, sealed envelopes are deposited with the U.S. Postal Service that same day in the ordinary course of business with postage thereon fully prepaid at Los Angeles, California.

10

11

12  ☒  **BY E-MAIL**: I hereby certify that this document was served from Los Angeles, California, by e-mail delivery on the parties listed herein at their most recent known e-mail address or e-mail of record in this action.

13  ☐  **VIA CM/ECF**: I hereby certify that this document was served via the USDC CM/ECF on the parties Notice of this filing was served by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  I certify that the parties or their counsel are registered as ECF filers and that they will be served by the CM/ECF system.

14

15

16

17  ☐  **BY PERSONAL SERVICE**: I caused to be delivered by messenger such envelope(s) by hand to the office of the addressee(s).

☐  **BY OVERNIGHT DELIVERY**: I am "readily familiar" with this firm's practice of collection and processing correspondence for overnight delivery.  Under that practice, overnight packages are enclosed in a sealed envelope with a packing slip attached thereto fully prepaid.  The packages are picked up by the carrier at our offices or delivered by our office to a designated collection site.

18

19

20  ☒  (**FEDERAL**) I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

21  ☐  (**STATE**)  I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct

22

Executed this 7th day of October, 2016 at Los Angeles, California.

23

24

25                          ___/s/____Tarek Zohdy_____
                            Tarek Zohdy

26

27

28

1

**SERVICE LIST**

2

3

4

5

6

7

8

9

Morgan, Lewis & Bockius LLP
David Schrader
David.schrader@morganlewis.com
Esther ro
Esther.ro@morganlewis.com
Jahmy graham
Jahmy.graham@morganlewis.com
300 South Grand Ave.
Twenty-Second Floor
Los Angeles, CA 90071-3132
Telephone: (213) 612-2500
Facsimile: (213) 612-2501

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# Exhibit 3

# Salas *v.* TMS

## HVAC Defects Analysis
## Initial Report

### PREPARED FOR

Tarek Zohdy
Capstone Law, APC
1875 Century Park East, Suite 1000
Los Angeles, California 90067
310.556.4811

September 9, 2016

### PREPARED BY

**Murat Okçuoğlu**
4175 Lago Dr.
Santa Barbara, CA 93110
murat@cox.net
(805)-637-5482

# TABLE OF CONTENTS

I.     INTRODUCTION AND QUALIFICATIONS .................................................... 3

II.    APPROACH AND METHODOLOGY ............................................................... 6

III.   OVERVIEW OF THE SUBJECT HVAC SYSTEM ......................................... 7

IV.    SUBJECT HVAC SYSTEM PROBLEM AND COMPLAINTS ........................ 11

V.     EXEMPLAR INSPECTIONS ......................................................................... 14

VI.    TOYOTA ATTEMPTS TO FIX THE PROBLEM .......................................... 16

VII.   SUMMARY AND CONCLUSION ................................................................... 18

© Murat Okçuoğlu MMXVI - Confidential and Proprietary, for use in Salas matter only

# I.   INTRODUCTION AND QUALIFICATIONS

My name is Murat Okçuoğlu.  I was retained by Capstone Law, APC, ("Counsel"), counsel to the proposed plaintiff class (the "Class") in *Alfred Salas and Gloria Ortega, vs. Toyota Motor Sales, USA INC.*, Case No.: 2;15-cv-08629 FMO (Ex),  (the "Litigation"), to analyze the nature of the alleged HVAC defect in the subject class 2012 -2015 Toyota Camry vehicles.

All work contained in this report is my intellectual property and is solely intended for use in the Litigation.  This report may contain confidential, proprietary, and protected information, as well as original compilations, approaches, concepts, trade secrets and information that has commercial value.  No one may use, benefit from or disclose this intellectual property without my express permission.

Counsel has requested that I prepare this written report to explain the HVAC system noxious fume and odor emitting issue affecting the subject Toyota vehicles, the nature of the problem and the potential of safety risks posed by such defect.

I have read the First Amended Complaint in this Litigation and am so acquainted with the allegations in this case regarding the HVAC system defect at issue.  In preparing this report, I have relied on the documents listed in this report as well as on my own pre-existing knowledge and expertise, as reflected below.

My professional qualifications, in brief, are as follows: For nearly a decade, I was Chief Engineer for McLaren Automotive.  I have over thirty-nine years of active involvement in automotive engineering, vehicle design, vehicle manufacturing and vehicle testing. A true and correct copy of my current CV is attached as Attachment "A," and, as required to be disclosed per Federal Rule of Civil Procedure 26(a)(2)(B)(v)-(vi), my testimonies as an expert at trial or by deposition in the past four years are attached as Attachment "B."  My automotive career includes engineering, designing and testing components and systems for car manufacturers and car manufacturer suppliers, (OEMs[1] and Tier-1[2] suppliers),

---

[1]    OEM refers to "Original Equipment Manufacturer," and industry acronym used to denote a "Vehicle Manufacturer."

© Murat Okçuoğlu MMXVI - Confidential and Proprietary, for use in Salas matter only
*Page 3 of 19*

integrating vehicles and systems, including HVAC systems, track and road testing and dynamic vehicle behavior validation for OEMs as well as designing, preparing and driving race cars.

In addition to my vast experience in multiple aspects of automotive design and engineering, I have invented and developed various advanced automotive technologies and components, including all-wheel drive and traction control systems. These systems are currently licensed and being used by major SUV and car manufacturers. During the integration of these systems to individual vehicle platforms, I had the opportunity and the necessity to work intimately together with the development teams for seamless vehicle dynamics integration and optimized handling and stability.

Following an intense 15-year vehicle research and development career and vehicle handling work with almost all US and European automobile manufacturers. In the last ten years, I have conducted numerous detailed systems analyses of catastrophic injury accidents in accordance with established automotive industry practices and protocols and published standards.

I have worked and consulted with various automotive and defense manufacturers on vehicle systems engineering and design, including HVAC systems.

I have worked with and participated in dynamic vehicle testing for safety improvement and overall vehicle systems evaluation issues with most major vehicle manufacturers and suppliers at many proving grounds and test tracks, driving, testing and evaluating vehicles for automobile manufacturers and automotive component suppliers.

I have published several research papers and articles on advanced automotive technology and presented my findings in technical conferences, and academic venues.

My compensation for my work on this matter is $300/hour.   My compensation is not dependent either on the opinions I express or the outcome of

---

2       Tier-1 Supplier is an industry term used to denote first tier supplier of automotive systems and components to OEMs.

© Murat Okçuoğlu MMXVI - Confidential and Proprietary, for use in Salas matter only
*Page 4 of 19*

this Litigation.  A list of the sources I consulted in preparing this report, as required by Federal Rule of Civil Procedure 26(a)(2)(B)(ii) may be found in this report.

© Murat Okçuoğlu MMXVI - Confidential and Proprietary, for use in Salas matter only

## II.   APPROACH AND METHODOLOGY

As part of my assignment, I evaluated the HVAC system of the subject Toyota vehicles' design relevant to this assignment for the purposes of characterizing my opinions and the basis for them.

I also used well-established vehicle and system field performance evaluation methodology and protocols, similar or identical to methods and protocols used by the automotive trade and industry, including automotive manufacturers, automotive system suppliers and automotive component suppliers. The review of these analyses allowed me to assess and opine whether some aspect of the vehicle's design, construction and performance is defective.

My analysis also includes opinions and proofs based on field data, test results, and Toyota's own findings.   This analysis focuses only on relevant information and the performance of systems operating in accordance with the evidence in this case and the laws of physics, chemistry and biology.

My opinions integrate all currently available, relevant information. While I may conduct additional work to confirm and demonstrate my hypotheses, this report provides information on my current findings, pending receipt of additional information or testimony from other experts. If such materials are provided, additional time to incorporate them into my analyses may be necessary and may result in additional or revised opinions.

© Murat Okçuoğlu MMXVI - Confidential and Proprietary, for use in Salas matter only
*Page 6 of 19*

## III.   OVERVIEW OF THE SUBJECT HVAC SYSTEM

Typical automotive HVAC systems include an evaporator and a radiator under the dash to condition the air inside the cabin. A compressor, condenser, dryer supply a compressed gas for cooling; and engine coolant is piped in for heating. Ducting and a fan are used to direct and blow the air. In some models, a dust / pollen filter helps clean the air introduced from outside.



The Automotive Air Conditioning System

While the use of fresh air from outside is obviously preferable, HVAC systems are designed to use recirculated air from the cabin as needed to improve cooling/heating efficiency and to avoid dirty outside air for short periods.

© Murat Okçuoğlu MMXVI - Confidential and Proprietary, for use in Salas matter only

Incidentally, improving cooling efficiency by recirculation also reduces A/C compressor duty cycles and thus reduces vehicle fuel consumption, improving vehicle fuel mileage, but compromising optimum air quality and freshness. Stagnant air will recirculate, including all the organic and inorganic particles, fumes and odors, trapping and spreading contaminated air throughout the cabin.



Components of the subject HVAC system
1-HVAC unit, 2-drain tube for condensing moisture, 3-cooling evaporator, 4-heating radiator

The evaporator of an HVAC system is cooled down to just above freezing temperatures and cycles the compressor as necessary to stay at that temperature. For less cooling, hot air from the heater core is blended into the cold air from the evaporator. Air is pushed via an upstream fan and ducted to the vents downstream. HVAC duct design is crucial. Well-insulated and long ducting will improve cooling efficiency and reduce rushing air noise, but inner walls and crevices of such ducts may act as an incubator for mold and mildew. The low and relative constant temperature attained inside the ducts will allow condensation which harbors microbes and fungus. Some new duct designs involve thick walled structures with a hydrophobic coating for the airway. Such coatings may contain

© Murat Okçuoğlu MMXVI - Confidential and Proprietary, for use in Salas matter only
*Page 8 of 19*

surface defects or the coatings may become compromised with age and use, creating an ideal habitat for mold.



The Toyota Camry HVAC system unit inside cabin, mounted under the dash

Mold problems are more evident in warm and high humidity climates.

All 2012 – 2015 Toyota Camry vehicles have the same HVAC system design and they all share the same HVAC system defect described in this report. The subject Toyota Camry owners suffer from persistent offensive odor emanating from the HVAC system[3]. Toyota has determined that the odor comes from organic matter trapped and breeding in the HVAC system[4]. Toyota also observed that the odors are most strong during startup when accumulated and potentially newly grown organic matter is blown into the cabin[5].

Toyota attempted multiple fixes; however none of these repairs resulted in a permanent or complete fix. They were all temporary, ineffective or insufficient improvements.

---

[3] Salas_Toyota 0008373-00088481, Toyota_Salas_00022175, Toyota_Salas_00023287
[4] Toyota_Salas_00021906
[5] Toyota_Salas_00021905

© Murat Okçuoğlu MMXVI - Confidential and Proprietary, for use in Salas matter only
*Page 9 of 19*



A typical HVAC Evaporator



Blower section of the subject HVAC system
5-Amplifier (electronic control circuits) 6-Air filter element 7-blower fan

© Murat Okçuoğlu MMXVI - Confidential and Proprietary, for use in Salas matter only
*Page 10 of 19*

## IV.   SUBJECT HVAC SYSTEM PROBLEM AND COMPLAINTS

The HVAC system design is defective in that it does not properly drain condensing moisture inside the HVAC housing. This is most likely a combination of several factors, such as defective HVAC system automated servo control logic design, location of the drain pipe, ducting design, defectively designed crevices that trap organic particulates, defectively designed crevices that trap moisture and stagnant air, excessive internal condensation, excessive duct length, excessive duct insulation, unsuitable duct material such as high porosity or organically habitable material properties, fragile interior surfaces susceptible to micro voids caused by wear or damage, unsuitable or defective evaporator coating, unsuitable or defective airway gaskets or seals, including evaporator perimeter seals or defective evaporator design. The review of the evidence and reports suggests that the trapped and possibly pooling moisture breeds mold and mildew inside the car's A/C system.

The defective design allows condensing water to accumulate, naturally present organic  contaminants to be trapped, kept moist and cultivate organic matter such as microbes, bacteria, mold and fungus. The defective design traps, instead of flushing out, the contaminants with flowing condensation, creating an ideal breeding habitat for organic matter. The contamination causes strong unpleasant fumes and odor, most obvious right after first startup of the vehicle after an extended period, when organic activity of biologic matter and accumulation of resultant byproduct fumes takes place.

In an ill-conceived attempt to obtain CAFE credits and avoid hefty fines for missing corporate average fuel consumption targets, Toyota decided to implement a revised control logic on HVAC systems where recirculating inside air becomes the default setting. The so-called GHG or green house gas logic[6] prevents fresh air introduction to the cabin in most cases. Stagnant conditions created by the HVAC GHG control logic design likely exacerbated the odor problem by recirculating cabin air without introducing fresh air for extended periods.

The HVAC defect is present in all vehicles sharing the defective HVAC design. The odor appears to vary, most likely depending on the environment and

---

[6] Toyota_Salas_00000035

© Murat Okçuoğlu MMXVI - Confidential and Proprietary, for use in Salas matter only
*Page 11 of 19*

the mix of organisms breeding, but has been consistently offensive and independently described as "dead rat"[7] to "gym locker"[8]. According to customer complaints, the HVAC odor does not meet expectations of a vehicle interior free of unpleasant and potentially toxic odors and fumes.

Inhaling such contaminated air, especially prolonged and repeated exposure such as in a personal vehicle may have serious health consequences. Besides the obvious discomfort and irritation caused by foul odors emitted from air vents, breathing mold, fungus and bacteria contaminated air in a confined space is considered a health hazard. National and international public health agencies such as CDC, EPA and WHO list mold as a health hazard:

*Some people are sensitive to molds. For these people, exposure to molds can cause symptoms such as nasal stuffiness, eye irritation, wheezing, or skin irritation. Some people, such as those with serious allergies to molds, may have more severe reactions. Severe reactions may occur among workers exposed to large amounts of molds in occupational settings, such as farmers working around moldy hay. Severe reactions may include fever and shortness of breath. Some people with chronic lung illnesses, such as obstructive lung disease, may develop mold infections in their lungs[9].*

*In 2004 the Institute of Medicine (IOM) found there was sufficient evidence to link indoor exposure to mold with upper respiratory tract symptoms, cough, and wheeze in otherwise healthy people; with asthma symptoms in people with asthma; and with hypersensitivity pneumonitis in individuals susceptible to that immune-mediated condition. The IOM also found limited or suggestive evidence linking indoor mold exposure and respiratory illness in otherwise healthy children. In 2009, the World Health Organization issued additional guidance, "the WHO Guidelines for Indoor Air Quality: Dampness and Mold[10]. Other recent studies have suggested a potential link of early mold exposure to development of asthma in some children, particularly among children who may be genetically susceptible to asthma development, and that selected interventions that improve housing conditions can reduce morbidity from asthma and respiratory allergies, but more research is needed in this regard[11].*

---

[7] Toyota_Salas_00011989
[8] Toyota_Salas_00009050
[9] CDC, US government Centers for Disease Control and Prevention,
[10] World Health Organization, http://www.euro.who.int/document/E92645.pdf
[11] Ibid

© Murat Okçuoğlu MMXVI - Confidential and Proprietary, for use in Salas matter only
*Page 12 of 19*

*Molds have the potential to cause health problems. Molds produce allergens (substances that can cause allergic reactions) and irritants. Inhaling or touching mold or mold spores may cause allergic reactions in sensitive individuals. Allergic responses include hay fevertype symptoms, such as sneezing, runny nose, red eyes, and skin rash. Allergic reactions to mold are common. They can be immediate or delayed. Molds can also cause asthma attacks in people with asthma who are allergic to mold. In addition, mold exposure can irritate the eyes, skin, nose, throat, and lungs of both moldallergic and nonallergic people. Symptoms other than the allergic and irritant types are not commonly reported as a result of inhaling mold[12].*

According to Toyota's investigation, Toyota concluded HVAC odors are generated in at least five distinct stages.[13]

1. When A/C is switched on, air flow disperses organic matter

2. When A/C is running, resultant water condensation on the evaporator fins dissolves and releases further contaminants into the cabin air.

3. When the evaporator freezes, remaining undissolved organic matter is released, contaminating the cabin air.

4. When the A/C compressor cycles, the evaporator condenses and dries with the cycles, incrementally releasing biological agents.

5. When the A/C is switched off, dissolved organic matter is dispersed into the cabin air along with evaporating water.



---

[12] EPA, US government Environmental Protection Agency
[13] Toyota_Salas_00021905

© Murat Okçuoğlu MMXVI - Confidential and Proprietary, for use in Salas matter only

# V.    EXEMPLAR INSPECTIONS

2015 and 2014 Toyota Camry exemplars were inspected.







© Murat Okçuoğlu MMXVI - Confidential and Proprietary, for use in Salas matter only
*Page 14 of 19*



The 2015 Toyota Camry exemplar had 65,378 miles on the odometer. The 2014 Toyota Camry had 31,158 miles on the odometer.



The vehicles were inspected to confirm a common design. I observed that the HVAC systems on both vehicles were of substantially similar or identical design. Both vehicles appear to be in excellent repair, well kept and carefully serviced and detailed. Visual inspection of the HVAC design appeared unremarkable and typical. Operation of the HVAC system appeared typical. The ducting and vent design appeared unremarkable. The HVAC systems of both vehicles did not present any signs of alteration or tampering.

© Murat Okçuoğlu MMXVI - Confidential and Proprietary, for use in Salas matter only
*Page 15 of 19*

## VI.    TOYOTA ATTEMPTS TO FIX THE PROBLEM

Toyota's made multiple attempts to "fix" the HVAC defect. Some of the fixes resulted in temporary relief, while others did not help. According to reports provided, no successful permanent and satisfactory fix has been implemented by Toyota[14].

None of the attempted fixes by Toyota addressed the root cause, the accumulation of moisture and organic particulates. Organic matter trapped in a dark, warm humid place cultivates rapidly, breeding bacteria, microbes, fungi and mold. Elimination of this favorable, perhaps perfect habitat has not been attempted by Toyota. Disrupting the favorable conditions to prevent breeding of organic matter would be another solution, but Toyota did not come up with a permanent disruption strategy. Topical application of sanitizers may offer temporary relief but would not do anything prevent recolonization of organic matter once the antibacterial materials dissipate.

Without HVAC system design changes to provide proper condensation drainage and continuous particulate flushing, the problems resulting from the HVAC defect kept recurring.

Additional attempts to avert consequences of state "lemon" laws resulted in failures to report complaints, distorting the field data on the problem[15]. Resultant confusion most likely delayed action.

Some of the attempted "fixes" Toyota has developed are as follows:

1.  Removal of customer placed air fresheners from the cabin

2.  Cleaning of the upholstery and other interior surfaces by spraying with water and wiping it off followed by drying with A/C (baking method)[16]

3.  "Refreshing" the evaporator

---

[14] Toyota_Salas_00022173, Toyota_Salas_00022175, Toyota_Salas_00058063
[15] Toyota_Salas_00022175
[16] Toyota_Salas_00021911- Toyota_Salas_00021914

© Murat Okçuoğlu MMXVI - Confidential and Proprietary, for use in Salas matter only
*Page 16 of 19*

4. Advising customers to switch to A/C fresh air mode every time before turning the engine off.

5. Replacing or adding a charcoal filter (this may have happened at the customers' expense)

6. Revised HVAC control logic (had to be revised again, initial version of the revised logic only operated in the "auto" mode)

7. Revised A/C firmware, "Komori logic", where immediately after startup, the HVAC air is not blown to the faces of the occupants but initially directed only to the footwells.

8. Revised HVAC control logic, where the blower is automatically operated for a short period briefly after parking the vehicle if certain criteria are met.

© Murat Okçuoğlu MMXVI - Confidential and Proprietary, for use in Salas matter only

## VII.  SUMMARY AND CONCLUSION

The 2012 to 2015 Toyota Camry has a closed HVAC unit with a design defect that causes moisture to be trapped and stagnate, and in which biological matter flourish. Specifically, the evaporator housing design does not allow for efficient drainage to prevent pooling and stagnating moisture. The HVAC system lacks proper drainage, flushing and other features that would discourage and prevent organic growth. The design of the HVAC system and components allows crevices with warm, humid, dark conditions for organic cultivation.

Moisture accumulates and stagnates providing a breeding ground for organic particulates such as bacteria, mold, microbes and fungus inside the HVAC system that emit noxious odors into the cabin. The defective HVAC system of subject Toyota Camry vehicles helped support and sustain the habitat for organic growth.

Microbial elements, including mold and bacteria, grow and thrive in the moist, closed environment, which results in the severe and unhealthy odor of which customer complain. Toyota's  introduction of GHG logic in the 2012 model exacerbated the condition by recirculating tainted cabin air and reducing fresh air introduction.

All 2012 – 2015 Toyota Camry vehicles have the same HVAC system design and they all share the same HVAC system defect.

Toyota has contemplated various countermeasures to address the odor and customer dissatisfaction. Despite various and multiple attempts, Toyota was unable to produce a permanent and satisfactory solution to this problem. Apart from the obvious discomfort and irritation caused by foul odors emitted from air vents, breathing mold, fungus and bacteria contaminated air in a confined space is considered a health hazard by various authorities.

The bases for my opinions are my investigation and analysis of this issue, my review of subject design, customer complaints, relevant documents, TSBs, field reports, internal Toyota correspondence and engineering reports, my over 35 years of automotive and automotive engineering, design and research experience, my review of exemplar components and vehicles, and my knowledge and

© Murat Okçuoğlu MMXVI - Confidential and Proprietary, for use in Salas matter only

experience of the automotive industry and internal engineering practices regarding engineering standards, robust design, HVAC design, safety implications and failure mode effects and analysis.

The opinions expressed in this report are based on the information reviewed to date. I reserve my right to amend, revise and finalize my report and opinions when further information becomes available.

I declare the foregoing to all be correct and true to the best of my knowledge. Executed on the 9th day of September, 2016

Murat Okçuoğlu

© Murat Okçuoğlu MMXVI - Confidential and Proprietary, for use in Salas matter only
*Page 19 of 19*

# APPENDIX "A"

MURAT OKÇUOĞLU
AUTOMOTIVE SAFETY & FORENSIC RESEARCH

4175 LAGO DRIVE
SANTA BARBARA, CALIFORNIA 93110

TELEPHONE +1-805-637-5482
FACSIMILE +1-207-692-9385
Email   murat@cox.net

## Curriculum Vitae of
## Murat Okçuoğlu

Murat Okçuoğlu has over 35 years of active involvement in automotive design, testing and evaluation of drivetrains, suspension systems, brake systems, chassis control systems including electronic stability control systems, vehicle handling and vehicle stability. His automotive career includes engineering, designing and testing components for automotive manufacturers, OEMs, and Tier1 suppliers, integrating vehicles and vehicle systems, test track and road testing of dynamic vehicle behavior, validation of components and systems for OEMs and Tier1 suppliers, designing and preparing racecars, driving racecars. Mr. Okçuoğlu has invented and developed advanced all-wheel drive systems. These systems are currently being used by leading SUV and car manufacturers. During the integration of these systems to individual vehicle platforms, Mr. Okçuoglu worked intimately with the development team for seamless vehicle dynamics integration. Following an intense 15-year vehicle research and development career and vehicle handling work with almost all US and European automobile manufacturers, Mr. Okçuoglu began conducting detailed systems analyses of vehicle handling and stability issues that lead to catastrophic injury accidents. In the last 13 years, he has conducted numerous detailed systems analyses of catastrophic injury accidents in accordance with established industry practices and protocols published by SAE. Mr. Okçuoglu has worked with and participated in dynamic vehicle testing for handling and safety issues with OEM and supplier engineers on many proving grounds and test tracks, testing and evaluating vehicles manufactured by most OEMs. Mr. Okçuoglu has additional and concurrent 18 years of racing experience with production vehicles including suspension design, stability improvement and handling optimization work.

He has published several research papers and articles on advanced automotive technology, presented his findings in technical conferences and lectures.

## CURRENTLY

- Automotive design, handling and stability research and consulting
- Design analysis
- Formulates opinions from available factual data about vehicle design characteristics, failure modes and vehicle trajectories,
- Scientifically validates, quantifies and illustrates opinions by computer analysis
- Evaluates the feasibility, performance and potential effects of design alternatives and available technology
- Conducts research relating to active vehicle safety systems and other automotive technology

# MURAT OKÇUOĞLU
## AUTOMOTIVE SAFETY & FORENSIC RESEARCH

4175 LAGO DRIVE
SANTA BARBARA, CALIFORNIA 93110

TELEPHONE +1-805-637-5482
FACSIMILE +1-207-692-9345
Email   *murat@cox.net*

---

## EDUCATION

Boğaziçi University (Formerly known as Robert College) BS in Mechanical Engineering

## EXPERIENCE SUMMARY



- <u>Independent Consultant, 2000 - Current</u>
  Vehicle Dynamics and ESC research

- <u>Friedman Research Corporation, consulting 2000-2009</u>
  Director of Engineering for Vehicle Stability

- <u>McLaren Automotive / Asha Corporation   1991-1999</u>
  Executive Engineer, 1998-1999
  Chief Engineer, 1991-1998

- <u>Motar Automotive Co.  1985-1986</u>
  Assistant Technical Manager



- <u>Bosch GmbH  1982-1985</u>
  Team Chief & Engineer

- <u>OtoKar Co. Magirus-Deutz 1980-1982</u>
  Technical coordinator



Extensive experience in vehicle dynamics and research including:

- Vehicle dynamics, handling analysis, performance and safety evaluation
- Evaluation of driver interface and driver feedback mechanisms for improved vehicle control
- Analysis of surface condition and road condition effects on vehicle dynamics
- Effects of drivetrain configuration on motor vehicle handling and safety
- Brake system performance, effects of brake system on handling and brake system fatigue resistance
- Steering systems, steering response and steering geometry

Murat Okçuoğlu

Automotive Safety & Forensic Research

4175 Lago Drive
Santa Barbara, California 93110

Telephone +1-805-637-5482
Facsimile +1-207-692-9385
Email   murat@cox.net

- Suspension geometry and design, suspension compliance and effects of thereof on vehicle handling
- Shock absorbers, damping characteristics and effects on handling
- Spring rates, optimizing spring rates for improvement of vehicle handling
- Driver ergonomics and optimization of vehicle controls for driving tasks
- Tire selection, tire performance validation, tire failures and tire durability
- Effects of traction control systems on vehicle dynamics at high speeds
- Active electronic stability control systems
- Utilization of Active Torque Transfer Systems for improvement of vehicle control including vectoring
- Suspension systems and optimization of suspension tuning for improved handling and safety
- Systems level approach to vehicle handling through system integration
- Performed dynamic vehicle testing and evaluation in many facilities worldwide, including:

  – AM General test track, South Bend, Indiana
  – Dana Corporation test track, Indiana
  – Chrysler test track, Chelsea, Michigan
  – General Motors test track, Milford, Michigan
  – Ford Motor Company test track, Dearborn, Michigan
  – Porsche AG test track, Weißach, Germany
  – Audi AG test track, Neustadt, Germany
  – Nürnbergring, Germany
  – Smithers Winter Test Center, Raco Michigan
  – Steyr Daimler Puch Fahrzeugtechnik test track, Graz, Austria
  – Arvidsjaur, Sweden
  – Arjeplog Test Center, Lapland, Sweden
  – Skellefteå, Sweden
  – Arctic Circles test track, Sault Ste. Marie, Michigan
  – Land Rover test track, Eastnor Castle, Birmingham, England
  – Bosch Proving Ground, Boxberg, Germany
  – Rovaniemi, Finland

Worked with all Detroit OEMs and most European OEMs and Tier1 suppliers, including

- General Motors
- Cadillac
- Pontiac
- Buick
- Chevrolet
- GMC
- Saturn

- Ford Motor Company
- DaimlerChrysler
- Jeep
- Visteon
- Delphi
- Dana
- Rockwell (Meritor)

# MURAT OKÇUOĞLU
## AUTOMOTIVE SAFETY & FORENSIC RESEARCH

4175 LAGO DRIVE
SANTA BARBARA, CALIFORNIA 93110

TELEPHONE +1-805-637-5482
FACSIMILE +1-207-692-9385
Email   murat@cox.net

- NVG, New Venture Gear
- AAM, American Axle Manufacturing Co.
- Porsche
- Audi
- BMW
- ZF

- Peugeot
- Renault
- Fiat
- Saab
- Steyr Daimler Puch
- Bugatti

Designed following systems

- Suspension systems
- Brake systems
- Electrical systems
- Transmission systems
- All wheel drive systems
- Differential systems
- Traction control systems
- Emergency brake systems
- Front axles
- Rear axles
- Transaxles
- Transfer cases

- Exhaust systems
- Intake and air induction systems
- Forced induction systems
- Water injection systems
- Cooling systems
- Seating systems
- Instrument panels
- Safety systems
- Fire extinguishing systems
- Safety harness systems
- Fuel systems

Designed following components

- Shock absorbers
- Differentials
- Couplings
- A-arms
- Fasteners

- Axle shafts
- Exhaust manifolds and headers
- Inlet manifolds
- Air cleaner enclosures
- Seats

Worked on the design of following systems and components

- Suspension systems
- Brake systems
- Electronic stability control systems
- Transmission systems
- All wheel drive systems
- Differential systems
- Traction control systems

- Front axles
- Rear axles
- Differentials
- Axle shafts
- Couplings
- Transaxles
- Transfer cases

MURAT OKÇUOĞLU
AUTOMOTIVE SAFETY & FORENSIC RESEARCH

4175 LAGO DRIVE
SANTA BARBARA, CALIFORNIA 93110

TELEPHONE +1-805-637-5482
FACSIMILE +1-207-692-9385
Email   _murat@cox.net_

## MEMBERSHIPS

- Society of Automotive Engineers
- American Society of Mechanical Engineers
- International Council of Motorsport Sciences

## SOME OF THE PUBLICATIONS AND PRESENTATIONS

- SAE 952642 *"A Descriptive Analysis of Gerodisc Type Limited Slip Differential and All Wheel Drive Couplings"* Presented at Society of Automotive Engineers, Bus and Truck Congress, North Carolina, 1995

- SAE 962541 *"Adjustable Racing Limited Slip Differentials Utilizing Gerodisc System"* Presented at Society of Automotive Engineers, Motorsports Congress, Detroit, 1996

- SAE 973235 *"All Wheel Drive Systems Utilizing Twin Hydraulic Couplings With Gerodisc System "* Presented at Society of Automotive Engineers, Bus and Truck Congress, 1997

- SAE *"Rationalized 4x4 Systems for the 21st Century"* Presented at the Innovations in All Wheel Drive / Four Wheel Drive Systems TOPTEC, Society of Automotive engineers, South Bend, Indiana, 1999

- EuroForum *"Platform Consolidation in the Automotive Industry"*
  London, England, 1999

- SAE 2000-01-3460 *"Influencing Dynamic Handling Response Through Manipulation of Advanced All Wheel Drive Systems"* Presented at Society of Automotive engineers, Truck & Bus Meeting & Exposition, Portland, Oregon 2000

- Safety Forum, *"Vehicle Design and Driving Safety"* Presented at Istanbul Technical University, 2006

- ICrash2006, *"Consideration of Vehicle Handling and Stability with Improved Roof Strength"* M Okcuoglu, K Friedman, D Mihora, and J Hutchinson, J Wiedmann, S Reid, and S Chan, International Crashworthiness Conference, Athens, Greece, 2006

- Invited Lecture, *"Vehicle Dynamics and Safety"*, Automotive Technology Research and Development Center, Istanbul Technical University, 2006

## MURAT OKÇUOĞLU
### AUTOMOTIVE SAFETY & FORENSIC RESEARCH

4175 LAGO DRIVE
SANTA BARBARA, CALIFORNIA 93110

TELEPHONE +1-805-637-5482
FACSIMILE +1-207-692-9385
Email   *murat@cox.net*

- Vehicle Dynamics Expo, *"Explaining the mechanism of contribution of under steer reduction function of Electronic Stability Control Systems in overall accident prevention effectiveness of Electronic Stability Control Systems"* Detroit, Michigan 2007

- Technology Forum, Vehicle Dynamics Expo *"Establishing Adaptive Engagement Criteria for Electronic Stability Control Systems"* Novi, Michigan 2008

- Invited Lecture, *"Practical Aspects of Vehicle Dynamics"*, Department of Mechanical Engineering, University of California, Santa Barbara, 2010

- Open Technology Forum, Traction, Stability and Braking, Vehicle Dynamics Expo *"Retrofit of electronic stability control systems, analysis of possibilities and benefits"* Stuttgart, Germany 2010

- Invited Lectures, *"Various topics Automotive Engineering"*, Department of Mechanical Engineering, University of California, Santa Barbara, UCSB 2011

- Invited Lecture, *"Automotive Design"*, Boğaziçi University, 2012

- Invited Presentation, *"Automotive Engineering"*, American Society of Mechanical Engineers (ASME) Section, University of California, Santa Barbara, UCSB 2012

- Invited Lectures, *"Automotive Engineering"* ASME & ME11, University of California, Santa Barbara, UCSB 2014

- Technical Workshop, Professional Motorsport World Expo, *"Electronic Stability Control and Driving Aids in Amateur Racing"* Cologne, Germany, 2014

## SOME OF THE PATENTS AND INVENTIONS

- US patent 5,310,388 Vehicle drivetrain hydraulic coupling
- US patent 5,536,215 Hydraulic coupling for vehicle drivetrain
- US patent 5,595,214 Hydraulic coupling for vehicle drivetrain
- US patent 5,735,764 Hydraulic coupling for vehicle drivetrain
- US patent 5,827,145 Hydraulic coupling having supplemental actuation
- US patent 5,888,163 Hydraulic coupling for vehicle drivetrain
- US patent 5,941,788 Vehicle drivetrain differential
- US patent 5,964,126 Hydraulic coupling for auxiliary drive axle of a vehicle drivetrain
- US patent 6,176,800 Hydraulic coupling for vehicle drivetrain
- European patent 0 682 754 B1 Vehicle drivetrain hydraulic coupling
- European patent 0 886 083 A3 Hydraulic coupling for vehicle drivetrain
- European patent 0 886 083 A2 Hydraulic coupling for vehicle drivetrain





*Page 6 of 12*

0057

# MURAT OKÇUOĞLU
## AUTOMOTIVE SAFETY & FORENSIC RESEARCH

4175 LAGO DRIVE
SANTA BARBARA, CALIFORNIA 93110

TELEPHONE +1-805-637-5482
FACSIMILE +1-207-692-9385
Email  *murat@cox.net*

- European patent 0 830 528 A1 Hydraulic coupling for vehicle drivetrain
- European patent 0 682 754 A1 Hydraulic coupling for vehicle drivetrain
- European patent EP 0 886 083 B1 Differentiel à glissement limité
- European patent 0 682 754 A4 Couplage hydraulique de transmission de vehicule
- Japanese patent JP 2002 523 30 2T
- Australian patent AU 5702399A
- Japanese patent JP H09 501 21 9A
- Austrian patent AT 221632T Differential mit begrenztem schlupf
- Austrian patent AT 180047T Fahrzeugantrieb mit hydraulischer kupplung
- Chinese patent CN 1109423A Vehicle drivertrain hydraulic coupling
- Australian patent AU 7171396A Vehicle drivetrain hydraulic coupling
- Australian patent AU 727417B2 Hydraulic coupling having supplemental actuation
- Australian patent AU 681329B2 Vehicle drivetrain hydraulic coupling
- Australian patent AU 6155598A
- Brazilian patent BR 9808025A Acoplamento Hidráulico Tendo Atuação Suplementar
- Australian patent AU 3916393A Vehicle drivetrain hydraulic coupling
- Australian patent AU 672602B2
- German patent DE 69332179T2 Differential mit begrenztem schlupf
- German patent DE 69324931T2 Fahrzeugantrieb mit hydraulischer kupplung
- Spanish patent ES 2131 111 T3 Acoplamiento hidraulico para transmision de vehiculo
- Korean patent KR 10-019 611 4B1 Vehicle drive train hydraulic coupling
- International patent WO 984 178 3A1 Hydraulic coupling having supplemental actuation
- European patent 0 966 626 A1
- Japanese patent JP 2001 521 60 5A
- European patent 0 830 528 A4 Hydraulic coupling for vehicle drivetrain



- Japanese patent JP H11 506 81 8A
- Mexican patent MX PA 01 0023 11A
- Japanese patent JP 2002 523 30 2A
- European patent EP 1 108 159 A1
- Canadian patent CA 234 222 6A1
- Australian patent AU 5883596A
- International patent WO 199 604 109 0A1
- International patent WO 001 291 5A1
- International patent WO 964 109 0A1

- 1999 Jeep Grand Cherokee All Wheel drive system
- 1999 Jeep Grand Cherokee transfer case coupling
- 1999 Jeep Grand Cherokee front axle limited slip differential
- 1999 Jeep Grand Cherokee rear axle limited slip differential
- 2000 Ford Mustang Cobra R rear axle limited slip differential



# MURAT OKÇUOĞLU
## AUTOMOTIVE SAFETY & FORENSIC RESEARCH

4175 LAGO DRIVE
SANTA BARBARA, CALIFORNIA 93110

TELEPHONE +1-805-637-5482
FACSIMILE +1-207-692-9385
Email   *murat@cox.net*

- 2001 Pontiac Aztek All Wheel Drive system
- 2001 Pontiac Aztek rear third member
- 2002 Buick Rendezvous All Wheel Drive system
- 2002 Buick Rendezvous rear third member
- 2002 Chevrolet Venture All Wheel Drive system
- 2002 Chevrolet Venture rear third member
- 2002 Pontiac Montana All Wheel Drive system
- 2002 Pontiac Montana rear third member
- 2002 Oldsmobile Silhouette All Wheel Drive system
- 2002 Oldsmobile Silhouette rear third member
- 2003 Saturn Vue All Wheel Drive System
- 2003 Dodge Viper SRT-10 Limited Slip rear Differential
- 2005 Chevrolet Equinox, self-activating All Wheel Drive System
- 2005 Buick Terraza All Wheel Drive System
- 2006 Chevrolet Uplander All Wheel Drive System
- 2006 Pontiac Torrent All Wheel Drive System
- 2014 Mercedes CLA 4matic All Wheel Drive System
- HydraLok system
- VariLok differentials
- Gerodisc differentials
- TwinDisc systems
- GeroMatic system
- VersaTrak system







▲ The new 4MATIC from Mercedes-Benz in detail: torque-on-demand rear-axle transmission with integrated electrohydraulic disc clutch







Mercedes-Benz



Twin GeroMatic





MURAT OKÇUOĞLU
AUTOMOTIVE SAFETY & FORENSIC RESEARCH

4175 LAGO DRIVE
SANTA BARBARA, CALIFORNIA 93110

TELEPHONE +1-805-637-5482
FACSIMILE +1-207-692-9385
Email  *murat@cox.net*

## SOME OF THE VEHICLES UTILIZING THE INVENTIONS

### Jeep Grand Cherokee
Front and rear limited slip differential systems (HydraLok differentials in VariLok progressive axles, 1999 and later models Jeep Grand Cherokee) Licensed to and manufactured by Dana Corporation

Transfer case coupling (Quadra Trac II Transfer Case, 1999 and later models Jeep Grand Cherokee) Licensed to and manufactured by New Venture Gear

All Wheel Drive system, integrating above inventions (Quadra-Drive system and Vari-Lok axles, 1999 and later models Jeep Grand Cherokee)



### Ford Mustang Cobra R
Gerodisc self contained speed and torque sensitive rear axle limited slip differential, introduced in model year 2000



### Pontiac Aztek
TwinDisc All Wheel Drive system (GeroMatic, VersaTrak) Licensed to and manufactured by Steyr Daimler Puch, currently a division of Magna, introduced in model year 2001



### Buick Rendezvous
TwinDisc All Wheel Drive system (GeroMatic, VersaTrak) Licensed to and manufactured by Steyr Daimler Puch, currently a division of Magna, introduced in model year 2002



### Chevrolet Venture
TwinDisc All Wheel Drive system (GeroMatic, VersaTrak) Licensed to and manufactured by Steyr Daimler Puch, currently a division of Magna, introduced in model year 2002





MURAT OKÇUOĞLU
AUTOMOTIVE SAFETY & FORENSIC RESEARCH

4175 LAGO DRIVE
SANTA BARBARA, CALIFORNIA 93110

TELEPHONE +1-805-637-5482
FACSIMILE +1-207-692-9385
Email   *murat@cox.net*

---

**Oldsmobile Silhouette**
TwinDisc All Wheel Drive system (GeroMatic, VersaTrak) Licensed to and manufactured by Steyr Daimler Puch, currently a division of Magna, introduced in model year 2003



**Pontiac Montana**
TwinDisc All Wheel Drive systems (GeroMatic, VersaTrak) Licensed to and manufactured by Steyr Daimler Puch, currently a division of Magna, introduced in model year 2002, Montana was available with StabiliTrak (ESC)



**Saturn Vue**
All Wheel Drive System. Licensed to and manufactured by New Venture Gear, integrated by Visteon, introduced in model year 2002



**Dodge Viper SRT-10**
HyroLok self contained rear axle limited slip differential. Licensed to and manufactured by Dana Corporation, introduced in model year 2003



**2005 Chevrolet Equinox**
All Wheel Drive System. Licensed to and manufactured by New Venture Gear, integrated by Visteon, introduced in model year 2005



**2005 Chevrolet Uplander**
TwinDisc All Wheel Drive systems (GeroMatic, VersaTrak) Licensed to and manufactured by Steyr Daimler Puch, currently a division of Magna, introduced in model year 2005, available with StabiliTrak (ESC)



MURAT OKÇUOĞLU
AUTOMOTIVE SAFETY & FORENSIC RESEARCH

4175 LAGO DRIVE
SANTA BARBARA, CALIFORNIA 93110

TELEPHONE +1-805-637-5482
FACSIMILE +1-207-692-9385
Email  murat@cox.net

## 2005 Buick Terraza
TwinDisc All Wheel Drive systems (GeroMatic, VersaTrak) Licensed to and manufactured by Steyr Daimler Puch, currently a division of Magna, introduced in model year 2002, available with StabiliTrak (ESC)



## COMBATT Military Truck
Front and rear limited slip differential systems (HydraLok differentials in VariLok progressive axles, Truck by Dodge, axles licensed to and manufactured by Dana Corporation



## 2006 Pontiac Torrent
TwinDisc All Wheel Drive systems (GeroMatic, VersaTrak) Licensed to and manufactured by Steyr Daimler Puch, currently a division of Magna, introduced in model year 2002



## 2005 Saturn Relay
TwinDisc All Wheel Drive systems (GeroMatic, VersaTrak) Licensed to and manufactured by Steyr Daimler Puch, currently a division of Magna, introduced in model year 2002, available with StabiliTrak (ESC)



## 2001 GMC TerraCross Concept Vehicle
All Wheel Drive (VersaTrak) system



# MURAT OKÇUOĞLU
## AUTOMOTIVE SAFETY & FORENSIC RESEARCH

4175 LAGO DRIVE
SANTA BARBARA, CALIFORNIA 93110

TELEPHONE +1-805-637-5482
FACSIMILE +1-207-692-9385
Email   murat@cox.net

---

**Jeep Compass Concept Vehicle**
All Wheel Drive (Quadra-Drive) system with front and rear limited slip differential systems



**Buick Centieme Concept Vehicle**
All Wheel Drive (VersaTrak) system



**2014 Mercedes CLA 4matic**
Torque On Demand rear axle transmission





Twin GeroDisc Rear Axle Unit

# APPENDIX "B"

# MURAT OKÇUOĞLU
## AUTOMOTIVE SAFETY RESEARCH

4175 LAGO DRIVE
SANTA BARBARA, CALIFORNIA 93110

TELEPHONE +1-805-637-5482
FACSIMILE +1-207-692-9385
Email   *murat@cox.net*

## Murat Okçuoğlu Testimony List

| Case Name | Event | Attorney | Date |
|---|---|---|---|
| Anderson-Barahona v. GMC | Deposition | H. Shevin | 03/14/2002 |
| Anderson-Barahona v. GMC | Deposition | H. Shevin | 03/15/2002 |
| Salinas/Garcia v. Ford | Deposition | S. Van Gaasbeck | 04/03/2003 |
| Salinas/Garcia v. Ford | Deposition | S. Van Gaasbeck | 05/05/2003 |
| Miragliotta v. Isuzu | Deposition | D. Lira | 05/30/2003 |
| Conca v. Toyota | Deposition | G. Marks | 03/09/2004 |
| Potts v. Ford | Deposition | P. Farrel | 03/17/2005 |
| Johnson v. Nissan | Deposition | G. Esdale | 08/25/2005 |
| M. Gonzales v. GMC | Deposition | M. Cowen | 11/29/2005 |
| Leray v. Nissan | Deposition | D. Carimi | 01/19/2006 |
| Tedder v. Ford | Deposition | W. Smith | 03/02/2006 |
| White v. Ford | Deposition | G. Esdale | 03/21/2006 |
| Leray v. Nissan | Deposition | D. Carimi | 08/01/2006 |
| Leray v. Nissan | Trial | D. Carimi | 08/22/2006 |
| Leray v. Nissan | Trial | D. Carimi | 08/23/2006 |
| Robeck v. Ford | Deposition | D. DeFoe | 09/14/2006 |
| Driscoll v. Ford | Deposition | M. Cowen | 11/08/2006 |
| Jones v. Toyota | Deposition | T. Willingham | 11/28/2006 |
| Hachinsky v. Ford | Deposition | O. Medina | 11/30/2006 |
| Ibarra v. Ford | Deposition | J. Regan | 03/14/2007 |
| Cervantes v. Cooper | Deposition | M. Cantu | 03/23/2007 |
| Fierro v. GM | Deposition | D. Slavik | 05/24/2007 |
| Shaver v. GM | Deposition | M. Avila | 06/06/2007 |
| Shrivastav v. Toyota | Deposition | D. Dell'Osso | 06/12/2007 |
| Fierro v. GM | Trial | D. Slavik | 08/22/2007 |
| Khan v. Mitsubishi | Deposition | S. Nutter | 08/30/2007 |
| Barton v. Ford | Deposition | R. Harris | 09/12/2007 |
| Nowell v. GM | Deposition | J.P. Sawyer | 02/28/2008 |
| Rosales v. Ford | Deposition | M. Cowen | 03/07/2008 |
| Bouza v. Ford | Deposition | N. Porter | 03/21/2008 |
| Rose v. Nissan | Deposition | W. Smith | 03/27/2008 |
| Granier v. GM | Deposition | T. McElroy | 04/23/2008 |

MURAT OKÇUOĞLU
AUTOMOTIVE SAFETY RESEARCH

4175 LAGO DRIVE
SANTA BARBARA, CALIFORNIA 93110

TELEPHONE +1-805-637-5482
FACSIMILE +1-207-692-9385
Email   *murat@cox.net*

## Murat Okçuoğlu Testimony List

| Case Name | Event | Attorney | Date |
|---|---|---|---|
| Mendez v. GM | Deposition | K. Buckingham | 07/07/2008 |
| Boren v. Kia | Deposition | J. Merritt | 12/22/2008 |
| Robinson v. Nissan | Deposition | G. Allen | 02/06/2009 |
| Boren v. Kia | Trial | J. Merritt | 02/24/2009 |
| Jurkanski v. Honda | Deposition | H. Feldman | 03/19/2009 |
| Tornberg v. Ford | Deposition | J. Kelsey | 05/15/2009 |
| Cambron v. Ford | Deposition | T. Yuhas | 06/03/2009 |
| Colomb v. Nissan | Deposition | S. Cichowski | 06/09/2009 |
| Cambron v. Ford | Deposition | T. Yuhas | 06/17/2009 |
| Jurkanski v. Honda | Deposition | H. Feldman | 06/30/2009 |
| Robinson v. Nissan | Trial | G. Allen | 09/04/2009 |
| Robinson v. Nissan | Trial | G. Allen | 09/08/2009 |
| Kim Chu v. Enterprise | Deposition | M. Avila | 09/29/2009 |
| Kim Chu v. Enterprise | Deposition | M. Avila | 10/27/2009 |
| Molly Smith v. Ford | Deposition | C. Niedenthal | 03/05/2010 |
| Lucky v. Polar | Deposition | J. Embry | 03/22/2010 |
| Cambron v. Ford | Trial | T. Yuhas | 03/24/2010 |
| Cambron v. Ford | Trial | T. Yuhas | 03/25/2010 |
| Lee v. Ford | Deposition | C. Cowan | 05/27/2010 |
| Forte v. Hyundai | Deposition | T. Knowles | 08/18/2010 |
| Emmanuel v. Ford | Deposition | C. Baumberger | 09/09/2010 |
| Cohorst v. Nissan | Deposition | L. Accurso | 12/22/2010 |
| Martin v. GM | Deposition | D. Lewis | 02/25/2011 |
| Pugh v. Ford | Deposition | R. Chapman | 05/07/2011 |
| Cohorst v. Nissan | Trial | L. Accurso | 05/16/2011 |
| Martin v. GM | Trial | J. Scarola | 05/23/2011 |
| Brentar v. Ford | Deposition | B. Lakin | 06/01/2011 |
| Person v. Ford | Deposition | N. VanDerVeer | 06/27/2011 |
| Hinkle v. Ford | Deposition | D. Slavik | 01/26/2012 |
| Marzano v Land Rover | Deposition | H. Feldman | 02/17/2012 |
| Green v. Ford | Deposition | R. Chapman | 05/07/2012 |
| Poty v Ford | Deposition | C. Baumberger | 09/25/2012 |
| Kim v. Toyota | Deposition | I. Herzog | 10/01/2012 |

# MURAT OKÇUOĞLU
## AUTOMOTIVE SAFETY RESEARCH

4175 LAGO DRIVE
SANTA BARBARA, CALIFORNIA 93110

TELEPHONE +1-805-637-5482
FACSIMILE +1-207-692-9385
Email   *murat@cox.net*

## Murat Okçuoğlu Testimony List

| Case Name | Event | Attorney | Date |
| --- | --- | --- | --- |
| Kim v. Toyota | Trial | I. Herzog | 11/26/2012 |
| Rodriguez v Ford | Deposition | R. Andrews | 02/07/2013 |
| Hinkle v. Ford | Trial | B. Shapiro | 5/15-16/13 |
| Poty v. Ford | Trial | C. Baumberger | 09/16/2013 |
| Mercado v GM | Deposition | S. Cavalli | 11/08/2013 |
| Kobe, Falco v. Nissan | Deposition | R. Tellis | 09/28/2015 |
| Saul v. Volvo | Deposition | J. Embry | 02/26/2016 |

Exhibit 4

ROBERT KUHN, PE - 11/11/2016

1              UNITED STATES DISTRICT COURT

2            CENTRAL DISTRICT OF CALIFORNIA

3

4   ALFRED SALAS and GLORIA ORTEGA,   )  No. CV15-08629
    individually, and on behalf of a  )      FMO (Ex)
5   class of similarly situated       )
    individuals,                      )
6                                     )
              Plaintiffs,             )
7                                     )
          vs.                         )
8                                     )
    TOYOTA MOTOR SALES, U.S.A., INC., )
9   a California corporation,         )
                                      )
10            Defendant.              )
                                      )
    _____)

11

12

13

14

15  VIDEO TAPED DEPOSITION OF:

16

17                    ROBERT KUHN, PE

18                    Friday, November 11, 2016

19                    9:01 a.m.

20

21

22

23  Reported by:

24                    MONICA T. VOGELBACHER

25                    CSR No. 6406

| | | |
|---|---|---|
| 1 | BY MR. ZOHDY: | 13:31:07 |
| 2 | Q   Let's stick with that level -- | 13:31:07 |
| 3 | A   Okay. | 13:31:07 |
| 4 | Q   -- layout and packaging. | 13:31:07 |
| 5 | Would you agree that all 2012 to 2015 Toyota | 13:31:10 |
| 6 | Camry vehicles have the same design? | 13:31:13 |
| 7 | MR. SCHRADER:  Objection, argumentative as | 13:31:14 |
| 8 | phrased, compound. | 13:31:17 |
| 9 | THE WITNESS:  Again, that's -- in the overall, | 13:31:17 |
| 10 | if you're going to look at the shape and size of the HVAC | 13:31:18 |
| 11 | unit, yes, they share a similar housing. | 13:31:22 |
| 12 | BY MR. ZOHDY: | 13:31:24 |
| 13 | Q   Thank you. | 13:31:24 |
| 14 | Was it Mr. Murat's [sic] obligation to present a | 13:31:31 |
| 15 | alternative design for the HVAC unit as part of his | 13:31:36 |
| 16 | duties? | 13:31:41 |
| 17 | A   Are you on a particular page? | 13:31:41 |
| 18 | Q   Well, you -- I'm -- you say on the next page, | 13:31:43 |
| 19 | page 6 -- | 13:31:47 |
| 20 | A   Yes. | 13:31:48 |
| 21 | Q   -- "Even more significantly, he does | 13:31:48 |
| 22 | not indicate or state that HVAC odors | 13:31:50 |
| 23 | or their potential occurrence can be | 13:31:52 |
| 24 | eliminated completely nor does he | 13:31:55 |
| 25 | offer any type of alternative design | 13:31:57 |

# Exhibit 5



**JP Research, Inc.**

8451 Boulder Court, Suite 200 • Commerce Twp., MI 48390
Phone: (248) 564-7852 • Fax: (248) 564-7925 • www.jpresearch.com

October 07, 2016


Ms. Esther K. Ro, Esq.
Morgan Lewis & Bockius LLP
300 S. Grand Avenue
22nd Floor
Los Angeles, CA 90071


Re: <u>Alfred Salas & Gloria Ortega vs. Toyota Motor Sales, USA, Inc.</u>

Dear Ms. Ro:

At your request I have reviewed and analyzed the expert report of Mr. Murat Okcuoglu regarding the HVAC systems of 2012 to 2015 Toyota Camry vehicles. My analysis is based upon the available information provided in this matter, my knowledge and experience in the field of automotive vehicle system testing, and my knowledge and experience testing and developing automotive HVAC systems for a variety of markets including severe duty cycle A/C system markets such as Thailand and the Middle East.

As part of my examination, I have reviewed the additional materials listed below as well as the materials listed in my initial report on this matter dated September 9, 2016. Based upon these materials, observations, and my experience and training described above, I have formed the opinions set forth below. My opinions are held to a reasonable degree of engineering certainty. I reserve the right to expand or modify these opinions based upon the receipt of any additional relevant material, including additional expert reports, provided in this matter.

***Materials Received:***

**Expert Reports:**
- Murat Okcuoglu – "HVAC Defect Analysis Initial Report"
- Expert Report and Rebuttal Report of Jeffrey Hicks, CIH, QEP

***Mr. Okcuoglu's Report:***

Plaintiffs have alleged that the 2012 to 2015 Toyota Camrys are equipped with a defectively designed HVAC system. They further allege that this defect:

> *"leads to an environment favorable to the growth of mold and other contaminants" and the emission of 'noxious, foul, and moldy odors.'"*

Confidential                                                                                                          1

Ms. Esther K. Ro, Esq.
October 7, 2016
Page 2

*(First Amended Class Action Complaint, paras. 6, 26)*

In support of these allegations, Mr. Okcuoglu offers an unsupported theory. On Page 11 of his expert report, he theorizes that:

> *"The HVAC system design is defective in that it does not properly drain condensing moisture inside the HVAC housing."*

Mr. Okcuoglu fails to document or demonstrate his theory in anyway.  He speculates on Page 11, using vague and uncertain language, that the supposed design defect is "***most likely*** a combination of ***several factors***" (Emphasis added), listing eleven generic HVAC components and design attributes:

- Automated servo control logic
- Location of the drain pipe
- Ducting design
- Crevices that trap organic particulates and moisture
- Excessive internal condensation
- Excessive duct length
- Excessive duct insulation
- Unsuitable duct material
- Unsuitable or defective evaporator coating
- Unsuitable or defective gaskets or seals
- Defective evaporator design

Mr. Okcuoglu fails to identify, document or demonstrate any actual and specific defect with any of the eleven components or design attributes of the 2012 to 2015 Toyota Camry HVAC system that he lists.  Although he describes speculative concerns with such generic design characteristics, such as duct lengths and coatings for airways (Page 8), he does not document or state that any of these theoretical concerns actually exist in the 2012 to 2015 Toyota Camry HVAC system.

Although Mr. Okcuoglu fails to identify, document or demonstrate any actual and specific defect with any aspect of the 2012 to 2015 Toyota Camry HVAC system, he speculatively states on Page 11, again using vague and uncertain language, that:

> *"The review of the evidence and reports **suggests** the trapped and **possibly** pooling moisture breeds mold and mildew inside the car's A/C system."* (Emphasis added).

Mr. Okcuoglu does not document, demonstrate, or cite to any specific evidence of any kind in support of this statement.  I have reviewed the documents specifically cited by Mr. Okcuoglu in his report and none of them identify or discuss *"trapped and possibly pooling moisture [that] breeds mold and mildew inside the car's A/C system,"* as theorized by Mr. Okcuoglu.  In fact, Mr. Okcuoglu's citation to Toyota_Salas_00021905

Confidential

Ms. Esther K. Ro, Esq.
October 7, 2016
Page 3

in support of his theory (Page 13) is incomplete and misstates and misinterprets what is shown on that document. The Toyota_Salas_00021905 document is shown below:



Contrary to what Mr. Okcuoglu claims in bullet points 1, 2, 3, 4, and 5 on Page 13 of his report, the document does not make any reference or conclusions as to "organic matter," "contaminants," or "biological agents" being present in the HVAC system. The document simply states that odor particles can become trapped in the evaporator and then released into the cabin of the vehicle as the evaporator core temperature changes during A/C system operation. This phenomenon does not support Mr. Okcuoglu's theory or indicate the existence of a design defect in any way.

Additionally, Mr. Okcuoglu cites to a document titled "Florida AC Odor Investigation Summary" (Toyota_Salas_00023287), in which competitive vehicle testing performed by Toyota actually supports the statements in my September 9 report (Pages 7 – 8) that HVAC odors may potentially occur in any vehicle regardless of make and model and that the potential occurrence of such odors is not indicative of or consistent with any type of design defect. The same document also supports the statement on Page 13 of my September 9 report that HVAC-related odors can be affected by numerous contributing factors, including operator habits and the operating environment of the vehicle. The document states that the study done in Florida was conducted after a similar study in Michigan in order to take into account the "difference in climate and complaint rate" between Michigan and Florida. Florida represented the "[]highest IQS complaint area[] where high heat and humidity are common."

Confidential

Ms. Esther K. Ro, Esq.
October 7, 2016
Page 4

On Pages 11 and 12 of his report, Mr. Okcuoglu states that these purported theoretical conditions result in:

> *"...strong unpleasant fumes and odor..."* and that
> *"...inhaling such **contaminated** air, especially prolonged and repeated exposure such as in a personal vehicle may have serious health consequences."*

(Emphasis added.)

Mr. Okcuoglu does not document, demonstrate, or provide any empirical evidence of any kind in support of these statements. Accepted scientific method and engineering analysis requires the measurement, quantification, and confirmation of an alleged effect or condition before the determination of what, if any, potential root causes are contributing to its occurrence. Mr. Okcuoglu provides no empirical evidence or engineering analysis of any kind to support his theory that "improper drainage of condensing moisture" within the HVAC system leads to "contaminated air." Specifically:

- Mr. Okcuoglu did not perform any engineering investigation to determine the actual presence or potential causes of any alleged mold or odor in any 2012 to 2015 Toyota Camry HVAC unit.

- Mr. Okcuoglu did not inspect, evaluate, or examine an exemplar Camry HVAC unit or the HVAC systems of Plaintiffs Salas and Ortega's vehicles.

- Mr. Okcuoglu provided no empirical evidence that the HVAC systems of Plaintiffs Salas and Ortega's vehicles were not properly draining condensing moisture.

- Mr. Okcuoglu provided no empirical evidence that the HVAC systems of Plaintiffs Salas and Ortega's vehicles were not functioning in a normal and expected manner.

- Mr. Okcuoglu provided no empirical evidence that the HVAC systems of Plaintiffs Salas and Ortega's vehicles contained mold growth leading to any type of hazardous or unhealthy environment within those vehicles.

In fact, Mr. Okcuoglu's theory is contradicted by his own visual inspection of two exemplar Camry vehicles:

- Mr. Okcuoglu did not observe any pooling moisture, HVAC odors, or mold in either of the two exemplar Camry vehicles he examined. In fact, on page 15 of his report he states the HVAC design "***appeared unremarkable and typical***", and the "***Operation of the HVAC system appeared typical***," and *"The ducting and vent design appeared **unremarkable**."* (Emphasis added).

Confidential

0075

Ms. Esther K. Ro, Esq.
October 7, 2016
Page 5

Mr. Okcuoglu's theory is also contradicted by the empirical evidence obtained from the two named Plaintiffs' vehicles and presented in Toyota's expert reports.  As discussed on Pages 16 and 18 of my September 9 report, I evaluated Plaintiffs Salas and Ortega's vehicles and observed that the condensed moisture from the evaporator cores of those vehicles was draining in a manner consistent with a properly designed and functioning HVAC system.  Additional borescope inspections inside each of the HVAC housings near the evaporator core surface also confirmed the absence of excess, trapped, or pooling water, in further contradiction of Mr. Okcuoglu's theory.

I have also reviewed Mr. Hicks' report documenting his analysis of the environmental sampling of Plaintiffs Salas and Ortega's vehicles. As stated in his report, based upon the testing conducted on the named Plaintiffs' vehicles, Mr. Hicks has concluded that:

- "The exposure to fungi and dust in both vehicles is comparable to or lower than the concentrations of fungi and dust that would be experienced in the outdoor environment. ...
- "The levels of fungi reported in both vehicles do not present any increase in health risk relative to exposures found in the outdoor environment."

Clearly Mr. Hicks' opinions, and the objective and empirical measurements and analysis on which they are based, contradict the unsupported statement by Mr. Okcuoglu that the HVAC systems of Plaintiffs Salas and Ortega's vehicles contain mold growth leading to any type of hazardous or unhealthy environment within those vehicles.

On Page 9 of his report, Mr. Okcuoglu again offers an unsupported statement concerning the design of the 2012 to 2015 Toyota Camry HVAC system.  He states:

> "All 2012 - 2015 Toyota Camry vehicles have the same HVAC system design and they all share the same HVAC system defect described in this report."

Mr. Okcuoglu provides no support for this statement.  He has not identified and/or documented a defect in any HVAC system. Further, his theory is contradicted by the differences in materials and software design among the 2012 to 2015 Toyota Camry HVAC systems, described in my September 9 report.  In fact, several of these design differences, such as the Greenhouse Gas Logic, Komori Odor Logic, and evaporator coatings, are noted by Mr. Okcuoglu, in direct contradiction of his own statement that "2012 – 2015 Toyota Camry vehicles have the same HVAC system design."

On Page 16 of his report, Mr. Okcuoglu further states:

> "no successful permanent and satisfactory fix has been implemented by Toyota."

Quite simply, Mr. Okcuoglu has not documented or demonstrated any defect and as such cannot offer any feasible alternative design or "fix."  Indeed, he offers nothing more than a general observation that:

Confidential

Ms. Esther K. Ro, Esq.
October 7, 2016
Page 6

> *"Disrupting the favorable conditions to prevent breeding of organic matter would be another solution, but Toyota did not come up with a permanent disruption strategy."*

As stated on Page 7 in my September 9 report, HVAC odors occur as a result of what passes through the HVAC unit during its normal operation, not because of the HVAC unit itself. The presence or absence of HVAC-related odors is affected by numerous contributing factors, including operator habits, operating environment of the vehicle, and factors unique to an individual vehicle. As a consequence of this, the potential occurrence of HVAC odors cannot be completely eliminated. Likewise, there is no one single solution or method to eliminate all potential HVAC odors that may occur. Also, Mr. Okcuoglu offers no discussion of odor abatement. Even more significantly, he does not indicate or state that HVAC odors or their potential occurrence can be eliminated completely, nor does he offer any type of alternative design that would achieve such a result.

Mr. Okcuoglu has not produced or collected any empirical evidence to support his theory. He did not inspect or evaluate Plaintiffs Salas and Ortega's vehicles, nor did he scientifically document the internal environment of those vehicles and their HVAC systems in an objective and repeatable manner. As such, his theory and report concerning alleged HVAC odors or mold in the named Plaintiffs' vehicles, or any 2012 to 2015 Toyota Camry, have no factual or scientific basis whatsoever. Also, Mr. Okcuoglu overlooks the large body of industry technical literature, OEM service bulletins, and peer group testing and evaluations performed by Toyota, which demonstrate that HVAC odors may potentially occur in any vehicle, regardless of make and model, and that the potential occurrence of such odors is not indicative of or consistent with any type of design defect.

### *Opinions and Observations*

In addition to the Opinions and Observations provided in my September 9 report on this matter, I offer the following opinions:

- Mr. Okcuoglu provides no empirical evidence, including data, measurements, test results, sampling, objective evaluations, observations, or any other type of accepted scientific or engineering evidence, in support of the theory stated in his report.

- Mr. Okcuoglu does not identify, document, or demonstrate any type of design defect in the HVAC systems of the 2012 to 2015 Toyota Camry vehicles.

- Mr. Okcuoglu's theory that the 2012 to 2015 Toyota Camrys do "*...not properly drain condensing moisture inside the HVAC housing...*" is unsupported, unproven, undocumented, and inconsistent with the empirical evidence in the case.

Confidential

0077

Ms. Esther K. Ro, Esq.
October 7, 2016
Page 7

- Mr. Okcuoglu's claim that "…*trapped and possibly pooling moisture breeds mold and mildew inside the car's A/C system…*" is unsupported, unproven, undocumented, and inconsistent with the empirical evidence in the case.

- Mr. Okcuoglu's claim that "*All 2012 -2015 Toyota Camry vehicles have the same HVAC system design and they all share the same HVAC system defect described in this report*" is unsupported, unproven, undocumented, and inconsistent with the empirical evidence in the case.

- Mr. Okcuoglu's claim that the failure to "*properly drain condensing moisture inside the HVAC housing…*" results in a "*health hazard*" is unsupported, unproven, undocumented, and inconsistent with the empirical evidence in the case, including the environmental sampling, analysis, and results provided by Toyota.

- My testing and evaluation of Plaintiff Salas and Ortega's vehicles demonstrates and confirms that the design of the HVAC systems of those vehicles properly drains condensing moisture from inside the HVAC housing. The evaluations and scientific testing performed by Toyota on Plaintiff Salas and Ortega's vehicles contradict and do not support Mr. Okcuoglu's theory regarding a design defect resulting in HVAC odors in the 2012 to 2015 Toyota Camry vehicles. As such, Plaintiffs Ortega and Salas's vehicles are not representative of, or consistent with, Mr. Okcuoglu's theory of an HVAC design defect within the HVAC systems of the 2012 to 2015 Toyota Camry vehicles.

- Mr. Okcuoglu has not offered any feasible alternative design of the HVAC system in 2012 to 2015 Toyota Camrys that would completely eliminate the potential occurrence of an HVAC odor.

These opinions and observations are provided with a reasonable degree of engineering certainty using currently available data. If additional information becomes available, including additional expert reports filed by the parties, I reserve the right to supplement this report and to offer additional opinions.

Very truly yours,

Robert M. Kuhn P.E.
Managing Engineer

Confidential

**PROOF OF SERVICE**

I, Candice S. Wynne, declare:

I am a citizen of the United States and employed in Los Angeles County, California. I am over the age of eighteen years and not a party to the within entitled action. My business address is 300 South Grand Avenue, Twenty-Second Floor, Los Angeles, CA 90071-3132. On October 7, 2016, I served the following:

**Rebuttal Report prepared by Robert M. Kuhn, P.E.**

☒ (U.S. MAIL) by placing the document(s) listed above in a sealed envelope with postage thereon fully prepaid, in the United States mail at Los Angeles, California addressed as set forth below.

☒ (E-Mail) by electronically transmitting via e-mail a true and correct copy of the document(s) listed above on this date to the person(s) at the email address(es) set forth below.

Cody R. Padgett                                             *Counsel for Plaintiffs*
Robert K. Friedl
Tarek H. Zohdy
Jordan L. Lurie
Capstone Law APC
1875 Century Park East, Suite 1000
Los Angeles, CA 90067
Phone:      (310) 556-4811
Fax:        (310) 943-0396
Email:      cody.padgett@capstonelawyers.com
            robert.friedl@capstonelawyers.com
            tarek.zohdy@capstonelawyers.com
            jordan.lurie@capstonelawyers.com

I am readily familiar with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

Executed on October 7, 2016, at Los Angeles, California. I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

Candice S. Wynne

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
LOS ANGELES

DB2/ 30662401.1

PROOF OF SERVICE OF TOYOTA MOTOR SALES, U.S.A., INC.'S
REBUTTAL REPORT PREPARED BY ROBERT M. KUHN, P.E.

0079

# Exhibit 6

ROBERT KUHN, PE - 11/11/2016

```
 1              UNITED STATES DISTRICT COURT

 2              CENTRAL DISTRICT OF CALIFORNIA

 3

 4  ALFRED SALAS and GLORIA ORTEGA,   )  No. CV15-08629
    individually, and on behalf of a  )      FMO (Ex)
 5  class of similarly situated       )
    individuals,                      )
 6                                     )
            Plaintiffs,               )
 7                                     )
            vs.                       )
 8                                     )
    TOYOTA MOTOR SALES, U.S.A., INC., )
 9  a California corporation,          )
                                       )
10          Defendant.                )
    _____   )

11

12

13

14

15  VIDEO TAPED DEPOSITION OF:

16

17                   ROBERT KUHN, PE

18                   Friday, November 11, 2016

19                   9:01 a.m.

20

21

22

23  Reported by:

24                   MONICA T. VOGELBACHER

25                   CSR No. 6406
```

ROBERT KUHN, PE - 11/11/2016                    Page 151

| | | | |
|---|---|---|---|
| 1 | A   Oh.  Well, again, I -- like I said, my opinion | 13:16:35 |
| 2 | is based on the fact that I researched the issue within | 13:16:38 |
| 3 | the industry, I observed the technical papers and the | 13:16:42 |
| 4 | manufacturers' publications that are out there, and | 13:16:45 |
| 5 | that's consistent with the fact that HVAC odors could | 13:16:48 |
| 6 | possibly occur due to environmental reasons. | 13:16:52 |
| 7 | Q   Could they possibly occur due to a design | 13:16:54 |
| 8 | defect? | 13:16:58 |
| 9 | A   In theory, sure. | 13:16:58 |
| 10 | Q   Next you -- at the bottom of the page, it | 13:17:00 |
| 11 | starts -- says: | 13:17:04 |
| 12 | "In fact, Mr. Okcuoglu's citation to | 13:17:05 |
| 13 | Toyota_Salas_00021905" -- | 13:17:11 |
| 14 | A   Right. | 13:17:13 |
| 15 | Q   -- "in support of this theory" -- | 13:17:14 |
| 16 | "of his theory (page 13) is incomplete | 13:17:16 |
| 17 | and misstates and misinterprets what | 13:17:19 |
| 18 | is shown on the document." | 13:17:22 |
| 19 | Do you see that? | 13:17:24 |
| 20 | A   Yes, I do. | 13:17:24 |
| 21 | Q   Then you have the -- a diagram.  Or it looks | 13:17:25 |
| 22 | like it may be even a portion of a document, correct? | 13:17:35 |
| 23 | A   That is the page that -- the Toyota Salas | 13:17:38 |
| 24 | number. | 13:17:43 |
| 25 | Q   Okay. | 13:17:43 |

# Exhibit 7

ROBERT KUHN, PE - 11/11/2016

```
 1                UNITED STATES DISTRICT COURT

 2                CENTRAL DISTRICT OF CALIFORNIA

 3

 4   ALFRED SALAS and GLORIA ORTEGA,   )  No. CV15-08629
     individually, and on behalf of a  )      FMO (Ex)
 5   class of similarly situated       )
     individuals,                      )
 6                                     )
                 Plaintiffs,           )
 7                                     )
             vs.                       )
 8                                     )
     TOYOTA MOTOR SALES, U.S.A., INC., )
 9   a California corporation,         )
                                       )
10               Defendant.            )
     _____)

11

12

13

14

15   VIDEO TAPED DEPOSITION OF:

16

17                        ROBERT KUHN, PE

18                        Friday, November 11, 2016

19                        9:01 a.m.

20

21

22

23   Reported by:

24                        MONICA T. VOGELBACHER

25                        CSR No. 6406
```

| | | |
|---|---|---|
| 1 | being the air and humidity in the air.  You could have a | 11:04:41 |
| 2 | plog (ph) or a plugged-up condensate line that could | 11:04:46 |
| 3 | cause moisture not to drain.  That may or may not give | 11:04:49 |
| 4 | you an odor.  It may just spill over onto your feet. | 11:04:52 |
| 5 | So I'll go back to what the statement says, the | 11:04:56 |
| 6 | odors occur by what passes through. | 11:04:59 |
| 7 | BY MR. ZOHDY: | 11:05:02 |
| 8 | Q   Can odors occur because of accumulated moisture? | 11:05:02 |
| 9 | A   Odors -- | 11:05:05 |
| 10 | MR. SCHRADER:  Incomplete hypothetical. | 11:05:05 |
| 11 | THE WITNESS:  Odors can occur for any number of | 11:05:06 |
| 12 | reasons. | 11:05:09 |
| 13 | BY MR. ZOHDY: | 11:05:11 |
| 14 | Q   Well, is -- | 11:05:11 |
| 15 | A   It passes through air or -- | 11:05:11 |
| 16 | Q   Is one of those accumulated moisture? | 11:05:11 |
| 17 | A   No.  I would say one of those potentially is | 11:05:13 |
| 18 | humidity that's extracted from the air passing through. | 11:05:16 |
| 19 | Q   So if moisture accumulates in an evaporator box, | 11:05:19 |
| 20 | you're saying there is no chance it will create an odor? | 11:05:23 |
| 21 | MR. SCHRADER:  Incomplete hypothetical. | 11:05:27 |
| 22 | THE WITNESS:  I didn't say that.  I just said | 11:05:28 |
| 23 | that you could -- say you have a plugged line.  It won't | 11:05:30 |
| 24 | necessarily generate an odor just because that line is | 11:05:33 |
| 25 | plugged, but that's certainly a possibility. | 11:05:37 |

# Exhibit 8



**JP Research, Inc.**

8451 Boulder Court, Suite 200 • Commerce Twp., MI  48390
Phone: (248) 564-7852 • Fax: (248) 564-7925 • www.jpresearch.com

September 09, 2016


Ms. Esther K. Ro, Esq.
Morgan Lewis & Bockius LLP
300 S. Grand Avenue
22nd Floor
Los Angeles, CA. 90071


Re: <u>Alfred Salas & Gloria Ortega vs. Toyota Motor Sales, USA, Inc.</u>

Dear Ms. Ro:

At your request, I have performed an evaluation and analysis of technical issues related to the matter captioned <u>Alfred Salas & Gloria Ortega vs. Toyota Motor Sales, USA, Inc.</u> Specifically, I was asked to analyze the design of the heating, ventilation, and air conditioning (HVAC) systems in "Toyota Camry XV50 model vehicles" ("Subject Vehicles") (including the 2012 to 2015 Toyota Camry, and possibly the 2016 Camry), and inspect and evaluate the performance of the HVAC systems in Plaintiffs Alfred Salas and Gloria Ortega's vehicles. My analysis is based upon the available information provided in this matter and my knowledge and experience in the fields of HVAC system design, performance, and operation, engine and powertrain testing and development, and on road vehicle performance evaluations.

My professional background includes testing and evaluation of vehicle systems including HVAC systems in a variety of vehicle and equipment installations both on and off road. I have design and testing experience with two major automotive Original Equipment Manufacturers (OEMs) and am familiar with the operational characteristics and function of major vehicle systems including the HVAC systems through testing and evaluating their operation in a wide range of environments and conditions across the United States and international markets. In addition, I have conducted numerous technical investigations to evaluate the performance of various engine, powertrain, and vehicle systems in a variety of duty cycles and environments as well as having investigated numerous on and off-road vehicle crashes. I have also served in the Chrysler Vehicle Safety Office working directly with the National Highway and Traffic Safety Administration (NHTSA) to investigate and resolve a variety of technical investigations. I am currently the instructor for SAE (Society of Automotive Engineers) Course C1344 Engine Failure Investigation and Analysis.  A copy of my curriculum vitae and Testimony List for the last 4 years is provided as attachments.  JP Research currently charges $230.00/hour for my services.

**CONFIDENTIAL**

Ms. Esther K. Ro, Esq.
Sept. 09, 2016
Page 2

As part of my examination, I have reviewed the materials listed below and the literature listed in Appendix 1. Based upon these materials, observations, and my experience and training described above, I have formed the opinions set forth below. My opinions are held to a reasonable degree of engineering certainty, and may be expanded based upon the receipt of any additional relevant material provided in this matter.

**_Materials Received Including:_**

**Deposition Testimony and Exhibits:**
- Alfred Salas
- Gloria Ortega
- Dwayne Kinsey
- Russell Suzuki
- Stefan Young
- Barry Hare
- David Cosgrove

**Photographs and Inspection Materials:**
- Ortega Vehicle Inspection Photographs July 17th, 2016
- Salas Vehicle Inspection Photographs August 9th, 2016
- Exemplar Camry Component Photographs
- Exponent Vehicle Inspection Photographs and Videos

**Pleadings and Discovery Materials:**
- First Amended Class Action Complaint
- Requests for Inspection of Plaintiffs' Vehicles
- Toyota Production Documents, including Technical Service Bulletins, Toyota Product Service Documents, Toyota Features Documents, Toyota Camry Owners Manuals and Maintenance Guides, Toyota Sales Brochures, PowerPoint Presentations and Summaries of Toyota's Activities Relating To HVAC Odor, Plaintiffs' Vehicle Information and Service Documents, Toyota Inspection Photographs and Scan Tool Files
- Plaintiff Discovery Responses and Production Documents, including Plaintiffs' Vehicle Service Documents

**Miscellaneous Materials:**
- Miscellaneous Public Domain Documents

**_Issue Background and Description_**

Plaintiffs allege that the Subject Vehicles are equipped with a defectively designed HVAC system. They further allege that this defect:
> *"leads to an environment favorable to the growth of mold and other contaminants" and the emission of "noxious, foul, and moldy odors."*

**CONFIDENTIAL**

Ms. Esther K. Ro, Esq.
Sept. 09, 2016
Page 3

*(First Amended Class Action Complaint, paras. 6, 26)*

In support of this claim, Plaintiffs have offered the alleged experiences of Mr. Alfred Salas (who owns a used 2014 Toyota Camry with a manual air conditioning system) and Ms. Gloria Ortega (who owns a 2012 Toyota Camry with an automatic air conditioning system), Toyota technical service bulletins (TSB's), and other public domain records, including complaints from various consumer websites and the NHTSA website. Plaintiffs have also claimed that the Salas and Ortega vehicles are representative of a common design defect in the HVAC systems of the Subject Vehicles. To my knowledge, as of the date of my report, Plaintiffs have not identified an alleged design defect.

### *HVAC System & Performance*

*A/C System Overview*
All vehicles marketed in the United States are equipped with an HVAC system of some kind. Modern automotive HVAC systems are extremely sophisticated and incorporate numerous components in a very high level of design complexity including electronic, mechanical, electro-mechanical, and fluid flow elements located throughout the vehicle. Computer algorithms work in tandem with the operator controls to coordinate the efficient operation of these elements and ensure a comfortable cabin environment throughout a wide range of external environmental operating conditions.

The majority of passenger vehicles and light trucks currently sold in the United States are also equipped with a factory installed air conditioning (A/C) system as part of the overall HVAC system. The purpose of the A/C system is to remove heat from inside the passenger cabin and expel it to the external environment of the vehicle. More simply, it cools down the air inside the vehicle to a temperature that is lower than that of the ambient air outside the vehicle.

The A/C system circulates a refrigerant fluid through a series of lines and heat exchangers to cool down the heated interior air. A heat exchanger known as the evaporator core collects heat from the cabin air and transfers it to the refrigerant. The refrigerant is then pumped to another heat exchanger known as a condenser where the heat is expelled to the air outside the vehicle. The refrigerant is circulated through the system by the compressor. A simplified diagram of an automotive A/C system is shown below:

**CONFIDENTIAL**

Ms. Esther K. Ro, Esq.
Sept. 09, 2016
Page 4



*Generic Diagram of Automotive Air Conditioning System*

The components of the A/C system are mounted in the vehicles' engine bay and passenger cabin.  The passenger cabin portion of the system is contained in the interior HVAC unit which contains, among other components, the evaporator core, heater core, blower motor, and air distribution system.  This unit is typically mounted within/behind the vehicle dashboard assembly and is operated using a set of controls mounted on the face of the instrument panel within the driver's reach.    A typical interior HVAC assembly is shown in the figure below:

                                    CONFIDENTIAL

Ms. Esther K. Ro, Esq.
Sept. 09, 2016
Page 5



*Example Automotive Interior HVAC Assembly*

One feature of modern automotive HVAC systems is the ability to choose between a continuous inflow of fresh air from outside the vehicle or a recirculated flow of the interior cabin air with little to no input of exterior air added to the cabin. The use of recirculated air allows the operator to essentially isolate the vehicle interior from external air and environmental conditions while the system is in operation. The use of recirculated air also allows for faster cool down of the vehicle's interior and more efficient operation of the A/C system by not requiring it to continuously cool a constant stream of hot and/or humid air from the vehicle's exterior.

Many modern automotive HVAC systems are also available with additional control options such as an "auto" feature that automatically maintains the cabin temperature at a user programmed setting. These systems incorporate computer control algorithms that control system functions such as compressor engagement, blower fan speed, fresh air/recirculation airflow selection, and vent selection. A typical set of controls for a modern automotive HVAC is shown below.

**CONFIDENTIAL**

Ms. Esther K. Ro, Esq.
Sept. 09, 2016
Page 6



*HVAC System Control Panel with "Auto" and Dual Zone Control Features*

The advent of electronically controlled HVAC systems has also allowed manufacturers to include additional control features such as energy efficiency modes that automatically manage system function to improve vehicle fuel efficiency and exhaust emissions without additional inputs from the user.

Modern automotive HVAC system designs incorporate a serviceable cabin air filter through which the air (regardless of whether fresh or recirculation) passes before entering the HVAC system. The purpose of this filter is to reduce the flow of contaminants into the HVAC system, and in turn into the passenger cabin space. Cabin air filters are considered a maintenance item, and so periodic replacement of these filters is generally included in the vehicle's recommended maintenance schedule. An example of a typical cabin air filter is shown below.



*Typical Automotive Cabin Air Filter Element*

**CONFIDENTIAL**

Ms. Esther K. Ro, Esq.
Sept. 09, 2016
Page 7

The purpose of the A/C evaporator is to cool down and dehumidify the cabin air of the vehicle.  In order to do so, refrigerant is circulated through the core while air is blown across the core by the HVAC system blower fan. The cooled and dehumidified air can then enter the passenger cabin via the HVAC ducting system and vents.  A diagram of a typical automotive A/C system evaporator is shown below.



*Typical Automotive Evaporator Core*

As the air is cooled it is also dehumidified. This means that moisture (i.e., humidity) in the air condenses on the colder surface of the evaporator as it passes across that surface. This is a normal process, similar to the "sweating" seen on the outside surface of chilled beverage bottle placed outside on a warm summer's day. Condensed moisture sheds from the evaporator surface and is collected at the base of the evaporator core. The moisture is then drained through a tube to the outside of the vehicle.  The amount of moisture condensed and drained is directly dependent on the humidity of the air passing across the evaporator.

### <u>Automotive HVAC Odors</u>

*Overview*
Every HVAC system, automotive or otherwise, has the potential to develop odors during normal and expected operating conditions.  Complaints of and/or the occurrence of odors in an automotive HVAC system is not unusual nor is it unique to any individual make or model of vehicle.  All major automotive manufacturers have experienced or addressed HVAC system odors in some of their vehicles.  These odors result from a variety and combination of operational and environmental inputs experienced during normal vehicle operating conditions. In other words, HVAC odors occur as a result of what passes through the HVAC unit during its normal operation, not because of the HVAC unit itself.

Published industry research and technical papers listed in Appendix 1 indicate that odors occurring in an automotive HVAC system are not generated by the HVAC system itself.

**CONFIDENTIAL**

Ms. Esther K. Ro, Esq.
Sept. 09, 2016
Page 8

Odors that may occur are the result of contaminants, humidity, and external odors that travel into and/or through the HVAC system while it is in operation.  The presence or absence of HVAC-related odors can be affected by numerous contributing factors, including but not limited to:

- *Operator habits* (e.g., bringing foods into or smoking inside the vehicle, use of air fresheners, use of leather cleaners, transporting pets or other cargo, and how the system is operated in regards to use of fresh air or recirculated air, etc.),
- *Operating environment of the vehicle* (i.e., humidity, temperature, etc.), interior components (e.g., leather seats, plastics, spills inside the vehicle, etc.), and external contaminants.
- *Unique factors of an individual vehicle*, such as a blocked evaporator drain tube or cabin air filter contamination are also potential contributors to HVAC odor in an individual vehicle.

Odors, when they do occur, are often released when the A/C system is started up or with the initial engagement of the vehicle HVAC system blower.  Usually these odors are not continuous and are only present for a brief period of time.  Odors can also occur during A/C system operation based on the changing temperature (causing evaporation and condensation), and wetness of the evaporator core surface.

As part of the ongoing vehicle development process, Toyota evaluates customer reports including those of HVAC odors in the field. One of the trends noted by Toyota engineer Stefan Young was the majority of claims were from the southeastern United States, specifically Florida, where the climate is typically hot and humid for much of the year. This is consistent with HVAC odor issues being a consequence of climatic, environmental, and usage factors of an individual vehicle as opposed to any type of design defect.

*System Features and Maintenance Procedures*
Research, testing, and development have documented and demonstrated the severity and likelihood of occurrence of HVAC odors is subjective and highly variable. Despite the stochastic nature of these odors, their intensity, and their likelihood of occurrence, vehicle manufacturers and HVAC system/component suppliers have developed several system features intended to reduce the likelihood and/or intensity of HVAC odors that may be experienced by their customers.

**Software Control Logic**: Some manufacturers, Toyota included, have taken advantage of their existing HVAC software control algorithms to address the issue of HVAC odor. One such feature, intended to dissipate trapped air from the HVAC housing, directs the initial flow of air from the HVAC housing toward the occupant's feet, instead of their face.  Some of the Subject Vehicles software combines this feature with an additional software control logic that modulates the speed of the blower motor when the A/C system is turned on to help minimize any potential odor occurrence.  Toyota refers to this feature as Komori odor logic.

**CONFIDENTIAL**

Ms. Esther K. Ro, Esq.
Sept. 09, 2016
Page 9

Another control strategy, also used by some of the Subject Vehicles,
automatically switches the HVAC system to fresh air mode when the vehicle is
parked to help ventilate the HVAC system housing while the vehicle is parked.

***Evaporator Core Coatings***: All of the air passing through the HVAC system must
pass through the evaporator core. Not only is the evaporator subjected to any
contaminants or odors in that air flow but it is also extracting humidity from the
air when the A/C system is in operation. As a normal part of the product
development process, certain evaporator core suppliers have, over time,
implemented evaporator core surface coating treatments which improve their anti-
odor, anti-corrosion, and water shedding characteristics. The Subject Vehicles
have such coating treatments.

Vehicle service and maintenance can also reduce the likelihood of HVAC odors. Most
vehicle manufacturers, Toyota included, have adopted the use of a cabin air filter which
filters out and absorbs odors along with physical contaminants. These filters can be
either a standard paper or activated charcoal type to more effectively absorb odors. As a
serviceable item, periodic replacement of the cabin air filter is included as part of the
vehicles required maintenance schedule. Like any other serviceable item such as an air
or oil filter, this is done to ensure optimal efficiency of the HVAC air filtration feature.

Toyota and other manufacturers also provide information in their vehicle owner manuals
concerning the possibility of HVAC odors and how to operate the HVAC system controls
to help mitigate them should they occur. AC refresh service kits are also available
through OEM vehicle dealers, as are established service and maintenance procedures to
address HVAC odor complaints. A number of example technical service bulletins of
other OEMs are listed in Table 1 below.

### *Peer Vehicle Review and Comparison*

*Content and Design*

Toyota and other OEM interior HVAC system designs are similar in both content and
layout. A comparison of the Toyota Camry interior HVAC unit and one found in a
similar sized Ford Fusion is shown below:



**Ford Fusion HVAC unit**          **Toyota Camry HVAC Unit**

**CONFIDENTIAL**

Ms. Esther K. Ro, Esq.
Sept. 09, 2016
Page 10

Both units consist of a central "box" which houses duct outlets, evaporator and heater cores, and the internal "blend" door(s) which manage airflow over the two cores while the right hand portion of each unit contains the blower motor, cabin filter, and fresh/recirc door which controls the source of airflow through the unit.  Both units are mounted behind the vehicles instrument panel with the blower/filter portion of the unit occupying the space behind the glove compartment on the passenger (right) side of the vehicle.

A basic review of owner manuals and sales literature confirms modern HVAC units such as the ones used in the Toyota Camry and its peer competitors also come in manual and automatically controlled versions with most having "dual zone" capability.  Dual zone capability allows the driver and passenger to independently adjust the temperature on their side of the vehicle while the "auto" control feature works to monitor the temperature inside the vehicle cabin and automatically adjust the HVAC control settings to maintain a user specified temperature.

The use of electronic control units and computer algorithms has become nearly ubiquitous in automotive HVAC systems.   Starting with the 2014 Toyota Camry, Toyota implemented a "Parking Fresh Logic" control feature that automatically switches the HVAC system to fresh air mode when the vehicle is parked.  This is done to help reduce or prevent the buildup of odor(s) within the HVAC system while the vehicle is parked. Other OEMs have used similar control features. This is consistent with the fact that such odors are not unique to the Subject Vehicles and can potentially occur in other manufacturers' vehicles:

2012 Jeep Wrangler Owner's Manual
> *"When the ignition switch is turned to the LOCK position, the recirculation feature will be cancelled."*

*Peer Comparisons and Evaluations*
Peer comparisons and evaluations of competitive vehicle A/C odors were conducted by Toyota in May and October of 2012, in Michigan and Florida, respectively.  These evaluations confirmed that HVAC odors were in fact not unique to the Toyota Camry. These evaluations also indicated the Camry's subjective ranking among competitors was better in Michigan's climate than it was in the climate of Florida.  Further evaluations in Florida confirmed that the use of features such as "parking fresh" by other manufacturers positively affected the subjective quality of A/C odor in those vehicles.  Subsequent evaluations were then conducted which confirmed that when Parking Fresh Logic was also implemented in the Camry, its odor occurrence intensity and duration in the Florida climate was improved, as was its ranking among its competitors.

*Owner's Manuals*
A review also of other manufacturer's owner's manuals, which are publicly available on the Internet, confirms that HVAC odors are not unique to the Subject Vehicles and the existence of such odors does not establish the presence of a design defect with the

**CONFIDENTIAL**

Ms. Esther K. Ro, Esq.
Sept. 09, 2016
Page 11

Subject Vehicles' HVAC systems.   Excerpts from some of these owner's manuals
include the following:

2014-16 Nissan Altima Owner's Manual (pgs. 200, 206, 201 A/C system)
    *"Odors from inside and outside the vehicle can build up in the air conditioner
    unit. Odor can enter the passenger compartment through the vents."*

2012-16 Kia Optima Owner's Manual (pgs. 4-99,125 A/C system)
    *"Operating the air conditioning system in the recirculated air position provides
    maximum cooling, however, continual operation in this mode may cause the air
    inside the vehicle to become stale."*

2016 Renault Megane Estate Owner's Manual (pg. 3.3 A/C system)
    *"To remove bad odours from your vehicles, only use the systems designed for this
    purpose. Consult an approved Dealer."*

2012-16 Toyota Camry Owner's Manual
    *"During use, various odors from inside and outside the vehicle may enter into and
    accumulate in the air conditioning system. This may then cause odor to be emitted
    from the vents."*

*Consumer Databases*
Reports of HVAC system odors occurring in many other 2012 to 2016 model year OEM
vehicles can also be found on the NHTSA's website.   Consumer narratives known as
"Vehicle Owner Questionnaires" (VOQ's) which describe odors emanating from their
vehicles' HVAC systems include vehicles from the following manufacturers:

- GM              - Honda           - Volvo
- Ford            - Nissan          - Volkswagen
- Chrysler        - BMW (Mini)      - Kia
- Hyundai

*OEM HVAC Odor Servicing and Maintenance Bulletins*
A review of OEM service and maintenance bulletins further confirms that all automotive
HVAC systems have the potential to develop odors at some point in time due to a variety
of environmental, climatic, and operator inputs.   This issue is not unique to the Subject
Camry Vehicles.   In fact, the technical service bulletin(s) (TSB) issued by Toyota Motor
Sales, U.S.A., Inc. and referenced by Plaintiffs are typical of service bulletins issued by
other OEMs. Some examples of these HVAC odor service bulletins are listed below:

| Honda | SN-13-12-3 Dec 13 | A/C – Best Way to Control Musty Evaporator Odors (all models) |
|---|---|---|
| Mercedes | L183.30-P-045340 | Air conditioning Musty/Moldy Odor Complaints |
| Mercedes | L183.00-P-051588 | Smell of Mold, Decay, or Urine from |

**CONFIDENTIAL**

Ms. Esther K. Ro, Esq.
Sept. 09, 2016
Page 12

| | | Ventilation |
|---|---|---|
| Chrysler | TSB 21-013-05 | A/C Cooling Coil Odor |
| GM | 99-01-39-004B and C | Air Conditioning Odor (Install Evaporator Core Dryer Kit and Apply Cooling Coil Coating) |
| Mazda | 07-001/03<br>07-001/07<br>07-002/09 | Air Conditioning – Musty / Mildew Odor |
| Audi | 2010146/7 | 87 Unpleasant odor from heating and ventilation system |
| Ford | TSB 14-0099 | Musty Odor from A/C Vent on Initial start up – Built on or Before 2/24/2014 |
| SAAB | 06/95-0592 Code 845 | Addressing A Customer Complaint of Smell from Climate System  (All Saab 9000) |
| VW | 87 07 07 May 10, 2007, 2005566 | Unpleasant "musty" odor coming from Heating and Ventilation system |
| Volvo | Technical Service Bulletin # 887942 | A/C - Odor From The Ventilation System |
| BMW | 64 08 00 (645) weltweit all countries Datum/Date: 11/2000 Update: 11/2003 Update: 03/2005 Update: 06/2006 Update: 09/2006 Update: 08/2007 | Mouldy smell from air conditioner All series |

Table 1: OEM HVAC Odor Service Bulletins and Procedures

Not only is HVAC odor a well-known issue, but treating it is clearly an ***established service and maintenance procedure***.  It is not due to or indicative of any type of design defect.   HVAC odor is a maintenance issue which can occasionally occur due to a combination of environmental, climatic, and operator inputs.  As an example, BMW, in their HVAC odor service procedure listed above, explains the occurrence of this condition as follows:

> *"Cause:*
>> *The cause of this complaint is not a fault in the air conditioner or automatic air conditioner,  nor in the vehicle. The odour is caused by environmental influences during the air conditioner's operation period."*

This description of HVAC odor by a major vehicle OEM is consistent with industry findings that such odors are not the result of a design defect. They can occur periodically over the operating life time of a vehicle due to a combination of environmental, climatic,

**CONFIDENTIAL**

Ms. Esther K. Ro, Esq.
Sept. 09, 2016
Page 13

and operational inputs. Consequently, many OEM vehicle manufacturers also have servicing kits available to address HVAC system odors if and when their customers bring the issue to a dealer. An example of such a service kit is shown below.



**Exemplar Subaru Dealer A/C System Refresh Kit**

### *Plaintiffs' Subject Vehicles*

In their First Amended Class Action Complaint, Plaintiffs allege that Subject Vehicles share a common design defect in their HVAC systems that:

> *"leads to an environment favorable to the growth of mold and other contaminants" and the emission of "noxious, foul, and moldy odors." (paragraphs 6, 26)*

To my knowledge, Plaintiffs have not yet identified the alleged design defect they claim to be common to the HVAC system of all the Subject Vehicles. The available evidence and peer group comparisons are in fact consistent with HVAC odor being caused by various combinations of environmental, climatic, and operational inputs. This finding is inconsistent with any type of design defect common or otherwise. There is no evidence of a design defect. There are also a number of differences in both the hardware and software control algorithms among the Subject Vehicles that not only preclude the existence of a common HVAC design defect, but also could affect the occurrence and intensity of any HVAC odors that may be perceived by a customer in any specific Subject Vehicle.

*Hardware and Content*
- The use of unique blend door and control actuator designs and components between the manual and automatic versions of the HVAC system in each model year of the Subject Vehicles. This provides dual zone climate control capability for vehicles equipped with automatic systems
- Rear passenger compartment heater ducting unique to the automatic dual zone version of the system. The presence of rear floor ducts permits the HVAC system to distribute air flow to the rear of the vehicle as well as the front. The manual system cannot do this.

**CONFIDENTIAL**

Ms. Esther K. Ro, Esq.
Sept. 09, 2016
Page 14

*Software Control Logics*
- Komori Odor Logic is a standard HVAC control algorithm found in 2012 and later model year Toyota Camrys equipped with an automatic HVAC system. This logic slowly ramps up the blower motor speed and blows the HVAC system air through the floor ducts each time the vehicle is started. This is done so that any odors that may be present in the HVAC system are not blown into the occupants' faces. Subject Vehicles with a manual HVAC system do not have this logic as a standard feature.
- Greenhouse Gas Logic is software control algorithm that automatically switches the A/C system from fresh air to recirculated air when the outside temperature is approximately 75 degrees Fahrenheit or above. This feature was implemented in order to increase A/C system efficiency and improve fuel economy. Greenhouse Gas Logic was implemented in December of 2012 and affects 2013 and later model year Toyota Camrys.
- Parking Fresh Logic is a software control algorithm that automatically switches the HVAC system to fresh air mode when the vehicle is parked to help ventilate the HVAC system while the vehicle is parked. Parking Fresh Logic is a standard logic in 2014 and later model year Toyota Camrys.

*Evaporator Coating Changes*
- In January of 2013, a change was made by the supplier to the evaporator core surface coating curing process to address inconsistencies in the manufacturing process of the evaporator coating.
- In or around September of 2014, a running change in the evaporator core surface coating was implemented by the supplier, affecting 2015 and later model year Toyota Camrys.

The variations in content, functionality, and control features present in the Subject Vehicles' HVAC systems, and their possible effects on the probability of HVAC odor occurring in any single Subject Vehicle, preclude the existence of a common design defect within the Subject Vehicles.

### ***Inspection of Plaintiffs Gloria Ortega's and Alfred Salas' Vehicles***

Based on my inspection and review of these vehicles along with my review of deposition testimony from Plaintiffs, I observed and determined the following:

*Plaintiff Ortega's Vehicle*
Plaintiff Ortega's vehicle was inspected in Long Beach, California on July 17th, 2016. The vehicle is a 2012 Toyota Camry VIN 4T4BF1FK3CR████ with 82,884 miles showing on the odometer. Plaintiff Ortega purchased her vehicle new on October 29th, 2011. The vehicle was initially examined at Plaintiff Ortega's residence in the location where she testified she parked her vehicle on a regular basis. The vehicle was parked outdoors in an open area beneath an overhead covering. A small amount of dead plant

**CONFIDENTIAL**

Ms. Esther K. Ro, Esq.
Sept. 09, 2016
Page 15

debris was present in the cowl area of the vehicle where air is drawn into the HVAC system.



*Plaintiff Ortega Vehicle Parking Space and HVAC Cowl Inlet Vent*

The exterior of Plaintiff Ortega's vehicle was in average condition with multiple scrapes, scratches, and small areas of rust.  The interior was marked by multiple stains on the interior fabrics and was heavily scented with multiple air fresheners consistent with the can of "Mahogany Teakwood" room spray, hanging air freshener, and clip on vent freshener found inside the vehicle.



*Sample of Air Fresheners Observed in the Ortega Vehicle*

Plaintiff Ortega's vehicle is equipped with a dual zone automatic A/C system with individual left and right automatic temperature controls.  At the time of our inspection, the A/C system was turned on and in the recirculation mode when the vehicle ignition was cycled to the on position.

**CONFIDENTIAL**

Ms. Esther K. Ro, Esq.
Sept. 09, 2016
Page 16



*Ortega Vehicle HVAC System Controls as Set When Parked*

As part of the initial examination, the engine was started and idled while the A/C system was operated in both the fresh air and recirculation modes.  While running, water was observed draining from the evaporator drain tube onto the ground beneath the vehicle, consistent with proper operation of the evaporator and drain tube system.  Each of the A/C system controls operated as expected and designed including the temperature, mode, zone, and fresh air/recirculation controls.



*Ortega Vehicle Evaporator Condensate Draining*

After the examination at Ms. Ortega's residence, the vehicle was driven to the Cabe Toyota dealership where it was placed on a hoist for further inspection and photo documentation of the vehicle and its HVAC unit.  The HVAC blower motor was removed so that the surface of the evaporator core could be examined and photographically documented using a borescope.  A cotton swab was used to take material samples from the evaporator surface. The cabin air filter was also removed, examined, photographically documented and swabbed to collect samples of surface

**CONFIDENTIAL**

Ms. Esther K. Ro, Esq.
Sept. 09, 2016
Page 17

contaminants for further analysis by industrial hygienist Jeffrey Hicks. The filter was of the non-charcoal variety and found to be extremely dirty and in my experience obviously in need of replacement.



*Ortega Vehicle Cabin Air Filter as Seen at the Time of Inspection*

During her deposition, Plaintiff Ortega described a moldy or "old dirty socks" smell that she could detect when the system was running in fresh air mode. She stated that this smell would stop "right away" once she put the system into the recirculated air mode. Plaintiff Ortega also stated that the odor has not changed over time and that she will even sometimes turn the A/C system off while keeping the mode switch in recirculate once the vehicle interior is cool. (Pg.145 lines 3-8) Plaintiff Ortega confirmed that she periodically sprays various interior surfaces, including the cabin air filter and floor mats, with the aerosol air freshener found in the vehicle. She stated that she may have been doing this for possibly up to three years. (Pg. 163 lines 4-6)

While at Cabe Toyota, the vehicle HVAC control computer was scanned and the HVAC system evaluated for odors using various combinations of blower, fresh air, recirc, and A/C on off settings including those described in Ms. Ortega's deposition. These included:
- A/C running in fresh air mode
- A/C running in recirculated air mode
- Blower fan running in fresh air with the A/C system turned off
- Blower fan running in recirc mode with the A/C system turned off

While certain combinations of control settings could create brief, intermittent instances of mild and barely detectable odors, none of the odors were strong, offensive, or continuous as described by Plaintiff Ortega in her deposition. In fact, the prevailing odors I detected in the vehicle were those of the air fresheners found in the vehicle at the time of our inspection. Additionally, the extremely dirty condition of the cabin air filter in Plaintiff

**CONFIDENTIAL**

Ms. Esther K. Ro, Esq.
Sept. 09, 2016
Page 18

Ortega's vehicle was indicative that the filter had not been replaced either recently or on a regular basis. According to the provided service documents, the only recorded dealer service replacement of the filter occurred at 29,509 miles on June 21, 2013 at Autonation Toyota Cerritos (SLS 00182)

*Plaintiff Salas's Vehicle*
Plaintiff Salas's vehicle was inspected in Los Angeles, California on August 9th, 2016. The vehicle is a 2014 Toyota Camry VIN 4T1BF1FK3EU█████ with 30,016 miles showing on the odometer at the time of my inspection. Plaintiff Salas purchased this vehicle used on June 20, 2015, with 16,049 miles showing on the odometer. The vehicle was initially examined at Mr. Salas's residence in the location where he testified he parked his vehicle on a regular basis. The vehicle was parked outdoors in an open area beneath an overhead covering with an overflowing and unemptied garbage dumpster nearby. Odors from the dumpster were obvious as was what appeared to be water damage to the ceiling surface over the parking area.



***Salas Vehicle Parking Location and Vicinity to Dumpster***

The cowl area of the vehicle where air is drawn into the HVAC system was found to be clear and free of debris but the vehicle itself was covered in a noticeable layer of dust and dirt. The vehicle was equipped with a manual A/C system which was observed to have been turned off and the air source set to fresh air when the vehicle was parked prior to our inspection. The interior was clean and neat with no noticeable odors or damage other than what appeared to be a cigarette burn hole in the driver side front seat cushion. According to Mr. Salas's deposition, the cigarette burn hole existed when he purchased his vehicle, which leads him to believe that the prior owner was a smoker.

As part of the initial inspection, the engine was started and idled while the A/C system was operated in both fresh air and recirculation modes. While running, water was observed draining from the evaporator drain tube underneath the vehicle consistent with proper operation of the evaporator and drain system.

**CONFIDENTIAL**

Ms. Esther K. Ro, Esq.
Sept. 09, 2016
Page 19



*Salas Evaporator Condensate Draining*

Each of the A/C system controls operated as expected and designed including the temperature, mode, zone, and fresh air/recirc controls. At the conclusion of the inspection at Mr. Salas's residence, the vehicle was driven to the Toyota of Glendale dealership for further inspection and photo documentation of the vehicle and its HVAC unit.

During the drive to the dealership, the controls of the A/C system were operated as Mr. Salas described in his deposition.  This was done in an attempt to recreate the odor condition he alleged was present in the vehicle.   He described those conditions as follows:

- The odor occurs when running the A/C system in the fresh air mode.
- The odor stops when the system is switched to the "recirc" mode.
- The system needs to run for 10 minutes or more for the odor to stop.
- The odor is more prevalent the more the vehicle is driven with the A/C running.

Mr. Salas also testified that the odor is present in his vehicle even after it has been parked with the A/C system turned off.  He stated that he has driven 2015 and 2016 Toyota Camrys that do not have any HVAC system odors at all.  (Pg.97 Lines 1-24)

During our drive I noted that certain combinations of the A/C system control settings could create very mild and intermittent instances of a warm, moist air odor from the HVAC system.  The odor(s) was very mild and marginally perceptible to me and was easily mitigated by adjusting the HVAC system settings.  The odor did not persist for ten minutes nor was it continuously present in the fresh air mode as Mr. Salas described.

While at the dealer, the HVAC blower motor was removed so that the surface of the evaporator core could be examined and photographically documented using a borescope. A cotton swab was used to take samples from the evaporator surface. The cabin air filter was also removed, examined, photographically documented, and swabbed to collect

**CONFIDENTIAL**

Ms. Esther K. Ro, Esq.
Sept. 09, 2016
Page 20

samples for further analysis by an industrial hygienist, Jeffrey Hicks.  The filter was found to be of the carbon type and in good condition not yet requiring replacement. The plenum area leading to the HVAC system intake was free of debris and a video recording was created to document the proper operation of the fresh air/recirculation door mechanism.

Atmospheric samples were also taken around and inside each of the vehicles with the A/C system in operation.  These samples were provided to industrial hygienist Jeffrey Hicks for analysis. It is my understanding that at the time of my report Mr. Hicks concluded that the levels of fungi reported in both vehicles do not present any increase in health risk relative to exposures found in the outdoor environment. (Hicks Expert Report, Key Opinions)

### *Opinions and Observations*

- The HVAC systems of the Subject Vehicles are not defectively designed.

- The overall design of the HVAC systems in the Subject Vehicles is typical of the design of other HVAC systems of similar sized vehicles manufactured by other OEMs.

- All automotive HVAC systems have the potential to experience odor issues at some time during their operating life.  Automotive HVAC odors are acknowledged by most if not all OEM vehicle manufacturers to be a service and maintenance issue and do not occur as a result of a defect within the HVAC system.

- While the Subject Vehicles have the same general HVAC structure, there are content and control algorithm variations in the HVAC system of the various vehicle model years that may affect the potential for, and occurrence of, odors.

- HVAC odors in the Subject Vehicles may occur as a consequence and combination of operational factors, maintenance factors, and environmental inputs to the vehicles and their HVAC systems.  The occasional occurrence of odors from the HVAC systems in some of the Subject Vehicles is not unusual or unique and the potential for their occurrence is not indicative of a common design defect within that system.

- During my inspection of Plaintiff Ortega's vehicle, the HVAC systems and controls of the vehicle functioned and performed as per their intended design. The odors that were experienced were minimal in occurrence and intensity and easily dissipated using the available control settings.

**CONFIDENTIAL**

Ms. Esther K. Ro, Esq.
Sept. 09, 2016
Page 21

- During my inspection of Plaintiff Salas's vehicle, the HVAC systems and controls of the vehicle functioned and performed as per their intended design. The odors that were experienced were minimal in occurrence and intensity and easily dissipated using the available control settings.

- Inspection of Plaintiffs' vehicles did not reveal any defect within those vehicles' HVAC systems and as such they do not support Plaintiffs' allegations of a common design defect with the HVAC systems of the Subject Vehicles.

These opinions and observations are provided with a reasonable degree of engineering certainty using currently available data. If additional information becomes available, including additional expert reports filed by the parties, I reserve the right to supplement this report and to offer additional opinions.

Very truly yours,

Robert M. Kuhn P.E.
Managing Engineer
Enclosures (2)

**CONFIDENTIAL**

Ms. Esther K. Ro, Esq.
Sept. 09, 2016
Page 22

**Appendix 1: Relevant Technical Literature Identified or Reviewed**

SAE Technical Paper          950016
*Air Quality and Odors Evaluation for Passengers Compartment*
Nathalie LeMaitre              Valeo Climate Control
Martine Meyer and Françoise      Burgun Renault

SAE Technical Paper          2004-01-0214
*Reduction of Odor Adhesion to Evaporator*
Masaaki Kawakubo, Osamu Kasebe, Kazuhisa Uchiyama,
Kengo Kobayashi, Etsuo Hasegawa and Toshio Ohara
Denso Corporation

*Analysis for Adsorbed Odor from Car Air Conditioner Evaporator*
Kazuhisa Uchiyama, Osamu Kasebe, Kengo Kobayashi, Shigeyuki Sato, Hiroshi Ito

SAE Technical Paper           2015-01-0354
*Analysis of Microorganism Causing Odor in an Air Conditioning System*
Ji Wan Kim, Tae Hee Lee      Hyundai Motor Company

SAE Technical Paper 930014, 1993, doi:10.4271/930014
*Particulate and Odor Control in Car Ventilation Systems*
Tadeusz Jaroszczyk T. J. Ptak Stephen L. Fallon Jon Wake
Nelson Industries, Inc.

SAE Technical Paper          2001-01-1430
*Subjective Odor Evaluation in Automotive Industry*
Samuel E. Lee, Visteon Corp.

**CONFIDENTIAL**



**JP Research, Inc.**
8451 Boulder Court, Suite 200, Commerce Township, MI  48390
Phone: (248) 564-7852 • Fax: (248) 564-7925 • www.jpresearch.com

## **Robert Kuhn**, PE
*Managing Engineer*

Mr. Robert Kuhn is a Managing Engineer in JP Research's Detroit area office. A skilled automotive systems engineer, Mr. Kuhn specializes in analysis of engineering design issues, instrumented testing and test data, analysis of warranty data, and investigation and analysis of failure events for a variety of vehicle types including passenger cars, SUVs, and light trucks. With significant vehicle (particularly powertrain and chassis) design, development, testing, and analysis experience in both hands-on and supervisory/management capacities, he brings a unique depth of knowledge to consulting projects.

At JP Research, Mr. Kuhn supports both vehicle OEM and component Tier Suppliers on a variety of mechanical system and vehicle projects ranging from individual on road vehicle components to marine and off road heavy equipment powertrain systems.  As a consultant, Mr. Kuhn has testified in state, federal, and international venues on a variety of technical matters.  His experience and depth of knowledge have allowed him to provide effective and compelling insight for his clients in cases involving crash investigation, warranty claims, class action and lemon law matters, vehicle recalls and investigations, patents and intellectual property, and real-world performance and design of vehicle- and non-vehicle-related products.

Prior to joining JP Research, Mr. Kuhn was a managing engineer with Exponent/Failure Analysis Associates.  While there he supervised engineering and analysis projects across a variety of industries, with particular focus on vehicle and vehicle system performance.  Many of these projects included full vehicle driving and performance evaluations of both on road and off road UTV/ROV-type vehicles.

While employed by DaimlerChrysler, Mr. Kuhn served in a number or positions including Vehicle Safety Office Chassis Systems Investigation Supervisor. During this assignment he worked directly with both corporate staff and the National Highway Traffic Safety Administration (NHTSA) on safety related investigations. In other positions he held lead roles in designing, developing, and testing complete vehicles and vehicle systems, including overseeing development for the Jeep Liberty (KJ) vehicle line.

In addition to his accomplishments in the automotive industry and technical consulting fields, Mr. Kuhn has assisted in the design and analysis of specialty truck equipment, solar powered cars, race, and specialty vehicles. He has also undertaken a variety of unique assignments including a six-month assignment as Manager of the US Army Rapid Equipping Force Laboratory in Kandahar, Afghanistan.  During this assignment Mr. Kuhn oversaw the design, development, and rapid prototyping of numerous electrical, mechanical, and electromechanical devices for US soldiers serving in the Afghanistan conflict.

Mr. Kuhn is also an instructor for the Society of Automotive Engineers and teaches an SAE course on "Engine Failure Investigation and Analysis" several times a year.  Most recently Mr. Kuhn was invited to be a guest lecturer in the mechanical engineering program at Yancheng Institute of Technology in Yancheng, China.  Mr. Kuhn also holds a Professional Engineering License in the State of Michigan, as well as two United States patents involving steering and suspension system designs.

CONFIDENTIAL

Robert Kuhn

### *Industry Experience and Expertise*
- Product design and development
    - Component, system, & vehicle level
- Instrumented performance and durability testing
    - Component, system & vehicle level
- Design FMEA (Failure Modes & Effect Analysis) creation
- DVP&R (Design Verification Plan & Report) creation
- Customer duty cycle evaluation and recreation
- Customer warranty review and root cause analysis
- Product Investigation and Recall Process (direct NHTSA interface)
- Full vehicle design, testing, & evaluation
- Powertrain and Chassis component design, analysis, testing, and evaluation

### *Consulting Experience and Expertise*
- Product/component failure and root cause analysis
- Instrumented product Testing and Evaluation
- Client development and design process review and evaluation
- Product Litigation support and testimony
- Arbitration Support and testimony
    - Patent and IP matters
    - Design Infringement
    - Manufacturing process review
    - International and domestic arbitration hearings
- Client support worldwide including Korea, China, United States, Singapore, Hong Kong, Afghanistan
- Product warranty
    - Review and analysis
    - Countermeasure evaluation and assessment
    - Root cause analysis and determination
- Class Action Lawsuit Support and Litigation
- ROV (recreation off-highway vehicles)
    - crash analysis and recreation
    - vehicle dynamics and driver performance evaluations

### *Education, Memberships, and Professional Honors*

| | | |
|---|---|---|
| University of Michigan, Dearborn, Michigan | M.S., Automotive Systems Engineering | 2001 |
| Carnegie Mellon University, Pittsburgh, Pennsylvania | B.S., Mechanical Engineering | 1984 |

**Licenses and Certification**

| | |
|---|---|
| Licensed Professional Engineer, Michigan, #6201035566 | 1990 |

**Patents**

| | |
|---|---|
| Patent 5,782,484: Short Long Arm Independent Suspension | 1998 |
| Patent 5,934,404: Rack & Pinion Steering System for Solid Front Axle (with L Delellis) | 1999 |

2

CONFIDENTIAL

Robert Kuhn

**Memberships / Professional Affiliations**
- Society of Automotive Engineers (SAE), Member
- SAE Instructor: "Engine Failure Investigation and Analysis," a 2-day SAE seminar taught several times a year, in various locations around the world. http://training.sae.org/seminars/c1344/
- Invited guest lecturer Yancheng Institute of Technology, Yancheng, China

---

### Professional Experience

**JP Research, Inc**., Detroit, Michigan
*Managing Engineer,* 2014–Present
Providing engineering and technical support for research, analysis, and litigation related projects. Project experience and expertise includes; vehicle testing and performance analysis; component design and performance analysis; vehicle and component development methods, computer simulations; review of intellectual property and patent claims, analysis of warranty and class action related claims, accident reconstruction for passenger car, truck, SUV and off-road vehicles.

**US Army Rapid Equipping Force (REF) Laboratory**, Kandahar, Afghanistan
*Manager*, April 2012 –October 2012
During a unique assignment while at Exponent, directed efforts at the US Army REF lab, which was responsible for the design, development, and fielding of electrical and mechanical equipment and systems for US troops serving in the Afghanistan conflict.

**Exponent, Inc. (**formerly **Failure Analysis Associates)**, Farmington Hills, Michigan
*Managing Engineer,* 2003–2014
Provided technical consulting, expert testimony, and analysis for a variety of clients including automotive OEMs, component and system manufacturers, off-road vehicle manufacturers, engine manufacturers, service parts suppliers, insurance companies, and others in both vehicle and non-vehicle related industries. Types of projects included product design, performance, development, testing, and warranty claims. Work involved the use of computer-aided engineering, analytical and statistical tools as well as instrumented testing, analysis, and evaluation of vehicle and product performance.

Responsibilities included project management (budgeting, planning, and execution), preparing technical reports and project presentations, and marketing of technical services to new and existing clients.

**DaimlerChrysler**, Detroit, Michigan
*Supervisor,* 1998–2003
Project responsibilities included:
Jeep Liberty (KJ) Vehicle Development & Synthesis Supervisor —
    Responsible for all aspects of the vehicle development process
Vehicle Safety Office Chassis Systems Investigation Supervisor—
    Responsible for project management and management presentations
    Interact directly with the NHTSA to coordinate safety related investigations
Jeep CKD Market Vehicle Design Supervisor—
    Responsible for all aspects of timing, design, and release of multiple Jeep platform products in Venezuela, Thailand, Egypt, and other "Complete Knock-Down" (CKD) kit markets on all vehicle systems, powertrain, and chassis.

3

**CONFIDENTIAL**

Robert Kuhn

**Chrysler / DaimlerChrysler**, Detroit, Michigan
*Senior Engineer,* 1995–1998
Jeep Platform Advanced Vehicle Engineering.
> Responsible for all future Jeep vehicle chassis, suspension, and powertrain packaging, layout, and concept design; coordination of prototype vehicle design and build; and coordination of concept design studies, modeling, and analysis of chassis, suspension, and powertrain systems.

**Ford Motor Company**, Dearborn, Michigan
*Development Engineer,* 1992–1995
6.8l V-10 Base Engine Development Planning and Testing
> Responsible for planning, coordination, and testing of prototype vehicle durability fleets, prototype engine build and test plan coordination and implementation, and creation of new engine testing protocols.

**Algor FEA Software**, Pittsburgh, Pennsylvania
*Field Engineer*, 1991–1992
*Midwest Field Service Engineer*
> Responsible for customer service, sales, training, and liaison for PC-based finite element analysis (FEA) software. Also provided FEA instruction, client project tutoring, and assistance.

**Chrysler Corp. / ARCAD**, Highland Park, Michigan
*Design & Development Engineer,* 1984–1991
> Responsible for exhaust system design, development, testing, planning, and release. While at the ARCAD project, responsibilities included chassis packaging, suspension design, and body structure analysis. Also part of the Large Car Platform Engine Development team.

---

### *Selected Presentations and Publications*

"Recreational Off-Highway Vehicle (ROV) Handling and Control," Society of Automotive Engineers 2012 World Congress, Detroit, MI; SAE Paper 2012-01-0239, 2012 (with JC Brown, R Larson, G Fowler).

"Effect of Weld Pitch Variation on the Performance of a Two Piece Spot-Welded Body Structure," SAE 2001 World Congress Detroit, MI; SAE Paper 02M-123, 2001.

4

**CONFIDENTIAL**

# TESTIMONY OF ROBERT KUHN

| Case | Testimony Date | Type of Testimony |
|------|----------------|-------------------|
| Mitchell v Hyundai | February 2012 | Deposition |
| Ogle v. Chrysler | February 2013 | Deposition |
| Automotive Gate vs. Heibei Zhongxing | December 2013 | Arbitration Hearing International Chamber of Commerce (Hong Kong) |
| Williams vs. Gander Mountain | March 2014 | Trial |
| Nelson vs. Nissan | April 2014 | Deposition |
| Bullock vs. Honeywell et. Al | January 2015 | Deposition |
| Hurley vs. Toyota et. Al | July 2015 | Deposition |
| Nexteer vs. KDAC | August 2015 | Arbitration Hearing (Singapore) |
| Schmidt vs. Ford | September 2015 | Deposition |
| Herbert vs. Ford/Takata | August 2016 | Deposition |
| Robinson vs. KIA | August 2016 | Deposition |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

CONFIDENTIAL

# Exhibit 9

# Know Howe  The latest news from Howe T...

search

18th September 2013    HVAC system maintenance

T-SB-0142-13 September 12, 2013

## HVAC Odor Maintenance

Service

Category

Vehicle Interior

Section

Heating/Air Conditioning Market USA

Applicability

YEAR(S) MODEL(S) ADDITIONAL INFORMATION

2004 – 2014 4Runner, Avalon,

Avalon HV, Camry,

Camry HV, Corolla, FJ

Cruiser, Highlander,

Highlander HV, Land

Dynamic Views template. Template images by Nic_Taylor. Powered by Blogger.

http://howemotors.blogspot.com/2013/09/hvac-system-maintenance.html

0115

1/6

Cruiser, Matrix, Prius,

Prius C, Prius PHV,

Prius V, RAV4,

Sequoia, Sienna,

Tundra, Venza, Yaris

Introduction

Some 2004 – 2014 model year Toyota vehicles may exhibit odors naturally occurring from the HVAC

system and/or related environmental factors. Although there is no way to eliminate these odors,

follow the General Procedure in this bulletin to minimize the odors experienced.

# Not Applicable to Warranty – – – –

Parts Information

MODEL MODEL YEAR PART NUMBER PART NAME

4Runner 2010–2014

Avalon 2007–2014

Avalon HV 2013–2014

Camry 2007–2014

Camry HV 2007–2014

Corolla 2009–2013

87139-50100 High Performance Charcoal Filter

© 2013 Toyota Motor Sales, USA Page 1 of 3

T-SB-0142-13 September 12, 2013 Page 2 of 3

## HVAC Odor Maintenance

Parts Information (Continued)

MODEL MODEL YEAR PART NUMBER PART NAME

Highlander 2008–2014

Highlander HV 2008–2014

Land Cruiser 2008–2014

Matrix 2009–2014

Prius 2010–2014

Prius C 2012–2014

Prius PHV 2010–2014

Prius V 2012–2014

RAV4 2006–2014

Sequoia 2008–2014

Sienna 2011–2014

Tundra 2007–2013

Venza 2009–2014

Yaris 2007–2014

87139-50100

Sienna 2004–2010

FJ Cruiser 2007–2014

Prius 2004–2009

0117

87139-33010

High Performance Charcoal Filter

General Procedure

When diagnosing HVAC odors it is important to remember the following possible causes:

• During use, various odors from inside and outside the vehicle may enter into and accumulate in

the air conditioning system. These odors may then be emitted from the vents.

• Odors coming from the outside air and interior can accumulate on the evaporator. As the

evaporator core changes temperature, some of these odors may be released resulting in an

unpleasant smell from the HVAC vents.

• Interior odors from sources such as air fresheners, animals, dirt, or trash can also accumulate

within the HVAC system and contribute to unpleasant odors.

• Odors emitted from the A/C system are a normal characteristic of automotive A/C systems.

• It is normal to experience odor upon the initial startup due to the moist/humid air that is trapped

in the HVAC system, after the vehicle has been parked.

© 2013 Toyota Motor Sales, USA

T-SB-0142-13 September 12, 2013 Page 3 of 3

## HVAC Odor Maintenance

General Procedure (Continued)

0118

NOTE

This procedure will NOT eliminate the odors experienced, but it's provided to help reduce the

intensity of these odors.

1. Confirm the condition as described in the

introduction.

If the condition is constant or is caused by outside

influences (such as debris) this bulletin may not

be effective in reducing the odors experienced.

2. Advise the customer to set the HVAC system to the outside (fresh) air mode when parking the

vehicle to assist in the reduction of odors that could be trapped in the HVAC system.

3. Replace the HVAC filter on an annual basis or every 10,000 miles with a charcoal impregnated

filter (refer to Parts Information for correct part).

4. If the condition still persists, conduct an A/C evaporator cleaning service on an annual or

bi-annual basis depending on climate conditions and customer preference.

NOTE

If the A/C evaporator cleaning service is not performed prior to the installation of the High

Performance Charcoal Filter, the filter may take several days to produce a noticeable

improvement in the A/C odor.

© 2013 Toyota Motor Sales, USA

Posted 18th September 2013 by Know Howe

2    View comments

0119

 Unknown  September 26, 2014 at 3:14 PM

This comment has been removed by the author.

Reply

---

 Unknown  September 26, 2014 at 3:16 PM

Since there is a TSB on this problem, it should have been disclosed by the salesperson before purchase.

Reply



# Exhibit 10

TOYOTA

Technical Service
**BULLETIN**

*May 9, 1997*

Title:

# AIR CONDITIONING EVAPORATOR ODOR

Models:

**All Models**

TSB

HEATING & AIR CONDITIONING

AC002–97

---

**Introduction**

A musty odor may be emitted from the air conditioning system of some vehicles which are usually operated in areas with high temperature and humidity.  It is most noticeable when the air conditioner is first turned  "ON" after the vehicle has been parked for several hours.  The odor could result from one or more of the following conditions:

1. Blockage of the evaporator housing drain pipe, resulting in the build up of condensate.
2. Microbial growth in the evaporator, arising from dampness in the evaporator housing where the cooling air flow is dehumidified.

To address excessive air conditioning evaporator odor, check the evaporator housing drain pipe for blockage.  If no problems are found, the evaporator and housing should be cleaned and disinfected using the general procedure given on page 2, and the model specific procedure on the pages indicated in the Table of Contents at the bottom of this page.

**Affected Vehicles**

● While this procedure may be used on any Toyota vehicle, this bulletin gives details specifically for the **AE100** Corolla, **SXV/VCV10** Camry, **MCX10** Avalon, **MX83** Cressida, **AT180/200** Celica, **ST184/204** Celica, **JZA80** Supra, **EL42/44/53** Tercel/Paseo, **TCR10/20** Previa, **FZJ80** Land Cruiser series as well as recent production Truck, Tacoma, T100, 4Runner and MR2 models.

**Tools & Materials**

| PART NUMBER | DESCRIPTION OF TOOLS & MATERIALS | QUANTITY | SOURCE |
|---|---|---|---|
| 08821–00810–01 | Spray Gun Kit | 1 | OTC |
| 08821–00811–01 | Spray Gun (replacement) | (1) | OTC |
| 08821–00812–01 | Spray Gun Nozzle (replacement) | (1) | OTC |
| 08821–00813–01 | Freshener Mixing Container (replacement) | (1) | OTC |
| 08821–00801–DS | Air Conditioning Freshener | 1 per vehicle | TMS |

> **CAUTION:**
> Wear safety glasses, protective mask, and gloves while working with the freshener.

**Table of Contents**

| MODEL | PAGE | MODEL | PAGE | MODEL | PAGE | MODEL | PAGE |
|---|---|---|---|---|---|---|---|
| General | 2 | Cressida | 6 | Tercel | 8 | 4Runner | 9 |
| Camry | 3 | Celica | 7 | Paseo | 8 | Truck | 9 |
| Corolla | 4 | Supra | 7 | MR2 | 9 | Tacoma | 9 |
| Avalon | 6 | Previa | 8 | Land Cruiser | 9 | T100 | 9 |
| General Procedure applies to all models and model years. The Specific Model Sections cover only the most recent models. | | | | | | | |

Toyota Supports ASE Certification

**AIR CONDITIONING EVAPORATOR ODOR** – AC002–97                    May 9, 1997

**General Procedure**

1. Preparation of freshener solution:

   (a)   Invert freshener container and shake vigorously for 30 seconds.
   (b)   Mix 3.4 fl. oz. of freshener (1 container) with 30 fl. oz. to make 1 qt. of solution.

2. Drying the evaporator:
   - Dry the evaporator for 10 minutes with the following settings:
     AC: ........... **Off**
     Air Outlet: ..... **Foot**
     Mode: ......... **Recirc.**
     Blower: ....... **High**
     Temp: ......... **Max Warm**

3. Evaporator Treatment Preparation:

   (a)   Ensure availability of 30–45 psi compressed air to be used with spray gun for application of freshener.
   (b)   Place a tray under the evaporator housing drain hose to collect used cleaning solution.
   (c)   Place shop cloth under the evaporator housing in the vehicle to prevent cleaning solution from dripping onto the floor mat.

4. Vehicle Preparation: **See specific model section.**

5. Evaporator treatment:

   (a)   Set HVAC mode as follows:
     AC: ........... **Off**
     Air Outlet: ..... **Face**
     Mode: ......... **Fresh**
     Blower: ....... **High**
     Temp: ......... **Max Warm**
     Windows: ..... **Open**
   (b)   Insert spray nozzle into the filter inlet and spray the entire quantity (1 qt.) of freshener solution into the evaporator while moving the nozzle around to cover the complete evaporator surface.
   (c)   Turn the blower OFF.

6. Reinstallation of Parts.

7. Completion of Treatment.

   (a)   Dry the evaporator for 30 minutes with the following settings:
     AC: ........... **Off**
     Air Outlet: ..... **Foot**
     Mode: ......... **Recirc.**
     Blower: ....... **High**
     Temp: ......... **Max Warm**
     Windows: ..... **Closed**
   (b)   If vehicle still has alcohol smell, open windows for ventilation.  Do not turn on the AC switch until the evaporator is completely dry as this can reduce the effectiveness of the solution.



**CAUTION**
**Do not get into the vehicle during this drying operation.**

**AIR CONDITONING EVAPORATOR ODOR** – AC002–97                               May 9, 1997

**Camry**          1. Removal of parts.

(SXV/VCV10)        (a)   Pull down the carpet from the center console as indicated by **red** arrow in the illustration.



(b)   Remove the plate on the side of the heater unit using steps and, indicated with red arrows to show direction, in the illustration.

> **CAUTION:**
> **1. Do not bend the cable.**
> **2. The plate will be reused.**



(c)   Remove the blower resistor.

2. Cleaning the Evaporator.

● Follow the general procedures given on page 2.



3. Reinstallation of parts.

(a)   Reinstall the plate on the side of the heater unit using steps and, indicated with red arrows to show direction, in the illustration.

> **CAUTION:**
> **Confirm that the plate is secure.**



(b)   Restore the carpet to its original position taking care not to bend the cable.

**AIR CONDITIONING EVAPORATOR ODOR** – AC002–97                    May 9, 1997

**Corolla**         1.  Removal of parts.

(AE100)              (a)   Remove the scuff plate from the
                           passenger side door sill.



                     (b)   Open the glove box door and
                           temporarily remove the Air Bag
                           Harness Cover as shown in the
                           illustration.

> **CAUTION:**
> **Do not disconnect the Air Bag Harness.**



                     (c)   Pass the cover up through the hole.

> **CAUTION:**
> **Take care not to pinch the Air Bag Harness when reinstalling the cover.**



                     (d)   Remove the glove box.



**AIR CONDITIONING EVAPORATOR ODOR** – AC002–97                    May 9, 1997

**Corolla**

continued

(e)   Remove the passenger side air duct.



Air Duct (Right Side)

(f) Remove the blower resistor to allow access for the spray nozzle (insert at **red** arrow).

2. Cleaning the Evaporator.

• Follow the general procedures given on page 2.



Blower Resistor

Insert Spray Nozzle

Cooling Unit

3. Reinstallation of parts.

• Reinstall the parts in the reverse order of removal described in step 1.

**CAUTION:**
**Make sure that the three guides of glove box are inserted back into the three holes as shown in the illustration.**



Glove Box Door

Hole

Guides

**CAUTION:**
**Take care not to pinch the Air Bag Harness when reinstalling the glove box.**



Cover

Glove Box Door

**AIR CONDITIONING EVAPORATOR** AC002–97                                            May 9, 1997

**Avalon**

(MCX10)

1. Removal of parts.

   (a) Remove lower finish panels.
   (b) If manual AC remove blower resistor.
   (c) If auto–AC remove power transistor.

2. Cleaning the Evaporator.

   • Follow the general procedures given on page 2.

3. Reinstallation of parts.

   • Reinstall the parts in the reverse order of removal described in step 1.



**Cressida**

(MX83)

1. Removal of parts.

   (a)   Remove glove box.
   (b)   Remove power transistor.

2. Cleaning the Evaporator.

   • Follow the general procedures given on page 2.

3. Reinstallation of parts.

   • Reinstall the parts in the reverse order of removal described in step 1.



Case 2:15-cv-08629-FMO-E   Document 85-5   Filed 12/07/17   Page 128 of 290   Page ID #:2234

**Celica**

(AT180/200)
(ST184/204)

1. Removal of parts.

   (a)   Remove glove box.
   (b)   Remove blower resistor.

2. Cleaning the Evaporator.

   ● Follow the general procedures given on page 2.

3. Reinstallation of parts.

   ● Reinstall the parts in the reverse order of removal described in step 1.



**Supra**

(JZA80)

1. Removal of parts.

   (a)   Remove the glove box, side air duct and the ECM.
   (b)   Remove evaporator cover.

2. Cleaning the Evaporator.

   ● Follow the general procedures given on page 2.

3. Reinstallation of parts.

   ● Reinstall the parts in the reverse order of removal described in step 1.



**AIR CONDITIONING EVAPORATOR ODOR** – AC002–97                    May 9, 1997

**Tercel/Paseo**

(EL42/44/53)

1. Removal of parts.

   (a)   Remove glove box.
   (b)   Remove blower resistor.

2. Cleaning the Evaporator.

   ● Follow the general procedures given on page 2.

3. Reinstallation of parts.

   ● Reinstall the parts in the reverse order of removal described in step 1.



**Previa**

(TCR10/20)

1. Removal of parts.

   (a)   Remove air duct and blower motor.

2. Cleaning the Evaporator.

   ● Follow the general procedures given on page 2.

3. Reinstallation of parts.

   ● Reinstall the parts in the reverse order of removal described in step 1.



**AIR CONDITIONING EVAPORATOR ODOR** – AC002–97                    May 9, 1997

**Land Cruiser**

(FZJ80)

1. Removal of parts.

    (a)    Remove glove compartment door.
    (b)    Remove blower resistor.

2. Cleaning the Evaporator.

   ● Follow the general procedures given on page 2.

3. Reinstallation of parts.

   ● Reinstall the parts in the reverse order of removal described in step 1.



**Blower Resistor**

**MR2,
T100,
Truck,
Tacoma,
4Runner
Other**

1. Removal of parts.

   ● Remove the blower motor.

2. Cleaning the Evaporator.

   ● Follow the general procedures given on page 2.

3. Reinstallation of parts.

   ● Reinstall the blower motor.



**Blower Motor**

# Exhibit 11

Case 2:15-cv-08629-FMO-E   Document 85-5   Filed 12/07/17   Page 132 of 290   Page ID #:2238

## Automatic A/C System Repair Techniques

Due to similarities between the refrigerant and control systems among different automatic A/C systems. most complaints can be diagnosed using standard A/C system tools and techniques. Take all appropriate measures in regard to personal safety around pressurized gases and electrical devices. Observe standard procedures for refrigerant recovery. recycling, evacuation and charging.

Automatic A/C systems may require wiring harness repairs, particularly following a collision. Since these  systems sense temperature conditions by looking at electrical resistance, proper wiring repairs are very important to system operation. Be sure to use the components and procedures of the Toyota Wiring Harness Repair Kit to avoid adding excess resistance to the automatic A/C circuit.

## A/C System Odors

A/C system odors are a common complaint among users, especially after start-up. Odors are primarily caused by one of two things:

1. Dirt or microscopic particles which are trapped in the evaporator. then later blown into the vents. This results in a "musty" or "stale" odor.

2. **Microbes** growing on the evaporator surfaces. These are later blown into the vent ducts. Microbes are small living bacteria which are carried into the evaporator case, then grow in the warm, moist environment. The Xenon tube in some rear A/C systems helps reduce these microbes.

3. Change the clean air filter when odor is detected.

There is no permanent mechanical repair for either type of odor. Replacing the evaporator or cleaning it with a strong chemical is only a temporary fix. The driver must change how the system is used.

To avoid evaporator odor, operate the system in the **FRESH** mode rather than in **RECIRC.** This allows a flow of clean, fresh air over the evaporator. The compressor should be switched **OFF** with the A/C switch while the fan runs for several minutes before shutting off the engine. In addition. park the vehicle with the windows slightly open with the system in the **FRESH** mode to allow the evaporator to dry out.

# Exhibit 12



5th & 6th Generation (2002-2006 & 2007-2011) Toyota Camry Discussion for years: 2002-2006 & 2007-2011 Topics of discussion range from fuel economy, safety, modifications, performance all involving America's favorite family car, the Toyota Camry.

09-06-2009, 11:46 PM Thread Starter post #1 of 8

njerald
'07 XLE

Join Date: Feb 2006
Location: Tacoma, WA
Posts: 6,123
Mentioned: 0 Post(s)
Tagged: 0 Thread(s)
Quoted: 0 Post(s)
Thanks: 0
Thanked 72 Times in 59 Posts
iTrader Score: 0 reviews
(Thread Starter)

GEN 6 T-SB-0261-09 August 6, 2009 HVAC Odor

2007 – 2010 Camry, Camry HV
2004 – 2008 Prius

Some Camry, Camry HV, and Prius models may exhibit an intermittent HVAC system odor. A newly designed evaporator sub-assembly has been made available to decrease the potential for HVAC odor.

This TSB applies to:
• 2007 – 2009 model year Tsutsumi produced Camry and Camry HV
• 2007 – 2010 model year TMMK produced Camry and Camry HV
• 2007 – 2010 model year TMMSIA produced Camry
• 2004 – 2008 model year Priusvehicles
**BEFORE** the Production Change Effective VINs shown below.

MODEL DRIVETRAIN PLANT PRODUCTION CHANGE EFFECTIVE VIN

Camry
2AZ Tsutsumi JTNBE46K#93165488
2GR Tsutsumi JTNBK46K#93040647
2AR TMMK 4T1BF3EK4AU506018
2GR TMMK 4T1BK3EK5AU597702
2AR TMMSIA 4T4BF3EK9AR017958

Camry HV
2AZ Tsutsumi JTNBB46K#93050107
2AZ TMMK 4T1BB3EKAU112760

Prius
1NZ Tsutsumi JTDKB20U#83394055
1NZ Toyota Auto Body JTDKB20U#87764355

Remove and replace the evaporator sub-assembly.

This repair is covered under the Toyota Comprehensive Warranty. This warranty is in effect for 36 months or 36,000 miles, whichever occurs first, from the vehicle's in-service date.

SEARCH

Featured Vehicle

2015 Toyota Camry
21/31 MPG hwy
Build | Prices

Auto Insurance

Get a Free Online Insurance Quote Now!

Premium Vendor Showcase

Wheels and Tires

Interactive Wheel System
See many of our wheels directly on your car!

Recent Discussions

## 10 Month HVAC Certificate

Earn your certificate in HVAC w/ Charter College - Request info!

○  ○

| | Quote | Quick Reply |
|---|---|---|



---

**09-07-2009, 01:26 AM**     post #2 of 8

**SE_2007**
Official TN Member

Join Date: May 2009
Location: minnesota
Posts: 107
Mentioned: 0 Post(s)
Tagged: 0 Thread(s)
Quoted: 0 Post(s)
Thanks: 0
Thanked 0 Times in 0 Posts
iTrader Score: 0 reviews

what happens ow that i'm past the warranty period?

| | Quote | Quick Reply |
|---|---|---|

---

**09-07-2009, 03:24 AM**     post #3 of 8

**compfreak**
Official TN Member
Join Date: May 2007
Location: N/A
Posts: 52
Mentioned: 0 Post(s)
Tagged: 0 Thread(s)
Quoted: 0 Post(s)
Thanks: 0
Thanked 0 Times in 0 Posts
iTrader Score: 0 reviews

How do you know if you have an affected VIN? Mine matches up in the beginning...

| | Quote | Quick Reply |
|---|---|---|

---

**09-07-2009, 03:39 AM**     post #4 of 8

**Luna2**

### Latest Toyota News

**Toyota Tacoma Diesel Not Worth it Says Chief Engineer**

Despite the fact that GM's new midsize pickup trucks are about

**2015 Toyota Yaris, Tacoma Recall Announced**

Toyota is recalling two of its models for separate problems. The

**Special Edition Camry, Corolla Debut in Red and Blue**

Toyota is showcasing special editions of the Corolla and Camry at the

**Today 01:18 AM** Grego 92's - 91' V6 LE... by BaronVonOttobat

**Today 01:16 AM** What's your MPG? by Bent Arrow

**Today 01:03 AM** This is the next... by Gibson99

**Today 01:02 AM** Hesitation when coasting... by juandelnorte

**Today 12:59 AM** Ant's (maybe one... by Haloruler64

**Today 12:57 AM** XenonDepot NEW Phillips... by OmoPastor

**Today 12:51 AM** door vibration/buzzing... by taco'rolla

**Today 12:46 AM** 10 Japanese cars from... by SuperchargedMR2

**Today 12:45 AM** DIY Rear Wheel Bearings... by Xylus

**Today 12:44 AM** 98 avalon xls doesn't... by pmesfun

0135

Twin & (1 of 8)

Join Date: Mar 2007
Location: Greenbush,
USA
Posts: 1,428
Mentioned: 0 Post(s)
Tagged: 0 Thread(s)
Quoted: 6 Post(s)
Thanks: 23
Thanked 170 Times in
161 Posts
iTrader Score: 1 reviews

Quote:
Originally Posted by compfreak

> How do you know if you have an affected VIN? Mine matches up in
> the beginning...

Quote:
Originally Posted by njerald

> 2007 – 2010 Camry, Camry HV
> 2004 – 2008 Prius
>
> *Some Camry, Camry HV, and Prius models may exhibit an*
> *intermittent HVAC system odor. A newly designed evaporator sub-*
> *assembly has been made available to decrease the potential for*
> *HVAC odor.*
>
> *This TSB applies to:*
> *• 2007 – 2009 model year Tsutsumi produced Camry and Camry HV*
> *• 2007 – 2010 model year TMMK produced Camry and Camry HV*
> *• 2007 – 2010 model year TMMSIA produced Camry*
> *• 2004 – 2008 model year Prius* vehicles
> BEFORE *the Production Change Effective VINs shown below.*
> MODEL DRIVETRAIN PLANT PRODUCTION CHANGE EFFECTIVE VIN
>
> Camry
> 2AZ Tsutsumi JTNBE46K#93165488
> 2GR Tsutsumi JTNBK46K#93040647
> 2AR TMMK 4T1BF3EK4AU506018
> 2GR TMMK 4T1BK3EK5AU597702
> 2AR TMMSIA 4T4BF3EK9AR017958
>
> Camry HV
> 2AZ Tsutsumi JTNBB46K#93050107
> 2AZ TMMK 4T1BB3EKAU112760
>
> Prius
> 1NZ Tsutsumi JTDKB20U#83394055
> 1NZ Toyota Auto Body JTDKB20U#87764355
>
> *Remove and replace the evaporator sub-assembly.*
>
> This repair is covered under the Toyota Comprehensive Warranty. This
> warranty is in effect for 36 months or 36,000 miles, whichever occurs first,
> from the vehicle's in-service date.

Before means less than = you are included in the tsb.

(MATCH) MODEL DRIVETRAIN PLANT PRODUCTION CHANGE EFFECTIVE
VIN and higher = already completed



2011 XLE, I4, AT, Sliver, New May 2, 2010
MFG 02/25/2010
Accident w/frame damage, got rid of car.
No Toyota in possession, now.

Last edited by Luna2; 09-07-2009 at 03:41 AM.

| Quote | Quick Reply |

---

09-07-2009, 05:38 AM                                                post #5 of 8

**ny_transplant**
New TN User

Join Date: Nov 2007
Location: Bear, DE
Posts: 11
Mentioned: 0 Post(s)
Tagged: 0 Thread(s)

Extended Service Contract

If you are above the 36K miles, would this be covered under the Platinum
Extended Service Contract?

0136



---

09-07-2009, 06:13 AM          post #6 of 8

**Luna2**
Twin & (1 of 8)

Join Date: Mar 2007
Location: Greenbush, USA
Posts: 1,428
Mentioned: 0 Post(s)
Tagged: 0 Thread(s)
Quoted: 6 Post(s)
Thanks: 23
Thanked 170 Times in 161 Posts
iTrader Score: 1 reviews

Quote:

> Originally Posted by ny_transplant
>
> If you are above the 36K miles, would this be covered under the Platinum Extended Service Contract?

No. I believe the following statement is very specific:

[This repair is covered under the Toyota Comprehensive Warranty. This warranty is in effect for 36 months or 36,000 miles, whichever occurs first, from the vehicle's in-service date.]

2011 XLE, I4, AT, Sliver, New May 2, 2010
MFG 02/25/2010
Accident w/frame damage, got rid of car.
No Toyota in possession, now.

Last edited by Luna2; 09-07-2009 at 06:24 AM. Reason: clarification

---

09-10-2009, 02:49 AM          post #7 of 8

**ophamTastic**
Official TN Member

Join Date: Apr 2009
Location: torrance/riverside
Posts: 226
Mentioned: 0 Post(s)
Tagged: 0 Thread(s)
Quoted: 0 Post(s)
Thanks: 0
Thanked 3 Times in 2 Posts
iTrader Score: 2 reviews

ah yes, will do this on my next service check. thanks njerald. i wonder why this thread got so little attention. i sure do recall tons of people complaining about their AC odor. i have a feeling someone will start another thread about AC odor...

---

09-10-2009, 06:12 PM          post #8 of 8

**camryen08**
Official TN Member

Join Date: Jun 2008
Location: East Bay, CA
Posts: 58
Mentioned: 0 Post(s)
Tagged: 0 Thread(s)
Quoted: 1 Post(s)
Thanks: 9
Thanked 2 Times in 2 Posts
iTrader Score: 0 reviews

Quote:

> Originally Posted by njerald
>
> MODEL DRIVETRAIN PLANT PRODUCTION CHANGE EFFECTIVE VIN
>
> Camry
> 2AZ Tsutsumi JTNBE46K#93165488
> 2GR Tsutsumi JTNBK46K#93040647
> 2AR TMMK 4T1BF3EK4AU506018
> 2GR TMMK 4T1BK3EK5AU597702
> 2AR TMMSIA 4T4BF3EK9AR017958

No 2AZ TMMK made included? ( 4T1BE46K... ) too bad, mine is 357xx miles now and has the smell 😕

Reply

Toyota Nation Forum : Toyota Car and Truck Forums > Toyota Passenger and Sports Car Forums > Camry and Solara
Forum > 5th & 6th Generation (2002-2006 & 2007-2011)

**Bookmarks**

Digg          del.icio.us          StumbleUpon          Google

**Quick Reply**

Message:

Options
☐ Quote message in reply?

Register Now

In order to be able to post messages on the Toyota
Nation Forum : Toyota Car and Truck Forums forums,
you must first register.
Please enter your desired user name, your email
address and other required details in the form below.
User Name:

If you do not want to register, fill this field only and the
name will be used as user name for your post.

Password
Please enter a password for your user account. Note
that passwords are case-sensitive.
Password:                    Confirm Password:

Email Address
Please enter a valid email address for yourself.
Email Address:

Log-in

User Name              ☐ Remember
Password                    LOG IN

Human Verification
In order to verify that you are a human and not a spam bot, please enter the answer into the
following box below based on the instructions contained in the graphic.



Please click to reveal the security code.

0138



Your Answer

POST QUICK REPLY GO ADVANCED

« Previous Thread | Next Thread

User Tag List

Posting Rules

You may post new threads
You may post replies
You may not post attachments
You may not edit your posts

BB code is On
Smilies are On
[IMG] code is On
HTML code is Off
Trackbacks are On
Pingbacks are On
Refbacks are On

Forum Rules

-- Toyota Forum

Contact Us | Advertise | Toyota Nation Forum : Toyota Car and Truck Forums | Archive | Privacy Statement | Top

Terms of Use

# Exhibit 13

| From: | Dwayne E Kinsey (TMS) on behalf of dwayne kinsey |
|---|---|
| To: | christopher hitt |
| CC: | ed quirk; russell suzuki; mike craik; mike robinson |
| BCC: | Osamu Sawanobori; Makoto Baba |
| Sent: | 5/16/2011 6:43:22 PM |
| Subject: | Re: ACTION REQUIRED AC info for consistent inspection. |
| Attachments: | 6030C8 AC odor Questionnaire .xls |

Chris,
Please see the attached file for questions regarding use and correctly
identify observations using the TMC AC Odor evaluation method.


Thank you in advance for your assistance,

Doc

(See attached file: 6030C8 AC odor Questionnaire .xls)
********************************
Dwayne E. Kinsey

Field Product Engineer
Product Quality Field Office - South East
Toyota Motor Sales USA, Inc.
9983 Pritchard Road
Jacksonville, FL 32219
Mail Stop: PM-89

Desk: 904.378.4561
********************************

Notice : This E-mail message and all attachments transmitted with it are
intended solely for the use of the original addressee('s) and may contain
legally privileged and confidential information.
If the reader of this message is not the intended recipient, you are hereby
notified that any dissemination , distribution , copying or other use of
this message or it's attachments is strictly prohibited.

If you have received this message in error, please notify the sender
immediately by E-mail reply and please delete this message from your
computer. Thank you.



Christopher
Hitt/TMS/Toyota
To
05/09/2011 05:08 Dwayne Kinsey/TMS/Toyota@Toyota
PM cc
Russell Suzuki/TMS/Toyota@Toyota,
Ed Quirk/TMS/Toyota@Toyota
Subject
Re: ACTION REQUIRED AC info for
consistent inspection.(Document
link: Dwayne Kinsey)




Doc,

Confidential                                    Toyota_Salas_00007942

# Exhibit 14

| | |
|---|---|
| **From:** | Dwayne Kinsey on behalf of dwayne kinsey |
| **To:** | Christopher Hitt |
| **Sent:** | 3/14/2012 7:47:38 PM |
| **Subject:** | Proposed agenda for HVAC activity |

```
Current idea is ...

Day 1-
Toyota Dealer - Al Hendrickson (Post 2010 vehicles)
Lexus Dealer - JM Lexus Competitor evaluation of possible Used cars/Trade
ins

Day 2 -
-Meet with SET at hotel in AM (8 - 10am)
Agenda to be developed
Topics will include impact of HVAC odor for SET, NCDS (buy back arbitration
comments by health care professionals and no supporting documents from
TMC/TMS to assist with issue.

-Dealer visit at Earl Stewart Toyota of North Palm Beach, FL.

Thanks
Doc


*******************************
Dwayne E. Kinsey

Field Product Engineer
Product Quality Field Office - South East
Toyota Motor Sales USA, Inc.
9983 Pritchard Road
Jacksonville, FL 32219
Mail Stop: PM-89

Desk: 904.378.4561
Cell: 904.████████
*******************************

Notice : This E-mail message and all attachments transmitted with it are
intended solely for the use of the original addressee('s) and may contain
legally privileged and confidential information.
If the reader of this message is not the intended recipient, you are hereby
notified that any dissemination , distribution , copying or other use of
this message or it's attachments is strictly prohibited.

If you have received this message in error, please notify the sender
immediately by E-mail reply and please delete this message from your
computer. Thank you.
```

Confidential

Toyota_Salas_00007899

# Exhibit 15

| | |
|---|---|
| **From:** | Percy Chan |
| **To:** | Francisco Euyoque; Guadalupe Perez |
| **CC:** | Enrique Orozco; Russell Suzuki |
| **Sent:** | 7/25/2013 6:15:48 PM |
| **Subject:** | RE: Please see the note below from TMS case mgr Lupe Perez |

Frank – thanks so much for your lightening service!!! The wrong suggestion shares some similarities with the old TSB shown below (being model/model generation specific). Someone might have got the idea from the TSB and created that invalid FAQ.

Thanks again Frank!

pc





**From:** Francisco Euyoque
**Sent:** Thursday, July 25, 2013 11:06 AM
**To:** Percy Chan; Guadalupe Perez
**Cc:** Enrique Orozco; Russell Suzuki
**Subject:** RE: Please see the note below from TMS case mgr Lupe Perez

Confidential

Hi Percy,

I removed the last section from the FAQ.  I confirmed it's no longer found on the FAQ on Toyota.com.

***If the condition already exists, spraying a mixture of isopropyl alcohol and water (1 to 5 ratio/mixture) or a disinfectant in the outside air intake may help reduce the smell. If these steps do not alleviate the odor, we encourage you to contact your local Toyota dealership for a thorough evaluation of the condition.***

Frank Euyoque
CEC Systems Planning Consultant
Toyota Motor Sales, USA
Phone (310) 974-7512
Fax (310) 974-5089



This email and any attachments may contain confidential and/or legally privileged communications. If you are not the intended recipient or if you received this email in error, you should immediately destroy it, as well as any attachments or copies. You are strictly prohibited from retaining.

---

**From:** Percy Chan
**Sent:** Thursday, July 25, 2013 10:54 AM
**To:** Guadalupe Perez
**Cc:** Francisco Euyoque; Enrique Orozco; Russell Suzuki
**Subject:** RE: Please see the note below from TMS case mgr Lupe Perez

Thanks so much for your quick answer Lupe!!!

Frank – we need to remove the last item highlighted below asap.

Thanks again!!!

Pc


*Russ – please let us know if more revisions will be needed. Thanks again.


What causes air conditioner odor? How can I prevent the odor from occurring?
During air conditioner operation, cold refrigerant is pumped through the evaporator core by an engine-driven compressor. A fan then blows air through "fins" in the evaporator to cool the air. These fins also act as an air filter, trapping bacteria, spores, and dirt. These airborne particles are normally washed out a drain hole with condensation, but if they remain on a moist evaporator, they may collect and cause an unpleasant odor. This effect is more frequently found in humid climates where more condensate accumulates. This situation is not unique to Toyota; it is an industry-wide condition.

To prevent the odor, Toyota recommends the following:

Avoid parking under trees to reduce the possibility of leaves entering the air intake.
Use the fresh air setting on your climate control rather than the recirculated air setting whenever possible to allow the evaporator to dry out.
Drive on paved roads whenever feasible as dusty conditions may accelerate the condition.
***If the condition already exists, spraying a mixture of isopropyl alcohol and water (1 to 5 ratio/mixture) or a***

0146

Confidential

*disinfectant in the outside air intake may help reduce the smell. If these steps do not alleviate the odor, we encourage you to contact your local Toyota dealership for a thorough evaluation of the condition.*

---

**From:** Guadalupe Perez
**Sent:** Thursday, July 25, 2013 10:51 AM
**To:** Percy Chan
**Cc:** Francisco Euyoque; Enrique Orozco; Russell Suzuki
**Subject:** RE: Please see the note below from TMS case mgr Lupe Perez

No, the info is in the FAQ's on Toyota.com.


# Lupe Perez

**Case Manager**
**Kansas City Region &**
**Southeast Toyota**
**Toyota Motor Sales, USA, Inc.**
**(310) 974-7498 – p**
**(310) 381-4010 – f**

 

---

**From:** Percy Chan
**Sent:** Thursday, July 25, 2013 10:50 AM
**To:** Guadalupe Perez
**Cc:** Francisco Euyoque; Enrique Orozco; Russell Suzuki
**Subject:** FW: Please see the note below from TMS case mgr Lupe Perez

Hi Lupe!

Did you locate the info below through KM? I have not been able to locate the same info. We need to delete the last item asap.

Thanks Lupe!

Pc


What causes air conditioner odor? How can I prevent the odor from occurring?
During air conditioner operation, cold refrigerant is pumped through the evaporator core by an engine-driven compressor. A fan then blows air through "fins" in the evaporator to cool the air. These fins also act as an air filter, trapping bacteria, spores, and dirt. These airborne particles are normally washed out a drain hole with condensation, but if they remain on a moist evaporator, they may collect and cause an unpleasant odor. This effect is more frequently found in humid climates where more condensate accumulates. This situation is not unique to Toyota; it is an industry-wide condition.

To prevent the odor, Toyota recommends the following:

Avoid parking under trees to reduce the possibility of leaves entering the air intake.

0147

Use the fresh air setting on your climate control rather than the recirculated air setting whenever possible to allow the evaporator to dry out.

Drive on paved roads whenever feasible as dusty conditions may accelerate the condition.

*If the condition already exists, spraying a mixture of isopropyl alcohol and water (1 to 5 ratio/mixture) or a disinfectant in the outside air intake may help reduce the smell. If these steps do not alleviate the odor, we encourage you to contact your local Toyota dealership for a thorough evaluation of the condition.*

# Lupe Perez

Case Manager
Kansas City Region &
Southeast Toyota
Toyota Motor Sales, USA, Inc.

---

**From:** Russell Suzuki
**Sent:** Thursday, July 25, 2013 9:16 AM
**To:** Percy Chan
**Subject:** RE: Please see the note below from TMS case mgr Lupe Perez

**From:** Webb, Eddie [mailto:eddie.webb@setoyota.com]
**Sent:** Thursday, July 25, 2013 7:03 AM
**To:** Russell Suzuki
**Subject:** Please see the note below from TMS case mgr Lupe Perez

Is alcohol or a disinfectant a suggested remedy?

Also they want to recommend Charcoal filters...

Give me a call when you get a chance

Thanks

*Eddie Webb*
*Dealer Technical Support Mgr*

*Southeast Toyota Distributors, LLC*
*9985 Pritchard Road*
*Jacksonville, FL 32219*

*p: 904-378-4833*
*c: 904-*

Please consider the environment before printing this e-mail.

*Classification: PROTECTED*

*"Protected" means this email, its contents and attachments, if any, are intended for use solely within the Toyota companies and appropriate Toyota business partners.*

*NOTICE: If you are not the intended recipient of this email message, or person responsible for delivering this message to the intended recipient, please notify the sender immediately by email reply of the misdelivery. Please do not copy, forward or otherwise share this message, its contents or attachments for any reason with any other person. Once you have notified the sender, please delete this message from your computer. Thank you.*

0148

# Exhibit 16

# Toyota / Lexus / Scion TAS Report

| Case Number: TA121030402 | | | VIN: 4T1BF1FK0CU■■■■ | | | Submitted Date: 12-APR-2012 | | Modified Date: 16-JUL-2012 |
|---|---|---|---|---|---|---|---|---|
| Model | Year | Mileage | Dealer Code | Region/Area | District | Status | Owner | Repair Date |
| Camry | 2012 | 5687 | ■■■■ | SET | 3 | CLOSED-WITHOUT RESOLUTION | Dwayne Kinsey | 04/12/2012 |

**Title:** Vehicle Interior Heating/Air Conditioning Unknown Condition-Not-Listed

### Case Condition

Customer States There Is A Smell From A/C Vents In The Morning. Compares Smell To Moldy Odor. Inspected Cabin Filter And Vents , No Obvious Concerns Found. >>> Case Opened By Tuttlet2 On [2012-04-12 12:17:50] >>> Case Closed By Lowerl07 On [2012-05-15 06:20:37] --------------- Lowerl07 At [2012-05-15 06:20:37] -------------- >>> Case Closed By Lowerl07 On [2012-05-15 06:20:37] >>> Case Closed By Kinseyd On [2012-07-16 12:15:25] -------------- Kinseyd At [2012-07-16 12:15:25] -------------- >>> Case Closed By Kinseyd On [2012-07-16 12:17:30] --------------- Kinseyd At [2012-07-16 12:17:30] ---------------

### Suggestion

Shawn Taylor At 321-480-9355.  Advised To Confirm Odor And Follow Up. Also To Take Photos Of Customer Settings And Cabin Air Filter. --------------- Tuttlet2 At [2012-04-12 12:17:49] ---------------  Confirmed Odor At Start Up. Controls On About 70 Degrees And Recirc. Odor Described As Musty And Disipated After About 10 Seconds. Advised No Repair At This Time And Question If Customer Is Open To Inspection If Requested.  --------------- Tuttlet2 At [2012-04-13 07:25:06] ---------------

### Repair

****Status Changed To Open-No Activity At [2012-05-14 00:08:42]  By T3monitor Due To 30 Days Of Inactivity. --------------Close Request---------------- Was Advised By Tech Support Not To Attempt Repair. Concern Was Being Investigated By Technical. ----------Taylors14 At [2012-05-14 10:28:16]---------- --------------- Lowerl07 At [2012-05-15 06:20:37] -------------- --------------- Kinseyd At [2012-07-16 12:15:25] -------------- Summary Is That Vehicel'S Hvac Systme Is Operating At And Is Within The Perameters Of It'S Design. No Further Replacementparts, Repairs Or Adjustments Are Recommended At This Time. -------------- Kinseyd At [2012-07-16 12:17:30] ---------------

Confidential                                                                                      Toyota_Salas_00006029

# Exhibit 17

**Certified Copy**

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

| | |
|---|---|
| ALFRED SALAS and GLORIA ORTEGA, individually, and on behalf of a class of similarly situated individuals, | ) ) ) ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| vs. | ) CASE NO. |
| | ) 2:15-cv-08629FMO(Ex) |
| TOYOTA MOTOR SALES, U.S.A., INC., a California corporation, | ) ) |
| | ) |
| Defendants. | ) |
| _____ | ) |

C O N F I D E N T I A L

DEPOSITION OF DWAYNE KINSEY

TAKEN ON THURSDAY, JUNE 30, 2016

Reported by:    ADRIANA M. LETENDER
                CSR No. 11006

DEPOSITION OF DWAYNE KINSEY

```
 1   or very subjective comment of "Smells moldy."  Again, what
 2   may smell bad to one person, may not smell bad to another
 3   person.  Yes, it was confirmed by either Shawn Taylor or
 4   Tim Tuttle that there was an odor, confirmed odor at start
 5   up, all right.  We don't know what this odor was, other
 6   than we know that it happens at start up.  We know that
 7   Komori odor typically happens at start up.  We don't know
 8   if it was a result of something that was introduced to the
 9   vehicle or if it was -- the operational characteristics
10   of this vehicle, meaning where it was operated.  If it
11   was -- if the person was eating inside the vehicle or
12   anything.  We don't know what environmental impact had
13   occurred on this vehicle yet.  All that we were able to
14   determine was at this point it's operating within design
15   parameters and so there was no repairs necessary at this
16   time.
17   BY MR. PADGETT:
18        Q    So with all those unknowns you were still able
19   to determine that this customer was not entitled to
20   any replacements, any repairs or any adjustments?
21        A    At this time.
22        Q    Based on this complaint that there is a smell
23   of a moldy odor?
24        A    That's correct.  Because at this time all the
25   warrantable parts on the vehicle were operating as
```

DEPOSITION OF DWAYNE KINSEY

1    designed.  There was nothing wrong with them.

2        Q    What do you mean when you say "There was nothing

3    wrong"?  If there's a customer that's smelling mold or

4    moldy odor coming out of an air-conditioning system,

5    would you say that's nothing wrong?

6            MR. SCHRADER:  Objection.  Compound.

7    Argumentative.

8            THE WITNESS:  I'm not saying that there was

9    nothing wrong with what -- with what the customer was

10   experiencing.  I'm saying that we could not identify

11   anything wrong with any component of the vehicle itself.

12   BY MR. PADGETT:

13       Q    Did you test this vehicle for mold?

14       A    No.  I did not test this vehicle for mold.

15       Q    Did anybody, as far as you know?

16       A    As far as I know, no.  No one tested this vehicle

17   for mold.  As far as I know.  I don't know if this ended up

18   being one of the vehicles that we chose as a recovery part

19   or not.

20       Q    Showing you what's been marked as Plaintiffs'

21   Exhibit 3.

22           (Exhibit No. 3 was marked for identification.)

23   BY MR. PADGETT:

24       Q    Going back to Exhibit 2 for a second.  Is it

25   common to make a decision without testing for mold?

# Exhibit 18

# Toyota / Lexus / Scion TAS Report

| Case Number: TA123390227 | | | | VIN: 4T1BK1FK2CU█████ | | Submitted Date: 04-DEC-2012 | | Modified Date: 01-MAR-2013 |
|---|---|---|---|---|---|---|---|---|
| Model | Year | Mileage | Dealer Code | Region/Area | District | Status | Owner | Repair Date |
| Camry | 2012 | 4805 | █████ | SET | 3 | CLOSED-WITHOUT RESOLUTION | Dwayne Kinsey | 12/04/2012 |
| **Title:** Vehicle Interior Heating/Air Conditioning Unknown Abnormal Smell | | | | | | | | |

**Case Condition**

Customer States Strange Smell From Air Conditioning>>> Case Closed By Lowerl07 On [2012-12-04 12:42:46]  -------------- Lowerl07 At [2012-12-04 12:42:46] -------------- >>> Case Closed By Lowerl07 On [2012-12-04 12:42:46] >>> Case Closed By Cooke On [2013-02-20 20:29:50] -------------- Cooke At [2013-02-20 20:29:50] -------------- >>> Case Closed By Kinseyd On [2013-02-27 16:00:36]  -------------- Kinseyd At [2013-02-27 16:00:36] -------------- >>> Case Closed By Kinseyd On [2013-03-01 10:03:53]  -------------- Kinseyd At [2013-03-01 10:03:53] ---------------

**Suggestion**

Customer States There Is An Abnormal Odor Coming From The A/C Vents When The Vehicle Is Started In The Morning.  Technician Was Unable To Duplicate Any Smell After The Vehicle Sat Overnight.  Technician Does Smell The Remnants Of Some Type Of Tropical Air Freshener Even Though He Could Not Find Any Air Fresheners Present.  The Interior Is Spotless Inside.  No Action Taken.  Advised Customer To Use Fresh Air As Much As Possible.  -------------- Lowerl07 At [2012-12-04 12:42:46] ---------------

**Repair**

Ftr Issued For Hvac Odor Inspection   -------------- Kinseyd At [2013-02-27 16:00:36] ---------------

**Monday, June 13, 2016**

**Page 1    of   1**

Confidential

Toyota_Salas_00006030

Exhibit 19

# Toyota / Lexus / Scion TAS Report

| Case Number: TA130920061 | | | | VIN: 4T1BF1FK3CU■■■■ | | | Submitted Date: 02-APR-2013 | | Modified Date: 15-APR-2013 |
|---|---|---|---|---|---|---|---|---|---|
| Model | Year | Mileage | Dealer Code | Region/Area | District | Status | | Owner | Repair Date |
| Camry | 2012 | 12414 | ■■■■ | SET | 1 | CLOSED-FIXED | | Dwayne Kinsey | 04/02/2013 |
| Title: Vehicle Interior Heating/Air Conditioning Vents/Outlets Abnormal Smell | | | | | | | | | |

**Case Condition**

C/S Bad Odor Coming From Ac Vents >>> Case Opened By Buskeg On [2013-04-02 06:49:56] >>> Case Closed By Kinseyd On [2013-04-15 12:41:00] -------------- Kinseyd At [2013-04-15 12:41:00] -------------- >>> Case Closed By Kinseyd On [2013-04-15 12:41:00]

**Suggestion**

No Repairs Have Been Made To This Veh.  Pqfo Go And See Will Be Performed Today.  Dealer Associate Veh.  -------------- Buskeg At [2013-04-02 06:49:55] --------------  Vehicle Was Inspected As Requested For Odor From Hvac System On 04/02/2013  And 04/03/2013.  04/02/13 An Odor Was Detected To Be Coming From The Dash Vents Upon Initial Start Up Of The Hvac System After Vehicel Had Been Sitting.  Odor Lasted For Approximately 20 Seconds.   Vehicle  Running With Ac On Vehicle Was Allowed To Sit With Air Supply In Fresh Air Mode For 12 Hours.   Odor Still Present With Same Intensity After 12 Hour Fresh Air Soak.   Recommend Replacing Evap Core.  -------------- Kinseyd At [2013-04-09 08:48:28] --------------  Corrected Previous Spelling Errors  -------------- Kinseyd At [2013-04-09 09:05:01] --------------

**Repair**

Confidential                                                                                         Toyota_Salas_00006032

Exhibit 20

Certified Copy

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

| | |
|---|---|
| ALFRED SALAS and GLORIA ORTEGA, individually, and on behalf of a class of similarly situated individuals, ) ) ) ) | |
| Plaintiffs, ) | |
| ) | |
| vs. ) | CASE NO. |
| ) | 2:15-cv-08629FMO(Ex) |
| TOYOTA MOTOR SALES, U.S.A., INC., a California corporation, ) ) | |
| ) | |
| Defendants. ) | |
| ———————————————————) | |

C O N F I D E N T I A L

DEPOSITION OF DWAYNE KINSEY

TAKEN ON THURSDAY, JUNE 30, 2016

Reported by:   ADRIANA M. LETENDER
               CSR No. 11006

DEPOSITION OF DWAYNE KINSEY

```
1    odor.  I was tested at TTC Ann Arbor, Michigan to determine

2    if I was able to detect certain -- a specific amount of

3    an odor within a compound and I passed that test.  I was

4    certified to be able to pick out this odor that's related

5    to HVAC odor for the Komori odor itself.

6        Q    What's the compound that you just mentioned?

7        A    I can't remember the technical name of it.

8        Q    Do you remember the non-technical name?  Could you

9    describe it in any way?

10       A    Yes.  It's, like, smelling a gym bag, basically.

11   A dirty, sweaty gym bag or a dirty, sweaty gym bag, as well

12   as wet rag smell.  A sour wet rag.

13       Q    Does that smell indicate the presence of

14   bacteria?

15       A    Not necessarily, no.

16       Q    Why do you say, "Not necessarily"?

17       A    Because there are other things that can smell

18   very similar to that.

19       Q    What other things?

20       A    You have amines that are very close to that.

21   A-m-i-n-e-s.

22       Q    Do amines come --

23            MR. SCHRADER:  I don't know if he's finished.

24            THE WITNESS:  You have some silicones that will

25   actually as they're degrading will smell like this and
```

# Exhibit 21

Id Number Creation Time Case History Long 2000 Seeks Stated Reg Code Coding Type Category Component Ve
Year Ve Model Contact Method Case Source Dealer 1 Problem Area Condition Ve Vin





1209260419 9/26/2012 "*** 2012/09/26 08:01:26 CALL - INBOUND ***
CUST STS HE IS EXPERIENCING A VERY FOUL AND OBNOXIOUS ODOR FROM HVAC SYSTEM. CUST
STS HE HAS ABOUT 11K MILES AND ABOUT A FEW THOUSAND MILES. CUST STS HE NOTICED THE
SMELL. CUST STS SMELL BECAME STRONGER AND HAD HEADACHES AND ALLERGIES. CUST STS
THE SMELL IS A PROBLEM FOR HIS ASTHMA AND ALLERGIES. CUST STS THE SMELL IS A PROBLEM
FOR HIS DAUGHTER AND WIFE. CUST STS HE WENT TO DLR AND DLR STS IT'S DUE TO A DIFFERENT
COATING SPRAYED IN EVAPORATOR CORE. DLR STS SAID SEVERAL COMPLAINTS, DLR STS THEY
WOULD ADD A CARBON CHARCOAL FILTER AND CLEAN OUT THE EVAPORATOR CORE COULD HELP
THE SITUATION TEMPORARILY, BUT DLR ADV THAT IT WILL GET WORSE.

CUST SKS AN ANSWER TO SEE IF WE CAN DO SOMETHING ABOUT THIS, WILL WE DO SOMETHING
ABOUT THIS, AND WHAT ARE HIS OPTIONS.

NCR APOL AND ADV CUST THAT WE HAVE DOCUMENTED THE CONCERN. NCR WAS ABLE TO FIND
OUT THAT PER TECH ROGER MCPHAIL, IF CUSTOMER TURNS OFF RECIRCULATED AIR BUTTON FOR
ABOUT A WEEK WHILE USING THE VEH, THAT SHOULD EVAPORATE ALL THE CONDENSATION
BUILDING IN THE HVAC SYSTEM AND THAT SHOULD ADDRESS THE ISSUE. NCR ADV CUST TO DO
THAT AND IF PROBLEM PERSISTS, VISIT DLR AND CALL US BACK. NCR PROVIDED CASE NUMBER IN
AN EMAIL.CUSTOMER

*** 2012/09/26 08:29:13 EMAIL - OUTBOUND ***
DEAR  LARKINS:

THANK YOU FOR CONTACTING TOYOTA MOTOR SALES, INC. YOUR CASE IS FILED AT OUR
HEADQUARTER OFFICE UNDER YOUR NAME AND FILE #1209260419.


IF YOU HAVE ANY FURTHER QUESTIONS, PLEASE CONTACT US AT 800-331-4331. OUR HOURS OF
OPERATION ARE 5:00 AM TO 6:00 PM PST MONDAY THROUGH FRIDAY AND 7:00 AM TO 4:00 PM PST
SATURDAY.


SINCERELY,

LEO OBASOHAN
TOYOTA CUSTOMER EXPERIENCE

PLEASE DO NOT ATTEMPT TO RESPOND TO THIS MESSAGE. WE CANNOT ACCEPT ELECTRONIC
REPLIES TO THIS E-MAIL.CUSTOMER

*** 2012/11/28 12:35:43 CALL - INBOUND ***
" 0 0 22 COMPLAINT PRODUCT HVAC SYSTEM 2012 CAMRY CALL - INBOUND CUSTOMER 16057
ABNORMAL CONDITION ODOR

# 3

file://1/...duced%20by%20D°o20(Toyota_Salas_00006029%o20-°%2000017888)/TOY_SAL003/TEXT/TEXT002/Toyota_Salas_00013764.txt[7/11/2016 3:25:11 PM]

LIKE SOME MOLD SMELL. STS WHENEVER SWITCHING OVER TO A/C, IT GOES OFF.

CLLR SKS TO KNOW IF THERE IS ANYTHING THAT CAN BE DONE TO ADDRESS THE ODOR ISSUE.

NCR APOL & ADV CLLR THAT THE CNCRN SHOULD BE TAKEN TO A TOY DLR FOR AN INSPECTION AS TO WHAT IS CAUSING THE ODOR. ADV CLLR THERE ARE NO TSB'S OR SSC'S FOR THE ISSUE.CUSTOMER

" 0 0 0 COMPLAINT PRODUCT HVAC SYSTEM 2012 CAMRY HYBRID CALL - INBOUND CUSTOMER 0 ABNORMAL CONDITION ODOR

1309302669 9/30/2013 "*** 2013/09/30 15:57:36 EMAIL - INBOUND ***
===PA===
E█████
MARSHALL
4T1BD1FK8CU█████
130928-000223
09/28/2013 09:24 PM
WARRANTY ASSISTANCE

FOR THE PAST YEAR NOW I HAVE HAD AN INTENSE, FOUL ODOR, SMELLING LIKE MILDEW COMING FROM THE AIR CONDITIONING SYSTEM. I HAVE HAD AN AFTERMARKET SERVICE DONE TO FLUSH THE EVAPORATOR, I HAVE DRIVEN FOR WEEKS WITHOUT RECIRCULATE ON, AND I HAVE DRIVEN IN THE HEAT WITH NO AC FOR TEN DAYS STRAIGHT AS DIRECTED BY THE DEALERSHIP, WITH NO SUCCESS. I HAVE BEEN TOLD BY TOYOTA OF THE DESERT THAT THERE IS NOTHING THAT CAN BE DONE FOR ME, ONCE AGAIN THEY RECOMMEND THAT I DRIVE THE VEHICLE WITHOUT RECIRCULATE ON FOR A WEEK TO ALLOW THE SYSTEM TO DRY. LET ME START BY SAYING IT IS COMPLETELY RIDICULOUS TO ASK SOMEONE TO EXPOSE THEMSELVES TO AN UNHEALTHY SITUATION ( BREATHING MOLD OR MILDEW SPORES) TO FIX AN OBVIOUS DESIGN FLAW. I HAVE LEFT MY CAR AT TOYOTA FOR THREE WEEKS NOW WAITING FOR A CALL BACK FROM CORPORATE TOYOTA, WITH NO SUCCESS. I AM NOT WILLING TO DRIVE THIS CAR IN ITS CURRENT CONDITION, I HAVE ASTHMA AND YOUNG CHILDREN, WHOSE HEALTH I WILL NOT RISK. I CURRENTLY OWN A TUNDRA, THIS CAMRY HYBRID AS WELL AS A 2013 PRIUS, I WILL NOT BUY ANOTHER TOYOTA IF THIS ISSUE DOES NOT GET RESOLVED. I LOOK FORWARD TO RECEIVING A PROMPT RESPONSE.CUSTOMER

*** 2013/09/30 16:22:59 EMAIL - OUTBOUND ***
DEAR MR. MARSHALL,

THANK YOU FOR CONTACTING TOYOTA MOTOR SALES, U.S.A., INC.

WE APOLOGIZE FOR THE CONCERN WITH THE ODOR COMING FROM THE AIR CONDITIONING SYSTEM IN YOUR 2012 TOYOTA CAMRY HYBRID AND HAVE FORWARDED YOUR EMAIL TO A CASE MANAGER.  THE CASE MANAGER ASSIGNED TO YOUR CASE WILL BE YOUR POINT OF CONTACT DURING THE REVIEW OF YOUR SPECIFIC SITUATION.

WE HAVE ADVISED THE CASE MANAGER OF THE CONTACT INFORMATION THAT YOU PROVIDED IN YOUR EMAIL, AND THEY WILL FOLLOW UP WITH YOU BEFORE BY THE END OF BUSINES" 0 0 11 COMPLAINT PRODUCT HVAC SYSTEM 2012 CAMRY HYBRID EMAIL - INBOUND CUSTOMER 4076 ABNORMAL CONDITION ODOR

1211081802 11/8/2012 "*** 2012/11/08 14:19:48 CALL - INBOUND ***
===PA===

# Exhibit 22

| From: | Dwayne Kinsey |
|---|---|
| To: | Mike Robinson |
| CC: | Andrew Curtin |
| Sent: | 2/14/2013 8:56:34 PM |
| Subject: | Follow up to LL Hearing observation activity this week |

Mike,

I wanted to take a few moments today and express a few concerns I've noted thus far in attending the Florida Lemon Law Hearings.

First a little prefacing for you...

All Florida Lemon Law hearings are public hearings and a brief summary of the cases are provided through Public access on the following link

http://myfloridalegal.com/pages.nsf/Main/696c4cd4b287529085256cc9005d5869

The latest case which will be posted later this year.
This case in particular I found interesting as in the customers letter of explanation for Lemon Law Arbitration they stated that they were contacted by Celeste Knight from the
Executive offices of Toyota as result of them having written an e-mail to Jim Lentz.

· This is the first time I have heard of a customer having contacted Mr. Lentz directly for such a matter.

This letter also has LL Board decisions cited from other case summaries involving Toyota's with HVAC odor complaints.
There are other manufacturers as well however the board nor the SET Reps mentioned those facts.

· Concern with this is that even though the reviewing board members know that this is an issue which there are at least 3 other manufactures have defended
the Fort Lauderdale board refuses to base its decision on facts and rather seems to look for any reason  to back the consumers position.
Not that it is a Mfg. Vs. Consumer issue but more that the board refuses to see the true evidence they have provided themselves with finding that this is truly
an issue which is seemingly Geographically based due to environmental conditions.

I was able to record the case and will put together a PPT to send to you on proposal we spoke of earlier this month.

Thanks
Doc
*********************************
Dwayne E. Kinsey
Field Product Engineer

Field Technical Operations
Product Quality Field Office - South East
Toyota Motor Sales USA, Inc.
9983 Pritchard Road
Jacksonville, FL 32219
Mail Stop: PM-89

Desk:  904.378.4561
Cell:   904.███████
Cell2:  904.███████

0166

Toyota_Salas_00095862

Exhibit 23

CERTIFIED COPY

1          UNITED STATES DISTRICT COURT

2        CENTRAL DISTRICT OF CALIFORNIA

3

4

ALFRED SALAS and GLORIA          )
5   ORTEGA, individually and on    )
    behalf of a class of           )
6   similarly situated             )
    individuals,                   )
7                                   )
              Plaintiffs,           )
8                                   )
        vs.                         )  Case No.
9                                   )  CV15-08629FMO(Ex)
    TOYOTA MOTOR SALES, U.S.A.,     )
10   INC., a California             )
    corporation,                   )
11                                  )
              Defendant.            )
12   _____)

13

14

15

16        VIDEOTAPED DEPOSITION OF GLORIA ORTEGA

17                June 17, 2016

18

19

20

21

22

23

24   JOANNA B. BROWN, CSR No. 8570, RPR, CRR, RMR.
       410004

25

BARKLEY
Court Reporters
barkley.com

SINCE 1972

(310) 207-8000 Los Angeles      (415) 433-5777 San Francisco   (949) 955-0400 Irvine        (858) 455-5444 San Diego
(310) 207-8000 Century City     (408) 885-0550 San Jose        (760) 322-2240 Palm Springs  (800) 222-1231 Carlsbad
(916) 922-5777 Sacramento       (800) 222-1231 Martinez         (702) 366-0500 Las Vegas     (800) 222-1231 Monterey
(951) 686-0606 Riverside        (818) 702-0202 Woodland Hills   (702) 366-0500 Henderson     (516) 277-9494 Garden City
(212) 808-8500 New York City    (347) 821-4611 Brooklyn         (518) 490-1910 Albany        (914) 510-9110 White Plains
(312) 379-5566 Chicago          00+1+800 222 1231 Paris         00+1+800 222 1231 Dubai      001+1+800 222 1231 Hong Kong

BY MS. RO:

     Q     Yeah, I personally -- I would like to know
what you personally believe, what harm or injury or
damages you've suffered --

          MR. PADGETT:  The same -- sorry.

BY MS. RO:

     Q     -- as a result of the alleged defect.

          MR. PADGETT:  Same objections.

BY MS. RO:

     Q     I just want to know, personally, what you
think.

     A     It's -- you know, by me buying the car, it's a
huge loss.  You know, I feel like I got cheated by
buying this car, you know.  For me, 20,000, whatever it
costs, is a lot of money for me.  You know, I feel like
I got lied to.  You know, if I would have been -- if I
would have known I would have had this much issues, I
would have not bought the car at all.

          So I feel like I got lied to.  I would have
not bought the car at all.  And like I said, I'm not an
expert, but I would have not bought the car.

     Q     Okay.  Anything else?

     A     No.

          MS. RO:  Let's take a quick break, please.

          THE VIDEOGRAPHER:  We are off the record at

237

BARKLEY
Court Reporters

Exhibit 24

CERTIFIED COPY

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA


ALFRED SALAS and GLORIA ORTEGA,          )
individually, and on behalf of a class   )
of similarly situated individuals,       )
                                         )
                    Plaintiffs,          )
                                         )
          vs.                            )   No. CV15-08629
                                         )   FMO (Ex)
                                         )
TOYOTA MOTOR SALES, U.S.A., INC., a      )
California corporation,                  )
                                         )
                    Defendant.           )
_____  )


DEPOSITION OF ALFRED SALAS

June 15, 2016


ANNA B. SACRIPANTI, CSR No. 9533
   409448


SINCE 1972

BARKLEY
Court Reporters
barkley.com

(310) 207-8000 Los Angeles      (415) 433-5777 San Francisco    (949) 955-0400 Irvine           (858) 455-5444 San Diego
(310) 207-8000 Century City     (408) 885-0550 San Jose         (760) 322-2240 Palm Springs     (800) 222-1231 Carlsbad
(916) 922-5777 Sacramento       (800) 222-1231 Martinez         (702) 366-0500 Las Vegas        (800) 222-1231 Monterey
(951) 686-0606 Riverside        (818) 702-0202 Woodland Hills   (702) 366-0500 Henderson        (516) 277-9494 Garden City
(212) 808-8500 New York City    (347) 821-4611 Brooklyn         (518) 490-1910 Albany           (914) 510-9110 White Plains
(312) 379-5566 Chicago          00+1+800 222 1231 Paris         00+1+800 222 1231 Dubai         001+1+800 222 1231 Hong Kong

```
 1   vehicle in any fashion?
03:12  2   A    No.
03:12  3   Q    Have you done any -- excuse me.
03:12  4        Have you done any research relating to the
 5   value of your vehicle?
03:12  6   A    Can you clarify that more?  Like -- you mean
 7   like recently or -- what do you mean like have I?
03:13  8   Q    Have you done any research or looked into what
 9   the value of your vehicle is now?  So I'm not referring
10   to when, you know, when you were doing the purchase.
03:13 11   A    Oh, no.
03:13 12   Q    Okay.  If you haven't done any research, what
13   is -- what is your basis that you believe that the value
14   of your vehicle has diminished?
03:13 15        MR. ZOHDY:  Let me object that that calls for
16   expert testimony prematurely.
03:13 17        But you can answer as to your understanding.
03:13 18        THE WITNESS:  As to my understanding is that,
19   if I would have known that my car had that problem, I
20   wouldn't have bought it nor I -- I wouldn't have bought
21   it.  But if a car has a problem, I don't think it's
22   worth what it would be worth if it didn't have a
23   problem.
03:13 24   BY MS. RO:
03:13 25   Q    What is your belief in terms of how much lower
```

164

ALFRED SALAS



# Exhibit 25

| | |
|---|---|
| **From:** | Christopher Hitt |
| **To:** | Ed Quirk |
| **Sent:** | 9/19/2012 5:57:21 PM |
| **Subject:** | FW: AC Odor Issue Summary |

You called it....

Chris Hitt
Product Engineer
Quality Assurance Electrical Department
Toyota Motor Sales, USA, Inc.
Phone (310) 468-3116
Fax (310) 974-5951
christopher_hitt@toyota.com

---

**From:** Bill Bergen
**Sent:** Wednesday, September 19, 2012 10:50 AM
**To:** Christopher Hitt
**Subject:** Re: AC Odor Issue Summary

Great info. Thanks Chris!

---

**From:** Christopher Hitt
**Sent:** Wednesday, September 19, 2012 12:43 PM
**To:** Bill Bergen
**Cc:** Russell Suzuki; Tom Krembs; Ed Quirk; Shaun Austin
**Subject:** AC Odor Issue Summary

Good Morning Bill,

I hope you are having a good trip.

Tom said this morning that SET has some questions on the current status of AC Odor. I would like to give you a brief summary of the history and current status of this issue.

**Background:**
· AC odor has been one of the top issues for SET for the last few years. There have been several countermeasures including an updated evaporator coating and AC amplifier logic change. These countermeasures have had some improvement but have not totally eliminated the condition.
   ○ Toyota Evaporators are coated with a protective layer that is designed to prevent odors from adhering to the surface of the Evaporator
   ○ The Anti-odor logic or Komori logic redirects air away from the customers face during start up when the AC odor is most prevalent
· SET stopped attempting to repair vehicles with AC odor, because of the severity of the Lemon Law in the state of Florida. SET started to tell customers the condition was normal.  This caused the warranty claims and field reports to drop off and TMC to think the issue was resolved.
· Starting this year PQFO-SE and I asked SET to start submitting more field reports so we could show TMC this was still one of SET's top issues.
· This spring, as part of OSFOD's Quarterly Field Visit we took TMC OSFOD, TMC 1AB, TTC VPD2 and TMC DQI to Florida to show them the severity of the issue. At the field visit, the decision was made to conduct 3 more survey activities over the course of this year.

**Survey Activity Results:**
· We selected 10 customers that complained of AC odor and tested the AC logic in their vehicles. Each customer agreed to complete follow up surveys every two weeks. Overall the customers felt the AC odor logic was unacceptable because it did not total eliminate the smell. However, most customers said there was some improvement in the severity of the AC odor.
· In May PQFO-SE, QA-E, TCI and TTC met in Ann Arbor and evaluated AC odor on competitor vehicles. The evaluation

0174

Highly Confidential

Toyota_Salas_00058063

# Exhibit 26

HIGHLY CONFIDENTIAL
STEFAN YOUNG, 30(B)(6) - 08/04/2016

HIGHLY CONFIDENTIAL

1    UNITED STATES DISTRICT COURT

2    CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3

4    ALFRED SALAS and GLORIA        )
     ORTEGA, individually, and on )
5    behalf of a class of          ) Case No.
     similarly situated            ) 2:15-cv-08629 FMO (Ex)
6    individuals,                  )
                                   )
7              Plaintiffs,         )
                                   )
8              vs.                 )
                                   )
9    TOYOTA MOTOR SALES, U.S.A.,   )
     INC., a California            )
10   corporation                   )
                                   )
11             Defendants.         )
                                   )

12

13

14              HIGHLY CONFIDENTIAL

15         RULE 30(b)(6) DEPOSITION OF

16      TOYOTA MOTOR SALES, U.S.A., INC. BY:

17              STEFAN YOUNG,

18     ALSO APPEARING IN HIS INDIVIDUAL CAPACITY

19            Los Angeles, California

20          Thursday, August 4, 2016

21

22   Reported by:

23   SHANDA GABRIEL, CSR No. 10094

24   Job No. LA-093886

25   Pages 1-194

HIGHLY CONFIDENTIAL
STEFAN YOUNG, 30(B)(6) - 08/04/2016          Page 137

1          That rhymes.

2      A.  So at this point, we didn't have

3  development responsibility for Camry, so it's really

4  Russ as the field engineer in dealing with the

5  development responsible group to decide that.  I

6  wasn't privy to all those discussions, so I don't

7  know.  I -- in this case, I was acting as sort of a

8  liaison and supporter but I'm not sure what -- what

9  all those discussions entailed.

10     Q.  Okay.  But I'm talking about your

11  discussions specifically.  Or not even your

12  discussions, but ultimately, did your recommendation

13  result in a combination of countermeasures being

14  implemented as a field fix?

15     A.  I believe that the final recommendation

16  included the evaporator cleaning and the charcoal

17  filter, but we didn't ultimately do the Parking

18  Fresh as a -- as a field fix.

19     Q.  And ultimately Parking Fresh was

20  implemented as a -- not option, but as a component

21  of the HVAC units starting with the 2014 model year,

22  correct?

23     A.  That's correct.

24     Q.  The countermeasures that were ultimately

25  approved, specifically the -- you said the cleaning

# Exhibit 27

CERTIFIED COPY



1                  UNITED STATES DISTRICT COURT

2                 CENTRAL DISTRICT OF CALIFORNIA

3

4

   ALFRED SALAS and GLORIA         )
5  ORTEGA, individually and on     )
   behalf of a class of            )
6  similarly situated              )
   individuals,                    )
7                                  )
              Plaintiffs,          )
8                                  )
         vs.                       ) Case No.
9                                  ) CV15-08629FMO(Ex)
   TOYOTA MOTOR SALES, U.S.A.,     )
10 INC., a California              )
   corporation,                    )
11                                 )
              Defendant.           )
12 _____  )

13

14

15

16        VIDEOTAPED DEPOSITION OF GLORIA ORTEGA

17                    June 17, 2016

18

19

20

21

22

23

24 JOANNA B. BROWN, CSR No. 8570, RPR, CRR, RMR.
      410004

25

BARKLEY
Court Reporters
barkley.com

(310) 207-8000 Los Angeles    (415) 433-5777 San Francisco    (949) 955-0400 Irvine           (858) 455-5444 San Diego
(310) 207-8000 Century City   (408) 885-0550 San Jose          (760) 322-2240 Palm Springs     (800) 222-1231 Carlsbad
(916) 922-5777 Sacramento     (800) 222-1231 Martinez          (702) 366-0500 Las Vegas        (800) 222-1231 Monterey
(951) 686-0606 Riverside      (818) 702-0202 Woodland Hills    (702) 366-0500 Henderson        (516) 277-9494 Garden City
(212) 808-8500 New York City  (347) 821-4611 Brooklyn          (518) 490-1910 Albany           (914) 510-9110 White Plains
(312) 379-5566 Chicago        00+1+800 222 1231 Paris          00+1+800 222 1231 Dubai         001+1+800 222 1231 Hong Kong

1    Toyota has not done anything to fix the mildew smell,

2    which is a health issue.

3           Why do you believe that the mildew smell is a

4    health issue?

10:04  5           MR. PADGETT:  Objection.  Calls for expert

6    opinion.

7           THE WITNESS:  Well, I'm not an expert, but

8    anybody that smells that -- like a moldy, mildew, foul

9    smell -- it's -- I would think that it's not, you know,

10:04  10   good for anybody or anybody to be breathing on.

11   BY MS. RO:

12      Q    Aside from that, is there any other reason or

13   any other basis to support your statement that you

14   believe that a mildew smell is a health issue?

10:05  15          MR. PADGETT:  Objection.  Calls for expert

16   opinion.  Calls for a legal conclusion.

17          THE WITNESS:  I believe that's for an expert

18   to answer.  I could just give you my opinion.

19   BY MS. RO:

10:05  20      Q    Yeah.  I only want -- yeah.  I only want your

21   opinion.  I'm not asking for an expert opinion, but you

22   did write it in your email that you believe that the

23   mildew smell caused a health issue.  So I just want to

24   understand what the basis of your understanding was,

10:05  25   why you believe that the mildew smell caused that

                                    24

BARKLEY
Court Reporters

1    Maybe in the last three years or two years I've had to

2    complain about allergies.

3        Q    But you haven't gone to see a doctor?

4        A    Not for the symptoms.

16:37 5        Q    Yeah.  If your -- I assume you are concerned

6    about your health.  Why haven't you gone to see a

7    doctor?

8        A    I just -- you know, regular allergies, I

9    guess.  As far as for this specific issue, I haven't

16:37 10   gone.

11       Q    Do you believe that the odor in your vehicle

12   exposes you to a health risk?

13            MR. PADGETT:  Objection.  Calls for expert

14   opinion.  Vague and ambiguous.

16:38 15           Go ahead.

16            THE WITNESS:  Can you repeat the question

17   again?

18   BY MS. RO:

19       Q    Do you believe that the odor in your vehicle

16:38 20   exposes you to a health risk?

21            MR. PADGETT:  Same objections.

22            THE WITNESS:  Like, I'm not an expert on it;

23   but the smell of it, a moldy smell is not a good smell,

24   and I don't think it's good for anybody especially when

16:38 25   you are in your car for so long.

0181

GLORIA ORTEGA


BARKLEY
Court Reporters

# Exhibit 28

CERTIFIED COPY

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

ALFRED SALAS and GLORIA ORTEGA,        )
individually, and on behalf of a class )
of similarly situated individuals,     )
                                       )
                    Plaintiffs,        )
                                       )
          vs.                          )   No. CV15-08629
                                       )   FMO (Ex)
                                       )
TOYOTA MOTOR SALES, U.S.A., INC., a    )
California corporation,                )
                                       )
                    Defendant.         )
                                       )

DEPOSITION OF ALFRED SALAS

June 15, 2016

ANNA B. SACRIPANTI, CSR No. 9533
   409448




BARKLEY
Court Reporters
barkley.com

(310) 207-8000 Los Angeles      (415) 433-5777 San Francisco    (949) 955-0400 Irvine          (858) 455-5444 San Diego
(310) 207-8000 Century City     (408) 885-0550 San Jose         (760) 322-2240 Palm Springs    (800) 222-1231 Carlsbad
(916) 922-5777 Sacramento       (800) 222-1231 Martinez         (702) 366-0500 Las Vegas       (800) 222-1231 Monterey
(951) 686-0606 Riverside        (818) 702-0202 Woodland Hills   (702) 366-0500 Henderson       (516) 277-9494 Garden City
(212) 808-8500 New York City    (347) 821-4611 Brooklyn         (518) 490-1910 Albany          (914) 510-9110 White Plains
(312) 379-5566 Chicago          00+1+800 222 1231 Paris         00+1+800 222 1231 Dubai        001+1+800 222 1231 Hong Kong

10:11  1           THE WITNESS:  Yes.

10:11  2   BY MS. RO:

10:11  3      Q     And what is the health risk that you were

       4   claiming?

10:11  5      A     Mold, the mold that might be present.

10:11  6      Q     Why do you believe that mold might be present

       7   in your HVAC system?

10:12  8           MR. ZOHDY:  I'm going to object.  It calls for

       9   speculation.  It calls for possible expert analysis.

10:12 10           You can respond as to your understanding.

10:12 11           THE WITNESS:  Because of the smell of the

      12   vehicle.

10:12 13   BY MS. RO:

10:12 14      Q     Anything else?

10:12 15      A     No.

10:12 16      Q     Prior to this litigation, did you have any

      17   testing done on your vehicle for mold?

10:12 18      A     No.

10:13 19      Q     Do you -- do you live by yourself?

10:13 20      A     No.

10:13 21      Q     No.  Do you -- are you married?

10:13 22      A     Domestic partner.

10:13 23      Q     Okay.  Do you have any children?

10:13 24      A     No.

10:13 25      Q     Okay.  What is the name of your domestic

                              30

ALFRED SALAS

BARKLEY
Court Reporters

# Exhibit 29

**Certified Copy**

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

| | |
|---|---|
| ALFRED SALAS and GLORIA ORTEGA, individually, and on behalf of a class of similarly situated individuals, | ) ) ) ) ) |
| Plaintiffs, | ) ) |
| vs. | )   CASE NO. )   2:15-cv-08629FMO(Ex) |
| TOYOTA MOTOR SALES, U.S.A., INC., a California corporation, | ) ) ) |
| Defendants. | ) ) |

C O N F I D E N T I A L

DEPOSITION OF RUSSELL SUZUKI

TAKEN ON WEDNESDAY, JULY 13, 2016

Reported by:   ADRIANA M. LETENDER
               CSR No. 11006

DEPOSITION OF RUSSELL SUZUKI

1    improve the efficiency of your AC system you will use less

2    gas and create less Greenhouse gases.

3              So -- so what they did starting in the 2012

4    model year was to run the HVAC system in the recirc mode

5    any time -- it would automatically flip over to the recirc

6    mode any time it was, like, over 80 degrees or so.  And

7    just automatically do that.  By keeping all of the air --

8    air-conditioned air in the vehicle, instead of grabbing the

9    hot air from the outside, the HVAC system does not have to

10   work as hard and, therefore, is more efficient.

11             And so that was a change we thought actually

12   had some, you know, significant effect on customer's --

13   especially if you're in the high humidity areas and such.

14   Because the -- if you run in recirc all the time, all the

15   stuff that you bring into the car, basically -- and maybe

16   some of it gets washed away, but the car doesn't air out.

17   And HVAC locks the air out.  When you're in fresh air mode,

18   you're bringing fresh air in.

19             And so because of this change by system design,

20   you may not notice it as a driver, but the system is

21   running in recirc a lot more.  So, therefore, when you

22   recirc a lot more or almost all the time then you can

23   basically build up more odors within the HVAC box.

24   BY MR. ZOHDY:

25        Q     Was there a spike in consumer complaints after

DEPOSITION OF RUSSELL SUZUKI

1    the 2012 model year was released regarding HVAC odor?

2        A    There was an increase in it.  I don't know if

3    I'd -- there was an increase in it.  It wasn't -- but

4    from -- it tended to be more regional and with -- yeah.

5    There was an increase.

6        Q    Okay.  All right.  We'll get back to that.

7             Okay.  All right.  So would you attribute the

8    increase in the number of complaints regarding the HVAC

9    odor in 2012 to that redesign of the HVAC system which

10   created a situation which recirculation mode was more

11   prevalent?

12            MR. SCHRADER:  Objection.  Calls for an opinion.

13            Go ahead.

14            THE WITNESS:  We think it was one of the -- that

15   design was a definitely a contributing factor to it.

16            MR. ZOHDY:  Thank you.

17       Q    Okay.  I'm going to show you now what we're going

18   to call -- you already have it.  Flip to No. 5.

19       A    Okay.

20       Q    Do you recognize this document?

21       A    Yes.

22       Q    What is this document?

23       A    This is a Tech Tip concerning HVAC odor.

24       Q    And a Tech Tip, is this something that's provided

25   in conjunction with a TSB to assist the dealer in handling

# Exhibit 30

## 1. Back ground

TMS requests parking fresh implementation as odor issue f/fix for 12MY Camry, because TMS thinks that 12MY Camry odor issue spike is caused by GHG logic.

## 2.1AB answer

12MY Camry odor issue spike is caused by EPC (evaporator surface treatment) manufacturing failure.
(Not GHG logic)

And even if NG evaporator is replaced, still there is high possibility of odor claim re-occurrence.
Therefore we would like to recommend  maintenance (Charcoal filter and cleaning) action.

Highly Confidential

Toyota_Salas_00012799

# Exhibit 31

| | |
|---|---|
| **From:** | **David Cosgrove/T70/TMMNA** |
| **Sent:** | 1/24/2013 12:11:23 AM |
| **To:** | JP Flaharty/T70/TMMNA@TMMNA |
| **CC:** | Michael Camilleri/T70/TMMNA@TMMNA; Shun Kurata/T70/TMMNA@TMMNA; Stefan Young/T70/TMMNA@TMMNA |
| **Subject:** | Re: Fw: Parking Fresh field fix |

Hi JP,

My understanding of the lemon law is that it is 3 (dependant on state) repair attempts for the same issue. However, the definition of a repair attempt isn't as simple as installing and removing an AC ECU (each would be a separate repair attempt). Basically anytime the customer comes in and complains about the issue and the dealer records this transaction it can be called a "repair attempt". It can be as simple as a quick comment from the customer and the dealer changing the air filter or as indepth as pulling the IP and replacing the evaporator. Each would be one repair attempt. Unfortunately with a chronic issue like AC Odor which can go away and come back with simple treatments (air filter change, evaporator refresh, etc) hitting the magic number of attempts becomes very easy. This is why the dealers and TMS are hesitant to try CMs that aren't guaranteed to solve the issue.

Thanks,

David Cosgrove
VPD2
Email: David.Cosgrove@tema.toyota.com
Phone: 734-995-3943

---

**JP Flaharty/T70/TMMNA**

01/23/2013 06:51 PM

To   Stefan Young/T70/TMMNA@TMMNA

cc   Shun Kurata/T70/TMMNA@TMMNA, Michael Camilleri/T70/TMMNA@TMMNA, David Cosgrove/T70/TMMNA@TMMNA

Subject   Re: Fw: Parking Fresh field fix

Thanks for the update Stefan.

For lemon law, are the three repair attempts for the same issue?

For this case, if we get one strike by replacing the ECU, what else would we do for AC odor that would constitute a repair attempt? We wouldn't replace the ECU again, so how would we get two more strikes?

Or can the three strikes be applied to any portion of the car?

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
JP Flaharty
General Manager
Vehicle Performance Development 2 (VPD2)
Toyota Motor Engineering and Manufacturing, North America
w: 734-995-3085
c: 734-████████
jp.flaharty@tema.toyota.com
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Highly Confidential

Toyota_Salas_00052719

# Exhibit 32

1  MORGAN, LEWIS & BOCKIUS LLP
2  David L. Schrader, Bar No. 149638
   david.schrader@morganlewis.com
3  Esther K. Ro, Bar No. 252203
   esther.ro@morganlewis.com
4  Jahmy S. Graham, Bar No. 300880
   jahmy.graham@morganlewis.com
5
6  300 South Grand Avenue
   Twenty-Second Floor
7  Los Angeles, CA 90071-3132
   Tel:   +1.213.612.2500
8  Fax:   +1.213.612.2501
9
10 Attorneys for Defendant
   TOYOTA MOTOR SALES, U.S.A., INC.
11

12                    UNITED STATES DISTRICT COURT
                      CENTRAL DISTRICT OF CALIFORNIA
13

| | |
|---|---|
| 14  ALFRED SALAS and GLORIA ORTEGA, individually, and on behalf of a class of similarly situated individuals, | Case No. CV15-08629 FMO (Ex) |
| 15 | |
| 16 | **DEFENDANT TOYOTA MOTOR SALES, U.S.A., INC.'S OBJECTIONS AND RESPONSES TO PLAINTIFFS' REQUESTS FOR PRODUCTION OF DOCUMENTS, SET ONE** |
| Plaintiffs, 17 | |
| 18  vs. | |
| 19  TOYOTA MOTOR SALES, U.S.A., INC., a California corporation, | |
| 20 | Judge:  Hon. Fernando M. Olguin |
| 21  Defendant. | Ctrm:  22 |

22

23 PROPOUNDING PARTY:    Plaintiffs ALFRED SALAS And GLORIA
24                        ORTEGA
25
   RESPONDING PARTY:     Defendant Toyota Motor Sales, U.S.A, Inc.
26
27 SET NO.:              One (1)

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
LOS ANGELES

0194        1

TMS'S OBJECTIONS AND RESPONSES TO
PLAINTIFFS' REQUESTS FOR
PRODUCTION OF DOCUMENTS, SET ONE

1    broad, unduly burdensome and asks for information that is neither relevant nor

2    proportional to the needs of the case.

3        17.    TMS incorporates by reference these General Objections and the

4    Prefatory Statement into each of the responses that follow.

5            **RESPONSE TO REQUESTS FOR PRODUCTION**

6    **REQUEST FOR PRODUCTION NO. 1:**

7        All DOCUMENTS YOU identify pursuant to your Rule 26 Initial

8    Disclosures, including all Databases. Please produce Databases in Microsoft Excel

9    (.xls) format.

10   **RESPONSE TO REQUEST FOR PRODUCTION NO. 1:**

11       TMS incorporates by reference each General Objection and the Prefatory

12   Statement as if set forth fully herein. TMS objects because Plaintiffs' definition of

13   "DOCUMENTS" is overly broad and unduly burdensome. TMS objects to the term

14   "YOU" as overly broad and unduly burdensome because it purports to require TMS

15   to respond on behalf of, or search for responsive materials at entities other than

16   itself, as well as seeks to require TMS to respond on behalf of agents, employees,

17   and other entities. TMS has construed the term "YOU" to refer to TMS only and

18   accordingly responds on its own behalf.  TMS objects because the undefined term

19   "Databases" is vague and ambiguous.

20       Subject to the foregoing objections, TMS responds as follows: TMS will

21   produce non-privileged, responsive documents identified pursuant to its Rule 26

22   disclosures.

23   **REQUEST FOR PRODUCTION NO. 2:**

24       All DOCUMENTS referencing, referring or evidencing the number or

25   approximate number of CLASS VEHICLES sold and/or leased in the State of

26   California, including all sales records, data, and ESI, as well as any records or

27   documents that identify California and nationwide purchasers or lessees of those

28   Vehicles.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
LOS ANGELES

DB2/ 30318101.1

7

0195

TMS'S OBJECTIONS AND RESPONSES TO
PLAINTIFFS' REQUESTS FOR
PRODUCTION OF DOCUMENTS, SET ONE

**RESPONSE TO REQUEST FOR PRODUCTION NO. 2:**

TMS incorporates by reference each General Objection and the Prefatory Statement as if set forth fully herein. TMS objects because Plaintiffs' definition of "DOCUMENTS" is overly broad and unduly burdensome. TMS objects to the term "CLASS VEHICLES" because it is inconsistent with the definition of class vehicles alleged in the First Amended Complaint, and is overly broad, unduly burdensome and improper in that it encompasses individuals and vehicles beyond the scope of Plaintiffs' allegations in this case. TMS objects to Plaintiffs' use of the term "ESI" because it is undefined. TMS further objects to the extent these Requests call for the production of personally identifiable information that invades individuals' rights to privacy. TMS further objects to the extent these Requests improperly seek information about absent class members without first establishing that such discovery is necessary prior to class certification and proportional to the needs of the case. TMS further objects to these Requests as unduly burdensome to the extent they call for TMS to produce documents about absent class members not in TMS's possession, custody, or control.

Subject to the foregoing objections, TMS responds as follows: TMS has searched its records and determined that as of May 26, 2016, 252,706 non-fleet 2012 model year to 2016 model year U.S. bound Toyota Camry vehicles have been sold by TMS to authorized dealerships in California. TMS, in the ordinary course of its business, does not sell vehicles directly to consumers.

**REQUEST FOR PRODUCTION NO. 3:**

All DOCUMENTS that IDENTIFY the purchasers or lessees in California of those CLASS VEHICLES who complained about the HVAC DEFECT, including their names and contact information, Vehicle Identification Number ("VIN"), vehicle in service date(s), incident date(s), incident mileage(s), and YOUR response to the complaint(s), including any vehicle inspection(s). Please provide the information in Microsoft Excel (.xls), or a compatible, format.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
LOS ANGELES

DB2/ 30318101.1

8

TMS'S OBJECTIONS AND RESPONSES TO
PLAINTIFFS' REQUESTS FOR
PRODUCTION OF DOCUMENTS, SET ONE

1  unduly burdensome because they purport to require TMS to respond on behalf of,

2  or search for responsive materials at entities other than itself, as well as require

3  TMS to respond on behalf of agents, employees, and other entities. TMS has

4  construed the terms "YOU" and "YOUR" to refer to TMS only and accordingly

5  responds on its own behalf.  TMS objects to the term "HVAC DEFECT" as

6  argumentative, misleading, and improper because it assumes facts not in

7  evidence and calls for a legal conclusion. TMS objects to the term "CLASS

8  VEHICLES" because it is inconsistent with the definition of class vehicles alleged

9  in the First Amended Complaint, and is overly broad, unduly burdensome and

10  improper in that it encompasses individuals and vehicles beyond the scope of

11  Plaintiffs' allegations in this case.  TMS objects because this Request is duplicative

12  of other document requests.

13

14

15  Dated:  June 8, 2016                              MORGAN, LEWIS & BOCKIUS LLP

16

17                                        By _____

18                                              David L. Schrader
                                                Esther K. Ro
19                                              Jahmy S. Graham
                                                Attorneys for Defendant
20                                              TOYOTA MOTOR SALES, U.S.A.,
                                                INC.

21

22

23

24

25

26

27

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
LOS ANGELES

DB2/ 30318101.1                                    37                TMS'S OBJECTIONS AND RESPONSES TO
                                                                    PLAINTIFFS' REQUESTS FOR
                                                0197                PRODUCTION OF DOCUMENTS, SET ONE

1

## PROOF OF SERVICE

2   I, Bernice E. Worley, declare:

3 I am a citizen of the United States and employed in Los Angeles County, California. I am over the age of eighteen years and not a party to the within entitled action. My business address is 300 South Grand Avenue, Twenty-Second Floor, Los Angeles, CA 90071-3132. On June 8, 2016, I served a copy of the within document:

4

5

6  **DEFENDANT TOYOTA MOTOR SALES, U.S.A., INC.'S OBJECTIONS AND RESPONSES TO PLAINTIFFS' REQUESTS FOR PRODUCTION OF DOCUMENTS, SET ONE**

7

8  ☒ (via U.S. Mail) by placing the document(s) listed above in a sealed envelope with postage thereon fully prepaid, the United States mail at Los Angeles, California addressed as set forth below.

9

10  ☒ (via E-Mail) by transmitting via email a true and correct copy of the document(s) listed above on this date to the person(s) at the e-mail address(es) set forth below.

11

12 Counsel for Plaintiffs:

13 Cody R. Padgett; Robert K. Friedl
Tarek H. Zohdy; Jordan L. Lurie

14 Capstone Law APC

15 1840 Century Park East, Suite 450
Los Angeles, CA 90067

16 Phone: (310) 556-4811

17 Fax: (310) 943-0396
Email: cody.padgett@capstonelawyers.com

18     robert.friedl@capstonelawyers.com

19     tarek.zohdy@capstonelawyers.com
jordan.lurie@capstonelawyers.com

20

21   I am readily familiar with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

22

23

24   Executed on June 8, 2016, at Los Angeles, California. I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

25

26

27        *Bernice E Worley*
Bernice E. Worley

28

# Exhibit 33

CERTIFIED COPY

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

ALFRED SALAS and GLORIA ORTEGA,      )
individually, and on behalf of a class )
of similarly situated individuals,    )
                                       )
                    Plaintiffs,        )
                                       )
        vs.                            )   No. CV15-08629
                                       )   FMO (Ex)
                                       )
TOYOTA MOTOR SALES, U.S.A., INC., a   )
California corporation,                )
                                       )
                    Defendant.         )
                                       )

DEPOSITION OF ALFRED SALAS

June 15, 2016

ANNA B. SACRIPANTI, CSR No. 9533
    409448

 



BARKLEY
Court Reporters
barkley.com

(310) 207-8000 Los Angeles    (415) 433-5777 San Francisco    (949) 955-0400 Irvine           (858) 455-5444 San Diego
(310) 207-8000 Century City   (408) 885-0550 San Jose         (760) 322-2240 Palm Springs      (800) 222-1231 Carlsbad
(916) 922-5777 Sacramento     (800) 222-1231 Martinez         (702) 366-0500 Las Vegas         (800) 222-1231 Monterey
(951) 686-0606 Riverside      (818) 702-0202 Woodland Hills   (702) 366-0500 Henderson         (516) 277-9494 Garden City
(212) 808-8500 New York City  (347) 821-4611 Brooklyn         (518) 490-1910 Albany            (914) 510-9110 White Plains
(312) 379-5566 Chicago        00+1+800 222 1231 Paris         00+1+800 222 1231 Dubai          001+1+800 222 1231 Hong Kong

```
     1   partner?
10:13  2        A    Jesus Fuentes.
10:13  3        Q    And how long have you lived with Mr. Fuentes?
10:13  4        A    Seventeen years.
10:13  5        Q    He also resides at the Finley address.
       6   Correct?
10:13  7        A    Yes.
10:13  8        Q    Does anyone else reside at the Finley address?
10:13  9        A    No.
10:13 10        Q    What about in the past five years?  Has anyone
      11   else resided in the Finley address?
10:14 12        A    No.
10:14 13        Q    What kind of vehicle does Mr. Fuentes own?
10:14 14        A    2004 Honda CRV.
10:14 15        Q    How long has he owned that vehicle?
10:14 16        A    Thirteen years.
10:14 17        Q    In your complaint, you state that Toyota failed
      18   to disclose information to you.  Correct?
10:14 19        A    Yes.
10:15 20        Q    What information is it that you believe Toyota
      21   should have disclosed to you?
10:15 22        A    That there was a defect with the
      23   air-conditioning system of my vehicle.
10:15 24        Q    Anything else?
10:15 25        A    No.
```

31

FRED SALAS

BARKLEY
Court Reporters

# Exhibit 34

Jordan L. Lurie (SBN 130013)
Jordan.Lurie@capstonelawyers.com
Tarek H. Zohdy (SBN 247775)
Tarek.Zohdy@capstonelawyers.com
Cody R. Padgett (SBN 275553)
Cody.Padgett@capstonelawyers.com
Karen L. Wallace (SBN 272309)
Karen.Wallace@capstonelawyers.com
Capstone Law APC
1875 Century Park East, Suite 1000
Los Angeles, California 90067
Telephone:  (310) 556-4811
Facsimile:   (310) 943-0396

Attorneys for Plaintiffs Alfred Salas and
Gloria Ortega

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ALFRED SALAS and GLORIA ORTEGA, individually, and on behalf of a class of similarly situated individuals, | Case No. 2:15-cv-08629 FMO (Ex) |
| | Hon. Fernando M. Olguin |
| Plaintiffs, | **CLASS ACTION** |
| vs. | **DECLARATION OF ALFRED SALAS IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION** |
| TOYOTA MOTOR SALES, U.S.A., INC., a California corporation; TOYOTA MOTOR ENGINEERING & MANUFACTURING NORTH AMERICA, INC., a Kentucky corporation; and DOES 1 through 10, inclusive, | Date:      January 4, 2018<br>Time:      10:00 a.m.<br>Place:      350 W. 1st Street<br>               Courtroom 6d, 6th Fl. |
| Defendants. | |

# DECLARATION OF ALFRED SALAS

I, Alfred Salas, declare as follows:

1. I am over 18 years of age and am competent to testify to the matters set forth herein.

2. I am a resident of Los Angeles, California, and a Plaintiff in the above-referenced action. I make this Declaration in support of Plaintiffs' Motion for Class Certification. The statements in this declaration are based on my personal knowledge of the matters discussed. If called as a witness, I could and would competently testify to the following.

3. In or around May 2015, I decided to upgrade my personal vehicle, which I drive to work and to school.

4. As part of my research regarding available models, I went to Toyota's website, Toyota.com, and reviewed the information Toyota provided about the 2014 Camry. I recall visiting Toyota.com multiple times. I also visited the Kelly Blue Book website to research the 2014 Toyota Camry.

5. I also test drove the vehicle with the sales manager. At no time did he tell me that its HVAC system may have a defect that causes foul odor.

6. My research did not reveal any disclosures by Toyota regarding the propensity of the Camry's HVAC system to emit noxious and foul odors or that such odors were likely due to microbial, organic growth within the system. Had Toyota disclosed those facts to me, I would not have purchased my vehicle.

7. On June 20, 2015, I purchased a Certified Used 2014 Toyota Camry with approximately 16,000 miles on the odometer from South Coast Toyota, an authorized Toyota dealer in Costa Mesa, California.

8. By August of 2015, I was experiencing severe noxious and foul odors coming from the air conditioning vents. The smell is often like dried-up urine in a fabric that's been out in the sun. It sometimes smells like old clothes.

9. The stench from the vents when I use the air conditioning

sometimes makes me think there is something brewing in the HVAC system that could be mold.

10.   On August 29, 2015, after I'd driven about 2,000 miles, I brought my vehicle back to South Coast Toyota and complained about the horrible smell coming from the AC vents. The sales manager suggested an air-conditioning treatment. Ultimately, the service manager recommended, and the dealership performed, an ozone treatment service. They also put in a more expensive charcoal filter. The smell diminished but came back within five (5) days.

11.   The repair order for my August 2015 service visit explains that "the O-zone machine did a good job to kill any bacteria build up in the vent system that would cause a fowl [sic] odor." The service advisor also told me not to use a deodorizer to mask the smell. (*See* Exhibit 1.)

12.   The dealer instructed me to put the HVAC system in "fresh mode" when I'm not using the air conditioning to remedy the foul-smelling emissions from the vents, but it doesn't help.

13.   It is humiliating when people get in my vehicle and tell me it smells like pee. I have to warn them that the air conditioning smells.

14.   Foul odors continue to emit from the air conditioning vents in my vehicle, despite my adhering to the instructions I was given by the service advisor at South Coast Toyota.

15.   I know that I am not alone in experiencing foul odors from the air containing in my vehicle. I believe that other Toyota Camry owners have had similar problems with their HVAC systems.

16.   I am familiar with the facts and the legal theories in my lawsuit and have been fully informed of the duties and responsibilities that I have undertaken by seeking to serve as a class representative. I am fully willing and able to carry out those duties and responsibilities.

17.   To date, I have responded to all Toyota's requests for information,

1   including being deposed on June 15, 2016, by attorney Esther Ro and making my

2   vehicle available for legal inspection by Toyota on August 9, 2016. I have

3   continued to stay informed about the status of the lawsuit throughout the course

4   of the litigation.

5        18.   I brought this lawsuit on behalf of myself and all other consumers

6   who purchased a Toyota Camry vehicle that suffers from an HVAC system

7   defect.  My interests are consistent with the interests of the other class members.

8   I also understand that, as a class representative, I am obligated to, and will,

9   always consider the interests of the class just as I would consider my own.  I will

10   continue to follow the progress of this lawsuit, provide information to my

11   attorneys, and otherwise help in any way I can.

12        19.   Attached to this Declaration is a true and correct copy of the August

13   29, 2015, repair record for my Toyota Camry.  My personal information has been

14   redacted.

15        Executed on November 11/6/2017, 2017, in Los Angeles, California.

16

17        I declare under penalty of perjury under the laws of the United States and

18   California that the foregoing is true and correct.

19

20   

21   ALFRED SALAS

22

23

24

25

26

27

28

DECLARATION OF ALFRED SALAS IN SUPPORT OF MOTION FOR CLASS CERTIFICATION

# EXHIBIT 1



**TOYOTA**

*"I love what you do for me."*

# South Coast Toyota
SCION

1966 Harbor Blvd. • Costa Mesa, CA 92627
PHONE (949) 722-2000
www.southcoasttoyota.com

SERVICE DEPT. HOURS:
MONDAY - FRIDAY 7:00 AM - 7:00 PM
SATURDAY 8:00 AM - 5:00 PM

B.A.R. # ARD214799          ALL PARTS LISTED ARE NEW UNLESS OTHERWISE INDICATED.          E.P.A. # CAL000288088

| DATE | TIME | PERSON CONTACTED | PHONE? | ADV. # | REVISION |
|------|------|------------------|--------|--------|----------|
|      |      |                  |        |        |          |
|      |      |                  |        |        |          |

IMPORTANT: REMOVE ALL PERSONAL PROPERTY AND VALUABLES FROM YOUR VEHICLE. WE DO NOT ASSUME RESPONSIBILITY FOR LOSS OR DAMAGE FOR ARTICLES LEFT IN YOUR VEHICLE.

Labor charges are based on predetermined flat rate amounts. They are not necessarily indicative of the actual time spent by the technician(s) to perform a particular repair or service.

| RO | Tag | Advisor | Added | License | VIN |
|----|-----|---------|-------|---------|-----|
| 31244 | J801 | 602 JON LEVASSEUR | 08/29/15  08:43 | CA 7BSW491 | 4T1BF1FK3 EU303890 |

Customer Information

**SALAS, ALFRED**

Work:
Cell:
Reservation:  067  08/29/15  08:00

LOS ANGELES
Email:

Vehicle Information

14 TOYOTA CAMRY 4DR SDN SE SPORT GRAY          Model#: 2548          Odometer: 18824
ENGINE- 2.5L DOHC 16V VVTI                     Stock No: 00052783
Dates: Production:          Inservice:  09/28/13    Sold: 06/20/15    SLSP: 919
Last Svc:  Client: 6T5001   Date: 06/27/15   Adv: 612   Odom: 16478   Daily Avg:   13   Month Avg:    390

| Ln | Type | Operation | Customer Concern | Hr./Qty |
|----|------|-----------|------------------|---------|
| 24 | IAT | RENTAL | CUSTOMER IN RENTAL VEHICLE | |
| 25 | IAT | LAMPI | PERFORMED MPI WORLD CLASS INSPECTION. SET TIRES PRESSURES TO OEM SPECIFICATIONS. | |
| 51* | IAT | | CUSTOMER STATES THERE IS NO CONDENSATION COMING OUT OF THE VEHICLE WHEN THE A/C IS ON. ALSO THERE IS A BAD SMELL NOTICE INSIDE OF THE VEHICLE. AT START UP ...... CHECK A/C OPERATION AND DRAINAGE    RUN OZONE MACHINE ////AND CHECK AC CABIN AIR FILTER .... | |

Additional Information

MFG: 26476     Dist: TOY          Fuel: UNL     Estimated Completion:  08/29/15  17:00
Name Verify:     Color Code: 01G3     Trim: FF20

HAZARDOUS WASTE FEE: REMOVAL CHARGE FOR ALL HAZARDOUS MATERIALS REMOVED FROM YOUR AUTOMOBILE, THAT MUST BE DISPOSED OF AS A HAZARDOUS WASTE.

TERMS CASH UNLESS ARRANGEMENTS MADE
I hereby authorize the following repair work to be done along with the necessary material and hereby grant you and/or your employees permission to operate the car or truck herein described on streets, highways or elsewhere for the purpose of testing and/or inspection. An express mechanic's lien is hereby acknowledged on above car or truck to secure the amount of repairs thereto. Please read warranty information & conditions on reverse side of this contract.

"By law, you may choose another licensed Smog Check facility to perform any needed repairs or adjustments that the Smog Check test indicates are necessary."

| ESTIMATES | |
|-----------|--|
| HAZARDOUS WASTES | |
| ORIGINAL EST. | |
| TOTAL | |

CUSTOMER ACKNOWLEDGES RECEIPT OF COPY HEREOF

Cust. Sign X

SLS 00004 CUSTOMER



# South Coast Toyota
## scion

1966 Harbor Blvd. • Costa Mesa, CA 92627
PHONE (949) 722-2000
SERVICE EXT. 3672
www.southcoasttoyota.com

E.P.A. # CAL000288088
B.A.R. # ARD214799

**TO ALL OUR SERVICE DEPARTMENT CUSTOMERS:**

We will be charging a surcharge on all service department repair orders in which automotive fluids have been drained. In accordance with the Sate of California regulations concerning the dumping of hazardous waste, this charge will be imposed with reference to engine oils, transmission oils and fluids, and antifreeze. The Environmental Protection Agency has strict laws as to the disposition of these fluids to make our state a cleaner and healthier place to live and work in.

| DATE | TIME | PERSON CONTACTED | PHONE? | ADV. # | REVISION |
|------|------|------------------|--------|--------|----------|
|      |      |                  |        |        |          |
|      |      |                  |        |        |          |

ALL CLAIMS MUST BE ACCOMPANIED BY THIS INVOICE. WARRANTY INFORMATION - FOR COMPLETE DETAILS PLEASE REFER TO BACK SIDE OF YOUR REPAIR ORDER.

| | Tag J801 | License 7BSW491 | 4T1BF1FK3EU303890 | Page 1 | Invoice I31244 |
|---|---|---|---|---|---|

| **Invoice to** | **Driver/Owner Information** |
|---|---|
| SALAS, ALFRED | SALAS, ALFRED |

| **For Office Use** | **Vehicle Information** |
|---|---|

14 TOYOTA CAMRY SE SPORT 4DR SUN GRAY

Stock#: 00P52783  Inv Acct: 3040

Sold: 06/20/15

## Customer Concern

| CUSTOMER IN RENTAL VEHICLE | Operation | Tech | Amount |
|---|---|---|---|
| RENTAL VEHICLE | RENTAL | TEC | |
| RENTAL | | | |

| Part Number | POH | Note | Description | Qty | List | Sell |
|---|---|---|---|---|---|---|
| TPT  RENTAL | | TRAC | 13286 | 1  B | | |
| Tech  TEC  TECH, DEFAULT | | | | | | |

| PERFORMED MPI WORLD CLASS INSPECTION. SET TIRES PRESSURES TO OEM SPECIFICATIONS. | Operation | Tech | Amount |
|---|---|---|---|
| SET AIR PRESSURE AT 35PSI | LMPI | TEC | |
| Tech  TEC  TECH, DEFAULT | | | |

CUSTOMER STATES THERE IS NO CONDENSATION COMING OUT OF THE VEHICLE WHEN THE A/C IS ON, ALSO THERE IS A BAD SMELL INSIDE OF THE VEHICLE, AT START UP ...... CHECK A/C OPERATION AND DRAINAGE ... RUN OZONE MACHINE ////AND CHECK AC CABIN AIR FILTER ....

CHECKED A/C ...EVAPORATOR IS DRAINING  TEMP AT CENTER VENT 40 DEGREES, OUTSIDE TEMP 90DEGREES ... RAN THE OZONE MACHINE FOR THREE HOURS ...CHANGED THE CABIN AIR FILTER ... LET CAR SIT FOR A TIME ... AT 5PM STARTED THE CAR SMELL FROM THE VENTS ...

TALKED TO THE CUSTOMER ABOUT US NOT USING A DEODORIZER, DID NOT WANT TO MASK THE SMELL . THE OZONE MACHINE  DID A GOOD JOB TO KILL ANY BACTERIA BUILD UP IN THE VENT SYSTEM THAT WOULD CAUSE A FOUL ODOR , CUSTOMER TO PICK UP THE CAR ON SUNDAY ...

| | Operation | Tech | Amount |
|---|---|---|---|
| | 62 | 723 | |

## THANK YOU FOR YOUR PATRONAGE!

DISCLAIMER OF WARRANTIES: THE SELLER HEREBY DISCLAIMS ALL WARRANTIES EITHER EXPRESS OR IMPLIED, INCLUDING ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE AND NEITHER ASSUMES NOR AUTHORIZES ANY OTHER PERSON TO ASSUME FOR IT ANY LIABILITY IN CONNECTION WITH THE SALE OF THE PARTS.

X _____
I acknowledge notice and oral approval of an increase in the original estimated price.

SLS 00005



## South Coast Toyota

SCION

1966 Harbor Blvd. • Costa Mesa, CA 92627
PHONE (949) 722-2000
SERVICE EXT. 3672
www.southcoasttoyota.com

E.P.A. # CAL000288088
B.A.R. # ARD214799

TO ALL OUR
SERVICE DEPARTMENT CUSTOMERS:

We will be charging a surcharge on all service department repair orders in which automotive fluids have been drained. In accordance with the Sate of California regulations concerning the dumping of hazardous waste, this charge will be imposed with reference to engine oils, transmission oils and fluids, and antifreeze. The Environmental Protection Agency has strict laws as to the disposition of these fluids to make our state a cleaner and healthier place to live and work in.

ALL CLAIMS MUST BE ACCOMPANIED BY THIS INVOICE
WARRANTY INFORMATION - FOR COMPLETE DETAILS
PLEASE REFER TO BACK SIDE OF YOUR REPAIR
ORDER.

| DATE | TIME | PERSON CONTACTED | PHONE? | ADV # | REVISION |
|------|------|------------------|--------|-------|----------|
|      |      |                  |        |       |          |
|      |      |                  |        |       |          |

| ... | Tag J601 | License 78SW491 | 4T1BF1FK3EU303890 | Page 2 (last) | Invoice I31244 |
|-----|----------|-----------------|-------------------|---------------|----------------|

| Invoice to: SALAS, ALFRED | | | | Driver/Owner: SALAS, ALFRED | | | |
|---|---|---|---|---|---|---|---|
|  |  |  |  | 14 TOYOTA CAMRY SE SPORT 4DR SDN GRAY | | | |
| Parts | Part Number | PO# | Note | Description | Qty | List | Sell |
|  | R T  W71AV-FX10 |  |  | ELEMENT, AIR REFINER | 1 |  |  |
|  |  |  |  |  |  |  |  |

| Summary of Charges for Invoice I31244 | Payment Distribution for Invoice I31244 |
|----------------------------------------|------------------------------------------|

If you have any questions - please see JON LEVASSEUR
'R' NEXT TO QUANTITY DENOTES A REMANUFACTURED
PART.

### THANK YOU FOR YOUR PATRONAGE!

DISCLAIMER OF WARRANTIES: THE SELLER HEREBY DISCLAIMS ALL WARRANTIES EITHER EXPRESS OR IMPLIED, INCLUDING ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE AND NEITHER ASSUMES NOR AUTHORIZES ANY OTHER PERSON TO ASSUME FOR IT ANY LIABILITY IN CONNECTION WITH THE SALE OF THE PARTS.

X

I acknowledge notice and oral approval of an
increase in the original estimated price.

SLS 00006

# South Coast Toyota
## scion
www.SouthCoastToyota.com
1966 Harbor Blvd. • Costa Mesa, CA 92627
Phone: (949) 722-2000 • Service Ext. 3672

**MULTIPOINT INSPEC**

**VEHICLE CONDITION ON ARRIVAL**

Date 8-29-15    Time In _____

Customer Name _____

Address _____

City _____    Zip _____

Today's Contact Phone # _____

Email _____

Year _____   Make _____   Model _____

Mileage 18824   License _____

VIN _____ 303890 _____

Hat / Tag No. 801

FOLLOW UP TIME _____   ASM NAME: JL

**SERVICE INFORMATION**
Description of services to be performed:
_____
_____
_____
_____
_____
_____

Initial Estimate: $ _____
I hereby authorize the repair work and inspection described to be performed along with the necessary materials and agree that dealer is not responsible for loss or damage to vehicle or articles left in vehicle in case of fire, theft or any cause beyond their control. I hereby grant you and/or your employees permission to operate the vehicle as necessary for testing and inspection purposes. I authorize South Coast Toyota to complete a basic inspection as outlined on this page. South Coast Toyota not responsible for valuables left in vehicle.

Wheel lock key needed? _____

SIGNATURE X _____

**EXTERIOR ON ARRIVAL**
- Horn operation
- Head lights / tail lights / turn signals / brake lights / hazard warning lights / exterior lamps (check for damage and operation)
- Windshield wiper and washer operation
- Windshield glass

Comments _____

**INTERIOR ON ARRIVAL**
- Dome light / map light / mirror / dimmer combination meter
- Cabin air filter
- Parking brake operation

Comments _____

**UNDER HOOD ON ARRIVAL**
- Air filter
- Drive belts (cracking / damage / wear)
- Cooling system (leaks)
- Hoses (cracking / damage / leaks)
- Battery appearance (cables / clamps / corrosion)
- Tested battery due to age / appearance

Comments _____

Comments _____

**FLUID LEVELS ON ARRIVAL**
Oil level on arrival

Advisor Notes
- Brake Fluid
- Power Steering
- Coolant
- Transmission
- Differential (if equip)
- Transfer Case (4wd)
- Clutch Res. (if equip)
- Washer Fluid

Tech Comments regarding condition or color of above fluids:
_____
_____

**UNDER VEHICLE ON ARRIVAL**
- Axle and drive shaft (damage / leaks)
- Drive shaft / CV boots / U-joints
- Steering linkage
- Suspension (components / shocks / springs)
- Fluid leaks (engine / transmission / differential)
- Exhaust system / muffler

Comments _____

**TIRES ON ARRIVAL**
Tire pressure PSI checked / adjusted to:

LF ___/___ RF ___/___ LR ___/___ RR ___/___

Spare ___/___

Tread depth:

LF ___/32 RF ___/32 LR ___/32 RR ___/32

Tire damage / abnormal wear:

LF    RF    LR    RR    Spare

Tires Rotated

Comments _____

**BRAKES ON ARRIVAL**
Brake lining:

LF ___mm RF ___mm LR ___mm RR ___mm

0-3 mm   4-6 mm   7-12 mm   FRONT/REAR DISC BRAKES

0-1 mm   2 mm   3-4 mm   REAR DRUM BRAKES

- Brake lines / hoses / parking brake
- cable

Brake inspections are visual.
Amount of brake lining remaining is an estimate.

Technician sign-off: _____

☐ CHECKED AND OK AT THIS TIME   ☐ MAY REQUIRE FUTURE ATTENTION   ☐ REQUIRES IMMEDIATE ATTENTION

The Reynolds and Reynolds Company   FL633062 Q (08/14)

SLS-00007

**SOUTH COAST TOYOTA**
1966 HARBOR BLVD
COSTA MESA CA  92627
949-722-2000

TOYOTA Rent a Car

*Dealer Code* 04137

*AUTHORIZED SYSTEM NUMBER*

RA NO. **CM-13286**

**RENTAL AGREEMENT   PAGE 1**
*THAC 24 Hour Roadside Assistance*
(800) 599-6766

| RENTER NAME | TO BE PAID BY | | VEHICLE IDENTIFICATION NUMBER (VIN) | LICENSE NUMBER | STATE |
|---|---|---|---|---|---|
| ALFRED SALAS | | | 4T1BD1FK2EU103427 | 7FMG881 | CA |
| HOME ADDRESS | | VERIFIED | YEAR - VEHICLE LINE | MODEL AND COLOR | |
| | JON/31244 | | 1900   TOYOTA | CAMRY   WHITE | |
| CITY | STATE | ZIP CODE | MILEAGE IN | | DATE AND TIME   IN | A.M. / P.M. |
| DRIVER'S LICENSE NUMBER | STATE | EXPIRES | MILEAGE OUT   1  1  9  6  3 | | DATE AND TIME   OUT   08/29/2015 | 08:46 A.M. / P.M. |
| BIRTH DATE | HOME TELEPHONE | VERIFIED | MILES DRIVEN   1 2 1 8 6 | | MAXIMUM PAYLOAD | |
| LOCAL CONTACT | ADDRESS | PHONE | MILES ALLOWED | | I AGREE TO RETURN THE RENTED VEHICLE TO THE ABOVE LOCATION ON OR BEFORE | |
| EMPLOYER'S NAME | PHONE NUMBER | VERIFIED | CHARGEABLE MILES | | DATE DUE IN   08:46 A.M. 08/30/2015 | P.M. |
| EMPLOYER'S ADDRESS | | REFERRED BY | DEPOSIT $ | EXTEND TO DATE | ADDITIONAL DEPOSIT | DATE EXTENDED | INITIAL |
| CITY | STATE | ZIP CODE | TOYOTA CAR SALE DEPARTME | | | |
| BILL TO NAME | PHONE NUMBER | | VEHICLE RETURNED AT: | ☐ NO DAMAGE | ☐ DAMAGE DESCRIPTION | ☐ SPARE ☐ JACK |

RATES DO NOT INCLUDE FUEL

NO SMOKING · NO PETS · PLEASE REPLACE FUEL
RENTAL VEHICLE MAY NOT BE TAKEN OUT OF THE STATE

X_____  I UNDERSTAND I AM RESPONSIBLE FOR ANY TRAFFIC OR TOLL VIOLATIONS INCURRED WHILE THIS VEHICLE IS IN MY POSSESSION.

X_____  PLEASE RETURN VEHICLE WITH SAME AMOUNT OF FUEL AS AT THE TIME OF CHECK-OUT. A 4.75 PER GALLON REFUELING FEE WILL BE ASSESSED FOR ANY FUEL USED AND NOT REPLACED.

X_____  NO SMOKING OR PETS IN THE RENTAL VEHICLE. EVIDENCE OF EITHER WILL RESULT IN A $100 FEE.

X_____  I AUTHORIZE THE USE OF THE CREDIT CARD PROVIDED FOR PAYMENT OF ANY TRAFFIC OR TOLL VIOLATIONS INCURRED WHILE THIS VEHICLE IS IN MY POSSESSION.

X_____  I AUTHORIZE A $35.00 PER DAY SURCHARGE TO THE CREDIT CARD PROVIDED IF THIS RENTAL CAR IS NOT RETURNED WITHIN 24 HOURS OF NOTIFICATION OF THE COMPLETED WORK ON MY VEHICLE.

X_____  I AUTHORIZE THE USE OF THE CREDIT CARD PROVIDED TO REPLENISH THE FUEL USED IN THIS VEHICLE, AT THE INDICATED RATE, WHILE THIS VEHICLE IS IN MY POSSESSION.

CREDIT CARD IMPRINT

| | | | RENTAL CHARGES |
|---|---|---|---|
| MILES | 0 | @ 0.00 | 0.00 |
| HOURS | 0 | @ $ 10.73 | 0.00 |
| DAYS | 1 | @ $ 32.18 | 32.18 |
| WEEKS | 0 | @ $ 0.00 | 0.00 |
| CALENDAR DAY/24 HOUR | | | |
| TOTAL TIME AND MILEAGE | | | 32.18 |
| TAXABLE FUEL | GAL. @ $ | | |
| SUBTOTAL | | | |
| SUPPLEMENTAL LIABILITY INSURANCE | | | 0.00 |
| SALES TAX OR SURCHARGE | 8.75 | | 2.82 |
| NON-TAXABLE FUEL | GAL. @ $ 4.75 | | 0.00 |
| LESS REFUND FOR: | | | |
| TOTAL CHARGES | | | 35.00 |
| LESS DEPOSITS | | | 0.00 |
| NET DUE MEMBER | | | 0.00 |
| NET DUE CUSTOMER | | | |
| AMOUNT DUE | | | 35.00 |

DAMAGE DESCRIPTION
SHOP NAME
PHONE NUMBER
SHOP CONTACT
VEHICLE MAKE/MODEL

NAME OF INSURED
ALFRED SALAS
INSURANCE COMPANY NAME
DATE OF LOSS
CL #/RO/PO

THE PERSONS NAMED BELOW ARE ADDITIONAL AUTHORIZED DRIVERS, IF NONE, PRINT "NONE" ACROSS THIS SECTION AND HAVE SIGNED BY CUSTOMER.
ADDITIONAL DRIVER NAME   LICENSE NO.   STATE   EXP. DATE   BIRTHDATE
NONE
ADDITIONAL DRIVER NAME   LICENSE NO.   STATE   EXP. DATE   BIRTHDATE
NONE

REMARKS

| CHARGED | | PAID | INITIAL |
|---|---|---|---|
| $ | AMEX | $ | 0.00 |
| ☐ EMPLOYER | CB | | REFUNDED |
| ☐ OTHER | DC | $ | 0.00 |
| | MC | CUSTOMER INITIALS   X | |
| ☐ CARD VERIFIED | VISA | CHECKED OUT BY: JON LEVASSEUR | |

**W A R N I N G**
THIS RENTAL AGREEMENT IS NOT A POLICY OF INSURANCE. OUR INSURANCE POLICY ONLY PROVIDES INSURANCE FOR THE STATE MINIMUM FINANCIAL RESPONSIBILITY LIMITS.
• READ ALL DRIVING RESTRICTIONS ON THE REVERSE SIDE CAREFULLY. YOU ARE RESPONSIBLE FOR ALL TRAFFIC VIOLATIONS AND MUST TURN IN ALL SUMMONSES UPON CHECK-IN.
• REPORT ALL ACCIDENTS IMMEDIATELY.
• OPERATION OF THE VEHICLE IN VIOLATION OF PARAGRAPH 2 IS PROHIBITED.
• YOU MAY BE PROSECUTED IF VEHICLE IS NOT RETURNED WHEN DUE IN.
• IF BILL TO PARTY DEFAULTS FOR ANY REASON, YOU ASSUME ALL RESPONSIBILITY FOR CHARGES.

THE UNDERSIGNED CUSTOMER HAS READ BOTH SIDES OF THIS AGREEMENT AND AGREES TO THE TERMS AND CONDITIONS THEREIN. CUSTOMER AUTHORIZES US TO PROCESS A CREDIT CARD VOUCHER, IF ANY, IN CUSTOMER'S NAME.

X_____   DATE

THIS AGREEMENT MAY NOT EXCEED A ONE MONTH PERIOD

CLOSED SUBJECT TO FINAL AUDIT

EXPIRES   OTHER

CHECKED IN BY:

*THANK YOU, WE APPRECIATE YOUR BUSINESS!*

TRAC 8642  CA  4/08

0212

SLS 00008

Unit# 135

FUEL   OUT / IN
F / F
3/4 / 3/4
1/2 / 1/2
1/4 / 1/4
E / E

# Exhibit 35

Jordan L. Lurie (SBN 130013)
Jordan.Lurie@capstonelawyers.com
Tarek H. Zohdy (SBN 247775)
Tarek.Zohdy@capstonelawyers.com
Cody R. Padgett (SBN 275553)
Cody.Padgett@capstonelawyers.com
Karen L. Wallace (SBN 272309)
Karen.Wallace@capstonelawyers.com
Capstone Law APC
1875 Century Park East, Suite 1000
Los Angeles, California 90067
Telephone: (310) 556-4811
Facsimile: (310) 943-0396

Attorneys for Plaintiffs Alfred Salas and
Gloria Ortega

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ALFRED SALAS and GLORIA ORTEGA, individually, and on behalf of a class of similarly situated individuals, <br><br> Plaintiffs, <br><br> vs. <br><br> TOYOTA MOTOR SALES, U.S.A., INC., a California corporation; TOYOTA MOTOR ENGINEERING & MANUFACTURING NORTH AMERICA, INC., a Kentucky corporation; and DOES 1 through 10, inclusive, <br><br> Defendants. | Case No. 2:15-cv-08629 FMO (Ex) <br><br> Hon. Fernando M. Olguin <br><br> **CLASS ACTION** <br><br> **DECLARATION OF GLORIA ORTEGA IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION** <br><br> Date: January 4, 2018 <br> Time: 10:00 a.m. <br> Place: 350 W. 1st Street <br> Courtroom 6d, 6th Fl. |

DocuSign Envelope ID: 83450838-0FA4-45EP-B7B7-B3AFA8510D24

# DECLARATION OF GLORIA ORTEGA

I, Gloria Ortega, declare as follows:

1.    I am over 18 years of age and am competent to testify to the matters set forth herein.

2.    I am a resident of Long Beach, California, and a Plaintiff in the above-referenced action.  I make this Declaration in support of Plaintiffs' Motion for Class Certification. The statements in this declaration are based on my personal knowledge of the matters discussed. If called as a witness, I could and would competently testify to the following.

3.    In October 2011, I had to replace my personal vehicle, a 2010 Toyota Camry, after it was totaled in accident. I went online to Toyota.com and TrueCar.com to research new vehicles, including Toyota models. To the best of my recollection, I also spoke to sales' representatives at AutoNation Toyota and Long Toyota, both authorized dealers in Southern California. Safety and reliability were my primary concerns.

4.    I also test drove the vehicle with a salesperson at Longo Toyota, an authorized Toyota dealer in El Monte, California. He did not tell me that the HVAC system may have a defect that causes foul or noxious odors.

5.    During my research, I did not see any disclosures by Toyota that the Camry's HVAC system was likely to emit foul odors or that such odors could be due to microbial, organic growth within the system. I would not have purchased my vehicle if Toyota had disclosed those facts to me.

6.    On October 29, 2011, I bought a new 2012 Toyota Camry from Longo Toyota.

7.    The HVAC system in my vehicle has emitted foul odors since the day I drove it off the lot. I complained about the odor every time I took my car in for service and explained that the vents consistently emit the smell of dirty, moldy socks. I never received assistance with the problem.

DECLARATION OF GLORIA ORTEGA IN SUPPORT OF MOTION FOR CLASS CERTIFICATION

8.     The smell can become intolerable within seconds, and I have to open the window and put the HVAC system in re-circulation mode to get rid of it.

9.     The advice I received from an authorized Toyota representative – to the best of my recollection at AutoNation Toyota in Cerritos – was to spray air freshener on the inner cabin filter to diminish the smell. I was also told to replace the cabin air filter, which I did. I got tired of asking for help because they didn't know how to fix the problem.

10.     On or about June 21, 2013, with approximately 29,500 miles on my odometer, I brought my vehicle to AutoNation Toyota Cerritos because the HVAC system was emitting a foul odor when I used it. The service advisor inspected my vehicle and confirmed the odor but did not perform any repairs. He recommended that I run the HVAC system in non-recirculation mode to dry out the smell coming from the evaporator. He also recommended a service to refresh the air conditioner.

11.     The service history for my June 2013 service visit states that the cabin air filter was replaced at a cost to me of $59.95. The service advisor also recommended an "A/C Evap Service $169.00," which I did not authorize. (*See* Exhibit 1.)

12.     I also followed the advice my service advisor gave me regarding running the HVAC system in non-recirculation mode to dry out the evaporator and using a deodorizer. Despite these measures, the HVAC system continued to emit foul odors whenever I used it.

13.     On March 28, 2015, with approximately 59,970 miles on the odometer, I brought my vehicle to Cabe Toyota, an authorized Toyota dealer in Long Beach, California. The service advisor confirmed the foul odor coming from the HVAC system and recommended a treatment for the air conditioning. He did not perform any repairs to eliminate the smell.

DocuSign Envelope ID: 8345083B-0FA4-45EB-B7B7-B3AFA8510D24

14.   The service history for my March 2015 service visit states that the service advisor "conformed [sic] odor coing [sic] from AC system, recommed [sic] to perform AC refresh service. No repairs made." (*See* Exhibit 1.)

15.   On April 15, 2015, I sent an email to Toyota's customer service to follow up on the complaint I had filed with Toyota regarding the mildew smell in my vehicle.  I expressed my concern that mildew is a health issue. Toyota confirmed its receipt of my email but didn't respond to my concerns. (*See* Exhibit 2.)

16.   I still experience these odors from my AC vents, and it is embarrassing to have people in my vehicle because of the smell. I also can't imagine somebody else wanting to buy a car with this problem.

17.   I believe that I am not alone in experiencing bad odors from the air vents in my vehicle and that other Toyota Camry owners have had similar problems with their HVAC systems.

18.   I am familiar with the facts and the legal theories in my lawsuit and have been fully informed of the duties and responsibilities that I have undertaken by seeking to serve as a class representative. I am fully willing and able to carry out those duties and responsibilities.

19.   To date, I have responded to all Toyota's requests for information, including being deposed on June 17, 2016, by attorney Esther Ro and making my car available for a legal inspection by Toyota on July 18, 2016. I have continued to stay informed about the status of the lawsuit throughout the course of the litigation.

20.   I brought this lawsuit on behalf of myself and all other consumers who paid for a Toyota Camry vehicle that suffers from an HVAC system defect. My interests are consistent with the interests of the other class members. I also understand that, as a class representative, I am obligated to, and will, always consider the interests of the class just as I would consider my own.  I will

DocuSign Envelope ID: 83450838-0FA4-45EP-87B7-B3AFA8510D34

1  continue to follow the progress of this lawsuit, provide information to my

2  attorneys, and otherwise help in any way I can.

3      21.    Attached to this Declaration are copies of the service history for my

4  Toyota Camry and the email I sent to

5  Toyota_Customer_Experience@toyota.com.  Each of these documents is a true

6  and correct copy.  My personal information has been redacted.

7      Executed on November 11/9/2017, 2017, in Long Beach, California.

8

9      I declare under penalty of perjury under the laws of the United States and

10  California that the foregoing is true and correct.

11

12

13  GLORIA ORTEGA

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF GLORIA ORTEGA IN SUPPORT OF MOTION FOR CLASS CERTIFICATION

# EXHIBIT 1

# Service History for 2012 CAMRY Detail

Here's more detailed information about the service or repair you had done. The record is displayed as reported by the dealer. Please contact them directly with any questions.

| | | | |
|---|---|---|---|
| DATE | 03/28/2015 | VEHICLE | 2012 CAMRY |
| TYPE | By Dealer | VIN | 4T4BF1FK3CR157641 |
| REPAIR ORDER # | 0383444 | MILEAGE | 59,970 |
| PROVIDER | Cabe Toyota 2895 Long Beach Blvd. Long Beach, CA 90806 | CUSTOMER | GLORIA ORTEGA |

| JOB | DATE | OPERATION | DETAILS | | PAYMENT |
|---|---|---|---|---|---|
| 24TOZCINT | RED SERVICE 15K | RED SERVICE 15K | RED SERVICE 15K ~ \|~PERFORM 15K INTERVAL MAINTENANCE ~ \| ~ ~ \|~RED SERVICE 15,45,75K | | Customer |
| | | | **PARTS** | | |
| | | | NAME | PART # | QTY |
| | | | BATTERY KIT | 5513 | 1 |
| | | | ELEMENT SUB-ASSY, AI | 178010H050 | 1 |
| | | | REPLACEABLE ELEMENT | 04152YZZA1 | 1 |
| | | | GASKET | 9043012031 | 1 |
| 11TOZACINS | *A/C DIAGNOSIS | *A/C DIAGNOSIS | *A/C DIAGNOSIS ~ \|~GUEST STATES WHEN AC IS RUNNING THERE IS A FOUL SMELL, CHECK AND ADVISE ~ \|~CONFORMED ODOR COING FROM AC SYSTEM, RECOMMED TO PERFORM AC REFRESH SERVICE ~ \|~NO REPAIRS MADE | | Customer |
| 24TOZMPI | MPI | MPI | MPI ~ \|~PERFORM MULTI POINT INSPECTION ~ \|~ ~ \|~COMPLETED MULTI POINT INSPECTION | | Customer |
| 99TOZFREEW | COMPLIMENTARY WASH | COMPLIMENTARY WASH | COMPLIMENTARY WASH ~ \| ~ ~ \| ~ ~ \|~COMPLIMENTARY CAR WASH ALL | | Customer |
| 51TOZ | CAMPAIGN | CAMPAIGN | CAMPAIGN ~ \|~SAFETY RECALL D0T REMEDY NOTICE HVAC ASSEMBLY ~ \|~PERFORMED SSC ~ \|~INSPECTED HVAC UNIT FOR SCREWS DESIGN AND NO WETNESS ON SENSOR AND INSTALLED SEAL TRAY 3511KB | | Customer |
| | | | **PARTS** | | |
| | | | NAME | PART # | QTY |
| | | | COVER KIT, HEATER | 0400349133 | 1 |
| 51TOZX01 | CAMPAIGN | CAMPAIGN | CAMPAIGN ~ \|~LIMITED SERVICE CAMPAIGN (LSC) E03 - SOFTWARE UPDATE FOR U760E TORQUE CONVERTER SHUDDER ~ \|~PERFORMED SSE ~ \|~PERFORMED SOFTWARE UPDATE AGGA2A | | Customer |

# Service History for 2012 CAMRY Detail

Here's more detailed information about the service or repair you had done. The record is displayed as reported by the dealer. Please contact them directly with any questions.

| | | | |
|---|---|---|---|
| DATE | 06/21/2013 | VEHICLE | 2012 CAMRY |
| TYPE | By Dealer | VIN | 4T4BF1FK3CR157641 |
| REPAIR ORDER # | 0914573 | MILEAGE | 29,509 |
| PROVIDER | Autonation Toyota Cerritos 18700 Studebaker Road Cerritos, CA 90703 | CUSTOMER | GLORIA ORTEGA |

| JOB | DATE | OPERATION | DETAILS | | | PAYMENT |
|---|---|---|---|---|---|---|
| VCPTR | PERFORM VCP LUBE, OIL, FILTER, AND TIRE ROTATION | PERFORM VCP LUBE, OIL, FILTER, AND TIRE ROTATION | PERFORM VCP LUBE, OIL, FILTER, AND TIRE ROTATION ~ | ~SERVICE ~ 10,000 MILES OR 12 MONTHS ~ | ~ ~ | ~29509 PERFORMED MAJOR SERVICE. OIL CHANGED, OIL FILTER REPLACED, ENGINE AIR FILTER REPLACED, CABIN AIR FILTER REPLACED, TIRE ROTATION AND ROAD TESTED VEHICLE. | | | Customer |
| | | | PARTS | | | |
| | | | NAME | PART # | QTY | |
| | | | 0W20-SINGLE QUART (W | 002790WQTE01 | 5 | |
| | | | REPLACEABLE ELEMENT | 04152YZZA1 | 1 | |
| | | | GASKET | 9043012031 | 1 | |
| 00TS1M | ROTATE TIRES | ROTATE TIRES | | | | Customer |
| | | | PARTS | | | |
| | | | NAME | PART # | QTY | |
| | | | 0W20-SINGLE QUART (W | 002790WQTE01 | 5 | |
| | | | REPLACEABLE ELEMENT | 04152YZZA1 | 1 | |
| | | | GASKET | 9043012031 | 1 | |
| 00TS1R | REPLACE ENGINE OIL & OIL FILTER | REPLACE ENGINE OIL & OIL FILTER | | | | Customer |
| | | | PARTS | | | |
| | | | NAME | PART # | QTY | |
| | | | 0W20-SINGLE QUART (W | 002790WQTE01 | 5 | |
| | | | REPLACEABLE ELEMENT | 04152YZZA1 | 1 | |
| | | | GASKET | 9043012031 | 1 | |
| 00TS8M | RESET OIL REPLACEMENT REMINDER | RESET OIL REPLACEMENT REMINDER | | | | Customer |
| | | | PARTS | | | |
| | | | NAME | PART # | QTY | |
| | | | 0W20-SINGLE QUART (W | 002790WQTE01 | 5 | |
| | | | REPLACEABLE ELEMENT | 04152YZZA1 | 1 | |
| | | | GASKET | 9043012031 | 1 | |

0221

**SLS 00182**

| TS10IN | INSPECT BRAKE LININGS/DRUMS AND BRAKE PADS/DISCS | INSPECT BRAKE LININGS/DRUMS AND BRAKE PADS/DISCS | PARTS | | Customer |

| NAME | PART # | QTY |
|---|---|---|
| 0W20-SINGLE QUART (W | 002790WQTE01 | 5 |
| REPLACEABLE ELEMENT | 04152YZZA1 | 1 |
| GASKET | 9043012031 | 1 |

| TS44IN | CHECK INSTALLATION OF DRIVER\'S FLOOR MAT | CHECK INSTALLATION OF DRIVER\'S FLOOR MAT | PARTS | | Customer |

| NAME | PART # | QTY |
|---|---|---|
| 0W20-SINGLE QUART (W | 002790WQTE01 | 5 |
| REPLACEABLE ELEMENT | 04152YZZA1 | 1 |
| GASKET | 9043012031 | 1 |

| TS45IN | INSPECT AND ADJUST ALL FLUID LEVELS | INSPECT AND ADJUST ALL FLUID LEVELS | PARTS | | Customer |

| NAME | PART # | QTY |
|---|---|---|
| 0W20-SINGLE QUART (W | 002790WQTE01 | 5 |
| REPLACEABLE ELEMENT | 04152YZZA1 | 1 |
| GASKET | 9043012031 | 1 |

| 00TS1M | ROTATE TIRES | ROTATE TIRES | PARTS | | Customer |

| NAME | PART # | QTY |
|---|---|---|
| 0W20-SINGLE QUART (W | 002790WQTE01 | 5 |
| REPLACEABLE ELEMENT | 04152YZZA1 | 1 |
| GASKET | 9043012031 | 1 |

| TS10IN | INSPECT BRAKE LININGS/DRUMS AND BRAKE PADS/DISCS | INSPECT BRAKE LININGS/DRUMS AND BRAKE PADS/DISCS | PARTS | | Customer |

| NAME | PART # | QTY |
|---|---|---|
| 0W20-SINGLE QUART (W | 002790WQTE01 | 5 |
| REPLACEABLE ELEMENT | 04152YZZA1 | 1 |
| GASKET | 9043012031 | 1 |

| TS44IN | CHECK INSTALLATION OF DRIVER\'S FLOOR MAT | CHECK INSTALLATION OF DRIVER\'S FLOOR MAT | PARTS | | Customer |

| NAME | PART # | QTY |
|---|---|---|
| 0W20-SINGLE QUART (W | 002790WQTE01 | 5 |
| REPLACEABLE ELEMENT | 04152YZZA1 | 1 |
| GASKET | 9043012031 | 1 |

| TS45IN | INSPECT AND ADJUST ALL FLUID LEVELS | INSPECT AND ADJUST ALL FLUID LEVELS | PARTS | | Customer |

| NAME | PART # | QTY |
|---|---|---|
| 0W20-SINGLE QUART (W | 002790WQTE01 | 5 |
| REPLACEABLE ELEMENT | 04152YZZA1 | 1 |
| GASKET | 9043012031 | 1 |

0222

| 00TS1M | ROTATE TIRES | ROTATE TIRES | PARTS | | Customer |
|---|---|---|---|---|---|
| | | | **NAME** | **PART #** | **QTY** |
| | | | 0W20-SINGLE QUART (W | 002790WQTE01 | 5 |
| | | | REPLACEABLE ELEMENT | 04152YZZA1 | 1 |
| | | | GASKET | 9043012031 | 1 |
| TS10IN | INSPECT BRAKE LININGS/DRUMS AND BRAKE PADS/DISCS | INSPECT BRAKE LININGS/DRUMS AND BRAKE PADS/DISCS | PARTS | | Customer |
| | | | **NAME** | **PART #** | **QTY** |
| | | | 0W20-SINGLE QUART (W | 002790WQTE01 | 5 |
| | | | REPLACEABLE ELEMENT | 04152YZZA1 | 1 |
| | | | GASKET | 9043012031 | 1 |
| TS44IN | CHECK INSTALLATION OF DRIVER\'S FLOOR MAT | CHECK INSTALLATION OF DRIVER\'S FLOOR MAT | PARTS | | Customer |
| | | | **NAME** | **PART #** | **QTY** |
| | | | 0W20-SINGLE QUART (W | 002790WQTE01 | 5 |
| | | | REPLACEABLE ELEMENT | 04152YZZA1 | 1 |
| | | | GASKET | 9043012031 | 1 |
| TS45IN | INSPECT AND ADJUST ALL FLUID LEVELS | INSPECT AND ADJUST ALL FLUID LEVELS | PARTS | | Customer |
| | | | **NAME** | **PART #** | **QTY** |
| | | | 0W20-SINGLE QUART (W | 002790WQTE01 | 5 |
| | | | REPLACEABLE ELEMENT | 04152YZZA1 | 1 |
| | | | GASKET | 9043012031 | 1 |
| PARTS | DISCOUNT APPLIED | DISCOUNT APPLIED | PARTS | | Customer |
| | | | **NAME** | **PART #** | **QTY** |
| | | | 0W20-SINGLE QUART (W | 002790WQTE01 | 5 |
| | | | REPLACEABLE ELEMENT | 04152YZZA1 | 1 |
| | | | GASKET | 9043012031 | 1 |
| MA30 | AIR FILTER ELEMENT - REPLACE | AIR FILTER ELEMENT - REPLACE | AIR FILTER ELEMENT - REPLACE ~\|~AIR FILTER ELEMENT - REPLACE ~\|~ ~\|~29509 REPLACED ENGINE AIR FILTER | | Customer |
| | | | PARTS | | |
| | | | **NAME** | **PART #** | **QTY** |
| | | | ELEMENT SUB-ASSY, AI | 178010H050 | 1 |
| MA83 | CABIN AIR FILTER (STANDARD POLLEN/ELECTROSTATIC) - REPLACE | CABIN AIR FILTER (STANDARD POLLEN/ELECTROSTATIC) - REPLACE | CABIN AIR FILTER (STANDARD POLLEN/ELECTROSTATIC) - REPLACE ~\|~CABIN AIR FILTER (STANDARD POLLEN/ELECTROSTATIC) - REPLACE ~\|~ ~\|~29509 REPLACED CABIN FILTER | | Customer |
| | | | PARTS | | |
| | | | **NAME** | **PART #** | **QTY** |
| | | | ELEMENT, AIR REFINER | 8713902090 | 1 |

0223

| MULTI- | MULTI-POINT INSPECTION INCLUDED IN PACKAGE SERVICE OR NOT NECC AT THIS TIME | MULTI-POINT INSPECTION INCLUDED IN PACKAGE SERVICE OR NOT NECC AT THIS TIME | MULTI-POINT INSPECTION INCLUDED IN PACKAGE SERVICE OR NOT NECC AT THIS TIME ~|~MULTI-POINT INSPECTION INCLUDED IN PACKAGE SERVICE OR NOT NECC AT THIS TIME ~|~ ~|~29509 ADJUSTED TIRE PRESSURE LF 34 PSI RF 34 PSI LR 34 PSI RR 34 PSI. BRAKES LF 6MM RF 6MM LR 6MM RR 6MM. STILL OKAY. | Customer |
| AC001 | CUSTOMER STATES A/C HAS BAD ODOR SMELL. PLEASE CHECK AND ADVISE. | CUSTOMER STATES A/C HAS BAD ODOR SMELL. PLEASE CHECK AND ADVISE. | CUSTOMER STATES A/C HAS BAD ODOR SMELL. PLEASE CHECK AND ADVISE. ~|~CUSTOMER STATES A/C HAS BAD ODOR SMELL. PLEASE CHECK AND ADVISE. ~|~ ~|~29509 SMELLED A SLIGHT SMELL. RECOMMEND TO CUSTOMER NEED TO RUN A/C SYSTEM IN NON RE-CIRCULATION MODE SO EVAPORATOR CAN DRY OUT SMELL. IF SMELL STILL PRESENT. RECOMMEND A/C EVAP SERVICE $169.00 | Customer |

DocuSign Envelope ID: 83450838-0F24-45EP-B7B7-B3AFA8510D24
Case 2:15-cv-08625-FMO-E   Document 85-5   Filed 12/07/17   Page 225 of 290   Page ID #:2331

ıyota Owners

Page 1 o

# Service History for 2012 CAMRY Detail

Here's more detailed information about the service or repair you had done. The record is displayed as reported by the dealer. Please contact them directly with any questions.

| | | | |
|---|---|---|---|
| DATE | 08/17/2012 | VEHICLE | 2012 CAMRY |
| TYPE | By Dealer | VIN | 4T4BF1FK3CR157641 |
| REPAIR ORDER # | 0858143 | MILEAGE | 15,840 |
| PROVIDER | Autonation Toyota Cerritos 18700 Studebaker Road Cerritos, CA 90703 | CUSTOMER | GLORIA ORTEGA |

| JOB | DATE | OPERATION | DETAILS | PAYMENT |
|---|---|---|---|---|
| MULTI- | MULTI POINT INSPECTION | MULTI POINT INSPECTION | MULTI POINT INSPECTION INCLUDED IN MAINTENANCE SERVICE ~ \| ~MULTI POINT INSPECTION INCLUDED IN MAINTENANCE SERVICE ~ \| ~MPI ~ \| ~15840 MPI MULTI POINT INSPECTION COMPLETEDTOPPED OFF FLUIDSCHECKED AND ADJUSTED AIR PRESSURE TO:LF: 34PSI LR: 34PSI RF: 34PSI RR: 34PSI | Customer |
| | INCLUDED IN MAINTENANCE SERVICE | INCLUDED IN MAINTENANCE SERVICE | | Customer |
| GBATT | BATTERY PASS | BATTERY PASS | | Customer |
| GBK | BRAKES-GREEN INSPECTED BRAKES AND OKAY, PLEASE SEE YOUR ADVISOR ON YOUR NEXT VIS | BRAKES-GREEN INSPECTED BRAKES AND OKAY, PLEASE SEE YOUR ADVISOR ON YOUR NEXT VIS | | Customer |
| GTIRE | GREEN-TIRE INSPECTED TIRES AND OKAY | GREEN-TIRE INSPECTED TIRES AND OKAY | | Customer |
| NOWASH | !!!!!!DO NOT WASH CAR!!!!!!! | !!!!!!DO NOT WASH CAR!!!!!!! | !!!!!!DO NOT WASH CAR!!!!!!! ~ \| ~!!!!!!DO NOT WASH CAR!!!!!!! ~ \| ~NO WASH ~ \| ~15840 NO WASH | Customer |

# EXHIBIT 2

DocuSign Envelope ID: 83450838-0FA4-45EF-B7B7-B3AFA8510D24



**From:** Gloria Orteg <span style="background:black"> </span>
**Date:** April 15, 2015 at 4:23:38 PM PDT
**To:** "Toyota_Customer_Experience@toyota.com"
<Toyota_Customer_Experience@toyota.com>
**Subject: Re: Toyota Customer Experience Center Case #1503303265**

Thank you for ur assistance im currently doing more research i have filed a complaint with Toyota however since Toyota has not done anything to fix the mildew smell which a health issue. i will file complaint with NHTSA and hire attorney. A class lawsuit was recently filed by other owners with same problem. Mildew is a safety issue to humans. Thank u for ur assistance.

Sent from my iPhone


On Apr 15, 2015, at 3:56 PM, Toyota_Customer_Experience@toyota.com wrote:

    Dear Ms. Ortega:

    Thank you for contacting Toyota Motor Sales, USA, Inc. Your case is filed at our headquarters office under your name and file #1503303265.


    If you have any further questions, please contact us at 800-331-4331. Our hours of operation are 5:00 am to 6:00 pm PST Monday through Friday and 7:00 am to 4:00 pm PST Saturday.


    Sincerely,

    Robert Arredondo

    Toyota Customer Experience

CONFIDENTIAL

DocuSign Envelope ID: 83450838-0FA4-25EP-B7B7-B3AFA8B10D24

Please do not attempt to respond to this message. We cannot accept electronic replies to this e-mail.

<T-SB-0142-13.pdf>

**CONFIDENTIAL**

Exhibit 36



**FIRM PROFILE**

Capstone Law APC is one of California's largest plaintiff-only labor and consumer law firms.  With thirty-one seasoned attorneys, many formerly with prominent class action or defense firms, Capstone has the experience, resources, and expertise to successfully prosecute complex employment and consumer actions.

Since its founding in 2012, Capstone has emerged as a major force in aggregate litigation, making law on cutting-edge issues and obtaining tens of millions of dollars in recovery for employees and consumers.  The firm's accomplishments include:

- In February, 2015, three Capstone attorneys, Glenn A. Danas, Raul Perez, and Ryan H. Wu, were honored with the prestigious California Lawyer of the Year (CLAY) award in labor and employment for their work in the landmark case *Iskanian v. CLS Transportation Los Angeles*, 59 Cal. 4th 348 (2014), which preserved the right of California workers to bring representative actions under the Labor Code Private Attorneys General Act ("PAGA") notwithstanding a representative action waiver in an arbitration agreement.

- Recognized as a leading firm in the prosecution of PAGA enforcement actions, Capstone is responsible for some of the most important decisions in this area.  In *Williams v. Superior Court (Marshalls of Calif.)*, 3 Cal.5th 531 (2017), Capstone attorneys achieved a landmark decision before the California Supreme Court as to the broad scope of discovery in PAGA actions.  In *Baumann v. Chase Inv. Servs. Corp*, 747 F.3d 1117 (9th Cir. 2014), a case of first impression, Capstone attorneys successfully argued that PAGA actions are state enforcement actions not covered by the Class Action Fairness Act.

- In April 2017, Capstone achieved a major victory for consumers in *McGill v. Citibank N.A.*, 2 Cal. 5th 945 (2017), where the California Supreme Court held that: (1) the right to seek public injunctive relief under the state's consumer protection laws cannot be waived; and (2) that consumers need not satisfy class certification requirements to enjoin unfair business practices on behalf of the public.

- Capstone served as class counsel in a number of significant wage and hour settlements, including $12 million on behalf of a nationwide class of nonexempt tellers and personal bankers in *Hightower v. JPMorgan Chase Bank*, Case No. 11-01802 (C.D. Cal.), over $10 million on behalf of non-exempt hourly workers in *Zamora v. Balboa Life & Casualty LLC*, Case No. BC360026 (L.A. Super. Ct.); and $6 million on behalf of non-exempt hourly workers in *Sheldon v. AHMC Monterey Park Hospital LP*, Case No. BC440282 (L.A. Super. Ct.).

- Capstone serves class counsel in a number of significant consumer actions, including *Falco v. Nissan N. Am. Inc.*, No. 13-00686 (C.D. Cal.) (certifying a class of owners/lessees of Nissan vehicles) and obtained final approval in *Vargas v. Ford Motor Co.*, No. 12-08388 (C.D. Cal.); *Chan v. Porsche Cars N.A., Inc.*, No. 15-2106 (D.N.J.); *Batista v. Nissan N.Am., Inc.*, No. 14-24728-RNS (S.D. Fla.); *Klee v. Nissan North America*, Case No. 12-08238 (C.D. Cal.); *Aceves v. AutoZone, Inc.*, No. 14-2032 (C.D. Cal.); *Asghari v. Volkswagen Group of America*, No. 13-02529 (C.D. Cal.); *Aarons v. BMW of North America*, Case No. 11-7667 (C.D. Cal.); *Fernandez v. Home Depot U.S.A.*, No. 13-648 (C.D. Cal.), and *Ford v. CEC Entertainment*, No. 14-677 (S.D. Cal.), that have conferred benefits to class members valued in the hundreds of millions.



**SUMMARY OF SIGNIFICANT SETTLEMENTS**

In the past four years, Capstone has settled over 100 high-stakes class and representative actions totaling well over $100 million dollars.  Capstone's settlements have directly compensated hundreds of thousands of California workers and consumers.  Capstone's actions have also forced employers to modify their policies for the benefit of employees, including changing the compensation structure for commissioned employees and changing practices to ensure that workers will be able to take timely rest and meal breaks.  A leader in prosecuting PAGA enforcement actions, Capstone has secured millions of dollars in civil penalties for the State of California.

The following is a representative sample of Capstone's settlements:

- *Hightower et al v. Washington Mutual Bank*, No. 2:11-cv-01802-PSG-PLA (N.D. Cal.): gross settlement of $12 million on behalf of approximately 150,000 personal bankers, tellers, sales associates, and assistant branch manager trainees for wage and hour violations;

- *Vargas v. Ford Motor Co.,* 12-08388-AB (C.D. Cal.): providing cash payments and unique buyback program for nearly 2 million consumers valued at well over $30 million;

- *Moore v. Petsmart, Inc.*, No. 5:12-cv-03577-EJD (N.D. Cal.): gross settlement of $10 million on behalf of over 19,000 non-exempt PetSmart employees for wage and hour violations;

- *Perrin v. Nabors Well Services Co.*, No. 56-2007-00288718 (Ventura Super. Ct.): gross settlement of over $6.5 million on behalf of oil rig workers for sleep time and other wage violations;

- *Cook v. United Insurance Co.*, No. C 10-00425 (Contra Costa Super. Ct.): gross settlement of $5.7 million on behalf of approximately 650 sales representatives;

- *Alvarez v. MAC Cosmetics, Inc.*, No. CIVDS1513177 (San Bernardino Super. Ct.): gross settlement of $5.5 million for approximately 5,500 non-exempt employees.

- *Aceves v. AutoZone, Inc.*, No. 14-2032 (C.D. Cal.): gross settlement of $5.4 million in a case alleging FCRA violations;

- *Berry v. Urban Outfitters Wholesale, Inc.*, No. 13-02628 (N.D. Cal.): gross settlement of $5 million on behalf of over 12,000 nonexempt employees;

- *The Children's Place Retail Stores Wage & Hour Cases*, No. JCCP 4790: gross settlement of $5 million on behalf of 15,000 nonexempt employees;

- *York v. Starbucks Corp.,* Case No. 08-07919 (C.D. Cal.): gross settlement of nearly $5 million on behalf of over 100,000 non-exempt workers for meal break and wage statement claims;

- *Rodriguez v. Swissport USA*, No. BC 441173 (Los Angeles Super. Ct.): gross settlement of nearly $5 million on behalf of 2,700 non-exempt employees following contested certification;

- *Felix v. Auto Club of Southern Calif.,* Case No. 07CC01421 (Orange Cty. Super. Ct.): $3.5 million settlement fund on behalf of over 2,000 insurance sales persons for wage and hour claims after taking this certified class action to trial;

- *Asghari v. Volkswagen Group of North America*, Case No. 13-02529 (C.D. Cal.): Settlement providing complementary repairs of oil consumption defect, reimbursement for repairs, and extended warranty coverage of certain Audi vehicles valued at over $20 million;

- *Klee v. Nissan of North America*, Case No. 12-08238 (C.D. Cal.): Settlement providing complimentary electric vehicle charging cards and extending warranty coverage for the electric battery on the Nissan Leaf valued at over $10 million.



**PROFESSIONAL BIOGRAPHIES**

<u>**Partners**</u>

**Rebecca Labat.**  Rebecca Labat is the managing partner of Capstone Law APC.  She supervises the pre-litigation phase for all of the firm's cases, including investigation, analysis, and client consultation.  She also manages the firm's co-counsel relationships and assists the firm's other partners and senior counsel with case management and litigation strategy.  Under Ms. Labat's leadership, Capstone has successfully settled over 35 cases, delivering tens millions of dollars to California employees and consumers while earning statewide recognition for its cutting-edge work in developing new law.

Ms. Labat's career accomplishments representing consumers and employees in class actions include the certification of a class of approximately 3,200 current and former automobile technicians and shop employees for the miscalculation of the regular rate for purposes of paying premiums for missed meal and rest breaks.

Before her work representing plaintiffs in class and representative actions, Ms. Labat was an attorney with Wilson Elser and represented life, health, and disability insurers in litigation throughout California in both state and federal courts.  She graduated from the University of California, Hastings College of the Law in 2002, where she was a member of the Hastings Civil Justice Clinic, served as a mediator in Small Claims Court for the City and County of San Francisco, and received the CALI Award for Excellence in Alternative Dispute Resolution.  She received her undergraduate degree from the University of California, Los Angeles.  Ms. Labat is a member of the National Employment Lawyers Association (NELA), the Consumer Attorneys Association of Los Angeles (CAALA), and the Beverly Hills Bar Association.

**Raul Perez.**  A partner at Capstone, Raul Perez has focused exclusively on wage and hour and consumer class litigation since 2011.  Mr. Perez is the lead negotiator on numerous large settlements that have resulted in tens of millions to low-wage workers across California, including many of the most valuable settlements reached by Capstone.

During his career, Mr. Perez has successfully certified by way of contested motion and/or been appointed Lead Counsel or Interim Lead Counsel in several cases, including:  *Lopes v. Kohl's Department Stores, Inc.*, Case No. RG08380189 (Alameda Super. Ct.); *Hightower v. JPMorgan Chase Bank*, Case No. 11-01802 (C.D. Cal.); *Tameifuna v. Sunrise Senior Living Managements, Inc.*, Case No. 13-02171 (C.D. Cal.) (certified class of over 10,000 hourly-paid employees); and *Berry v. Urban Outfitters Wholesale, Inc.*, Case No. 13-02628 (N.D. Cal.) (appointed lead counsel in a class action involving over 10,000 non-exempt employees).  As the lead trial attorney in *Iskanian v. CLS Transportation Los Angeles,* 59 Cal. 4th 348 (2014), Mr. Perez, along with Mr. Danas and Mr. Wu, received the 2015 CLAY Award in labor and employment.

Mr. Perez received both his undergraduate degree and his law degree from Harvard University and was admitted to the California Bar in December 1994.  Earlier in his career, Mr. Perez handled a variety of complex litigation matters, including wrongful termination and other employment related actions, for corporate clients while employed by some of the more established law firms in the State of California, including Morgan, Lewis & Bockius; Manatt Phelps & Phillips; and Akin Gump Strauss Hauer & Feld.  Before Capstone, Mr. Perez was a partner at another large plaintiff's firm, helping to deliver millions of dollars in relief to California workers.



**Matthew Theriault.**  Mr. Theriault is a partner at Capstone.  An expert in wage-and-hour law and litigation strategy, Mr. Theriault currently manages and assists Capstone's class action certification efforts and trials.  Recently, Mr. Theriault was lead trial counsel in a rarely-seen class action trial, representing a certified class of insurance salespersons alleging unpaid wages and break premiums in *Felix v. Auto Club of Southern Calif.*, Case No. 07CC01421 (Orange Cty. Super. Ct.).  The parties ultimately reached a multi-million dollar settlement in the middle of trial.

Over the course of his career, he has successfully certified numerous employee classes for claims involving misclassification, meal and rest breaks, and off-the-clock work, ultimately resulting in multi-million dollar settlements.  Cases where Mr. Theriault was certified as class counsel include *Zamora v. Balboa Life & Casualty LLC,* Case No. BC360026 (L.A. Super. Ct.), *York v. Starbucks Corp.,* Case No. 08-07919 (C.D. Cal.), *In re: Taco Bell Wage And Hour,* 2013 U.S. Dist. LEXIS 380 (N.D. Cal.), *In Re: Autozone, Inc., Wage and Hour Employment Practices Litigation,* Case No.: 3:10-md-02159-CRB (E.D. Cal.), *Mansfield v. Brackenhoff Mgmt. Group, Inc.,* No. BC356188 (L.A. Super. Ct.), and *Blair v. Jo-Ann Stores, Inc.,* Case No. BC394795 (L.A. Super. Ct.).

Mr. Theriault graduated from the Western New England School of Law in Springfield, Massachusetts, and received his undergraduate degree with honors from the University of Connecticut.  After graduation, Mr. Theriault practiced law in Connecticut starting in 2001.  He litigated primarily consumer actions involving allegations of auto dealership fraud, loan financing, and unlawful debt collection practices.  After moving to California, Mr. Theriault joined a large plaintiffs firm, where he litigated wage and hour class actions and was eventually made partner.

**Glenn A. Danas.**  A partner at Capstone, Glenn A. Danas heads the complex motion and appeals practice group.  A leading authority on arbitration law and PAGA actions, Mr. Danas was recently honored with the CLAY award for his work as lead counsel in *Iskanian v. CLS Transportation Los Angeles,* 59 Cal. 4th 348 (2014).  Mr. Danas briefed and argued this closely-watched case before the California Supreme Court, which resulted in a landmark decision that preserved employees' right to pursue PAGA actions notwithstanding a waiver in an arbitration agreement.  Mr. Danas was also recognized by The Daily Journal as one of California's Top 100 Lawyers for 2017 and Top 20 Lawyers Under 40 for 2013 and as one of the Top 75 Labor & Employment Lawyers in California for 2017.

Mr. Danas has argued over twenty appeals in the California Court of Appeal, the California Supreme Court, and the Ninth Circuit Court of Appeals, and has served as lead appellate counsel in many more.  While at Capstone, Mr. Danas argued before the California Supreme Court in three major victories for the plaintiffs: *Iskanian, McGill v. Citibank N.A.,* 2 Cal. 5th 945 (2017), and *Williams v. Superior Court,* 2017 WL 2980258 (2017). He also argued in the Ninth Circuit in *Baumann v. Chase Inv. Servs. Corp.,* 747 F.3d 1117 (9th Cir. 2014), *Chavarria v. Ralphs Grocery Co.,* 733 F.3d 916 (2013), which held that arbitration agreements may not be enforced if found unconscionable under general state contract law, and *Allen v. Bedolla,* 787 F.3d 1218 (9th Cir. 2015), which made law on judicial scrutiny of class action settlements.  Prior to joining Capstone, Mr. Danas successfully briefed and argued the precedent-setting appeal in *Brown v. Ralph's Grocery Co.,* 197 Cal. App. 4th 489 (2011), regarding the unenforceability of PAGA waivers.  Mr. Danas also successfully defeated an appeal of a motion to remand under the CAFA "local controversy exception" in *Coleman v. Estes Express Lines, Inc.,* 631 F.3d 1010 (9th Cir. 2011), establishing a new standard on when the circuit court may grant review in a discretionary appeal under CAFA.

Mr. Danas graduated from Emory University School of Law in 2001 with honors and authored *The Interstate Class Action Jurisdiction Act of 1999: Another Congressional Attempt to Federalize State Law,* 49 EMORY L.J. 1305



(2000), which was selected by the ABA as one of the top three student-written law journal articles in its annual nationwide competition. He received his undergraduate degree in Industrial and Labor Relations from Cornell University. After law school, he clerked for the Honorable U.W. Clemon, Chief U.S. District Judge for the Northern District of Alabama and began his career at an international law firm in New York City, where he primarily focused on antitrust and securities litigation.

**Melissa Grant.** Melissa Grant is a partner at Capstone. Ms. Grant is responsible for litigating many of the firm's most contentious and high-stakes class actions. The author of numerous successful motions for class certification, Ms. Grant is the lead or co-lead attorney on four certified class actions currently on track for trial, representing over 140,000 California employees in pursuing their wage and hour claims. She is also at the forefront in developing the law on PAGA, including administrative exhaustion, the scope of discovery, and PAGA trials. In *Williams v. Veolia Transp. Svcs.*, Case No. 08-02582 (C.D. Cal.), Ms. Grant's tenacious prosecution led to a settlement with civil penalty payment of $230,000, one of the largest on record for a PAGA enforcement action.

Prior to joining Capstone, Ms. Grant worked at the Securities and Exchange Commission as a staff attorney in the Enforcement Division, investigating ongoing violations of federal securities regulations and statutes and for Quinn Emanuel Urquhart & Sullivan, LLP, where she was an associate on the trial team that prosecuted the *Mattel v. Bratz* case. Ms. Grant began her legal career as a law clerk to the Honorable Harry Pregerson, Justice of the Ninth Circuit Court of Appeals before joining Sidley & Austin as an associate. She graduated from Southwestern Law School in 1999, where she served as editor-in-chief of the Law Review, and graduated *summa cum laude* and first in her class. Ms. Grant earned her undergraduate degree from Cornell University, where she received the JFK Public Service Award and the Outstanding Senior Award. Her published articles include: *Battling for ERISA Benefits in the Ninth Circuit: Overcoming Abuse of Discretion Review*, 28 Sw. U. L. Rev. 93 (1998), and CLE Class Actions Conference (SF) CAFA: *Early Decisions on Commencement and Removal of Actions* (2006).

### Of Counsel

**Jordan Lurie.** A renowned class action litigator, Jordan Lurie heads the automotive defect litigation practice group at Capstone, prosecuting cases involving violations of state and federal consumer protection laws, the Fair Credit Reporting Act, federal and state privacy laws, and federal securities law. Mr. Lurie has prosecuted class actions against major car manufacturers, and is serving (or has served as) class counsel in: *Falco v. Nissan N. Am. Inc.*; *Vargas v. Ford Motor. Co.*, *Batista v. Nissan N.Am., Inc.*; and *Chan v. Porsche Cars N.A., Inc.* Mr. Lurie helped negotiate class benefits valued in the tens of millions in *Klee v. Nissan N. Am.*; *Asghari v. Volkswagen Group of America*; and *Aarons v. BMW of N. Am.*.

Over his distinguished career, Mr. Lurie also has obtained settlements in excess of $100 million in actions where he was lead or co-lead counsel. Notable cases where Jordan served as lead counsel include: *In re: Apria Healthcare Group Secs. Litig.*, where Jordan settled on behalf of investors for $42 million in a securities fraud class action; *Morganstein v. Aura Systems*, where he settled claims for $18 million in a securities fraud class action; *In re Quintus Secs. Litig.*, a securities fraud class action which settled for $10.1 million; and *In re Southern Pacific Funding Corp., Sec. Litig.*, Case No. Civ. 98-1239-MA, (D. Or.), where he settled a class action for $19.5 million. Mr. Lurie has been selected as one of Southern California's "Super Lawyers" every year from 2012 through 2016.



Prior to joining Capstone, Mr. Lurie spent most his career at a national plaintiffs' law firm specializing in corporate securities and consumer class actions, where he was the managing partner of the firm's Los Angeles office. Mr. Lurie graduated from the University of Southern California Gould School of Law in 1987, where he was Notes Editor of the University of Southern California Law Review. He received his undergraduate degree with honors from Yale University. When not litigating, Mr. Lurie is an active educator and community leader. Jordan participated in the first Wexner Heritage Foundation leadership program in Los Angeles and holds leadership and executive positions in various organizations in the Los Angeles community. He has also been the featured speaker at California MCLE seminars regarding securities fraud and class actions, and has authored several publications for the California Continuing Education of the Bar.

### Senior Counsel

**Jennifer Bagosy**. Jennifer Bagosy is a senior counsel with Capstone Law, specializing in employment and consumer class action litigation, with an emphasis on trial preparation. She began her career as a litigation associate with Howrey LLP, first in Washington, D.C., and then in Irvine, California. At Howrey, she participated in two trials and two appeals in *Fifth Third Bank v. United States*, a breach of contract case arising from the S&L crisis of the 1980s, winning and upholding on appeal a $76.5 million verdict for the client. She also participated in trial in *Imagexpo v. Microsoft*, a patent infringement case, which resulted in a $62 million verdict for the client. Ms. Bagosy joined the firm of Morgan, Lewis & Bockius in 2011, where she specialized in securities litigation, D&O liability litigation, bank-failure related litigation, and professional liability. Jennifer graduated from Georgetown University Law Center in 2002. She received her undergraduate degree in Political Science from Bradley University, where she graduated summa cum laude.

Ms. Bagosy is admitted to practice law in California and before the United States District Court for the Eastern, Central, and Southern Districts of California, as well as the Ninth Circuit Court of Appeals, the Federal Circuit Court of Appeals, and the United States Supreme Court. She is actively involved in the Orange County Bar Association, where she is a member of the Professionalism & Ethics Committee.

**Liana Carter.** Liana Carter is a senior counsel with Capstone Law APC, specializing in complex motions, writs, and appeals. Her work on recent appeals has included successfully defeating a challenge to overturn the denial of a motion to compel arbitration in *Jacoby v. Islands Rests., L.P.*, 2014 Cal. App. Unpub. LEXIS 4366 (2014) and reversal of a dismissal of class claims in *Rivers v. Cedars-Sinai Med. Care Found.*, 2015 Cal. App. Unpub. LEXIS 287 (Jan. 13, 2015). Along with Mr. Danas, Ms. Carter was responsible for drafting the successful petition for review in *McGill v. Citibank N.A.*, as well as the petition for review and briefing on the merits in *Williams v. Superior Court*, 2017 WL 2980258. Ms. Carter also has extensive prior experience in overseeing settlement negotiations and obtaining court approval of class action settlements.

Ms. Carter was admitted to the California bar in 1999 after graduating from the University of Southern California Gould School of Law, where she was an Articles Editor on the board of the *Southern California Law Review*. She received her undergraduate degree with honors from the University of California, Irvine.

**Robert Drexler.** Robert Drexler is a senior counsel with Capstone Law where he leads one of the firm's litigation teams prosecuting wage-and-hour class actions. He has more than 25 years of experience representing clients in wage-and-hour and consumer rights class actions and other complex litigation in state and federal courts. Over the course of his career, Mr. Drexler has successfully certified dozens of employee classes for claims such as misclassification, meal and rest breaks, and off-the-clock work, ultimately resulting in multi-million dollar settlements. He has also arbitrated and tried wage-and-hour and complex insurance



cases.  Mr. Drexler has been selected as one of Southern California's "Super Lawyers" every year from 2009 through 2015.

Before joining Capstone, Mr. Drexler was head of the Class Action Work Group at Khorrami Boucher, LLP and led the class action team at The Quisenberry Law Firm.  Mr. Drexler graduated from Case Western Reserve University School of Law, where he served as Managing Editor of the Case Western Reserve Law Review and authored Defective Prosthetic Devices: Strict Tort Liability for the Hospital? 32 CASE W. RES. L. REV. 929 (1982). He received his undergraduate degree in Finance at Ohio State University where he graduated *cum laude*.  Mr. Drexler is a member of Consumer Attorneys of California (CAOC) and Consumer Attorneys of Los Angeles (CAALA).  He has been a featured speaker at class action and employment litigation seminars, and has published articles in CAOC's Forum Magazine and The Daily Journal.

**Robert Friedl.**  Robert Friedl is a senior counsel at Capstone, where he devotes most of his time to the briefing and litigation strategy of consumer protection cases.  Mr. Friedl has over 20 years of experience representing plaintiffs and defendants in consumer class actions, insurance coverage and defense, employment law, and personal injury.  His lengthy service as an appellate attorney has yielded several published cases, including successful outcomes in *Goldstein v. Ralphs*, 122 Cal. App. 4th 229 (2004), *Morgan v. AT&T*, 177 Cal. App. 4th 1235 (2009), and *Hecimovich v. Encinal School Parent Teacher Organization*, 203 Cal. App. 4th 450 (2012).  At Capstone, Mr. Friedl was responsible for the appellate win in *Grant v. Unifund CCR, LLC*, 577 Fed. Appx. 693 (9th Cir. 2014).

Prior to joining Capstone, Mr. Friedl was a partner at civil litigation boutique, where he handled the firm's most complex briefing.  He is a graduate of the University of Connecticut, and received his law degree from Southwestern School of Law, where he earned an American Jurisprudence Book Award.

**Katherine Kehr.**  A senior counsel at Capstone, Katherine Kehr prosecutes aggregate actions on behalf of California workers, handling all aspects of wage and hour litigation.  While at Capstone, Ms. Kehr developed expertise on issues relating to arbitration and PAGA issues.  At Capstone, Ms. Kehr was the primary attorney on *Brown v. Super. Ct.* (*Morgan Tire*), 216 Cal. App. 4th 1302 (2013) (superseded by grant of review), as well as the primary drafter of the intermediate court briefing in *Iskanian*.  Recently, Ms. Kehr was one of the primary drafters of a contested motion for class certification, by which Capstone successfully certified a class and was appointed class counsel in *Romo v. GMRI, Inc.*, Case No. 12-cv-00715-JLQ-SP (C.D. Cal.).

Ms. Kehr graduated from the University of Southern California Gould School Of Law in 2002, where she was a member of the Moot Court Honors Program.  After law school, she clerked for the Honorable Richard D. Savell of the Alaska Superior Court and the Honorable Anthony J. Mohr of the Los Angeles Superior Court.  Ms. Kehr received her undergraduate degree in French literature *cum laude* from Bryn Mawr College. She received her training as an associate at Selman Breitman LLP, where she handled all aspects of pre-trial litigation, in both state and federal court.

**Bevin Allen Pike.**  Bevin Allen Pike is a senior counsel with Capstone Law where she focuses primarily on wage-and-hour class actions.  Ms. Pike has spent her entire legal career representing employees and consumers in wage-and-hour and consumer rights class actions.  Over the course of her career, Ms. Pike has successfully certified dozens of employee and consumer classes for claims such as meal and rest breaks, unpaid overtime, off-the-clock work, and false advertising.



Before joining Capstone, Ms. Pike's experience included class and representative action work on behalf of employees and consumers at some of the leading plaintiffs' firms in California. Ms. Pike graduated from Loyola Law School, Los Angeles, where she was an Editor for the International and Comparative Law Review. She received her undergraduate degree from the University of Southern California. Ms. Pike has been selected as one of Southern California's "Super Lawyers – Rising Stars" every year from 2012 through 2015.

**Arlene Turinchak**. Arlene Turinchak. is a senior counsel with Capstone Law, where she drafts appellate briefs, complex motions, and writ petitions in consumer and employment class actions. She has extensive experience in appeals, having drafted briefs in 38 cases that resulted in published decisions. Ms. Turinchak began her career in New Jersey specializing in First Amendment law, reporters' rights, defamation defense, and libel. Since relocating to Los Angeles, Ms. Turinchak has been a civil litigator, handling contract and tort actions, along with plaintiff's legal malpractice cases.

Ms. Turinchak graduated from Fordham University School of Law and received her undergraduate degree in political science from Rutgers University. She is admitted to practice law in California, New Jersey, and New York, and before the United States District Court for the Central and Eastern Districts of California, and the District of New Jersey. She is also admitted to practice before the United States Court of Appeals for the Third and Ninth Circuits.

**Ryan H. Wu.** Ryan H. Wu is a senior counsel at Capstone and is primarily responsible for complex motion work and supervising court approval of class action settlements. Mr. Wu handles many of the most challenging legal issues facing Capstone's clients, including the scope and operation of PAGA, contested attorneys' fees motions, and responding to objectors. Mr. Wu is responsible for the merits briefing in the landmark *McGill v. Citibank, N.A.*, 2 Cal. 5th 945 (2017), which protected consumers' right to pursue public injunctive relief, and *Williams v. Superior Court*, 3 Cal.5th 531(2017), where the California Supreme Court set discovery guidelines in PAGA actions. Mr. Wu also authored the appellate briefs in *Baumann v. Chase Inv. Servs. Corp*, 747 F.3d 1117 (9th Cir. 2014), where, on an issue of first impression, the Ninth Circuit sided with Plaintiffs in holding that PAGA actions are state enforcement actions not covered by the CAFA. In February 2015, Mr. Wu, along with Mr. Danas and Mr. Perez, received the prestigious CLAY award for his successful appellate work, including briefing to the California Supreme Court, in *Iskanian*.

Mr. Wu graduated from the University of Michigan Law School in 2001, where he was an associate editor of the *Michigan Journal of Law Reform* and contributor to the law school newspaper. He received his undergraduate degree in political science with honors from the University of California, Berkeley. He began his career litigating international commercial disputes and commercial actions governed by the Uniform Commercial Code. Mr. Wu is co-author of "*Williams v. Superior Court: Employees' Perspective*" and "*Iskanian v. CLS Transportation*: Employees' Perspective," both published in the *California Labor & Employment Law Review*.

<u>Associates</u>

**Arnab Banerjee.** Arnab Banerjee is an associate with Capstone, where he litigates employment and consumer class actions. Mr. Banerjee's practice focuses primarily on wage and hour class action litigation where he has worked on more than 50 class action cases on behalf of employees for the failure to pay overtime and minimum wages, the failure to provide meal and rest breaks, and helping to obtain millions of dollars in recovery for employees. Admitted to the Bar in 2007, Mr. Banerjee began his career and received his training as an associate at Latham & Watkins LLP, where he handled all aspects of pre-trial litigation, in



both state and federal court in a wide variety of business litigation matters ranging from white collar defense to environmental litigation. Mr. Banerjee graduated from the University of Southern California Gould School Of Law, where he was an editor on the Interdisciplinary Law Journal, and received his undergraduate degrees in Political Science and Sociology, with a minor in Humanities and Law from the University of California, Irvine where he graduated *cum laude* and Phi Beta Kappa.

**Ari Basser**. Ari Basser is an associate with Capstone Law, where his practice focuses on litigating complex wage-and-hour class actions and PAGA representative actions. Prior to joining Capstone, Mr. Basser litigated consumer fraud, antitrust, product defect, securities, and employment class actions at several prominent plaintiffs' firms. Mr. Basser earned his Juris Doctor from Santa Clara University School of Law, where he spent his summers as a Bar Certified Law Clerk in the Economic Crimes Unit of the Santa Clara County Office of the District Attorney. He received dual-degrees in Economics and Psychology from the University of California, San Diego. He is admitted to practice law in California and before the United States District Court for the Northern, Eastern, Central, and Southern Districts of California and is a contributing author to the Competition Law Journal, the official publication of the Antitrust, UCL, and Privacy Section of the State Bar of California. His publications have examined trends in employment and antitrust litigation and the regulatory authority of the Federal Trade Commission.

**Brandon Brouillette**. Brandon Brouillette is an associate with Capstone Law, where his practice focuses on representing employees and consumers in complex litigation, primarily wage-and-hour class actions and PAGA representative actions. His entire legal career has been devoted to representing individual and class representative plaintiffs against large corporate entities. Prior to joining Capstone, Mr. Brouilette served as an associate at Boucher LLP where he managed the firm's wage-and-hour class actions. He earned his Juris Doctor from Loyola Law School, Los Angeles, where he spent a summer interning for the legal clearance and corporate legal departments at Warner Bros. He received his undergraduate degree from the University of Southern California and is admitted to practice in California and before the United States District Court for the Northern and Central Districts of California. In 2016, Mr. Brouillette was selected as one of Super Lawyers' "Rising Stars" in Southern California.

**Jordan Carlson**. Jordan Carlson is an associate with Capstone Law. His practice focuses on analyzing pre-litigation wage-and-hour and consumer claims, including claims for overtime wages, meal and rest periods, and off-the-clock work violations. Mr. Carlson began his career as an associate at a civil litigation firm where he handled a wide variety of matters including environmental contamination defense, bad faith insurance litigation, wrongful death, employment, real estate, and business litigation. He graduated from Whittier Law School in 2013. While attending law school, he served as a Summer Associate for the California Department of Justice. Mr. Carlson earned his bachelor's degree from Boston University where he graduated cum laude and is admitted to practice law in California and before the United States District Court for the Central District of California.

**Anthony Castillo**. Anthony Castillo is an associate with Capstone Law. His practice focuses on analyzing pre-litigation wage-and-hour and consumer claims, including claims for overtime wages, meal and rest periods, and off-the-clock work violations. Prior to joining Capstone, he was an associate at a California bankruptcy practice, where he represented individual and business debtors in liquidations and re-organizations as well as various debt and foreclosure defense-related issues. Mr. Castillo graduated from Loyola Law School, Los Angeles in 2009, where he volunteered with the Disability Rights Legal Center. He attended Stanford University for his undergraduate degree, majoring in Political Science and minoring in



History. Anthony is admitted to practice law in California and Washington and before the United States District Court for the Central and Southern Districts of California.

**Ruhandy Glezakos.**  Ruhandy Glezakos is an associate with Capstone Law. He works on behalf of employees, focusing primarily on wage-and-hour class action litigation for failure to pay overtime and minimum wages, failure to provide meal and rest breaks, and other Fair Labor Standards Act and California Labor Code violations. Mr. Glezakos advocates passionately for those in need and has extensive experience working in public interest, particularly for low-wage workers and undocumented communities. Ruhandy graduated from UCLA School of Law. During law school, he served as a judicial extern for the Honorable Harry Pregerson, Ninth Circuit Court of Appeals. He received his undergraduate degree from the University of California, Los Angeles where he graduated cum laude.

**Jamie Greene.**  Jamie Greene is an associate with Capstone where she evaluates potential new cases, develops new claims, and manages client relations. Well-versed in wage and hour law and federal and state consumer protection statutes, Ms. Greene supervises the pre-litigation phase for all cases, including investigation, analysis, and client consultation.  Ms. Greene began her legal career at Makarem & Associates representing clients in a wide array of cases ranging from wrongful death, insurance bad faith, employment, personal injury, construction defect, consumer protection, and privacy law.  She is a graduate of the University of Southern California Gould School of Law and earned her bachelor's degree from Scripps College in Claremont, California. She is an active member of the Consumer Attorneys Association of Los Angeles (CAALA), and the Beverly Hills, Los Angeles County, and Santa Monica Bar Associations.

**Robin Hall.**  Robin Hall is an associate with Capstone Law, where she heads the firm's research department. Ms. Hall assists in pre-litigation investigation of employment and consumer statutory claims, and handles complex research projects.  A founding editor of the Impact Litigation Journal (ILJ), Ms. Hall has authored numerous articles on emerging legal issues published on ILJ.  Ms. Hall began her career and received her training as an associate at Baker & Hostetler LLP, where she represented Fortune 500 companies in labor and employment litigation, including class actions. She attended Indiana University's Maurer School of Law, where she graduated *cum laude* in 2007. During law school, Ms. Hall served as Editor-in-Chief of the Indiana Journal of Global Legal Studies and Director of the Inmate Legal Assistance Clinic. She received her undergraduate degree from the University of Missouri and is admitted to practice law in California.

**Jonathan Lee.**  An associate with Capstone, Jonathan Lee primarily litigates employment class actions.  At Capstone, Mr. Lee has worked on several major successful class certification motions, and his work has contributed to multi-million dollar class settlements against various employers, including restaurant chains, retail stores, airport staffing companies, and hospitals.  Prior to joining Capstone, Mr. Lee defended employers and insurance companies in workers' compensation actions throughout California.  Mr. Lee graduated in 2009 from Pepperdine University School of Law, where he served as an editor for the Journal of Business, Entrepreneurship and the Law; he received his undergraduate degree from UCLA.

**Suzy E. Lee**.  Suzy Lee, an associate with Capstone, litigates complex matters with a focus on wage-and-hour class actions.  Ms. Lee has successfully litigated wage and hour class actions and single plaintiff cases in other practice areas, including consumer fraud, commercial litigation, personal injury, and employment discrimination. Prior to joining Capstone, Ms. Lee was an associate at several prominent plaintiff firms, where she litigated complex wage and hour and consumer class actions in state and federal courts. Ms. Lee also has experience defending businesses in cases involving contract disputes and other business litigation matters. Ms. Lee graduated from the Indiana University Maurer School of Law, where she served as the President of



the Asian Pacific American Association.  She received her undergraduate degree from the University of California, Irvine, where she graduated *cum laude*. Ms. Lee is proficient in Korean.

**Trisha Monesi**.  Trisha Monesi is an associate with Capstone Law. Her practice focuses on client consultation, claim identification, investigation, analysis, and development of new automotive defect class actions and other consumer class actions. She graduated from Loyola Law School, Los Angeles in 2014, where she served as an editor of the Loyola of Los Angeles Entertainment Law Review and was a certified law clerk at the Center for Juvenile Law and Policy. She earned her undergraduate degree from Boston University in 2011, where she majored in Political Science and International Relations. She is an active member of the Women Lawyers Association of Los Angeles, and the Los Angeles County and Beverly Hills Bar Associations. Trisha is admitted to practice law in California and before the United States District Court for the Central District of California.

**Cody Padgett.**  An associate with Capstone, Cody Padgett's practice focuses on prosecuting automotive defect and other consumer class action cases in state and federal court.  He handles consumer cases at all stages of litigation, and has contributed to major settlements of automobile defect actions valued in the tens of millions.  Prior to joining Capstone Law, Mr. Padgett was a certified legal intern with the San Diego County Public Defender's Office. During law school, Mr. Padgett served as a judicial extern to the Honorable C. Leroy Hansen, United States District Court for the District of New Mexico. He graduated from California Western School of Law in the top 10% of his class and received his undergraduate degree from the University of Southern California, where he graduated *cum laude*.

**Eduardo Santos.**  Eduardo Santos, an associate at Capstone, represents employees and consumers in class action litigation, with a special focus on negotiating, structuring, managing, and obtaining court approval of Capstone's class action settlements.  Having assisted in obtaining court-approval of over 60 wage and hour and consumer class action settlements during the course of his career, Mr. Santos has contributed significantly to the high approval rate of Capstone's settlements.  Before joining Capstone, Mr. Santos was an associate at one of California's largest plaintiffs-only employment law firms, and prior to that, an associate at a prominent plaintiff's firm specializing in mass torts litigation, where he was part of a team that secured a total of $4.85 billion for thousands of individuals with claims of injuries caused by taking Vioxx.  Mr. Santos received his JD from Loyola Law School of Los Angeles in 2007, which he attended on a full academic scholarship.  While in law school, he was an extern for the Honorable Thomas L. Willhite, Jr. of the California Court of Appeal.  He graduated *magna cum laude* from UCLA with majors in Political Science and History, and was a recipient of the Ralph J. Bunche scholarship for academic achievement.

**Mao Shiokura.**  Mao Shiokura is an associate with Capstone.  Her practice focuses on identifying, analyzing, and developing new wage-and-hour and consumer claims, including violations of the Fair Credit Reporting Act, Consumers Legal Remedies Act, False Advertising Law, and Unfair Competition Law.  Prior to joining Capstone, Ms. Shiokura was an associate at a California lemon law firm, where she represented consumers in Song-Beverly, Magnuson-Moss, and fraud actions against automobile manufacturers and dealerships.  Ms. Shiokura graduated from Loyola Law School, Los Angeles in 2009, where she served as a staff member of Loyola of Los Angeles Law Review. She earned her undergraduate degree from the University of Southern California, where she was a Presidential Scholar and majored in Business Administration, with an emphasis in Cinema-Television and Finance.

**Natalie Torbati.**  Natalie Torbati is an associate with Capstone Law. Her practice focuses on the firm's major motions and trials. Prior to joining Capstone, she was an associate at a prominent plaintiff's firm,



where she successfully litigated, mediated, and settled many single-plaintiff employment discrimination, harassment, and retaliation cases. Ms. Torbati obtained her Juris Doctor from UCLA School of Law in 2014, where she served as a writing advisor for UCLA Law's prestigious Lawyering Skills Program, Business Manager for the Women's Law Journal, and Co-Social Chair for the Jewish Law Students Association. She earned her undergraduate degree from the University of Southern California, where she graduated summa cum laude, majoring in Sociology and minoring in Business Law. Natalie is an active member of the Los Angeles County and Beverly Hills Bar Associations, and is admitted to practice law in California. She is fluent in Farsi and proficient in Spanish.

**Karen Wallace.**  An associate with Capstone, Karen Wallace handles the pre-litigation phase for prospective cases including investigation, claim identification and analysis, and client consultation. Ms. Wallace's expertise includes claims for meal and rest period violations, overtime wages, off-the-clock work, misclassification, and other employment and consumer claims.  Before attending Southwestern Law School, Ms. Wallace worked as a teacher for many years. She received her doctorate in English from the University of California, Los Angeles, where she also earned her master's degree in American Indian Studies.

**Tarek Zohdy.**  An associate with Capstone, Tarek Zohdy litigates automotive defect class actions, along with other consumer class actions for breach of warranty and consumer fraud.  At Capstone, he has worked on several large-scale automotive class action settlements that have provided significant relief to thousands of defrauded car owners. Before joining Capstone, Mr. Zohdy spent several years representing individual consumers in their actions against automobile manufacturers and dealerships for breaches of express and implied warranties pursuant to the Song-Beverly Consumer Warranty Act and the Magnuson-Moss Warranty Act, commonly referred to together as "Lemon Law."  He also handled fraudulent misrepresentation and omission cases pursuant to the Consumers Legal Remedies Act.  Mr. Zohdy graduated from Louisiana State University *magna cum laude* in 2003, and Boston University School of Law in 2006, where he was a member of the criminal clinic representing underprivileged criminal defendants.

OUTREACH AND EDUCATION

To increase public awareness about the issues affecting class action and other representative litigation in the consumer and employment areas, Capstone publishes the Impact Litigation Journal (www.impactlitigation.com).  Readers have access to news bulletins, op-ed pieces, and legal resources.  By taking advantage of social media, Capstone hopes to spread the word about consumer protection and employee rights to a larger audience than has typically been reached by traditional print sources, and to thereby contribute to the enforcement of California's consumer and workplace protection laws.

# EXHIBIT 37

1    Jordan L. Lurie (SBN 130013)
     Jordan.Lurie@capstonelawyers.com
2    Tarek H. Zohdy (SBN 247775)
     Tarek.Zohdy@capstonelawyers.com
3    Cody R. Padgett (SBN 275553)
     Cody.Padgett@capstonelawyers.com
4    Karen L. Wallace (SBN 272309)
     Karen.Wallace@capstonelawyers.com
5    Capstone Law APC
     1875 Century Park East, Suite 1000
6    Los Angeles, California 90067
     Telephone:  (310) 556-4811
7    Facsimile:  (310) 943-0396

8    Attorneys for Plaintiffs Alfred Salas and
     Gloria Ortega
9

10              UNITED STATES DISTRICT COURT

11             CENTRAL DISTRICT OF CALIFORNIA

12

13   ALFRED SALAS and GLORIA          Case No.: 2;15-cv-08629 FMO (Ex)
     ORTEGA, individually, and on
14   behalf of a class of similarly situated   **DECLARATION OF SUSAN K.**
     individuals,                       **THOMPSON IN SUPPORT OF**
15                                       **PLAINTIFFS' MOTION FOR**
              Plaintiffs,               **CLASS CERTIFICATION**
16
              vs.                       Date:       January 4, 2018
17                                       Time:       10:00 a.m.
     TOYOTA MOTOR SALES, U.S.A.,         Judge:      Hon. Fernando M. Olguin
18   INC., a California corporation,     Ctrm:       6D

19            Defendant.

20

21

22

23

24

25

26

27

28

## DECLARATION OF SUSAN K. THOMPSON

I, Susan K. Thompson declare as follows:

1.   I am the expert retained by Plaintiffs to opine regarding the damages suffered by class members in the above-referenced action.

2.   In connection with this litigation, I reviewed Plaintiffs' First Amended Class Action Complaint, the expert report of Kevin Lane Keller, dated September 9, 2016, and the sur-rebuttal report of Bruce Strombom, dated November 7, 2016. I also reviewed Technical Service Bulletin 0142-13 and the warranty database of repairs performed, produced by Defendant Toyota Motor Sales, U.S.A., Inc. ("TMS"). I prepared one rebuttal report, on which Plaintiffs relied in opposing TMS' motion for summary judgment. My report is attached as Exhibit A and incorporated herein by reference. The report states my credentials, which show affirmatively that I am competent to testify to the matters stated. The report also describes the work I performed and sets forth my opinions and their bases.

3.   In addition to my written report, I was deposed and questioned by defense counsel regarding my opinions in this case on November 10, 2016. During that deposition, I testified under penalty of perjury as to the opinions I expressed in my written report. I submitted an errata sheet regarding minor errors to the transcript, which did not change or alter my testimony or my opinions, and signed my deposition transcript on December 13, 2016.

4.   I submit this supplemental report  in response to concerns raised by TMS' expert Bruce Strombom regarding my damages analysis.

5.   Specifically, I was asked to rebut Mr. Keller's claim that "individual analysis is required to determine whether and to what extent each proposed Class Member allegedly overpaid for his or her Class Vehicle due to the alleged lack of disclosure from Toyota." To the contrary, Plaintiffs contend that they were damaged because, when they purchased their vehicles, they bargained for a

1   vehicle that did not contain a known HVAC design defect, which is not what

2   they received.

3       6.    Plaintiffs further contend that they are entitled to a payment in the

4   amount of the average cost required to mitigate the effects of the HVAC Defect

5   for the life of the vehicle. Under the pertinent TSB entitled "HVAC Odor

6   Maintenance," TMS directs its dealers to replace the HVAC filter with a

7   charcoal impregnated filter and to conduct evaporator cleaning services.

8       7.    Contrary to Dr. Keller's claims, and as described in my rebuttal report

9   (Exhibit A), classwide damages are calculable by computing the average cost of

10  the parts and labor required to make the repairs necessary to remediate the

11  HVAC defect.

12      8.    The economic principle underlying Plaintiff's theory of loss is benefit-

13  of-the-bargain and posits that Plaintiffs and the Class overpaid for their vehicles

14  at point of sale, believing them to be defect-free. Plaintiffs' theory of damages

15  thus assigns a monetary value to the premium paid for a defect-free HVAC

16  system at the time of sale or lease, which is the same amount regardless of the

17  actual price paid by each Class Member.

18      9.    The model I propose provides the average cost for the ongoing

19  mitigation of foul odors due to the design defect which, as I understand

20  Plaintiffs' theory, cannot be cured. This model can be applied on a classwide

21  basis to determine damages based on the cost to make the Class Vehicles

22  conform to the value Plaintiffs and other Class Members thought they were

23  getting in the price tendered.

24      10.   Contrary to Dr. Strombom's sur-rebuttal, whether or not an offensive

25  odor was or will be present is not the proper measure of benefit-of-the-bargain

26  damages. *See* Strombom Sur-Rebuttal (November 7, 2016) at 4, fn.12.

27  //

28  //

1    I declare under penalty of perjury under the laws of the United States and

2  the State of California that the foregoing is true and correct.  Executed on

3  November 𝒪 2017, at Fresno, California.

4

5                                              SUSAN K. THOMPSON

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF SUSAN K. THOMPSON ISO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

02246

# EXHIBIT A

## EXPERT REPORT OF SUSAN K. THOMPSON

### I.        Introduction and Qualifications

My firm, Hemming Morse, LLP, was retained by Capstone Law APC ("Counsel"), counsel to the proposed plaintiff class (the "Class") in *Salas et al. v. Toyota Motor Sales et al.*, Case No. 2:15-cv-08629-FMO (the "Litigation"), to provide an Expert Report and testimony regarding the damages suffered by class members in the Litigation in rebuttal to the report of Dr. Kevin Lane Keller.

In his report, Dr. Keller examines the variability of purchase transactions and concludes that final transaction prices will differ by consumer, making virtually impossible a class-wide damages calculation based on Defendants failure to disclose the HVAC Defect.  Dr. Keller's analysis is partly based on statistics regarding HVAC odor complaints from surveys typically collected within 3 months of purchase.[1]  Unfortunately, Dr. Keller fails to contextualize the data or consider the number of complaints that remain undocumented, since the problem has been designated a maintenance concern not captured by warranty claims.  His analysis also ignores the repairs that are made in response to complaints, and in accordance with TSB recommendations, and captured by records of repairs made at the discretion of authorized dealerships and service centers.

Dr. Keller opines and concludes that "Individual analysis is required to determine whether and to what extent each proposed class member allegedly overpaid for his or her class vehicle due to the alleged lack of disclosure from Toyota".[2]  To the contrary, Plaintiffs contend that they were damaged because, when they purchased their vehicles, they bargained for a vehicle that did not contain a known HVAC design defect, which is not what they received.  Plaintiffs further contend that they are entitled to a payment in the amount of the average cost required to mitigate the effects of the HVAC Defect for the life of the vehicle.  Contrary to Dr. Keller's claims, and as described in the following report, these damages are calculable by computing the average cost of the parts and labor required to make the repairs necessary to remedy the HVAC defect.

---

[1] *See* Keller report, Exhibits 3 and 4.
[2] *See* Keller report at ¶ 92.

Accordingly, damages can be calculated on a class-wide basis under a benefit of the
bargain theory.

I am a partner in the Forensic Consulting Services Group of Hemming.  I have
over 30 years of experience in public accounting with both a national firm and
local Fresno firm prior to joining Hemming in 2001. My expert qualifications,
including the testimony I have given during the last four years are described in
**Exhibit A** attached hereto.

My primary background is in auditing, and I have performed extensive litigation
and forensic accounting services for 30 years. My forensic accounting experience
includes assistance in various forms of business litigation, fraud investigations,
professional liability litigation, white collar crime, investigations of property and
casualty insurance and fraud claims.  I also have experience in criminal matters,
having provided services to United States Attorneys, County District Attorneys and
the California Attorney General.  I have testified several times in superior courts
and participated in arbitration proceedings, mediation proceedings and
administrative hearings.

I am a Certified Public Accountant in California and am Certified in Financial
Forensics by the American Institute of Certified Public Accountants.  I earned a
Bachelor of Science in Accounting from Loma Linda University, La Sierra
campus.

My hourly rate for preparing this report is $440 per hour.  My compensation for any
deposition and trial testimony in this Litigation is billed at the rate of $440 per hour.
Counsel has also agreed to reimburse my out-of-pocket expenses.  My compensation
is not dependent either on the opinions I express or the outcome of this Litigation.
A list of the sources I consulted in preparing this report, as required by Federal Rule
of Civil Procedure 26(a)(2)(B)(ii) may be found in Exhibit B to this report.

## II.    Background

Plaintiffs allege that certain vehicles manufactured and sold by Defendants had a
defective HVAC system.   Specifically, Plaintiffs allege that the HVAC system
contains one or more design defects that cause, among other problems, emissions of

noxious and foul odors from debris and contamination in the HVAC systems as well as possible growth of mold (the "HVAC Defect").[3]

## III. Documents Considered

The documents I considered in reaching my opinions in this matter are listed in Exhibit B attached to this report. Those documents include, among other items, a Toyota Technical Service Bulletin ("TSB") and a database of repairs done pursuant to the TSB produced by Defendant. Under the pertinent TSB entitled "HVAC Odor Maintenance", Toyota directs its dealers to replace the HVAC filter with a charcoal impregnated filter and to conduct evaporator cleaning services.[4] The database provides the amounts incurred for parts, labor, and sublet expenses for repairs performed during the years 2011 through 2015 related to the HVAC Defect in model year 2012 through 2015 Toyota Camrys.[5]

Other evidence may be produced to me that could be relevant to my conclusions, including the testimony and reports of other witnesses, and I reserve the right to amend my report and supplement my opinions after considering such evidence, if necessary.

## IV. Analysis

*Benefit of the Bargain Class-Wide Damage Model*

The class-wide damage model I proffer and compute is a benefit of the bargain model. Plaintiffs contend that they are damaged because when they purchased their vehicles, they bargained for a vehicle that did not contain known HVAC defects, but that is not what they received. In order to provide class members who have not yet paid out of pocket to repair their vehicles with the design-defect-free vehicles they bargained for, Plaintiffs further contend that they are entitled to a payment in the amount of the average cost of continuous, ongoing repairs to the HVAC system needed to abate the HVAC odor. The complaint states "On information and belief, the HVAC Defect cannot be resolved by the Defendant's offered "fixes" and thus may require expensive and temporary repairs, including repeated replacement of air

---

[3] *See* First Amended Class Action Complaint.
[4] *See* Toyota_Salas_00029567.
[5] *See* Toyota_Salas_00030709.

filters or other related components, as well as repeated foam flushes or other related repairs."[6]  The complaint also states that "The HVAC system will require repairs or replacements throughout the life of the vehicles."[7]  The measure of damages would be a payment in the amount of the average cost of the parts, labor, and sublet required to repair the HVAC Defect over the average life span of the vehicle.

To determine such amounts, we utilized the repairs database provided by Defendant in this litigation.  For each claim, the database lists various information including, but not limited to, city and state, description of repair, and the costs for parts, labor and sublet repairs.  We have calculated an average cost of parts, labor, sublet and total repair by state.  The results of our analysis for the claims related to this litigation, recorded by dealers in California, are outlined in Table 1 below:

| | Table 1 | | | |
| State | Average Cost of Parts | Average Cost of Labor | Average Cost of Sublet | Average Total Cost |
| CA | 45.48 | 108.58 | 159.13 | 313.20 |

To determine total damages to the Plaintiffs, the average cost of the repairs would be multiplied by the average estimated life of the vehicle which is estimated to be 10 years.

In calculating the averages in Table 1, we excluded any claim where $0 was paid for either the parts, labor or sublet portion of the repair in order to eliminate data representing repairs that received discounts. We also eliminated any total claim that was greater than $5,000 and removed other line items that included descriptions of work encompassing repairs unrelated to the HVAC Defect. Future increases in cost and labor for repairs are not reflected in the calculated average above.

Taking these factors into consideration, this model provides a conservative calculation of the average cost for repair.  If additional information is provided that changes the average total cost of repair reflected above and the amounts actually

---

[6] See First Amended Class Action Complaint, p. 3.
[7] See First Amended Class Action Complaint, p. 6.

incurred by the Plaintiffs, or the current cost of parts and labor, the computations may increase.

Additionally we have summarized our analysis for the claims recorded for dealers in other states, excluding California, which are outlined in Table 2 below:

| | | | Table 2 | |
| | Average Cost of Parts | Average Cost of Labor | Average Cost of Sublet | Average Total Cost |
| State | | | | |
|---|---|---|---|---|
| AL | 62.18 | 62.48 | 48.16 | 172.82 |
| AR | 40.67 | 163.26 | 48.70 | 252.63 |
| CT | 908.67 | 779.85 | 245.00 | 1,933.52 |
| FL | 50.57 | 78.23 | 26.92 | 155.72 |
| GA | 52.28 | 61.09 | 24.28 | 137.65 |
| IA | 55.66 | 582.00 | 5.40 | 643.06 |
| IL | 40.49 | 60.93 | 45.50 | 146.92 |
| IN | 27.49 | 114.75 | | 142.24 |
| KS | 48.20 | 100.70 | 24.99 | 173.89 |
| KY | 46.99 | 50.87 | | 97.86 |
| LA | 39.11 | 90.23 | 91.91 | 221.25 |
| MA | 51.00 | 17.60 | | 68.60 |
| MD | 20.00 | 30.60 | | 50.60 |
| MI | 16.49 | 348.17 | 395.55 | 760.20 |
| MN | 36.66 | 153.70 | 107.25 | 297.61 |
| MO | 50.51 | 71.76 | 42.04 | 164.31 |
| NC | 49.23 | 52.13 | 26.36 | 127.72 |
| NE | 70.97 | 110.40 | | 181.37 |
| NJ | 56.75 | 63.34 | 41.93 | 162.01 |
| NV | 19.97 | 56.00 | | 75.97 |
| NY | 51.00 | 303.42 | 618.25 | 972.67 |
| OH | 77.72 | 63.15 | | 140.87 |
| OK | 44.83 | 77.64 | 39.36 | 161.83 |
| OR | 45.49 | 109.30 | 19.97 | 174.76 |
| PA | 39.11 | 29.85 | | 68.96 |
| RI | 35.00 | 31.20 | | 66.20 |
| SC | 42.85 | 41.93 | 26.06 | 110.84 |
| TN | 54.97 | 42.50 | | 97.47 |
| TX | 36.13 | 108.74 | 32.51 | 177.38 |
| VA | 70.97 | 48.82 | | 119.79 |
| WA | 39.97 | 54.25 | 270.00 | 364.22 |
| WI | | 365.12 | | 365.12 |
| | | | | |
| Overall | 73.61 | 135.12 | 109.01 | 317.74 |

5

As noted above, the average cost of the repairs would need to be multiplied by the average estimated life of the vehicle, estimated to be 10 years, to compute Plaintiffs' total damages.

*Out of Pockets are Available*

Reimbursement of out of pocket costs incurred by class members for repairs to mitigate HVAC odor are calculable based on class members' receipts or invoices for HVAC defect-related repairs.

## V.    Conclusion

Our analysis, which makes reasonable assumptions supported by documents provided by the Defendant, shows, as outlined in Tables 1 and 2 above, the conservative average repair costs based on parts, labor, and sublet costs necessary because of the defective HVAC design system used by the Defendant.

The opinions expressed in this report are based on the information reviewed to date. When further information becomes available and has been reviewed, I reserve my right to amend, revise, and finalize my report and opinions accordingly.

I declare the foregoing to all be correct and true to the best of my knowledge. Executed on the 7th day of October 2016, at Fresno, CA.


_____
Susan K. Thompson

6

# EXHIBIT A

**HEMMING MORSE, LLP**

CERTIFIED PUBLIC ACCOUNTANTS,
FORENSIC AND FINANCIAL CONSULTANTS

CURRICULUM VITAE

www.hemming.com

# Susan K. Thompson, CPA/CFF

## Employment & Education

| | |
|---|---|
| 2012 – Present | **Hemming Morse, LLP**<br>*Certified Public Accountants,*<br>*Forensic and Financial Consultants*<br>Partner |
| 2001 – 2011 | **Hemming Morse, Inc.**<br>Director, 2004-2011<br>Manager, 2001-2003 |
| 1987 – 2001 | **Silva Harden & Adolph, AC**<br>Fresno, California |
| 1985 – 1987 | **Price Waterhouse**<br>San Jose, California |
| 1984 – 1985 | **Price Waterhouse**<br>Newport Beach / Riverside, California |
| 1983 | **Loma Linda University, Loma Linda, California**<br>B.S. Accounting |

## Professional & Service Affiliations

- **Certified Public Accountant, State of California**
- **Certified in Financial Forensics**
- **California Society of Certified Public Accountants**
  - Member, Forensic Services Section for Economic Damages
  - Member, Forensic Services Section for Fraud
  - Member, Litigation Steering Committee, 1997-2001
  - Chair, Litigation Services Committee, Fresno Chapter, 1997-1999
- **American Institute of Certified Public Accountants**
- **Loma Linda University Alumni Association**
- **Smile For A Lifetime, Fresno/Clovis Chapter**
  - Board of Directors

## Publications

- Co-editor of *The Witness Chair*, published quarterly by the Litigation Sections of the California Society of Certified Public Accountants, 1999-2002

page 1 of 5

**Fresno Office**
7541 N. Remington Avenue
Suite 103
Fresno, CA  93711
Tel: 559.440.0575
Fax: 415.777.2062

**HEMMING MORSE, LLP**

CERTIFIED PUBLIC ACCOUNTANTS,
FORENSIC AND FINANCIAL CONSULTANTS

CURRICULUM VITAE

www.hemming.com

# Susan K. Thompson, CPA/CFF

## Seminar Instruction/Presentations

- Speaker, California Society of CPAs Economic Damages Section Conference – Business Interruptions: When Good Food Goes Bad, 2015

- Speaker, State Association of County Auditors 103rd Conference – Developing Your Fraud Investigation Through Percipient and Subject Interviews, 2013

- Speaker, Fresno Chapter of the Institute of Management Accountants

## Testimony

### Trial and Arbitration

- **Ashley Lane, LP v. Producers AG Insurance Group (2015)**
  American Arbitration Association
  Case No. 74-20-1300-0169

- **Fresno RV, Inc., et al. v. Paul Evert's RV Country, Inc., et al. (2013)**
  California Superior Court, Fresno County
  Case No. 11CECG01433

- **Muhammad Anwar, M.D. v. State of California, et al. (2012)**
  California Superior Court, Madera County
  Case No. MCV034056

- **Jaime Hernandez v. Eugenia Costa, et al. (2012)**
  California Superior Court, Alameda County
  Case No. RG1049274

- **Lopez, et al. v. Allstate Insurance Company, et al. (2012)**
  California Superior Court, Fresno County
  Case No. 10CECG01035JH

- **In re: Zachariah, Jacob v. AMCO, Inc. (2012)**
  Judicial Arbitration and Mediation Services
  San Francisco Division, Ref No. 1100068786

- **eMocha, LLC, et al. v. Central Plaza Union City, L.P., et al. (2010)**
  California Superior Court, Alameda County
  Case No. RG06-296460

- **Primex Farms, LLC v. Chapparal Farms, Inc. (2010)**
  California Superior Court, Fresno County
  Case No. 07CECG02935

- **Gallegos, et al. v. NCRC, Inc. (2009)**
  California Superior Court, Fresno County
  Case No. 07CECG04060AMC

- **People v. Harry Kassebaum (2008)**
  California Superior Court, Fresno County
  Case No. F05906970-9

- **Monarch Nut Company, Inc. v. Mutual Service Casualty Insurance Company (2005)**
  California Superior Court, Tulare County
  Case No. 01-196556

- **Cal Farm Insurance Company v. Mister "C" Investments (2003)**
  California Superior Court, Fresno County
  Case No. 01 CE CG 00109

- **Freitas v. Hamlin (2001)**
  California Superior Court, Fresno County

page 2 of 5

**Fresno Office**
7541 N. Remington Avenue
Suite 103
Fresno, CA  93711
Tel: 559.440.0575
Fax: 415.777.2062

**HEMMING MORSE, LLP**

CERTIFIED PUBLIC ACCOUNTANTS,
FORENSIC AND FINANCIAL CONSULTANTS

CURRICULUM VITAE

www.hemming.com

# Susan K. Thompson, CPA/CFF

## Testimony

### Deposition

- **Bobby L. Lo and Nancy V. Lo v. Greater Fresno Health Organization, Inc.. dba North Marks Clinic; Vang Moua, et al. (2016)**
  California Superior Court
  County of Fresno, Civil Division
  Case No. 15CECG00854

- **Star Laundry Services, Inc. v. Western State Design, Inc., et al. (2015)**
  California Superior Court
  County of San Diego - Central Division
  Case No. 37-2014-00011335-CU-BC-CTL

- **Kobe Falco v. Nissan North America, Inc., et al. (2015)**
  U.S. District Court, Central District of California
  Case No. 2:13-cv-00686-DDP-MANx

- **Irvine Apartment Communities, L.P. v. Western National Construction, et al. (2015)**
  American Arbitration Association
  Case No. 73 443 Y 00234 12

- **Anamiria Madrigal, et al. v. New Cingular Wireless Services, Inc., et al. (2015)**
  American Arbitration Association
  Case No. 74 484 Y 00301 11 nolg

- **Melinda Ward v. Superior Carpet Care, et al. (2015)**
  California Superior Court, Fresno County
  Case No. 13CEGG00704 MWS

- **Centerplate v. Unite Here (2014)**
  U.S. District Court, Case No. 13-CV-2318 DMR

- **Sharron Warehime v. Farmers Insurance (2013)**
  California Superior Court, Fresno County
  Case No. 08CECG02976

- **Fresno RV, Inc., et al. v. Paul Evert's RV Country, Inc., et al. (2013)**
  California Superior Court, Fresno County
  Case No. 11CECG01433

- **Jaime Hernandez v. Eugenia Costa, et al. (2012)**
  California Superior Court, Alameda County
  Case No. RG1049274

- **Muhammad Anwar, M.D. v. State of California, et al. (2012)**
  California Superior Court, Madera County
  Case No. MCV034056

- **Primex Farms, LLC v. Roll International Corp., et al. (2012)**
  California Superior Court, Fresno County
  Case No. 10CECG01114

- **Lopez, et al. v. Allstate Insurance Company, et al. (2012)**
  California Superior Court, Fresno County
  Case No. 10CECG01035JH

- **Primex Farms, LLC v. Chapparal Farms, Inc. (2010)**
  California Superior Court, Fresno County
  Case No. 07CECG02935

- **eMocha, LLC, et al. v. Central Plaza Union City, L.P., et al. (2009)**
  California Superior Court , Alameda County
  Case No. RG06-296460

- **Gallegos, et al. v. NCRC, Inc. (2009)**
  California Superior Court, Fresno County
  Case No. 07CECG04060AMC

- **Tremblay v. Aladdin Resort & Casino, et al. (2009)**
  District Court, Clark County, Nevada
  Case No. A494547

- **Lucille Epperson v. Hope Manor, et al. (2008)**
  California Superior Court, Fresno County
  Case No. 07CECG02718

- **Elaine Cantu v. Family Healthcare, et al. (2007)**
  California Superior Court, Fresno County
  Case No. 05CECG00738DSB

page 3 of 5

**Fresno Office**
7541 N. Remington Avenue
Suite 103
Fresno, CA  93711
Tel: 559.440.0575
Fax: 415.777.2062

**H E M M I N G**
**M O R S E, LLP**

CERTIFIED PUBLIC ACCOUNTANTS,
FORENSIC AND FINANCIAL CONSULTANTS

CURRICULUM VITAE

www.hemming.com

# Susan K. Thompson, CPA/CFF

## Testimony continued

### Deposition continued

- **Marla Lynn Swanson v. Susan Jane Tovar, et al. (2005)**
  California Superior Court, Tulare County
  Case No. 04-211317

- **AMCO Insurance Company v. Madera Quality Nut, LLC (2005)**
  U.S. District Court, Case No. CIV-F-04-6456

- **Monarch Nut Company, Inc. v. Mutual Service Casualty Insurance Company (2003)**
  California Superior Court, Tulare County
  Case No. 01-196556

- **Cal Farm Insurance Company v. Mister "C" Investments (2003)**
  California Superior Court, Fresno County
  Case No. 01 CE CG 00109

## Selected Experience

- Expert witness for plaintiffs' counsel in a wage and hour matter involving multiple employees spanning multiple years. The case involved unpaid overtime, meal and rest break violations, unpaid drive time to job sites, and off-the-clock time for traveling repairmen. Reviewed and analyzed employment history files, time and travel records, job site records, compensation data, and other documents to determine the proper employee compensation and to quantify damages.

- Expert witness for plaintiff in a loss of business income case. Determined the loss that resulted from the failure to plant corn silage, based on the insurance agent's direction, on land that had previously flooded.

- Accounting consultant for the insured in a large business interruption case involving a nut processing plant. The case went to appraisal upon which each element of loss was unanimously decided in favor of client in excess of $1 million dollars.

- Accounting consultant for an insurance company to investigate a theft at the insured's nut processing plant. Analysis included documenting the accounting and physical controls surrounding inventory and calculating the resulting loss to the insured.

- Accounting consultant for a large insurance com pany in a suspected fraudulent claim of a nut processing plant. Based upon analysis performed, including following transactions through the perpetual inventory system, the receiving and shipping processes, the claim was denied and further action was taken against the insured.

- Expert witness for the plaintiff, a nut processor. Calculated damages in a breach of contract dispute, ultimately determining the lost contribution margin due to the breach. Plaintiff was awarded damages according to testimony.

- Accounting consultant to the plaintiff, a nut grower, against their nut processor for suspected fraudulent accounting practices. Analysis included assessing reasonable processing costs, allocation of fixed and variable costs and analysis of third party transactions. The analysis lead to successful settlement in favor of the plaintiff before trial.

- Served as a neutral in an insurance appraisal hearing involving lost profits of a fast food restaurant.

- Performs internal control reviews for not for profit as well as for profit businesses.

page 4 of 5

**Fresno Office**
7541 N. Remington Avenue
Suite 103
Fresno, CA  93711
Tel: 559.440.0575
Fax: 415.777.2062

HEMMING
**MORSE, LLP**

CERTIFIED PUBLIC ACCOUNTANTS,
FORENSIC AND FINANCIAL CONSULTANTS

CURRICULUM VITAE

www.hemming.com

# Susan K. Thompson, CPA/CFF

### Selected Experience continued

- Accounting consultant on behalf of the insurance company to assist in quantifying the losses of their insured's due to Class 1 food recalls, both domestically and internationally. This included interacting with the insured's customers and following the recalled product through all processors up to the point it is sold to the end consumer.  Losses included raw product, work in progress and finished goods. The results of the analysis were used by counsel and the insured to settle claims.  Assistance was provided in the settlement process as well.

- Accounting consultant to many of the larger property and casualty insurance companies in California in assessing claims for loss of earnings, loss of inventory stock and loss of other business assets in agricultural, retail, food services and construction.

- Accounting consultant in several insurance fraud cases on behalf of the insurance company and/or the legal counsel assisting the insurance company. Duties included tracing money in money laundering schemes, providing financial status information for businesses or individuals, determining probable asset/inventory on hand, analysis and interpretation of accounting records and internal control structures, as well as analyzing various financial transactions.

- Accounting consultant in a large insurance fraud case. Worked with investigators from the Federal Bureau of Investigation and the District Attorney of Fresno's office in tracing funds through several bank accounts of several businesses.

- Accounting consultant in white-collar crimes including embezzlement and kiting schemes.

- Accounting consultant to the California State Board of  Accountancy in an investigation of possible audit failure following a filing of bankruptcy of the auditor's client. The investigation included the application of appropriate accounting for reverse repurchase agreements, inverse floating securities and various other investment vehicles, as well as applicable audit procedures in accordance with Generally Accepted Auditing Standards. This case included significant document control issues. The investigation led to a filing on the part of the State Board of Accountancy against its licensee. The case was heard in an Administrative Hearing. The licensees were eventually subjected to discipline.

- Assisted attorneys in preparation for depositions, in various stages of litigation and in anticipation of litigation. Prepared exhibits and related write-up work for trial. Typical services included calculations of damages and loss of earnings, analysis and interpretation of accounting records, and analysis of internal controls in industries including agricultural, professional services, retail, food services, construction, automobile dealerships, governmental entities, and real estate development.

- Provided expert witness testimony in cases involving personal injury and wrongful termination and resulting lost wages/damages.

- Provided expert witness testimony in a criminal matter involving real estate fraud.  Our involvement included tracing investor funds over several years through several bank accounts and various businesses.

- Assisted a general contractor and a California city in mediation proceedings by calculating damages and resulting lost profits to lessees which was relied upon by all parties involved.

page 5 of 5

**Fresno Office**
7541 N. Remington Avenue
Suite 103
Fresno, CA  93711
Tel: 559.440.0575
Fax: 415.777.2062

# EXHIBIT B

Salas v Toyota
Files Considered
Exhibit B

**File Name:**
First Amended Class Action complaint.pdf
Toyota TSB0142-13.pdf
Toyota_Salas_0008738-8741.pdf (frequency)
Toyota_Salas_00009666.pdf
Toyota_Salas_00015854-55.pdf (cost up)
Toyota_Salas_00024831-33.pdf (filter, recirc cost)
Toyota_Salas_00029565-67.pdf (TSB)
Toyota_Salas_00030709_Highly Confidential.xlsx
TMS-Salas-TMS Expert Report K Keller Sept 2016-Highly Confidential.pdf

# Exhibit 38



**Expert Report of
Jeffrey Hicks, CIH, QEP**

In the matter of:

Alfred Salas and Gloria Ortega vs.
Toyota Motor Sales, USA, Inc.

United States District Court, Central
District of California, Case No.
CV15-08629 FMO (Ex)

**CONFIDENTIAL**

# E$^x$ponent®

## Expert Report of
## Jeffrey Hicks, CIH, QEP

In the matter of:

Alfred Salas and Gloria Ortega vs. Toyota
Motor Sales, USA, Inc.

United States District Court, Central District of
California, Case No. CV15-08629 FMO (Ex)

Prepared by

Jeffrey Hicks, CIH, QEP
Exponent, Inc.
475 14th Street, Suite 400
Oakland, California 94612

September 9, 2016

1602859.000 - 1520

0264

**CONFIDENTIAL**

September 9, 2016

# Contents

| | Page |
|---|---|
| **Limitations** | iv |
| **Qualifications** | 1 |
| **Materials Reviewed and Relied On** | 2 |
| **Assignment** | 4 |
| **General Information, Methods, and Observations** | 5 |
| Vehicle Inspections | 5 |
| Methods | 5 |
| Scenarios Evaluated | 5 |
| General Procedures | 7 |
| Terminology | 7 |
| Air Sampling | 7 |
| Spore Trap Sampling and Analysis | 7 |
| Culturable Fungi Sampling and Analysis | 8 |
| Microbial-related Volatile Organic Compounds (MVOCs) | 8 |
| Temperature and Humidity Measurements | 9 |
| Volatile Organic Compound (VOC) Measurements | 9 |
| Visual Survey and Surface Sampling | 9 |
| Visual and Olfactory Survey | 9 |
| Tape-lift Sampling Method | 9 |
| Swab Sampling | 10 |
| Laboratory Analysis and Chain of Custody Procedures | 10 |
| Observations and Findings | 10 |
| Plaintiff Ortega's Vehicle | 10 |
| Visual and Olfactory Observations | 10 |
| Temperature, Humidity, Total Particulate, and VOC Measurements | 13 |

$E^x$ ™

**CONFIDENTIAL**

September 9, 2016

Plaintiff Salas' Vehicle                                                          14

    Visual and Olfactory Observations                                  14

Temperature, Humidity, Total Particulate, and VOC Measurements       15

**Key Opinions**                                                                   **17**

iii

E$^x$ ™

**CONFIDENTIAL**

September 9, 2016

## Limitations

The findings herein are based on information I have been provided as of the date of this report, and the results of my evaluation.  I reserve the right to modify or supplement my opinions to the extent that any additional information is provided, including, but not limited to, expert reports provided by the Plaintiffs in this litigation.  My conclusions in this report are provided with a reasonable degree of scientific certainty.

iv

E$\mathcal{x}$™

**CONFIDENTIAL**

September 9, 2016

# Qualifications

I am a Principal Scientist in the Exponent, Inc., Health Group.  I am a certified industrial hygienist and a qualified environmental professional.  I have 39 years of experience in environmental health science.  I am also an instructor at University of California at Davis, and at the University of California at Los Angeles, in industrial hygiene, indoor air quality and chemical hazards.  I have direct experience in environmental health concerns about fungi in the built environment, odors, and mechanical ventilation systems.  I have conducted hundreds of studies concerning these issues in a variety of environmental settings, including, but not limited to, residences, schools, office buildings, and vehicles.

Attached in Appendix A is my current curriculum vitae, which describes my education, experience and publication history.  This appendix also includes a list of my sworn testimony over the last four years.

Exponent bills my time at a rate of $410 per hour.

$E^x$ ™

**CONFIDENTIAL**

September 9, 2016

# Materials Reviewed and Relied On

First Amended Class Action Complaint.  January 7, 2016.

Videotaped Deposition of Alfred Salas, June 15, 2016.

Videotaped Deposition of Gloria Ortega, June 17, 2016.

HVAC Odor Maintenance, September 12, 2013.

HVAC Odor Maintenance (Unredacted), September 12, 2013.

Salas, et al. v. Toyota Motor Sales, USA, Inc.  Re: Vehicle Inspection Protocol.

Defendant Toyota Motor Sales, USA, Inc.'s Request for Inspection to Plaintiff Alfred Salas, July 29, 2016.

Defendant Toyota Motor Sales, USA, Inc.'s Request for Inspection to Plaintiff Gloria Ortega, July 8, 2016.

Plaintiff Gloria Ortega's Responses to Defendant Toyota Motor Sales, USA, Inc.'s First Set of Request for Production, June 3, 2016.

Plaintiff Gloria Ortega's Responses to Defendant Toyota Motor Sales, USA, Inc.'s First Set of Interrogatories, June 3, 2016.

Plaintiff Alfred Salas' Responses to Defendant Toyota Motor Sales, USA, Inc.'s First Set of Request for Production, June 3, 2016.

Plaintiff Alfred Salas' Responses to Defendant Toyota Motor Sales, USA, Inc.'s First Set of Interrogatories, June 2, 2016.

AIHA.  Field Guide for the Determination of Biological Contaminants in Environmental Samples, 2nd Edition.  Hung, L.L. et al. (Editors).

AIHA.  2003.  The Occupational Environment: Its Evaluation, Control, and Management. Salvatore R. DiNardi, Ed. Second Edition.

AIHA.  2008.  Recognition, Evaluation, and Control of Indoor Mold.  Prezant, B, Weekes, DM, Miller, JD. Ed., Second Edition.

Shelton, BG, Kirkland, KH, Flanders WD and Morris GK.  2002.  Profiles of Airborne Fungi in Buildings and Outdoor Environments in the United States.  Appl. Environ. Microbiol. 68(4):1743.

Gots, RE, Layton, NJ, Pirages, SW.  2003.  Indoor Health: Background Levels of Fungi.  AIHA Journal. 64:427-438.

CONFIDENTIAL

September 9, 2016

Hicks, JB, Lu, ET, DeGuzman, R, Weingart, M.  2005.  Fungal Types and Concentrations from Settled Dust in Normal Residences.  Journal of Occupational and Environmental Hygiene. 2:481-492.

Ruth, JH.  1986.  Odor Thresholds and Irritation Levels of Several Chemical Substances: A Review.  Am. Ind. Hyg. Assoc. J. 47:A-142-A-151.

US EPA.  2015.  Distribution of BASE VOC Concentrations at All Sampling Sites.  Available Online: https://www.epa.gov/sites/production/files/2014-08/documents/base_voc_concentrations.pdf.  Accessed: August 25, 2016.

US Center for Disease Control (CDC).  Particle Pollution.  Available online: http://www.cdc.gov/air/particulate_matter.html.  Accessed: February 26, 2016.

USEPA 2016.  Volatile Organic Compounds' Impact on Indoor Air Quality.  Available Online: http://www.epa.gov/indoor-air-quality-iaq/volatile-organic-compounds-impact-indoor-air-quality.  Accessed: February 26, 2016.

Bates Number SLS_01418

Bates Numbers SLS_01253–SLS_01256

Bates Numbers SLS_01389–SLS_01394

Bates Number SLS_01395

Bates Numbers SLS_01396–SLS_01401

Bates Numbers SLS_01402–SLS_01407

Bates Numbers SLS_01408–SLS_01416

Bates Numbers SLS_01417–SLS_01417

Exponent Inspection Photographs, Videos, and Field Notes

E$^x$ ™

CONFIDENTIAL

# Assignment

Exponent was asked to assess the indoor environmental quality in Plaintiff Gloria Ortega's 2012 model year Toyota Camry and Plaintiff Alfred Salas' 2014 model year Toyota Camry in response to their allegations of malodors and potential fungal growth within their vehicles' heating, ventilation and air conditioning (HVAC) systems.  I advised Mike Posson of Exponent in developing the inspection procedures related to this assignment.  Mr. Posson, who is a certified industrial hygienist, and my direct report, conducted the inspections and evaluation of the two vehicles.  The site investigation included recording the sensation of odors, and the collection and subsequent analysis of air samples for fungi and chemical agents that are identified as being associated with fungi.  The site visit included the collection of air and surface samples from both outside and inside the vehicle cabins of each vehicle, and surface samples were also collected from interior surfaces of the air conditioning evaporator.  The collected samples were submitted for analysis for fungi, fungi-related volatile organic chemicals, and dusts.  This report presents my professional opinions related to exposure based upon my review and evaluation of the results of the vehicle inspections, the test results, and my experience and expertise in the fields of industrial hygiene and environmental health science.  All of my opinions are provided with a reasonable degree of scientific certainty.

The main body of my report includes a description of my observations, methods, findings, and opinions in this matter.  Tables, photographs, and the laboratory documentation are provided as appendices the end of this report.

Ex™

CONFIDENTIAL

September 9, 2016

# General Information, Methods, and Observations

## Vehicle Inspections

Inspections and air testing (as described below) were conducted by my team for Plaintiff Ortega's and Plaintiff Salas' vehicles at their individual residences. Following the air testing, the vehicles were transported to a local dealership for additional visual inspection of the HVAC system components and surface sampling.

Plaintiff Ortega's vehicle was inspected on July 18, 2016. The air testing was conducted at her apartment complex parking lot at ▮▮▮▮▮▮▮▮▮▮ in Long Beach, California. The vehicle odometer reading was 82,884. The vehicle was parked in the apartment complex parking lot the night prior by Ms. Ortega. Following the air testing, the vehicle was transported to Cabe Toyota Scion Long Beach located at 2895 Long Beach Boulevard in Long Beach, California by a designated representative, for additional inspection. Ms. Ortega's vehicle was a 2012 model year Toyota Camry with a vehicle identification number (VIN) 4T4BF1FK3CR▮▮▮▮. Representative photos of the vehicle exterior are provided in Photos 1 and 2.

Plaintiff Salas' vehicle was inspected on August 9, 2016. The air testing was conducted at his apartment complex parking lot at ▮▮▮▮▮▮▮▮▮▮ in Los Angeles, California. The vehicle odometer reading was 30,016. The vehicle was parked in the apartment complex parking lot the night prior by Plaintiff Salas. In proximity of the vehicle was a large garbage dumpster; odors were perceived by the investigator during the inspection that were believed to be emanating from that dumpster (Photo 3). Plaintiff Salas had been requested to park his vehicle in its normal location after using the air conditioner the day prior to the inspection, and to turn off his air conditioner and turn off the recirculation mode based on the settings described in his deposition (Deposition of Plaintiff Salas, page 174-175). Following the air testing, this vehicle was transported to Toyota of Glendale located at 1260 South Brand Boulevard in Glendale, California by a designated representative for additional inspection. Plaintiff Salas' vehicle was a 2014 model year Toyota Camry, VIN 4T1BF1FK3EU▮▮▮▮. Representative photos of the vehicle exterior are provided in Photos 4 and 5.

## Methods

### Scenarios Evaluated

#### Outdoor

Outdoor air samples were collected in close proximity of each of the vehicles tested. A set of outdoor samples were collected for a period immediately prior to and then after testing the interior of the vehicles. The outdoor air samples served as a point of comparison for the air samples collected from the interior of each vehicle under various settings and operation modes, as described below.

5



**CONFIDENTIAL**

**Inside Cabin Samples, No Vehicle Operation ("Interior Baseline")**

For both vehicles evaluated, the cabin air was evaluated for the air quality parameters discussed below.  The interior baseline evaluation was conducted to determine the presence of fungi and fungi-related microbial volatile organic compounds (MVOCs) in the vehicle without operation of the HVAC system.  During this testing, the vehicle was stationary and the engine was not operated.  All windows remained closed.

**Plaintiff Ortega's Vehicle**

Based on the information described in the deposition of Plaintiff Gloria Ortega, the following scenarios were evaluated:

**Scenario O1-Fresh mode, Air Conditioner Activated:** The engine was operated and the vehicle was stationary.  The ventilation system was set as shown in Photo 6.  The air conditioning system was found to be set at a medium fan setting with outdoor air entering the system (i.e., not in recirculation mode).  The temperature was not adjusted by the inspector.  It was found to be set at the low setting (or "LO") when the vehicle's engine was operated.  The cabin fan louvers were positioned so that air flow was oriented toward the face of the inspector.  According to Plaintiff Ortega's deposition testimony, this scenario produced odor events (Deposition of Gloria Ortega, p. 140-142).

**Scenario O2-Recirculation mode, Air Conditioner Activated:** The engine was operated, and the vehicle was stationary.  The ventilation system was set as shown in Photo 7.  The air conditioning system was set to recirculation mode at the start of this scenario.  The same fan speed, direction and temperature settings were in place as described for Scenario O1.  This setting was based on Plaintiff Ortega's deposition testimony that setting the air conditioning system into this setting reduced the smell and odors as compared to when the vehicle was not in recirculation mode (Deposition of Gloria Ortega, page 141).

**Plaintiff Salas' Vehicle**

Based on the information described in the deposition of Plaintiff Alfred Salas, the following scenarios were evaluated:

**Scenario S1-Vent Operation, No Air Conditioner:** The engine was operated, and the vehicle was stationary.  The ventilation system was found to be set as shown in Photo 8.  This scenario was intended to replicate Plaintiff Salas' deposition testimony that after operating the air conditioning system, a strong odor was present after the vehicle remained in a parked position and no air conditioning was activated (Deposition of Plaintiff Alfred Salas, p. 91, 103).  The fan speed was set at a medium level.

**Scenario S2-Fresh Mode, Air Conditioner Activated:** The engine was operated, and the vehicle was stationary.  The ventilation system was set as shown in Photo 9.  The air conditioning system was set at a medium fan setting (i.e., between low and high) based on the deposition of Plaintiff Salas (Deposition of Plaintiff Alfred Salas, p. 84-85).  The temperature was not adjusted by the inspector.  The temperature was found to be set just above the "Max A/C" line on the knob.  The fan direction was oriented toward the face.  The temperature

E*™

CONFIDENTIAL

appeared to be consistent with the "higher" blue or "middle" blue temperature setting discussed by Plaintiff Salas in his deposition (Deposition of Plaintiff Salas, page 84-85).

**Scenario S3-Recirculation Mode, Air Conditioner Activated:** The engine was operated, and the vehicle was stationary. The ventilation system was set as shown in Photo 10. The air conditioning system was set to recirculation mode at the start of this scenario. The same fan speed, direction, and temperature settings were in place as described for Scenario S2.

## General Procedures

During the sample collection, dedicated nitrile gloves were donned by the inspector for the collection of each sample. Prior to entering the vehicle to conduct the air sampling, a disposable new Tyvek coverall was donned to avoid the introduction of contaminants by the investigator. Further, all equipment that was placed in the vehicle was wiped down with a shop towel that was dampened with clean water to remove surface dust.

# Terminology

The terms fungi, fungal and mold are used interchangeably. Mold is a common term used to describe many of the genus and species of organisms that make up the biological classifications within the larger kingdom Fungi.

# Air Sampling

## Spore Trap Sampling and Analysis

Air samples were collected at selected indoor and outdoor locations to determine the presence and concentrations of airborne fungal spores. These air samples were collected using Zefon Air-O-Cell® spore-trap devices. This device consists of a microscope cover slip coated with a transparent adhesive material encased in a 37-millimeter-diameter polystyrene cassette fitted with an inlet nozzle. Air is passed through each sampling cassette by an electrically-driven, high-volume, air-sampling pump calibrated at a flow rate of 15.0 liters per minute by use of a precision rotameter at the beginning and end of the sampling period. Outdoor air samples were 3−4 feet above the ground in the vicinity of the vehicle. Samples were collected at approximately breathing zone height (the sample inlets were held in place with an adjustable tripod with the inlets positioned where a driver's head would be located during normal operation of the vehicle). Three samples were collected during each scenario at 0, 15 and 30 minutes following the start of each scenario. Each sample was collected for 5.0 minutes. At the completion of the sampling period, the cassettes were sealed and uniquely labeled. In the laboratory, the microscope cover slips were removed, stained, and examined under bright field light microscopy. Fungal spores were identified, counted and reported in concentrations of spores per cubic meter (s/m$^3$). One "field blank"[1] was collected for quality control purposes.

---

[1]   As set forth in the American Industrial Hygiene Association (AIHA). 2003. The Occupational Environment: Its Evaluation, Control, and Management. Salvatore R. DiNardi, Second Edition, page 1073: "A field blank is used to assess the extent to which an actual sample has been contaminated during the collection process. A field blank is treated as though it were an actual sample, that is, the field blank is handled as closely as possible in the

E$^x$™

CONFIDENTIAL

**Culturable Fungi Sampling and Analysis**

Fungi air samples for culture analysis were collected simultaneously with the spore trap samples.  These air samples were collected using an Andersen N6 Single Stage Bio-aerosol Impact Sampler ("Andersen Sampler").  Prior to sample collection, the Andersen Sampler was cleaned using wipes with 70% isopropanol and allowed to completely dry prior to reassembly.  A standard petri dish (100 millimeters [mm] x 15 mm) with a malt extract agar (MEA) medium was used.  The petri dish was seated in the Andersen Sampler.  The lid of the petri dish was then removed and placed into a new, sealable plastic bag during sample collection.  After removal of the lid, the Andersen Sampler was re-assembled for sample collection.  Air was passed through the Andersen Sampler by an electrically-driven, high-volume, air-sampling pump calibrated at a flow rate of approximately 28.3 liters per minute, unless otherwise noted, by use of a calibrated Bios DryCal primary flow device.  Flow was verified prior to and after the collection of each sample.  Outdoor air samples were 3−4 feet above the ground in the vicinity of the vehicle.  Samples were collected as described under spore trap sampling at the driver's breathing zone height within the cabin of the vehicle during each scenario.  Two samples were collected during each scenario at 0 and 30 minutes.  Each sample was collected for 3.0 consecutive minutes.  Each sample was collected within the same time interval as the spore trap samples as discussed above.  At the completion of each sample collection, the petri dishes were sealed and uniquely labeled.  Dedicated nitrile gloves were donned during the handling of the petri dishes.  In the laboratory, the petri dishes were incubated for seven days.  At the end of this period, the laboratory analysts quantified and identified (to the species level) organisms that had grown on the media.  Results were reported in units of colony forming units per cubic meter ($CFU/m^3$).  One field blank was collected for quality control purposes.

**Microbial-related Volatile Organic Compounds (MVOCs)**

All air samples were collected using evacuated 6-L individually certified SUMMA canisters, each fitted with a flow controller to integrate the samples over the sampling period.  The SUMMA canisters and flow controllers were provided by Environmental Analytical Services (EAS) in San Luis Obispo, California.  Sampling was conducted over approximately 30 to 45 minutes.  Outdoor air samples were 3−4 feet above the ground in the vicinity of the vehicle.  Samples were collected as described under spore trap sampling at the driver's breathing zone height within the cabin of the vehicle during each scenario.

Canister vacuum levels were measured before, during, and after the monitoring period and were verified on receipt at the laboratory.  One field blank prepared by the laboratory was collected for quality control purposes.

---

same way as an actual sample except that it is not exposed to the contaminated atmosphere. The field blank should accompany the actual sample(s) through every stage of the sampling process. The mass of contaminant found on the field blank is subtracted from that found on the actual sample(s) before dividing by the air volume sampled in the determination of mass concentration of the contaminant."

E$^x$ ™

CONFIDENTIAL

Based on research conducted by Exponent and the American Industrial Hygienist Association
(AIHA)[2], the VOCs associated with microbial growth and analyzed in the air samples included:
1-butanol, 1-octen-3-ol, 2-Heptanone, 2-nonanone, 2-octen-1-ol, 2-Pentanol, 3-Methyl furan, 3-
Methyl-1-Butanol, 3-Methyl-2-Butanol, 3-Octanol, 3-Octanone, borneol, and geosmin.

### Temperature and Humidity Measurements

A TSI Q-Trak was used to measure temperature and humidity during each scenario.  The
instrument had been calibrated according to the manufacturer's instructions.  The instrument
was placed in the area under study and allowed to equilibrate.  During each scenario,
approximately three measurements were collected.  For each of the three measurements, three
values were recorded to allow for an average to be calculated.

### Volatile Organic Compound (VOC) Measurements

A calibrated RAE Systems 3500 photo-ionization detector (PID) field instrument capable of
detecting select VOCs at the part per billion (ppb) level was used to obtain measurements during
the sample collection process.  The PID instrument is a non-specific method of measuring vapor
concentrations below the ionization potential of the instrument (10.6 electron volts [eV]).  The
measurements were collected during the sampling period to assess VOC concentrations within
the spaces under study.

# Visual Survey and Surface Sampling

## Visual and Olfactory Survey

Upon completion of the air testing, the vehicle was transported to a nearby dealership, as
previously described.  The interior and exterior of the vehicle was visually examined.  During
this examination, the general conditions of the interior surfaces of the vehicles were noted,
along with cleanliness of surfaces, signs of water intrusion, signs of any visible water stains
and/or fungal growth, as well as efforts to detect odors which may be associated with fungal
growth or chemical agents.  In addition, a borescope was used to examine the evaporator coil
and vents leading to the evaporator coil.

## Tape-lift Sampling Method

Tape-lift surface samples were collected from various locations in the vehicle cabins and
ventilation systems.  Tape-lift samples were collected using 0.75-inch wide, clear, gloss finish
transparent adhesive tape.  A two- to three-inch piece of tape was removed from the tape
dispenser.  The adhesive-side of the tape was applied to the surface being sampled, ensuring
contact.  The index finger was used to apply light pressure on the tape to assure adherence of the
material being sampled on the target surface to the tape.  The section of tape was then removed,
placed into a dedicated polyethylene bag, and labeled.  A field blank was collected by taking a

---

[2]   American Industrial Hygiene Association (AIHA).  Field Guide for the Determination of Biological
      Contaminants in Environmental Samples, 2nd Edition.  Hung, L.L. et al. (Editors).  Pp. 161-171.

$Ex$™

CONFIDENTIAL

clean section of tape and placing it into a polyethylene bag without contacting a surface; this
was collected for quality control purposes to determine if there were any residual fungal spores
or components on the sampling media.

### Swab Sampling

Surface swabs were collected from various locations in the vehicle cabins and ventilation
systems.  Swab samples were collected using dedicated sampling swabs provided by the
analytical laboratory.  The surface sampled was dry swabbed using light hand pressure or with
the aid of a borescope (only for the evaporator coil samples), ensuring contact; Dr. Amir Jokar
of Exponent collected the samples at the direction of Michael Posson.  The swab was then
placed in a dedicated, sterile sampling tube for either direct microscopic or culturable analysis,
as previously described.  A field blank was collected by taking a clean swab and not contacting
it to a surface; this was collected for quality control purposes to determine if there were any
residual fungal spores or components on the sampling media.

## Laboratory Analysis and Chain of Custody Procedures

Air and surface samples for the analysis of fungi (either via direct microscopic exam or
culturing) were delivered to Aemtek, Inc., in Fremont, California.  Aemtek, Inc. is an American
Industrial Hygiene Association (AIHA) accredited Environmental Microbiology laboratory.

The samples were submitted under standard chain of custody to Environmental Analytical
Services in San Luis Obispo, California, for analysis by EPA Method TO-15 using gas
chromatography/mass spectrometry (GC/MS).

## Observations and Findings

## Plaintiff Ortega's Vehicle

### Visual and Olfactory Observations

The visual examination of the interior of the vehicle and accessible HVAC system components
were unremarkable.  There were no signs of visible fungal growth, and there were no odors
which the investigator concluded may be associated with fungal growth.  The olfactory
sensations were based on those of the investigator (Mike Posson), who focused attention on
such sensations during the evaluation, because of the nature of the complaints.

The visual inspection of the vehicle's interior showed that there were multiple stains on the
interior of the vehicle (e.g., seat upholstery) that possibly came from wet materials in contact
with soft surfaces (Photos 11, 12, and 13), which likely introduced moisture into the vehicle at
some point in time.  Surface tape lift samples collected from these surfaces did not indicate
atypical fungal spores or related fungal material deposits, as described in more detail below.

The visual examination of the evaporator coil using a borescope showed some apparent rusting
or staining, which did not appear to be consistent with fungal growth (Photos 14, 15).

CONFIDENTIAL

A faint sweet/sour odor was observed upon entering the vehicle without any air circulation. Multiple air fresheners and spray deodorizers were observed in the vehicle during the inspection.  The odor from these air freshener products was noted during all scenarios.  The odor was less noticeable when the ventilation system was operating, as compared to when the vehicle was initially entered.  The air freshener products are shown in Photos 16, 17, and 18.

**Spore Trap and Culturable Air Sampling and Analysis**

The results of fungal spore trap sampling and analysis are presented in the Aemtek reports for the spore trap analysis (dated July 21, 2016) and culturable analysis (dated August 2, 2016) and are included in Appendix C.  The sample numbers and corresponding locations are provided in Table 1.

For all of the scenarios evaluated, the indoor spore types and concentrations were lower than the outdoor concentrations, and the same types of organisms were found, which is considered normal.

The conclusion that the air sampling results are "normal" or "typical" is based on:

1.  The comparison of the fungal spore genus (or "types") and concentrations detected inside the vehicle cabin as compared to what was observed outdoors.
2.  A comparison of the concentrations and types of fungi reported in the scientific literature.

The American Industrial Hygiene Association (AIHA) indicates that for fungi, outdoor air samples form the basis for comparison and interpretation of indoor air samples.[3]  Further, in interpreting fungal air sample results, and in particular for fungal spore counts, the AIHA recommends that the investigator compare the total counts of spores and the genus (or "types") of spores identified in the indoor and outdoor samples.[4]  The AIHA further states that "in general, indoor counts should be lower than those of outdoors" and that "generally fungal spore taxa from indoors and outdoors, and complaint versus non-complaint areas should be quantitatively similar."[5]  There are also scientific articles that identify typical concentrations of spores and culturable fungi both in the air and/or on surfaces in the indoor environment.[6,7,8] The concentrations of fungal spores and spore types found in the air within this vehicle, are

---

[3]   American Industrial Hygiene Association (AIHA).  2003.  The Occupational Environment: Its Evaluation, Control, and Management.  Salvatore R. DiNardi.  Second Edition.  P. 133.

[4]   American Industrial Hygiene Association (AIHA).  2003.  The Occupational Environment: Its Evaluation, Control, and Management.  Salvatore R. DiNardi.  Second Edition.  P. 156.

[5]   American Industrial Hygiene Association (AIHA).  2003.  The Occupational Environment: Its Evaluation, Control, and Management.  Salvatore R. DiNardi.  Second Edition.  P. 156.

[6]   Shelton, BG, Kirkland, KH, Flanders WD and Morris GK.  2002.  Profiles of Airborne Fungi in Buildings and Outdoor Environments in the United States.  Appl. Environ. Microbiol. 68(4):1743.

[7]   Gots, RE, Layton, NJ, Pirages, SW.  2003.  Indoor Health: Background Levels of Fungi.  AIHA Journal. 64:427-438.

[8]   Hicks, JB, Lu, ET, DeGuzman, R, Weingart, M.  2005.  Fungal Types and Concentrations from Settled Dust in Normal Residences.  Journal of Occupational and Environmental Hygiene.  2:481-492.

E$^x$ ™

CONFIDENTIAL

consistent with the levels and types reported in the literature.[9,10] This analysis of indoor versus outdoor environments is also applied to the analysis of the culturable fungi analyses.

The culturable fungi analysis results (presented in the Aemtek, Inc. Laboratory Analysis Report dated August 2, 2016) also indicate normal indoor air types and concentrations of fungal species.  Low levels of species of *Aspergillus* and *Penicillium* were identified in some samples collected in the vehicle that were not identified in outdoor samples.  The presence of trace concentrations of certain fungal species that were not found outdoors is a normal finding.  The presence of culturable fungi at the levels found indoors was consistent with those reported in other indoor environments in the scientific literature,[11,12] and at such low concentrations, they do not indicate any increase in health risk relative to exposures to the culturable fungi found in the outdoor environment.

No fungal spores and no fungal colonies were observed in either of the respective field blank samples.

### MVOC Sampling and Analysis

The results of the MVOC concentrations are provided in Table 2.  The MVOC compounds detected differed among the 3 scenarios; however, the compounds detected do not indicate presence of fungal growth.  Only two of the 14 MVOCs (i.e., 1-butanol and 3-octanol) were detected intermittently and at very low levels in the vehicle cabins.  The MVOC concentration values of 1-butanol were below its odor threshold concentration value[13]  1-Butanol is routinely detected in buildings based on reports from the US EPA at concentrations ranging from not detected[14] to 5.0 parts per billion (ppb) with an average concentration of approximately 1.1 ppb.[15] An odor threshold or typical values detected in indoor air was not available for 3-octanol.  If active fungal growth were occurring that resulted in noticeable odors, it would be expected that many different MVOCs would be present, with at least some above their odor threshold concentrations.  At the concentrations detected, there is no information in the scientific literature indicating that the two MVOC chemicals detected at low concentrations inside the vehicle cabin during this analysis results in any health risk.  The values listed in Table 2 with a less than sign

9    Shelton, BG, Kirkland, KH, Flanders WD and Morris GK.  2002.  Profiles of Airborne Fungi in Buildings and Outdoor Environments in the United States.  Appl. Environ. Microbiol. 68(4):1743.

10   Gots, RE, Layton, NJ, Pirages, SW.  2003.  Indoor Health: Background Levels of Fungi.  AIHA Journal. 64:427-438.

11   Shelton, BG, Kirkland, KH, Flanders WD and Morris GK.  2002.  Profiles of Airborne Fungi in Buildings and Outdoor Environments in the United States.  Appl. Environ. Microbiol. 68(4):1743.

12   Gots, RE, Layton, NJ, Pirages, SW.  2003.  Indoor Health: Background Levels of Fungi.  AIHA Journal. 64:427-438.

13   The odor threshold for 1-butanol ranges from 120 to 50,000 parts per billion (Ruth 1986).

14   The limit of quantification was not provided by the US EPA.

15   US EPA.  2015.  Distribution of BASE VOC Concentrations at All Sampling Sites.  Available Online: https://www.epa.gov/sites/production/files/2014-08/documents/base_voc_concentrations.pdf.  Accessed: August 25, 2016.

E𝑥™

**CONFIDENTIAL**

(<) before the numeric value indicates that the chemical was not detected, and the value listed is
the lowest reporting level or non-detect level, as reported by the laboratory.

**Temperature, Humidity, Total Particulate, and VOC Measurements**

The temperature and relative humidity measurements collected during the inspection are
presented in Table 3.

As shown in Table 3, the total particulate concentrations measured indoors were below those
measured outdoors.  The outdoor concentrations of particulate matter are typically found to be
greater than within the indoor environment.[16]  Therefore, the findings of airborne dust levels in
the interior of the vehicle were determined to be normal.

As shown in Table 3, indoor readings from the PID, which is a meter typically used to measure
volatile organic compounds (VOCs) were slightly higher than those measured outdoors.  The
concentration of VOCs inside the vehicle cabins measured  during this investigation were  low
and are expected based on trends noted by the USEPA[17] and the fact that this is a vehicle that
emits VOCs in engine exhaust.  Many VOCs at levels higher than what was detected during this
study can produce a solvent or chemical odor.  Such odors were not encountered during this
study, and they were also not reported by Plaintiff Ortega.

**Tape Lift and Culturable Surface Sampling and Analysis**

The results of the tape lifts (dated July 21, 2016) and culturable (dated July 28, 2016) surface
samples are provided in the Aemtek analytical report in Appendix C.  The locations of each
surface sample are identified in Table 3.  The fungal types and structures identified in the
samples, were normal in terms of both types and concentrations, on both interior and exterior
surfaces of the vehicle.  The types of fungal spores and structures were generally consistent with
those identified in air samples and are representative of the normal deposition of particulates on
the surfaces tested.  The swab samples that were cultured identified one to three colony forming
units (CFU) of fungi for each species in any individual sample.  This is a normal and expected
finding.  These results are considered representative of normal surfaces in indoor environments
with normal types of fungi based on data reported in the scientific literature. [18]

---

[16]  US Center for Disease Control (CDC).  Particle Pollution.  Available online:
    http://www.cdc.gov/air/particulate_matter.html.  Accessed: February 26, 2016.

[17]  USEPA 2016.  Volatile Organic Compounds' Impact on Indoor Air Quality.  Available Online:
    http://www.epa.gov/indoor-air-quality-iaq/volatile-organic-compounds-impact-indoor-air-quality.  Accessed:
    February 26, 2016.

[18]  Hicks, JB, Lu, ET, DeGuzman, R, Weingart, M.  2005.  Fungal Types and Concentrations from Settled Dust in
    Normal Residences.  Journal of Occupational and Environmental Hygiene.  2:481-492.

E$^x$ ™

**CONFIDENTIAL**

# Plaintiff Salas' Vehicle

## Visual and Olfactory Observations

The visual examination of the interior of the vehicle and accessible HVAC system components were unremarkable. There were no signs of visible fungal growth. Additionally, there were no odors which the investigator concluded may be associated with fungal growth. The olfactory sensations were based on those of the investigator (Mike Posson), who focused attention on such sensations during the evaluation, because of the nature of the complaints.

The visual inspection of the vehicle's interior showed that there were no remarkable stains or signs of moisture on surfaces inspected (representative Photos 19, 20, 21).

The visual examination of the evaporator coil using a borescope showed some apparent rusting or staining, which did not appear to be fungal growth (Photos 22, 23).

A faint odor of leather and a sweet/pleasant odor was observed upon entering the vehicle without any air circulation ("Interior Baseline").

### Spore Trap and Culturable Air Sampling and Analysis

The results of fungal spore trap sampling and analysis are presented in the Aemtek reports for the spore trap analysis (dated August 12, 2016) and culturable analysis (dated August 19, 2016) and are included in Appendix D. The sample numbers and corresponding locations are provided in Table 5.

For all of the scenarios evaluated, the indoor spore types and concentrations were lower than the outdoor concentrations, and the same types of organisms were found, which is considered normal.

The airborne culturable fungi analytical results (presented in the Aemtek, Inc. Laboratory Analysis Report dated August 19, 2016) also indicate normal types and concentrations of fungal species. Low levels of *Aspergillus* and *Penicillium* were identified in some samples collected in the vehicle that were not identified in outdoor samples. The presence of trace concentrations of certain fungal species that were not found outdoors is not unusual and is normal. The presence of culturable fungi at the levels found inside the vehicle cabins was consistent with those reported in other indoor environments in the scientific literature,[19,20] and at similar low concentrations. These findings do not indicate a health risk to the occupants. [21,22]

---

[19]   Shelton, BG, Kirkland, KH, Flanders WD and Morris GK. 2002. Profiles of Airborne Fungi in Buildings and Outdoor Environments in the United States. Appl. Environ. Microbiol. 68(4):1743.

[20]   Gots, RE, Layton, NJ, Pirages, SW. 2003. Indoor Health: Background Levels of Fungi. AIHA Journal. 64:427-438.

[21]   Shelton, BG, Kirkland, KH, Flanders WD and Morris GK. 2002. Profiles of Airborne Fungi in Buildings and Outdoor Environments in the United States. Appl. Environ. Microbiol. 68(4):1743.

[22]   Gots, RE, Layton, NJ, Pirages, SW. 2003. Indoor Health: Background Levels of Fungi. AIHA Journal. 64:427-438.

E*™

CONFIDENTIAL

Culturable samples for Scenario S1 were not submitted, as the pump used to collect the samples shut off during the sampling.  Upon the conclusion of the testing for this Scenario, the pump was checked and recalibrated, as previously described.  The pump operated normally for all other scenarios.

**MVOC Sampling and Analysis**

The results of the MVOC concentrations are provided in Table 6.  None of the MVOC compounds were detected in any of the air samples collected from this vehicle cabin.  At the non-detect levels reported in Table 6, there is no information in the scientific literature indicating that any of the MVOC chemicals result in any health risk.

**Temperature, Humidity, Total Particulate, and VOC Measurements**

The temperature and relative humidity measurements collected during the inspection are presented in Table 7.

As shown in Table 7, the total particulate concentrations measured inside the vehicle cabins were below those measured outdoors.  As previously discussed, outdoor concentrations of particulate matter are typically found to be greater than within the indoor environment.[23]  Therefore, the findings of dust levels in the interior of the vehicle were determined to be lower than the levels found outdoors, which is expected.

As shown in Table 7, indoor readings from the PID, which is a meter typically used to measure volatile organic compounds (VOCs), were slightly higher than those measured outdoors.  The concentrations of VOCs measured in the indoor air during this investigation were low and are expected based on trends noted by the USEPA[24] and the fact that this is a vehicle that emits VOCs in engine exhaust.  Many VOCs at levels higher than what was detected during this study can produce a solvent or chemical odor.  Such odors were not encountered during this study, and they were also not reported by Plaintiff Salas.

**Tape Lift and Culturable Surface Sampling and Analysis**

The results of the tape lifts (dated August 12, 2016) and culturable (dated August 18, 2016) surface samples are provided in the Aemtek analytical report in Appendix C.  The fungal types and structures identified in the samples, were detected at normal levels on interior and exterior surfaces of the vehicle.  The types of fungal spores and structures were generally consistent with those identified in air samples and are representative of normal deposition of particulates on the surfaces tested.  The swab samples cultured identified one to three colony forming units (CFU) for each species in any individual samples.  These findings were considered representative of normal surfaces in indoor environments with normal types of fungi based on data reported in the

---

[23]   US Center for Disease Control (CDC).  Particle Pollution.  Available online: http://www.cdc.gov/air/particulate_matter.html.  Accessed: February 26, 2016.

[24]   USEPA 2016.  Volatile Organic Compounds' Impact on Indoor Air Quality.  Available Online: http://www.epa.gov/indoor-air-quality-iaq/volatile-organic-compounds-impact-indoor-air-quality.  Accessed: February 26, 2016.

$E^x$ ™

CONFIDENTIAL

September 9, 2016

literature. [25]  No culturable fungi were identified on the surface of the evaporator coil (Sample SS5).

_____

[25]  Hicks, JB, Lu, ET, DeGuzman, R, Weingart, M.  2005.  Fungal Types and Concentrations from Settled Dust in Normal Residences.  Journal of Occupational and Environmental Hygiene.  2:481-492.

16

E$^{x}$™

**CONFIDENTIAL**

# Key Opinions

Based on my review of relevant documents and deposition testimony, and inspections of each of the vehicles owned by Plaintiff Salas and Plaintiff Ortega, I offer the following opinions to a reasonable degree of scientific certainty:

1. The air testing conducted on both Plaintiff Ortega's and Plaintiff Salas' vehicles under various HVAC system settings did not identify abnormal fungal types or concentrations (spore trap counts or culturable fungi), volatile organic compounds linked to fungi, or dust concentrations compared to those found outdoors. The surface sampling conducted in both vehicles did not indicate any abnormal fungal growth or deposits of fungal material compared to those found outdoors.

2. In both vehicles tested, there is no evidence that operation of air conditioning in either the "recirculation" or "fresh mode" had a marked relative difference in the air quality parameters measured. Further, in the case of Plaintiff Salas' vehicle, there was no observed relative difference in the operation of the HVAC system without activating the air conditioning versus operating the air conditioning in "recirculation" or "fresh mode" based on the air quality parameters measured.

3. Operation of the vehicles in the "recirculation" and "fresh" modes versus the engine not running (i.e., "Interior Baseline" scenario) generally lowered fungal spore counts, culturable fungi counts, and total dust measurements within the vehicle during the testing.

4. Based on the testing conducted, the exposure to fungi and dust in both vehicles is comparable to or lower than the concentrations of fungi and dust that would be experienced in the outdoor environment. Therefore, one's exposure potential to fungi and odors, if any, within both vehicles is no greater than or lower than exposures one would experience in the outdoor environment based on the testing conducted. The levels of fungi reported in both vehicles do not present any increase in health risk relative to exposures found in the outdoor environment.

5. Surface tape lifts collected from various surfaces within the vehicles revealed countable fungal spore types and related structures on most surfaces. The fungal spore types and related structures found on the surface tape lifts were of the same types found in the outdoor air samples. These deposits are likely attributable to normal deposits of fungi on exterior and interior surfaces which can be found in typical occupiable spaces.

6. Surface culturable samples yielded low levels of culturable fungi on some surfaces in the Salas vehicle, including the evaporator coil, at levels commonly found in the indoor environment, including residential structures.

7. In Plaintiff Ortega's vehicle, two of the fourteen MVOCs tested for were detected at very low levels and did not indicate the presence of fungal growth. In Plaintiff Salas' vehicle, no MVOCs were detected. For both vehicles, at the concentrations detected or the detection limits, there is no information in the scientific literature indicating that the MVOC chemicals result in any health risk.

8. Given the findings that there was no perception of recognizable fungal growth, there was no visible fungal growth, and the results of the MVOC analysis do not indicate chemicals consistent with fungal growth, there is no evidence of fungi that are causing odors in these two vehicles.

CONFIDENTIAL

# Tables

CONFIDENTIAL

**Table 1. Plaintiff Ortega's Vehicle: Spore Trap and Culturable Sampling Locations**

| Location | Approximate Start Time | Spore Trap Sample ID | Culturable Plate Sample ID |
|---|---|---|---|
| Outdoor, Start of Sampling | 0 mins | 2BA-1 | 2BC-1 |
|  | 15 mins | 2BA-2 | NA |
|  | 30 mins | 2BA-3 | 2BC-2 |
| Inside Cabin Samples, No Vehicle Operation – "Baseline" | 0 mins | 3BA-1 | 3BC-1 |
|  | 15 mins | 3BA-2 | NA |
|  | 30 mins | 3BA-3 | 3BC-2 |
| Scenario O1: Fresh Mode, Air Conditioner Activated | 0 mins | 4BA-1 | 4BC-1 |
|  | 15 mins | 4BA-2 | NA |
|  | 30 mins | 4BA-3 | 4BC-2 |
| Scenario O2: Recirculation Mode, Air Conditioner Activated | 0 mins | 5BA-1 | 5BC-1 |
|  | 15 mins | 5BA-2 | NA |
|  | 30 mins | 5BA-3 | 5BC-2 |
| Outdoor, End of Sampling | 0 mins | 6BA-1 | 6BC-1 |
|  | 15 mins | 6BA-2 | NA |
|  | 30 mins | 6BA-3 | 6BC-2 |

Notes:

NA - Not applicable.

CONFIDENTIAL Ex™

**Table 2. Plaintiff Ortega's Vehicle: Microbial Volatile Organic Compounds (MVOCs; in parts per billion)**

| Chemical | Outdoor, Start of Sampling | Inside Cabin Samples, No Vehicle Operation – "Baseline" | Scenario O1: Fresh Mode, Air Conditioner Activated | Scenario O2: Recirculation Mode, Air Conditioner Activated | Outdoor, End of Sampling |
|---|---|---|---|---|---|
| Sample ID: | 2BV-1 | 3BV-1 | 4BV-1 | 5BV-1 | 6BV-1 |
| 1-Butanol | <1.26 | **3.70** | <1.18 | **0.88** | <1.22 |
| 1-Octen-3-ol | <1.00 | <1.00 | <1.00 | <1.00 | <1.00 |
| 2-Heptanone | <1.26 | <1.26 | <1.18 | <1.39 | <1.22 |
| 2-Hexanone | <1.26 | <1.26 | <1.18 | <1.39 | <1.22 |
| 2-Nonanone | <1.00 | <1.00 | <1.00 | <1.00 | <1.00 |
| 2-Octen-1-ol | <1.00 | <1.00 | <1.00 | <1.00 | <1.00 |
| 2-Pentanol | <1.26 | <1.26 | <1.18 | <1.39 | <1.22 |
| 3-Methyl furan | <3.16 | <3.14 | <2.94 | <3.48 | <3.04 |
| 3-Methyl-1-Butanol | <1.00 | <1.00 | <1.00 | <1.00 | <1.00 |
| 3-Methyl-2-Butanol | <1.00 | <1.00 | <1.00 | <1.00 | <1.00 |
| 3-Octanol | <0.63 | **1.07** | <0.59 | <0.70 | <0.61 |
| 3-Octanone | <0.63 | <0.63 | <0.59 | <0.70 | <0.61 |
| Borneol | <1.00 | <1.00 | <1.00 | <1.00 | <1.00 |
| Geosmin | <1.00 | <1.00 | <1.00 | <1.00 | <1.00 |

Notes:

< = not detected (value listed is non-detect level)

ppb = parts per billion

CONFIDENTIAL

**Table 3. Plaintiff Ortega's Vehicle: Relative Humidity (Average), Temperature (Average), Total Dust, and Volatile Organic Compounds (Average VOCs) Measurements**

| Location | Time | Temperature (°F) | Relative Humidity (%) | Total Particulates min - max (average) (mg/m$^3$) | VOCs (ppb) |
|---|---|---|---|---|---|
| Outdoor, Start of Sampling | 9:21 AM | 70.6 | 69.2 | 0.030 - 0.292 (0.037) | 0 |
| | 9:37 AM | 71.2 | 67.9 | 0.029 - 0.049 (0.033) | 0 |
| | 10:05 AM | 73.5 | 63.9 | 0.029 - 0.057 (0.054) | 0 |
| Inside Cabin Samples, No Vehicle Operation – "Baseline" | 10:26 AM | 76.9 | 62.2 | 0.043 - 0.147 (0.064) | 108 |
| | 10:40 AM | 77.3 | 71.6 | 0.034 - 0.079 (0.040) | 293 |
| | 10:57 AM | 78.1 | 76.2 | 0.029 - 0.056 (0.034) | 365 |
| Scenario O1: Fresh mode, Air Conditioner Activated | 11:39 AM | 57.3 | 48.2 | 0.021 - 0.053 (0.024) | 159 |
| | 11:54 AM | 57.4 | 53.7 | 0.021 - 0.043 (0.024) | 132 |
| | 12:05 PM | 57.1 | 53.1 | 0.020 - 0.055 (0.023) | 135 |
| Scenario O2: Recirculation mode, Air Conditioner Activated | 12:49 PM | 56.9 | 42.6 | 0.007 - 0.056 (0.010) | 214 |
| | 1:03 PM | 55.6 | 43.2 | 0.025 - 0.139 (0.005) | 315 |
| | 1:18 PM | 57.0 | 40.3 | 0.000 - 0.025 (0.003) | 369 |
| Outdoor, End of Sampling | 1:48 PM | 87.8 | 38.0 | 0.030 - 0.061 (0.046) | 49 |
| | 2:05 PM | 86.0 | 44.1 | 0.000 - 0.089 (0.029) | 87 |
| | 2:19 PM | 84.8 | 46.1 | 0.000 - 0.206 (0.034) | 4 |

Notes:
mg/m$^3$ = milligrams per cubic meter
ppb = parts per billion
°F = degrees Fahrenheit
% = percent
Average values collected during sampling period are reported.

0288

CONFIDENTIAL

**Table 4. Plaintiff Ortega's Vehicle: Surface Sample Locations**

| Location | Sample Type | Sample ID |
|---|---|---|
| Field blank | Tape Lift | T1 |
| | Swab | S1 |
| Air conditioning intake grill, under engine hood | Tape Lift | T2 |
| | Swab | S2 |
| Interior side of air conditioning filter | Tape Lift | T3 |
| | Swab | S3 |
| Exterior side of air conditioning filter | Tape Lift | T4 |
| | Swab | S4 |
| Evaporator coil | Swab | T5 |
| | Swab | S5 |
| Ventilation fins inside vehicle cabin | Tape Lift | T6 |
| | Swab | S6 |
| Back seat stain, driver's side | Tape Lift | T7 |
| Back seat stain, passenger's side | Tape Lift | T8 |
| Back seat stain, driver's side | Tape Lift | T9 |
| Front seat stain, driver's side | Tape Lift | T10 |
| Air Conditioning intake, under cowell | Tape Lift | T11 |
| | Swab | S11 |

CONFIDENTIAL

**Table 5. Plaintiff Salas' Vehicle: Spore Trap and Culturable Sampling Locations**

| Location | Approximate Start Time | Spore Trap Sample ID | Culturable Plate Sample ID |
|---|---|---|---|
| Outdoor, Start of Sampling | 0 mins | 2SS-1 | 2SC-1 |
|  | 15 mins | 2SS-2 | NA |
|  | 30 mins | 2SS-3 | 2SC-2 |
| Inside Cabin Samples, No Vehicle Operation – "Baseline" | 0 mins | 3SS-1 | NA[a] |
|  | 15 mins | 3SS-2 | NA |
|  | 30 mins | 3SS-3 | NA[a] |
| Scenario S1: Vent Operation, No Air Conditioner Activated | 0 mins | 4SS-1 | 4SC-1 |
|  | 15 mins | 4SS-2 | NA |
|  | 30 mins | 4SS-3 | 4SC-2 |
| Scenario S2: Fresh mode, Air Conditioner Activated | 0 mins | 5SS-1 | 5SC-1 |
|  | 15 mins | 5SS-2 | NA |
|  | 30 mins | 5SS-3 | 5SC-2 |
| Scenario S3: Recirculation mode, Air Conditioner Activated | 0 mins | 6SS-1 | 6SC-1 |
|  | 15 mins | 6SS-2 | NA |
|  | 30 mins | 6SS-3 | 6SC-2 |
| Outdoor, End of Sampling | 0 mins | 7SS-1 | 7SC-1 |
|  | 15 mins | 7SS-2 | NA |
|  | 30 mins | 7SS-3 | 7SC-2 |

Notes:

[a] The sample pump used for culturable sample collection shut off during sample collection under Inside Cabin Samples, No Vehicle Operation – "Baseline". Therefore, samples were not collected for this scenario.

NA - Not applicable.

