Jordan L. Lurie (SBN 130013)
Jordan.Lurie@capstonelawyers.com
Tarek H. Zohdy (SBN 247775)
Tarek.Zohdy@capstonelawyers.com
Cody R. Padgett (SBN 275553)
Cody.Padgett@capstonelawyers.com
Karen L. Wallace (SBN 272309)
Karen.Wallace@capstonelawyers.com
Capstone Law APC
1875 Century Park East, Suite 1000
Los Angeles, California 90067
Telephone:  (310) 556-4811
Facsimile:   (310) 943-0396

Attorneys for Plaintiffs Alfred Salas and
Gloria Ortega

MORGAN, LEWIS & BOCKIUS LLP
David L. Schrader, Bar No. 149638
david.schrader@morganlewis.com
Esther K. Ro, Bar No. 252203
esther.ro@morganlewis.com
300 South Grand Avenue
Twenty-Second Floor
Los Angeles, California 90071-3132
Telephone:  (213) 612-2500
Facsimile:   (213) 612-2501

Attorneys for Defendant
TOYOTA MOTOR SALES, U.S.A., INC.

**FILED**
**CLERK, U.S. DISTRICT COURT**

DEC 7 2017

**CENTRAL DISTRICT OF CALIFORNIA**
**BY:** _____ vdr _____ **DEPUTY**

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

ALFRED SALAS and GLORIA ORTEGA, individually, and on behalf of a class of similarly situated individuals,

Plaintiffs,

vs.

TOYOTA MOTOR SALES, U.S.A., INC., a California corporation,

Defendant.

Case No: 2:15-cv-08629 FMO (Ex)

Hon. Fernando M. Olguin

**JOINT BRIEF RE: PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**
[REDACTED MOTION]
Date:        January 4, 2018
Time:        10:00 a.m.
Place:       350 W. 1st Street
             Courtroom 6D, 6th Fl.

1

**TABLE OF CONTENTS**

2

3  I.    INTRODUCTIONS..................................................................................1
4       A.   Plaintiffs' Introduction and Summary of the Argument.................1
5       B.   TMS' Introduction......................................................................2
6  II.   CLASS DEFINITION ..........................................................................5
7       A.   Plaintiffs' Class Definition...........................................................5
8       B.   TMS' Position: Plaintiffs' Class Definitions Are Overbroad and
9            Invalid ...................................................................................6
10 III.  PLAINTIFFS' COMMON PROOF.......................................................7
11      A.   Plaintiffs' Position:  Generalized Evidence Provides Common Proof
12           7
13           1.   The HVAC Design and Defect Are the Same for All Class
14                Vehicles..........................................................................7
15           2.   TMS' Knowledge of the HVAC Defect and Failure to Disclose
16                .....................................................................................9
17           3.   The HVAC Defect and TMS' Failure to Disclose Are Material
18                ...................................................................................11
19           4.   TMS' Remediation of the HVAC Defect ...........................12
20      B.   TMS' Position: Resolution of Each Class Member's Claims Turns on
21           Individualized Facts ................................................................13
22           1.   Plaintiffs Fail to Meet Their Burden of Demonstrating That
23                HVAC Odor is a Class-Wide Issue ...................................13
24           2.   HVAC Odor Can Occur in All Types of Vehicles .............14
25           3.   Many Different Factors Cause HVAC Odor .....................14
26           4.   There is No Common Class-Wide Evidence of An Alleged
27                Defect Across the Class Vehicles......................................15

28

5.   Each Class Member's HVAC System Must Be Inspected for
Any Organic "Contaminants" And Safety Risk ................17
6.   The Nature and Severity of HVAC Odor Differs Widely ..18
7.   TMS' Customer Service Efforts to Mitigate HVAC Odor Do
Not Show a Class-Wide Defect ..........................................18
8.   Exposure to The Alleged Omission and Knowledge About
HVAC Odor Varies by Class Member ...............................19
9.   The Impact of Any Additional Disclosure Varies by Class
Member ..............................................................................20
10.  Plaintiffs' Class-wide Damages Model Does Not Match Their
Theory of Liability and is Unreliable ................................21
IV.   CERTIFICATION UNDER RULE 23(A)...............................................22
A.   Plaintiffs' Position: The Requirements for Rule 23(a) Certification
are Satisfied ..............................................................................22
1.   Ascertainability ................................................................22
2.   Numerosity ........................................................................23
3.   Commonality......................................................................23
4.   Typicality ..........................................................................25
5.   Adequacy............................................................................26
B.   TMS' Position:  Plaintiffs Have Not Satisfied Rule 23(a)............28
1.   Plaintiffs Cannot Show Commonality Because Each Claim
Requires Individualized Inquiries......................................28
(a)   No Common Evidence Supports Plaintiffs' Implied
Warranty Claims ......................................................29
(b)   No Common Evidence Supports Plaintiffs' UCL And
CLRA Claims............................................................30

JOINT BRIEF RE: PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

|  |  | (i) | There is No Common Evidence of a Uniform Design Defect.................................................31 |
|  |  | (ii) | There is No Common Evidence of a Duty to Disclose..........................................................31 |
|  |  | (iii) | There is No Common Evidence Regarding the Cause of Any HVAC Odor.............................33 |
|  |  | (iv) | There is No Common Evidence of Exposure or Materiality...................................................34 |
|  | (c) |  | The Unjust Enrichment Claims Cannot Be Certified37 |
| V. | CERTIFICATION UNDER RULE 23(B)(3) ........................................37 |  |  |
|  | A. | Plaintiffs' Position: Rule 23(b)(3) Requirements Are Satisfied ...37 |  |
|  |  | 1. | Predominance ...................................................37 |
|  |  | (a) | Common Issues Predominate with respect to the UCL and CLRA Statutory Claims and Unjust Enrichment39 |
|  |  | (b) | Common Issues Predominate Plaintiffs' Claim for Breach of Implied Warranty Under Song Beverly and Mag-Moss ................................................41 |
|  |  | (c) | Damages Are Calculable on a Class-Wide Basis .....43 |
|  |  | 2. | A Class Action is Superior ................................47 |
|  | B. | TMS' Position: Plaintiffs' Proposed Rule 23(b)(3) Class of California Consumers Fails for Many Reasons ............................................48 |  |
|  |  | 1. | Individualized Issues Predominate ....................................48 |
|  |  | (a) | Individualized Issues Override Any Common Ones for Each Claim .............................................................48 |
|  |  | (b) | Individualized Issues Predominate the Calculation of Class-Wide Damages ...............................................49 |

(c)     Individualized Issues Predominate Regarding TMS' Affirmative Defenses ................................................51

2.     A Class Action is Not a Superior Way of Proceeding........52

VI.     CERTIFICATION UNDER RULE 23(B)(2) .........................................53

A.     Plaintiffs' Position: The Requirements Are Satisfied...................53

1.     Plaintiffs Satisfy the Rule 23(b)(2) Requirements..............54

2.     A Nationwide Class Should be Certified Under Rule 23(b)(2) ........................................................................55

B.     TMS' Position: Plaintiffs' Rule 23(b)(2) Classes for Injunctive Relief Fail for Additional Reasons.........................................................56

1.     Rule 23(b)(2) is Inapplicable Because Plaintiffs Predominantly Seek Monetary Relief.........................................................56

2.     The Proposed Class is Not Cohesive.................................57

3.     A Nationwide Rule 23(b)(2) Injunctive Relief Class Fails for the Additional Reason That the Differing Laws of All Fifty States Will Apply ...........................................................58

VII.     CERTIFICATION UNDER RULE 23(C)(4) .........................................60

A.     Plaintiffs' Position: A Liability-Only Class Can Be Certified......60

B.     TMS' Position: There is No Basis to Certify a "Liability-Only" Class Under Rule 23(c)(4) ..............................................................61

VIII.     PLAINTIFFS' EVIDENTIARY OBJECTIONS ...................................62

A.     Plaintiffs' Position: TMS' Expert Testimony is Inadmissible......62

1.     TMS' Expert Testimony Regarding Mold Should Be Excluded ........................................................................62

2.     TMS' Expert Testimony Regarding Damages Should Be Excluded.........................................................................63

B.     TMS' Position: Plaintiffs' Expert Testimony is Inadmissible......66

JOINT BRIEF RE: PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

1           1.     Plaintiffs' Challenges to TMS' Expert Opinions Are Meritless

2                                  ....................................................................66

3           2.     Mr. Okçuoğlu's Common Defect Opinion Should Be Excluded

4                                    ....................................................................68

5           3.     Ms. Thompson's Damages Opinion Should Be Excluded..69

6  IX.   CONCLUSION ......................................................................70

7      A.   Plaintiffs' Position......................................................70

8      B.   TMS' Position .............................................................70

1

## TABLE OF AUTHORITIES

2

3 ***FEDERAL CASES***

4 *Abdullah v. U.S. Sec. Assocs., Inc.*, 731 F.3d 952 (9th Cir. 2013)....................29

5 *Am. Honda Motor Co. v. Allen,* 600 F.3d 813 (7th Cir. 2010) .........................70

6 *Amador v. Baca*, No. 2:10–CV–01649, 2016 WL 6804910

7     (C.D. Cal. July 27, 2016) .................................................................62

8 *Amchem Products*, *Inc. v. Windsor*, 521 U.S. 591 (1997) ..........................48, 49

9 *Andrade v. Pangborn Corp.*, No. C 02–3771 PVT,

10     2004 WL 2480708 (N.D. Cal. Oct. 22, 2004)................................................29

11 *Astiana v. Hain Celestial Grp., Inc.*, 783 F.3d 753 (9th Cir. 2015)..................42

12 *Backus v. ConAgra Foods, Inc.*, No. C 16-00454 WHA,

13     2016 WL 7406505 (N.D. Cal. Dec. 22, 2016) ..............................................27

14 *Baker v. Microsoft Corp.*, 797 F.3d 607 (9th Cir. 2015) .................................39

15 *Barnes v. Am. Tobacco Co.*, 161 F.3d 127 (3d Cir. 1998)...............................50

16 *Barraza v. C. R. Bard Inc.,* No. CV16-01374-PHX-DGC,

17     2017 WL 3976720 (D. Ariz. Sept. 11, 2017)................................................59

18 *Berger v. Home Depot USA, Inc.*, 741 F.3d 1061 (9th Cir. 2014)........34, 35, 37

19 *Birdsong v. Apple, Inc.*, 590 F.3d 955 (9th Cir. 2009) ....................................30

20 *Bruce v. Harley-Davidson Motor Co., Inc.*, No. CV 09–9588,

21     2012 WL 769604 (C.D. Cal. Jan. 23, 2012)..................................................70

22 *Butler v. Porsche Cars N. Am., Inc.*, No. 16-CV-2042-LHK,

23     2017 WL 1398316 (N.D. Cal. Apr. 19, 2017)........................................*passim*

24 *Butler v. Sears, Roebuck & Co.,* 727 F.3d 796 (7th Cir. 2013) .......................61

25 *Chamberlan v. Ford Motor Co.*,402 F.3d 952 (9th Cir. 2005) .........................24

26 *Cholakyan v. Mercedes-Benz, USA, LLC*, 281 F.R.D. 534

27     (C.D. Cal. 2012)....................................................................................*passim*

28

1    *Comcast Corp. v. Behrend*, 133 S. Ct. 1426 (2013) ............................44, 46, 50

2    *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013) .........................................28, 29

3    *Daniel v. Ford Motor Co.*, 806 F.3d 1217 (9th Cir. 2015) .............31, 33, 34, 41

4    *Darisse v. Nest Labs, Inc.*, No. 5:14-CV-01363-BLF,

5      2016 WL 4385849 (N.D. Cal. Aug. 15, 2016) ..............................................60

6    *Daubert v. Merrell Dow Pharmaceuticals, Inc.*,

7      509 U.S. 579 (1993).........................................................................64, 65, 67

8    *Doyle v. Chrysler Grp. LLC*, 2014 WL 7690155

9      (C.D. Cal. Oct. 9, 2014).................................................................23, 24, 50

10   *Edwards v. Ford Motor Co.*, 603 F. App'x 538 (9th Cir. 2015) .................24, 25

11   *Ellis Costco Wholesale Corp.*, 657 F.3d 970 (9th Cir. 2011) ..............25, 29, 67

12   *Gartin v. S & M NuTec LLC*, 245 F.R.D. 429 (C.D. Cal. 2007).......................52

13   *Grodzitsky v. Am Honda Motor Co.*, No. 2:12–cv–01142,

14     2014 WL 718431 (C.D. Cal. Feb. 19, 2014) .........................................*passim*

15   *Gustafson v. BAC Home Loans Servicing, LP*, 294 F.R.D. 529

16     (C.D. Cal. 2013)..............................................................................................60

17   *Guzman v. Bridgepoint Educ., Inc.*, 305 F.R.D. 594 (S.D. Cal. 2015) .............53

18   *Hanlon v. Chrysler*, 150 F.3d 1011 (9th Cir. 1998)...............................23, 25, 27

19   *Hanon v. Dataproducts Corp.*, 976 F.2d 497 (9th Cir. 1992)....................26, 27

20   *Herskowitz v. Apple, Inc.*, 301 F.R.D. 460 (N.D. Cal. 2014)...........................58

21   *Houser v. Pritzker*, 28 F. Supp. 3d 222 (S.D.N.Y. 2014) ................................62

22   *In re Ford Tailgate Litig.,* 11-cv-02953-RS, 2015 WL 7571772

23     (N.D. Cal. Nov. 25, 2015)..............................................................................70

24   *In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices, &*

25     *Prods Liab. Litig.*, 2012 WL 7802852

26     (C.D. Cal. Dec. 28, 2012) ..............................................................................26

27   *In re Toyota Motor Corp.*, 790 F. Supp. 2d 1152 (C.D. Cal. 2011) .................48

28

*In re Yahoo Mail Litigation*, 308 F.R.D. 577 (N.D. Cal. 2015)......25, 55, 58, 61

*In the Matter of Rhone–Poulenc Rorer, Inc.,* 51 F.3d 1293
   (7th Cir. 1995) ..................................................................................63

*Keegan v. Am. Honda Motor Co.*, 284 F.R.D. 504 (C.D. Cal. 2012) ........*passim*

*Leyva v. Medline Indus., Inc.*, 716 F.3d 510 (9th Cir. 2013) ...........................44

*Lindell v. Synthes USA*, 2014 WL 841738 (E.D. Cal. March 4, 2014).............44

*Loritz v. Exide Techs.*, No. 2:13-CV-02607-SVW-E,
   2015 WL 6790247 (C.D. Cal. July 21, 2015) ...............................................27

*Lucas v. Breg, Inc.*, 212 F. Supp. 3d 950 (S.D. Cal. 2016) ..............................58

*Martinelli v. Johnson & Johnson*, No. 2:15-CV-01733-MCE-DB, 2017 WL
   2257171 (E.D. Cal. May 23, 2017).................................................................60

*Mazza v. Am. Honda Motor Co.*, 666 F.3d 581 (9th Cir. 2012) ...............*passim*

*McVicar v. Goodman Glob., Inc.*, 2015 WL 4945730
   (C.D. Cal. Aug. 20, 2015)......................................................................22, 58

*O2 Micro Int'l Ltd. v. Monolithic Power Sys., Inc.*,
   420 F. Supp. 2d 1070 (N.D. Cal. 2006) ........................................................68

*Ono v. Head Racquet Sports USA, Inc.*, No. 13–4222,
   2016 WL 6647949 (C.D. Cal. Mar. 8, 2016) .............................31, 35, 37, 49

*Pablo v. ServiceMaster Glob. Holdings Inc.*, No. C 08-03894 SI, 2011 WL
   3476473 (N.D. Cal. Aug. 9, 2011)................................................................53

*Parkinson v. Hyundai Motor Am.*, 258 F.R.D. 580
   (C.D. Cal. Dec. 12, 2008) ..................................................................25, 42

*Philips v. Ford Motor Co.*, No. 14–CV–02989-LHK,
   2016 WL 7428810 (N.D. Cal. Dec 22, 2016) .......................................*passim*

*Pulaski & Middleman, LLC v. Google, Inc.*, 802 F.3d 979
   (9th Cir. 2015) ...............................................................................................48

*Rahman v. Mott's LLP*, 693 F. App'x 578 (9th Cir. 2017)........................62, 63

1   *Rodriguez v. Hayes*, 591 F.3d 1105 (9th Cir. 2010) ........................................25

2   *Saavedra v. Eli Lilly & Co.*, No. 2:12-CV-9366-SVW,

3       2014 WL 7338930 (C.D. Cal. Dec. 18, 2014).......................................51, 63

4   *Stearns v. Ticketmaster Corp.*, 655 F.3d 1013 (9th Cir. 2011).............31, 34, 41

5   *Sweet v. Pfizer*, 232 F.R.D. 360 (C.D. Cal. 2005) ...........................................59

6   *Tait v. BSH Appliances Corporation*, 289 F.R.D. 466

7       (C.D. Cal. Dec. 20, 2012) ...................................................................*passim*

8   *Tasion Commc'ns, Inc. v. Ubiquiti Networks, Inc.*, 308 F.R.D. 630 (N.D. Cal.

9       2015)...................................................................................................62

10  *Tietsworth v. Sears,* 720 F. Supp. 2d 1123 (N.D. Cal. 2010) ..........................29

11  *Torres v. Mercer Canyons Inc.*, 835 F.3d 1125 (9th Cir. 2016) ........................6

12  *Torres v. Nissan N. Am. Inc.*, No. CV15-03251, 2015 WL 5170539 (C.D. Cal.

13      Sept. 1, 2015)......................................................................................*passim*

14  *Vaccarino v. Midland Nat'l Life Ins. C*o., 2014 WL 572365

15      (C.D. Cal. Feb. 3, 2014)...............................................................................44

16  *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227 (9th Cir. 1996)..............53, 62

17  *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256 (11th Cir. 2009) .........................37

18  *Vietnam Veterans of America v. C.I.A.,* 288 F.R.D. 192

19      (N.D. Cal. 2012) .........................................................................................23

20  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011)..............................*passim*

21  *Williams v. Yamaha Motor Co. Ltd.*, 851 F.3d 1015 (9th Cir. 2017)..........32, 34

22  *Wilson v. Hewlett-Packard Co.*, 668 F. 3d 1136 (9th Cir. 2012)...............31, 32

23  *Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168

24      (9th Cir. 2010) ..............................................................24, 32, 33, 39

25  *Zinser v. Accufix Research Inst., Inc.*,

26      253 F.3d 1180 (9th Cir. 2001)....................................................49, 53, 54, 61

27

28

*STATE CASES*

*Am. Honda Motor Co. v. Super. Ct.*, 199 Cal. App. 4th 1367 (2011).........19, 29

*Clothesrigger, Inc. v. GTE Corp.*, 191 Cal. App. 3d 605 (1987).....................57

*Collins v. eMachines, Inc.*, 202 Cal. App. 4th 249 (2011)...............................40

*Daugherty v. Am. Honda Motor Co.*, 144 Cal. App. 4th 824 (2006)...............32

*Davis-Miller v. Automobile Club of So. California*,

    201 Cal. App. 4th 106 (2011) ...............................................................34, 35

*In re Tobacco II Cases*, 46 Cal. 4th 298 (2009) ...............................................41

*In re Vioxx Class Cases*, 180 Cal. App. 4th 116 (2010) ...................................34

*Isip v. Mercedes-Benz USA, LLC*, 155 Cal. App. 4th 19 (2007).......................42

*LiMandri v. Judkins*, 52 Cal. App. 4th 326 (1997)..........................................40

*Massachusetts Mutual Life Insurance Co. v. Superior Court*,

    97 Cal. App. 4th 1282 (2002) .......................................................................41

*McCann v. Foster Wheeler LLC*, 48 Cal. 4th 68 (2010)...................................61

*Melchior v. New Line Prods., Inc.,* 106 Cal. App. 4th 779 (2003) ...................37

*Mexia v. Rinker Boat Co.*, 174 Cal. App. 4th 1297 (2009)...............................43

*Rutledge v. Hewlett-Packard Co.*, 238 Cal. App. 4th 1164 (2015) .................57

*Wershba v. Apple Computer, Inc.*, 91 Cal. App. 4th 224 (2001).....................57


*FEDERAL STATUTES*

15 U.S.C. §§ 2303 *et seq.*

    (Magnuson-Moss Warranty Act) ...................................................................6

Fed. R. Civ. P. 23 ...............................................................................................22

Fed. R. Civ. P. 23(a)...........................................................................................27

Fed. R. Civ. P. 23(a)(4) ......................................................................................28

Fed. R. Civ. P. 23(b)(2)..........................................................................1, 5, 55, 56

Fed. R. Civ. P. 23(b)(3).................................................................................*passim*

Fed. R. Civ. P. 23(c)(4) ............................................................1, 5, 61

Fed. R. Civ. P. 23(g) ......................................................................28

Fed. R. Evid. 702 .....................................................................65, 67


*STATE STATUTES*

Cal. Civ. Code § 1761(d) ..................................................................5

Cal. Civ. Code §§ 1790 *et seq*.

    (Song-Beverly Consumer Warranty Act (Song-Beverly)) .......................6, 42


*SECONDARY AUTHORITIES*

1 McLaughlin on Class Actions (9th ed.) ............................................37

*Allen, Mark A., et al.*,

    *Reference Guide on Estimation of Economic Damages* .........................44, 45

Birken, Emily Guy, "6 Cars You Can Drive (Almost) Forever," *Wise Bread* (April

    16, 2015) ..................................................................................47

http://www.wisebread.com/6-cars-you-can-drive-almost-forever ...................47

https://www.fjc.gov/sites/default/files/2015/SciMan3D01.pdf ......................44

*Reference Manual on Scientific Evidence*, 3rd Ed. ...........................................44

The National Academy of Sciences (2011) .......................................44

## I.     INTRODUCTIONS

### A.     Plaintiffs' Introduction and Summary of the Argument

The facts of this case are known to the Court from its prior Orders denying Toyota Motor Sales, U.S.A., Inc. ("TMS")'s Motion to Dismiss the First Amended Complaint (Dkt. No. 38), Motion to Dismiss the Second Amended Complaint (Dkt. No. 79), and Motion for Summary Judgment. (Dkt. No. 81 ("MSJ Order")). Plaintiffs allege that TMS failed to disclose that the Heating, Ventilation, and Air Conditioning ("HVAC") system, installed uniformly in the 2012-2015 Toyota Camry XV50 model vehicles (collectively, "Class Vehicles"), contains a design defect that prevents the efficient drainage of moisture, which in turn creates an ideal habitat for the growth of biological matter, including fungi, that emits foul, noxious odors from accumulated debris and contamination (the "HVAC Defect").

This Court has already determined, with respect to the named Plaintiffs, that "there are triable issues regarding the existence of a design defect that causes the foul odor at issue, and whether such odors are material."  MSJ Order at 7.  These same issues, and others discussed below, apply to the Class as a whole. Resolution of these issues, which predominate over any questions affecting only individual Class Members, is based on uniform proof common to the Class that will resolve this matter in one stroke under Rule 23(b)(3).  If, for any reason, the Court finds that the Rule 23(b)(3) requirements are not satisfied, Plaintiffs seek to certify a liability-only class under Rule 23(c)(4).

Plaintiffs also seek to certify a class for equitable or injunctive relief under Rule 23(b)(2).  As this Court noted sustaining Plaintiffs' equitable relief allegations, "*monetary relief alone will not mitigate the odor consumers will be forced to endure while they own the class vehicles*.  Toyota, however, has some solutions to help mitigate the odor which plaintiffs seek to have implemented on the class vehicles." (Dkt. No. 79) (emphasis added). TMS' own employee noted that TMS' policy with respect to HVAV odor is inequitable: "if this is a known

1    issue, with a TSB for how to repair, why are we asking to charge customers? . . . it

2    does seem challenging to explain why to get what a customer should expect as a

3    standard condition for the air conditioner (no odor) we charge more?"  (Exhibit

4    No. 1 to the Declaration of Tarek H. Zohdy, which is Exhibit A to Joint

5    Evidentiary Appendix) ("TZD").  Accordingly, in addition to damages, Plaintiffs

6    seek to compel TMS to offer under warranty the HVAC odor countermeasures it

7    has identified but for which Class members must pay out of pocket.

8         **B.   TMS' Introduction**

9         Plaintiffs bear the evidentiary burden of demonstrating that the

10   requirements of Rule 23 have been satisfied.  Plaintiffs contend that a defect exists

11   that causes organic "contamination" in their HVAC systems, which, in turn,

12   causes foul odors.  Based on this theory, Plaintiffs assert their vehicles are

13   unmerchantable and there was a duty to disclose that triggers liability under the

14   UCL, CLRA, and principles of unjust enrichment.  Plaintiffs seek to certify

15   classes for (1) damages, (2) injunctive relief, and (3) liability-only, including a

16   nationwide class of over one million 2012 to 2015 model year Toyota Camrys (the

17   "Class Vehicles").  No class may be certified because all of Plaintiffs' claims turn

18   on class-member specific facts and Plaintiffs have not met their Rule 23 burden.

19       In essence, Plaintiffs contend that classes should be certified because, at

20   summary judgment, this Court found that triable issues exist as to whether the

21   named Plaintiffs' vehicles have a defect causing HVAC odor.  This contention is

22   without merit.  The Court's summary judgment opinion recognized individualized,

23   outcome-dispositive issues differentiating even the named Plaintiffs' claims from

24   one another—which establishes that even if one or both named Plaintiffs can

25   individually establish their ***own claims***, the same evidence will not establish the

26   claims of ***all class members***. Dkt. 81 ("MSJ Order") at 6–7.

27       Here, common evidence cannot establish class-wide claims.  HVAC odor is

28   reported in only a small percentage of Vehicles and it may result from a multitude

1  of factors, independent of any alleged defect.  For those Class Vehicles that

2  experience HVAC odor, as this Court's summary judgment ruling makes clear,

3  evidence regarding the timing, nature, and severity of that odor will differ

4  significantly.  *Id.*  Most experience no odor; others experience little odor; and still

5  others experience odor only after the expiration of the warranty period, thereby

6  negating any claim.  In addition, class members have varying levels of knowledge

7  of the possibility of HVAC odor at the time of their particular purchase.  This is

8  because HVAC odor is an industry-wide issue that may arise with all car

9  manufacturers; it is widely known and discussed on car websites; and TMS

10  discloses the potential for HVAC odor in its owners' manuals.  Even more

11  critically, the Class Vehicles have material differences in HVAC system design

12  elements, including different software logics, air flow design, evaporator coatings,

13  and air filters, which impact HVAC odor.  These differences preclude certification

14  of any putative class based on a supposed common defect.

15      *First,* Plaintiffs cannot satisfy the Rule 23(a) factors because, among other

16  things, there are no common answers to the fundamental legal and factual

17  questions for each set of claims.  Rather, individualized analysis must be

18  conducted for each of the following key points: (1) the particular Class Vehicle's

19  HVAC design; (2) whether HVAC odor occurred during the warranty period, the

20  predicate for triggering any duty to disclose; (3) the severity of any HVAC odor;

21  (4) the specific cause of each Class Vehicle's HVAC odor, including whether the

22  alleged defect caused organic "contamination;"[1] (5) each class member's

23  knowledge about the potential for HVAC odor at the time of purchase or lease; (6)

24  the impact, if any, that any additional disclosure would have made to a class

25  member's purchasing decision; and (7) any harm or injury suffered by the class

26  ───────────────

27  [1] Plaintiffs' motion makes clear that the alleged defect is based upon odor-causing "organic contaminants, including fungi."  Mot. at 7-8 (herein "Mot." refers to Plaintiffs' briefing).

28

1  member as a result of the alleged defect.  Plaintiffs do not meaningfully address

2  these individual issues, and offer no trial plan on how they could try these claims

3  on a class-wide basis, in light of the individualized evidence.

4      *Second*, Plaintiffs' proposed Rule 23(b)(3) class fails because individual

5  issues predominate over any common questions, and due process gives TMS the

6  right to offer individualized evidence on each key issue, thereby requiring mini-

7  trials on each claim by each class member.  Additionally, Plaintiffs' supposed

8  damages methodology does not match their liability theory.  Plaintiffs' liability

9  theory is that class members would not have purchased, or overpaid for, their

10  Class Vehicles, but Plaintiffs' damages methodology does not even address

11  diminution of value assigned to the alleged defect at the time of purchase.

12  Instead, Plaintiffs' damages expert estimates the average cost of implementing

13  different countermeasures to mitigate HVAC odor and, without evidentiary

14  support, assumes that each class member should be paid for ten-years' worth of

15  countermeasures, regardless of whether or not they even experience HVAC odor.

16  Lastly, Plaintiffs ignore TMS' individualized affirmative defenses, including that

17  many class members must arbitrate their claims on an individual basis.

18      *Third*, Plaintiffs' proposed nationwide Rule 23(b)(2) class is improper.

19  Plaintiffs' request for injunctive relief is a thinly veiled attempt to seek monetary

20  relief, *i.e.,* paying for the countermeasures underlying their damages methodology.

21  Certification under Rule 23(b)(2) is invalid where, as here, the predominant relief

22  sought is monetary.  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 360 (2011).  In

23  addition, the proposed class is not "cohesive," given each class member's

24  individualized circumstances.  Finally, a nationwide class cannot be certified

25  because the differing laws of all fifty (50) states will have to apply.

26      *Finally*, Plaintiffs' proposed Rule 23(c)(4) class fails because liability

27  cannot be demonstrated on a class-wide basis, given the lack of common evidence

28  and individualized inquiries described above.  Nor would there be any efficiency

1   to such an approach: this Court still would need to hold individualized, factual

2   mini-trials for each class member, which, in turn, would overlap with the merits of

3   their claims and create Seventh Amendment violations.

4   **II.    CLASS DEFINITION**

5          **A.    Plaintiffs' Class Definition**

6          Plaintiffs seek to certify (1) an injunctive relief class under Rule 23(b)(2)

7   and (2) a damages class under 23(b)(3).  In the alternative, if neither of these

8   classes is certified, Plaintiffs seek to certify a liability-only class under Rule

9   23(c)(4), as follows:

10         Rule 23(b)(2): (1) a nationwide class consisting of all persons in the United

11  States who purchased or leased a 2012-2015 Toyota Camry XV50 model vehicle

12  from an authorized Toyota dealer and still own or lease their vehicles; (2) a

13  California-only sub-class consisting of all persons in California who purchased or

14  leased a 2012-2015 Toyota Camry XV50 model vehicle from an authorized

15  Toyota dealer and still own or lease their vehicles.

16         Rule 23(b)(3): (1) a California-only class consisting of all persons in

17  California who purchased or leased a 2012-2015 Toyota Camry XV50 model

18  vehicle from an authorized Toyota dealer; (2) a California CLRA sub-class

19  consisting of all members of the California class who are "consumers" within the

20  meaning of California Civil Code § 1761(d).

21         Rule 23(c)(4): a class consisting of all persons in California who purchased

22  or leased a 2012-2015 Toyota Camry XV50 model vehicle from an authorized

23  Toyota dealer. [2]

24  _____

25       [2] Excluded from the proposed Classes and Subclasses are: (a) TMS, its
    officers, directors, employees and outside counsel; its affiliates and affiliates'
26  officers, directors and employees; its distributors and distributor's officers and
    directors; and Toyota's dealers and their officers, directors, and employees; (b)
27  Plaintiffs' counsel, and their employees; (c) judicial officers and their immediate
    family members and associated court staff assigned to this case, or the Ninth
28  Circuit Court of Appeals; and (d) persons or entities who or which timely and

1    Plaintiffs seek to certify these Classes/Subclasses for violations of the UCL

2  and the CLRA, for breach of implied warranty under the Song-Beverly Consumer

3  Warranty Act ("Song-Beverly") (Cal. Civ. Code §§ 1790, *et seq.*), for violation of

4  the Magnuson-Moss Warranty Act ("Mag-Moss") (15 U.S.C. §§ 2303 *et seq.*),

5  and/or for unjust enrichment.

6    **B.    TMS' Position: Plaintiffs' Class Definitions Are Overbroad and**

7        **Invalid**

8    This Court "must ensure that "the class is not 'defined so broadly as to

9  include a great number of members who for some reason could not have been

10  harmed by the defendant's allegedly unlawful conduct.'" *Torres v. Mercer*

11  *Canyons Inc.*, 835 F.3d 1125, 1138 (9th Cir. 2016) (internal citation omitted).  In

12  addition, "no class may be certified that contains members lacking Article III

13  standing." *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 594 (9th Cir. 2012).

14    Plaintiffs' proposed classes run afoul of these principles.  As discussed

15  below in Section III.B.1, no class-wide injury exists because HVAC odor does not

16  occur in the overwhelming majority of Class Vehicles.  For the small fraction of

17  Class Vehicles that experience HVAC odor, Plaintiffs' expert concedes that such

18  odor may be caused by numerous individualized factors apart from the alleged

19  defect, and that such odor can occur in any vehicle, regardless of manufacturer.

20  Schrader Decl. ("DLS") Ex. 49 at 55, 87, 88, 110, 140, 162, 182.  As a result,

21  Plaintiffs' proposed classes are invalid because they include many individuals who

22  have not and could not have been harmed, including class members: (1) who never

23  experienced or will never experience HVAC odor during the warranty period; (2)

24  who experience HVAC odor not caused by the alleged defect; (3) who had

25  knowledge of HVAC odor before purchasing their Class Vehicles; and (4) who

26  would have purchased the Class Vehicles regardless of any additional disclosure

27    _____

28  properly exclude themselves from the Settlement Class.

1   about HVAC odor.

2   **III.   PLAINTIFFS' COMMON PROOF**

3       **A.   Plaintiffs' Position:  Generalized Evidence Provides Common**

4           **Proof**

5       Plaintiffs' claims turn on generalized evidence about the subject HVAC

6   system common to the Class Vehicles regarding, among others, the following

7   issues: 1) existence of the HVAC Defect; 2) TMS' knowledge of the defect and its

8   failure to disclose; 3) materiality of the defect; and 4) TMS' uniform remediation

9   of the defect.  This Court is familiar with some of Plaintiffs' common proof from

10  prior pleadings, including Plaintiffs' voluminous submission in opposition to

11  summary judgment.  (Dkt. 62.)

12      **1.   The HVAC Design and Defect Are the Same for All Class**

13          **Vehicles**

14      As this Court noted in its MSJ Order, Plaintiffs' expert Murat Okçuoğlu

15  identified the design defect in the Class Vehicles' HVAC system.  (MSJ Order at

16  8-9.)  Mr. Okçuoğlu determined that the HVAC system in the Class Vehicles

17  uniformly "lack[s] efficient drainage and contain[s] nooks and crevices that can

18  form ideal habitats for biological matter growth[; that t]he warm, humid, dark

19  crevices present inside this HVAC system may harbor organic matter[; and that

20  t]he foam material design used around the evaporator also has several crevices and

21  inherent porosity that may harbor moisture and growth." (MSJ at 8:7-12; *see also*

22  TZD Ex. 2 at 12-13.)  In addition, Mr. Okçuoğlu found that "the steps at the

23  bottom of the evaporator housing create obstacles for efficient drainage and the

24  sharp corners create crevices for contaminants.  The minimal drain slope of the

25  sump section under the evaporator housing does not allow for efficient drainage of

26  water."  (MSJ at 8:12-15; *see also* TZD Ex. 2 at 13.)  Mr. Okçuoğlu concluded

27  that naturally occurring organic contaminants, including fungi, are likely to be

28  trapped in the accumulating condensation, such that "[t]he contamination causes

1  strong unpleasant fumes and odor[.]"  (TZD Ex. 3 at 11.)

2      Plaintiffs' expert and TMS' expert Robert Kuhn both agree that the design

3  of the subject HVAC system is the same for every Class Vehicle.  (TZD Ex. 2 at

4  23; TZD Ex. 4 ("they share a similar housing."))  The only differences Mr. Kuhn

5  notes are related to the HVAC system's operator control settings, system control

6  algorithms, and the evaporator coating.  (TZD Ex. 5 at 5; *see also* TZD Ex. 3 at

7  11), which do not affect the design defect identified by Plaintiffs. Mr. Kuhn also

8  concedes that HVAC odors could be due to a design defect (TZD Ex. 6) or

9  accumulated moisture.  (TZD Ex. 7.)

10      An HVAC system typically includes an evaporator core that cools air,

11  which is circulated through the system by the compressor (TZD Ex. 3 at 8; TZD

12  Ex. 8 at 3). The portion that affects the passenger cabin is mounted within/behind

13  the dashboard assembly and contains, among other components, the evaporator

14  core, heater core, blower motor, and air distribution system.  (TZD Ex. 3 at 7;

15  TZD Ex. 8 at 4.)  A set of controls mounted on the face of the instrument panel

16  allow the driver to operate the system.  (TZD Ex. 8 at 4.)

17      A fan blows air across the evaporator core through which refrigerant

18  circulates to cool and dehumidify it.  (TZD Ex. 8 at 7.)  When the air conditioning

19  is on, that cooled air circulates throughout the passenger cabin via ducting and

20  vents.  (TZD Ex. 3 at 8; TZD Ex. 8 at 3.)  During operation, moisture condenses

21  on the surface of the evaporator as the relatively warmer air passes across it and

22  collects at the base to drain from the vehicle through a tube.  (TZD Ex. 2 at 14-15;

23  TZD Ex. 8 at 7.)  Plaintiffs' evidence shows that the HVAC Defect significantly

24  impedes this operation, such that the ineffective configuration of system

25  components and the use of unsuitable materials prevent proper drainage.  (TZD

26  Ex. 3 at 11, 16, 18; TZD Ex. 2 at 13-16, 18.)  The moisture that accumulates

27  creates an environment favorable to the growth of fungi and bacteria from

28  contaminants trapped on the evaporator surface.  (TZD Ex. 3 at 11; *see also* TZD

1  Ex. 8 at 8 ("Odors can also occur during A/C system operation based on the
2  changing temperature (causing evaporation and condensation), and wetness of the
3  evaporator core surface."); TZD Ex. 9 ("Odors coming from the outside air and
4  interior can accumulate on the evaporator."))

5  **2.  TMS' Knowledge of the HVAC Defect and Failure to**
6  **Disclose**

7  TMS' own documents confirm its knowledge of the unpleasant odors
8  emitted by the Class Vehicles' HVAC system.  For example, in May 9, 1997,
9  TMS issued TSB AC002-97 to its dealers in the United States, entitled "Air
10  Conditioning Evaporator Odor" informing them that a "musty odor may be
11  emitted from the air conditioning system of some vehicles," including the Camry,
12  which may be due to "[m]icrobial growth in the evaporator, arising from
13  dampness in the evaporator housing where the cooling air flow is dehumidified."
14  The bulletin recommended cleaning and disinfecting the evaporator and its
15  housing. (TZD Ex. 10.) Similarly, a training manual published in 2005 informed
16  TMS technicians that the two primary causes of HVAC odor are 1) "[d]irt or
17  microscopic particles which are trapped in the evaporator then later blown into the
18  vents [which] results in a 'musty' or 'stale' odor" and 2) "[m]icrobes [which are
19  small living bacteria] growing on the evaporator surfaces."  Technicians are
20  advised that there is "no permanent mechanical repair for either type of odor" and
21  that "[r]eplacing the evaporator or cleaning it with a strong chemical is only a
22  temporary fix."  It states further that drivers "must change how the system is
23  used…to allow the evaporator to dry out." (TZD Ex. 11.)

24  In August 2009, TMS released another service bulletin, TSB-0261-09,
25  entitled "HVAC Odor," informing its dealers of "a newly designed evaporator
26  sub-assembly…made available to decrease the potential for HVAC odor" in
27  various models, including the 2007-2010 Camry.  (TZD Ex. 12.)  This repair was
28  covered under the Toyota Comprehensive Warranty. *Id.* Subsequently, in May

1  2011, TMS engineer Dwayne Kinsey reported he was receiving "more and more

2  post [countermeasure] customer complaints and would like to standardize the

3  inspections." (TZD Ex. 13.) Around this time, TMS was surveying its customers

4  to document their experience with HVAC odors, based on intensity and

5  "unpleasantness," with a classification checklist that included "rotten," "musty,"

6  and "nauseating." (TZD Ex. 14.) TMS continued investigating foul HVAC odors,

7  and in 2013, even re-visited its 1997 recommendations regarding cleaning and

8  disinfecting the evaporator, in addition to new suggestions regarding higher

9  performance charcoal cabin filters. (TZD Ex. 15.)

10  Since 2012, TMS engineers have been investigating complaints of noxious,

11  foul HVAC odors in the Class Vehicles. On April 12, 2012, for example, TMS

12  issued a report regarding a 2012 Camry with only 5,687 miles that was emitting a

13  moldy odor from the A/C vents. (TZD Ex. 16.) TMS did not repair the vehicle,

14  despite confirming the odor, because it determined that the HVAC system was

15  "operating at and is within the perameters [sic] of it's [sic] design." *Id.* TMS did

16  not test for mold. (TZD Ex. 17.) In December 2012, TMS issued a similar report

17  regarding a "strange smell from air conditioning" in a 2012 Camry with 4,805

18  miles on the odometer. (TZD Ex. 18.) The investigator was unable to duplicate

19  the odor, noting simply that "[t]he interior is spotless," and no further action was

20  taken. *Id.* Another TMS report regarding a 2012 Camry with 12,141 miles and

21  "bad odor coming from AC vents," issued in April 2013, confirmed the odor but

22  noted that a "12-hour fresh air soak" failed to dissipate it. TMS recommended

23  replacing the evaporator core. (TZD Ex. 19.)

24  In September 2013, Toyota released another service bulletin, TSB 0142-13,

25  entitled "HVAC Odor Maintenance," affecting a range of vehicles, including the

26  2004-2014 Camry. (TZD Ex. 9.) Technicians were informed that "[o]dors coming

27  from the outside air and interior can accumulate on the evaporator. As the

28  evaporator core changes temperature, some of these odors may be released

1  resulting in an unpleasant smell from the HVAC vents." *Id.*

2         **3.**      **The HVAC Defect and TMS' Failure to Disclose Are**

3                    **Material**

4         In ruling on TMS' motion for summary judgment, this Court concluded that

5  there is a triable issue of fact as to whether foul HVAC odors are material.  (MSJ

6  Order at 7.) Materiality is an issue common to the Class that can also be resolved

7  based on generalized evidence.

8         A reasonable consumer expects that the air conditioning in her car will cool

9  the air during normal and routine use without simultaneously emitting foul or

10  noxious odors redolent of mold, mildew, or "an old gym bag." (*See, e.g.*, TZD Ex.

11  20 ("[odor is] like, smelling a gym bag, basically. A dirty, sweaty gym bag or a

12  dirty, sweaty gym bag, as well as wet rag smell. A sour wet rag.").)  However,

13  according to TMS' own documents, customers have complained that their

14  expectations of a vehicle interior free of unpleasant and potentially toxic fumes

15  are not met as a result of the HVAC Defect. (TZD Ex. 21.)  For example, one

16  customer told TMS on September 26, 2012, that he "is experiencing a very foul

17  and obnoxious odor from HVAC system," that he has "had headaches and

18  allergies," and that the smell "is a problem for his asthma and allergies."  (TZD

19  Ex. 21 at 1.) On September 30, 2013, another customer complained of "an intense,

20  foul odor, smelling like mildew coming from the air conditioning system." (TZD

21  Ex. 21 at 2.) He was emphatic that he was "not willing to drive this car in its

22  current condition, I have asthma and young children whose health I will not risk."

23  *Id.*  In fact, since 2013, the Florida Attorney General's Office has conducted 8

24  arbitration hearings regarding Toyota vehicles with HVAC odor. In each case, the

25  Florida Attorney General's Office has found in consumers' favor, concluding that

26  the foul and offensive "odor[s] emanating from the air conditioner substantially

27  impaired the use and value of the vehicle[s]."  TMS engineer Kinsey attended

28  certain of these hearings.  (TZD Ex. 22.)

1    Both Plaintiffs testified that they would not have purchased their vehicles

2    had the HVAC Defect been disclosed.  (TZD Ex. 23.)  ("I would have not bought

3    the car"); (TZD Ex. 24) ("[I]f I would have known that my car had that problem, I

4    wouldn't have bought it nor I—I wouldn't have bought it.")  Both Plaintiffs also

5    testified that they use their air conditioning regularly, that the HVAC Defect

6    continues to affect them, and that they complained repeatedly to TMS, either

7    directly or through their authorized dealers, regarding their concerns about the

8    foul odors.  Based on the foregoing, a reasonable consumer would consider

9    material – as Plaintiffs do – TMS' ongoing failure to disclose the HVAC Defect.

10    TMS itself clearly considers foul HVAC odors material, having undertaken

11    significant efforts to ameliorate them in the Class Vehicles through a series of

12    countermeasures, described below.  (*See, e.g.* TZD Ex. 25; TZD Ex. 8 at 8-9.)  In

13    particular, by designing and implementing Park Fresh Logic to mitigate foul

14    odors, TMS has effectively admitted that foul HVAC odors should be eliminated.

15    However, TMS determined that the Park Fresh ECU could not be implemented on

16    the 2012-2013 model year Camrys.  (*See, e.g.*, TZD Ex. 26.)

17    Finally, the HVAC Defect is also material because a reasonable person

18    would want to know that their vehicles contained a defect that could expose them

19    to mold, which can pose a safety concern[3]. Indeed, health concerns associated with

20    mold are a matter of public record.  (*See, e.g.*, TZD Ex. 3 at 12-13.)  Further,

21    Plaintiffs themselves felt that the defect posed a safety risk to them.  (TZD Exs. 27

22    and 28.)

23              **4.    TMS' Remediation of the HVAC Defect**

24    Common evidence in support of Plaintiffs' claim for equitable relief is

25

26    _____

      [3] As this Court has noted, Plaintiffs do not need to allege a safety concern
27    to prevail on their omissions claims.  (MSJ Order at 7, fn. 8); *see also* (Order
      Denying Toyota's Motion to Dismiss Plaintiffs' FAC, Dkt. No. 38 at p. 14-15.)
28    However, whether consumers would want to know of the risk of mold and its
      concomitant safety concerns is a common question.

1   documented Plaintiffs' Second Amended Complaint (Plaintiffs' SAC Dkt. 52.)
2   This Court is also familiar with this evidence from its Order sustaining Plaintiffs'
3   allegations.  (Dkt. 79.)  The evidence confirms that TMS has identified various
4   countermeasures to mitigate foul HVAC odors, including use of a charcoal filter
5   and cleaning or replacing the evaporator core.  It also confirms that foul HVAC
6   odors are exacerbated by TMS' 2012 implementation of "Greenhouse Gas Logic"
7   (GHG), which recirculates tainted air. and that TMS knew about this issue.  (TZD
8   Exs. 29 and 30.)  Finally, TMS specifically sought to designate the
9   countermeasures as "maintenance," rather than as "repairs," to prevent consumers
10   from accruing service visits that would potentially qualify the Class Vehicles for
11   warranty relief and vehicle buybacks as provided by state lemon laws.  (TZD Ex.
12   31.)  Now, Class Members have to pay out of pocket for countermeasures as
13   maintenance not covered by warranty.
14        Even TMS' own employees understood that TMS' "maintenance" policy for
15   HVAC odor abatement is unfair.  As discussed above, as one manager noted
16   regarding charcoal filters, "if this is a known issue, with a TSB for how to repair,
17   why are we asking to charge customers? . . . it does seem challenging to explain
18   why to get what a customer should expect as a standard condition for the air
19   conditioner (no odor) we charge more?"  (TZD Ex. 1.)
20        **B.     TMS' Position: Resolution of Each Class Member's Claims Turns**
21             **on Individualized Facts**
22             **1.     Plaintiffs Fail to Meet Their Burden of Demonstrating That**
23                  **HVAC Odor is a Class-Wide Issue**
24        Plaintiffs fail to establish the existence of any class-wide issue with HVAC
25   odor.  Plaintiffs offer only unverified hearsay and submit no evidence about the
26   percentage of Class Vehicles that experience any HVAC odor, let alone any odor
27   caused by organic "contamination" from the alleged defect.
28        Nor can they.  The unrebutted evidence is that only a small percentage of

1   Class Vehicle owners report HVAC odor.  According to the Initial Quality Survey

2   ("IQS") conducted by J.D. Power and Associates, the percentage of Class Vehicle

3   owners reporting "air from vents smells moldy/stale" is miniscule—between ██████

4   and ██████.  DLS Ex. 51; Keller Decl. ¶¶ 72, 82, Ex. 3; Young Decl. ¶ 7.

5   Likewise, the number of complaints about HVAC odor lodged with TMS'

6   customer service center is approximately 1,500 (Hare Decl. ¶ 6)—or roughly 1%

7   of 2012 to 2016 Camry vehicles sold in the United States.  Similarly, the number

8   of field communications about customers reporting HVAC odor amounts to

9   approximately 1% of 2012 to 2016 Camry vehicles.  *Id.* ¶ 7.

10                  **2.      HVAC Odor Can Occur in All Types of Vehicles**

11           HVAC odor is an industry-wide phenomenon addressed by nearly all

12   manufacturers and discussed in Internet consumer forums.  Kuhn Decl. ¶¶ 10-12,

13   28-34; Young Decl. ¶¶ 9-10; Keller Decl. ¶¶ 68-74.  Indeed, the IQS survey

14   includes a question about "moldy/stale" odors from air vents, reflecting the

15   industry-wide phenomenon of such odors.  DLS Ex. 51.  Owners of thirteen out of

16   sixteen 2012 to 2015 models reported varying degrees of "moldy/stale" odors.

17   DLS Ex. 51; Keller Decl. Ex. 3.  Only ██████ of 2012 Camry owners report

18   HVAC odor—less than the ██████ of Chevrolet Malibu owners and ██████ of

19   Mazda MAZDA6 owners who report odor.  Keller Decl. Ex. 3; *id.* ¶ 72.  Also,

20   ██████ of 2015 Camry owners report HVAC odor—compared to ██████ and ██████

21   of Nissan Altima and Kia Optima owners, respectively.  *Id.*  Further, peer vehicle

22   evaluations confirm that HVAC odor occurs in all vehicles to varying degrees, and

23   the Camry performs comparably to its peers.  Young Decl. ¶ 9–10.

24                  **3.      Many Different Factors Cause HVAC Odor**

25           Plaintiffs' expert concedes that HVAC odor can be caused by many factors

26   unrelated to the alleged defect.  DLS Ex. 49 at 87, 140, 162, 182.

27           *Odorants in the ambient air*.  Odorants are anything one smells in the air,

28   including exhaust fumes, garbage, and air fresheners.  Wysocki Decl. ¶ 25.

1   HVAC systems work by pulling in air from outside the vehicle (*i.e.,* fresh mode)

2   and from within the vehicle cabin (*i.e.,* recirculation mode).  Kuhn Decl. ¶¶ 17–

3   18; Young Decl. ¶ 8.  Air flowing through the HVAC system necessarily contains

4   odorants, which vary widely for each particular vehicle depending on the internal

5   and external environments.  *Id.*

6           *Operation of HVAC system*.  How a particular vehicle owner operates his or

7   her individual HVAC system can affect the occurrence of HVAC odor, based on

8   the recirculation level of existing odorants in the vehicle cabin, introduction of

9   new odorants into the vehicle cabin, and levels of condensation inside the vehicle.

10  Kuhn Decl. ¶ 18; DLS Ex. 49 (Okçuoğlu Dep.) at 162.

11          *Environmental conditions*.  As Mr. Okçuoğlu concedes, ambient

12  temperature and humidity affects the volume of condensation, which can impact

13  odor and drainage.  TZD Ex. 2 at 14; Kuhn Decl. ¶ 61; Young Decl. ¶ 8, 11.

14          *Other vehicle-specific factors*.  Factors unique to each Class Vehicle, such

15  as a blocked evaporator drain tube or air filter problem (items unrelated to the

16  alleged defect), also can contribute to HVAC odor.  Kuhn Decl. ¶ 18.

17              **4.      There is No Common Class-Wide Evidence of An Alleged**

18                       **Defect Across the Class Vehicles**

19          Plaintiffs rely on Mr. Okçuoğlu to establish that the HVAC system design

20  and alleged defect are the same for all Class Vehicles.  Mot. at III.A.1.

21  Mr. Okçuoğlu's opinions, however, do not support the existence of a ***common***

22  ***defect*** causing HVAC odor across all Class Vehicles for two main reasons.

23          *First*, Mr. Okçuoğlu fails to identify a specific and uniform design flaw.  He

24  hypothesizes that the HVAC systems do not "properly drain condensing moisture

25  inside the HVAC housing," and then asserts the alleged defect is "most likely a

26  combination of several factors," offering no fewer than sixteen possibly defective

27  components and design elements—some unidentified combination(s) of which he

28  believes may cause improper drainage, resulting in organic growth causing odors.

TZD Ex. 3 at 11, Ex. 2 at 12–15; *accord* Kuhn Decl. ¶ 54–104.

*Second*, Mr. Okçuoğlu's conclusory assertion that Class Vehicles "have the same HVAC system design" is unsupported by any reliable evidence.  TZD Ex. 3 at 9.  His report references only what is concededly "a generic diagram of an HVAC [system] . . . ."  Mot. at III.A.1; DLS Ex. 49 at 65.  Mr. Okçuoğlu looked at only three Class Vehicles, and he examined the HVAC system in only one of them.  TZD Ex. 3 at 14–15, Ex. 2 at 10–16.  Given the differences in HVAC designs among Class Vehicles, described below, reviewing only three 2014 and 2015 model year Class Vehicles is insufficient to extrapolate any valid conclusions across all Class Vehicles, particularly when Mr. Okçuoğlu observed and reported no foul odors, improper drainage, or mold growth in the one HVAC system he examined.  DLS Ex. 49 at 86–87; TZD Ex. 2 at 10–16.

The evidence establishes that the HVAC systems in the Class Vehicles contain different design elements that may impact HVAC odor.  There are at least five such material differences, which Mr. Okçuoğlu fails to address:

*Manual/Automatic*. Manual and automatic HVAC systems differ as to how airflow is managed.  Kuhn Decl. ¶¶ 25, 9 (Plaintiff Ortega's and Salas's vehicles are automatic and manual, respectively).  Also, some Class Vehicles with automatic systems have Komori Odor Logic, which redirects airflow within the system.  Kuhn Decl. ¶ 23; Young Decl. ¶ 13.  Mr. Okçuoğlu identifies airflow design as a potential defect (TZD Ex. 2 at 17–18), but fails to consider that some Class Vehicles have manual while others have automatic HVAC systems.

*Greenhouse Gas ("GHG") Logic*.  Some, but not all, Class Vehicles have GHG Logic, which switches the HVAC system to recirculation mode when the outside temperature reaches 75 degrees Fahrenheit.  Kuhn Decl. ¶ 23; Young Decl. ¶ 14.  Mr. Okçuoğlu speculates that the "automated servo control logic," *i.e.,* GHG Logic, may be defective and contribute to HVAC odor.  TZD Ex. 3 at 11; DLS Ex. 49 at 107–108.  Because not all Class Vehicles have this logic, common

1    evidence cannot demonstrate that GHG Logic is a class-wide defect.

2         *Parking Fresh Logic*.  Some, but not all, Class Vehicles (like Plaintiff

3    Salas) have Parking Fresh Logic, which switches the HVAC system to fresh mode

4    after the vehicle is parked and the engine is turned off.  Kuhn Decl. ¶ 23; Young

5    Decl. ¶ 15.  Switching to fresh mode allows for outside air to circulate within the

6    HVAC system, which helps dissipate accumulated odor and reduce moisture in the

7    HVAC system.  *Id.*

8         *Evaporator Coatings*.  The Class Vehicles have different evaporator

9    coatings.  Kuhn Decl. ¶ 24; Young Decl. ¶¶ 16–17.  Evaporator coatings serve as

10   an anti-odor agent and promote shedding of water from the evaporator surface—

11   both of which can impact the occurrence of HVAC odor.  *Id.*; Kuhn Decl. ¶ 24;

12   Young Decl. ¶¶ 16–17; *accord* DLS Ex. 49 (Okçuoğlu Dep.) at 180.  Evaporator

13   coatings are on Mr. Okçuoğlu's list of potential defects.  TZD Ex. 2 at 18.

14        *Cabin Air Filters*.  The Class Vehicles have different types of cabin air

15   filters, which is a maintenance item.  Kuhn Decl. ¶ 27; Young Decl. ¶ 18; DLS Ex.

16   55 (maintenance guide).  Charcoal filters are used in some (like Plaintiff Salas's

17   vehicle) but not all Class Vehicles, and can help minimize the occurrence of

18   HVAC odor.  Kuhn Decl. ¶¶ 27, 49; Young Decl. ¶ 18; DLS Ex. 55.

19             **5.    Each Class Member's HVAC System Must Be Inspected for**

20                  **Any Organic "Contaminants" And Safety Risk**

21        According to Plaintiffs, "Mr. Okçuoğlu concluded that 'naturally occurring

22   organic contaminants, including fungi, are likely trapped in the accumulating

23   condensation, such that '[t]he contamination causes strong unpleasant fumes and

24   odor.'"  Mot. at 7-8.  Plaintiffs claim the alleged defect "poses an unreasonable

25   health risk" in the form of mold.  Second Am. Compl. [Dkt. 52] ("SAC") ¶¶ 2–3;

26   TZD Ex. 27, 28 (Plaintiffs' unsubstantiated and unverified belief of a health risk).

27        Neither fact can be established with common or lay evidence. The HVAC

28   system of each Class Vehicle must be tested for organic "contaminants" to

determine whether odor was caused by the alleged defect and for the existence of mold.  Hicks Decl. ¶ 7-8.  Tellingly, Plaintiffs present no evidence of "contaminants" in or a safety issue with their vehicles, let alone on a class-wide basis.  Thus, there is absolutely no common evidence of organic "contaminants" or a safety risk that could be established on a class-wide basis.

### 6. The Nature and Severity of HVAC Odor Differs Widely

For the small percentage of Class Vehicles that experience HVAC odor, the nature and severity of these alleged odors differ widely.  Some, like Plaintiff Ortega, only report experiencing a momentary smell.  DLS Ex. 48 at 156-157; TZD Ex. 16 (another Class Vehicle had odor that dissipated after 10 seconds).  Others, like Plaintiff Salas, who admits he is sensitive to odorants, first detected the odor prior to purchase of his Class Vehicle and experiences the smell for a longer period of time.  DLS Ex. 47 at 27, 101, 108.  Each class member's ability to detect—and the severity of any perceived—odor is highly subjective and depends on the olfactory capabilities of that individual.  Wysocki Decl. ¶ 6-12.

### 7. TMS' Customer Service Efforts to Mitigate HVAC Odor Do Not Show a Class-Wide Defect

Plaintiffs point to TMS' technical service bulletins ("TSBs"), training manual, and countermeasures regarding HVAC odors to contend that TMS had knowledge of a common defect and that injunctive relief is appropriate in this case.  Mot. at III.A.2.  TMS' customer service efforts to mitigate HVAC odor, regardless of cause, and to improve customer satisfaction in a small percentage of Vehicles do not establish a common defect.  TSBs are routine communications to dealerships that do not establish the existence of a common defect.  *See Am. Honda Motor Co. v. Super. Ct.*, 199 Cal. App. 4th 1367, 1378 (2011).  Further, two of the three TSBs—T-SB AC002-97 and T-SB- 0261-09—on their face, do not even apply to the Class Vehicles and were issued before the Class Vehicles were manufactured.  TZD. Ex. 10, 12.  And T-SB-0142-13, titled "HVAC Odor

1    Maintenance," states nothing about drainage failure as the cause of HVAC odor,

2    and does not implicate the design aspects Mr. Okçuoğlu speculates may be

3    defective.  TZD Ex. 9.

4         The training manual fares no better.  Published almost seven years ***before***

5    the first Class Vehicle was manufactured, it discusses two causes of HVAC odor:

6    (1) dirt and particles trapped in the evaporator that are blown into the vehicle

7    cabin and (2) "microbes" growing on the evaporator surface.  TZD Ex. 11 (does

8    not state "mold" as Plaintiffs suggest).  Plaintiffs offer no evidence that the HVAC

9    systems referenced in the training manual in 2005 are comparable to the Class

10   Vehicles' HVAC systems.  And, like the TSBs, the training manual states nothing

11   about drainage failure as the cause of HVAC odor.

12        **8.    Exposure to The Alleged Omission and Knowledge About**

13        **HVAC Odor Varies by Class Member**

14        Plaintiffs claim that TMS failed to disclose the alleged defect, but, because

15   there is no evidence of a class-wide safety issue and the evidence demonstrates

16   that many class members will not experience HVAC odor during the warranty

17   period, there is no class-wide duty to disclose.  Opp. at 5, 13-14, 17-18 (herein

18   "Opp." refers to TMS' briefing).  Moreover, Plaintiffs do not identify how the

19   disclosure should have been made, in what form, or what specifically TMS should

20   have said.

21        Similarly, Plaintiffs offer no class-wide evidence showing that all class

22   members were presented with the same information at the time of purchase, much

23   less would have received any additional disclosure about HVAC odor.  Nor can

24   they, because different car-buying consumers seek information from many

25   different sources, such as consumer reports, websites, and dealer representatives.

26   Keller Decl. ¶¶ 25–50.  This is a critical point that demonstrates the variation in

27   each class member's exposure to the alleged omission.  For example, Plaintiff

28   Salas testified that Toyota should have made a disclosure on "the website for the

1   actual ad that they had for [his] vehicle" and nowhere else (DLS Ex. 47 at 32),

2   but, according to surveys of Class Vehicle owners, more than 25% did not use the

3   Internet for car information prior to purchase.  Keller Decl. ¶ 58.  Such class

4   members would not have been exposed to the very disclosure Plaintiffs want.

5           In addition, many class members were aware of the potential for HVAC

6   odor before purchasing their Class Vehicles.  TMS discloses the possibility of

7   HVAC odor in its owner's manuals—which are available online and distributed

8   with each vehicle at the time of initial retail sale.  Hare Decl. ¶ 4.  Class members

9   also could have discovered the possibility of HVAC odor prior to purchasing their

10  Class Vehicles in other ways.  Plaintiff Salas, for instance, experienced HVAC

11  odor when he test-drove his vehicle; he purchased his vehicle anyway.  DLS Ex.

12  47 at 108.  Consumers also had access to websites, trade publications, and reports

13  regarding the potential for HVAC odor.  Keller Decl. ¶¶ 64–69.

14          **9.      The Impact of Any Additional Disclosure Varies by Class**

15                    **Member**

16          Plaintiffs allege that, had they known about the supposed defect, they would

17  not have purchased their Class Vehicles or, alternatively, would have paid less for

18  them.  SAC ¶ 19.  The alleged odor they experienced in their Class Vehicles and

19  their reaction to the vague alleged omission, however, cannot be extrapolated to

20  all class members.  Further, Plaintiffs have not offered a valid method for

21  calculating damages on a class-wide basis.

22          Because class members' purchasing decisions depend on their preferences

23  for different car attributes, the significance attached to the alleged omission varies

24  among class members.  Keller Decl. ¶¶ 41–46 (survey data establishes varied

25  attributes important to Camry purchasers, including reliability, gas mileage, riding

26  comfort, and safety); *id*. ¶¶ 62–89 (discussing variation).  For instance, those class

27  members who already were aware of the possibility of HVAC odor would not

28  have been affected by an additional disclosure, particularly given the industry-

1   wide possibility of such odor. *Id.* ¶¶ 64–74. Likewise, a class member who cares

2   most about fuel efficiency and gas mileage may be willing to accept an increased

3   possibility of HVAC odor, particularly if the odor is momentary (like it is for

4   Plaintiff Ortega). *Id.* ¶¶ 75-89. Only an individualized inquiry can determine

5   whether an additional disclosure about HVAC odor would have impacted the

6   purchasing decision. *Id.* ¶¶ 62-89.

7   In addition, Plaintiffs have identified no common evidence regarding a

8   uniform purchase price for the Class Vehicles or how the alleged defect impacted

9   the price paid for any Class Vehicle. Consumers buy vehicles based on

10  individualized price negotiations, Keller Decl. ¶¶ 90–95, and prices are affected

11  by many other factors, too, such as whether a vehicle is new or used, purchased or

12  leased. *Id.* Thus, an individualized inquiry is needed to determine the alleged

13  defect's impact, if any, on the purchase price of any particular Class Vehicle.

14  **10.    Plaintiffs' Class-wide Damages Model Does Not Match**

15  **Their Theory of Liability and is Unreliable**

16  Plaintiffs rely exclusively on their damages expert, Ms. Thompson, to

17  support their argument that damages may be calculated on a class-wide basis.

18  Mot. at 43-47. Although purporting to calculate "benefit of the bargain" damages,

19  Ms. Thompson does nothing of the sort. Strombom Decl. ¶¶ 26–35. She admits

20  that she did not measure the market price of any Class Vehicle, the value of any

21  Class Vehicle actually received, the perceived value of the alleged defect, or the

22  amount each class member would have paid for the Class Vehicle had an

23  additional disclosure been made. *Id.;* DLS Ex. 50 at 105, 112, 114–116, 140–141.

24  Nor did she purport to calculate any overpayment. *Id.* at 136. Instead, she simply

25  measures the "average" cost of various measures performed by dealerships on

26  select vehicles to address HVAC odor, regardless of cause. *Id.* at 116–117. She

27  does not address the cost of fixing the alleged defect. *Id.* at 113.

28  Further, Ms. Thompson's damages model rests entirely upon the incorrect

1    assumption that HVAC odor will manifest in each Class Vehicle. *Id.* at 117–120.

2    She erroneously assumes that each class member is entitled to ten years' worth of

3    "countermeasures," even for those who have no issue with HVAC odor or who

4    will own or lease their Class Vehicles for far less than ten years. *Id.* at 120-121,

5    127-128, 130, 139-143.

6    **IV.   CERTIFICATION UNDER RULE 23(a)**

7        **A.   Plaintiffs' Position: The Requirements for Rule 23(a)**

8            **Certification are Satisfied**

9            **1.   Ascertainability**

10      Although not strictly part of Rule 23, a threshold requirement for class

11   certification is the existence of an identifiable and ascertainable class. *McVicar v.*

12   *Goodman Glob., Inc.*, 2015 WL 4945730, at *5 (C.D. Cal. Aug. 20, 2015), *appeal*

13   *denied* (Nov. 19, 2015) (citation omitted).  Limited to owners and lessees of the

14   Toyota Camry XV50 model vehicle, the classes in this case are easily defined by

15   objective criteria that are verifiable through documentation of purchase or lease

16   transactions. *See, e.g. Keegan v. Am. Honda Motor Co.*, 284 F.R.D. 504, 521-522

17   (C.D. Cal. 2012) (finding objective criteria sufficient to establish ascertainability.)

18   Furthermore, to the extent TMS diagnosed and repaired the HVAC Defect, Class

19   Members can be identified through TMS' own records pertaining to warranty and

20   good will claims. *See, e.g.*, *McVicar, supra,* 2015 WL 4945730, at *5 (finding

21   ascertainability satisfied where a defendant's own warranty databases would

22   provide sufficient information). Class members can also self-identify through

23   receipts for parts and/or services to mitigate the HVAC Defect. *Doyle v. Chrysler*,

24   2014 WL 7690155, at *6, *rev'd on other grounds*, 663 F. App'x 576 (C.D. Cal.

25   Oct. 9, 2014) (finding class ascertainable where class membership could be shown

26   by documentary evidence of part numbers of regulators installed on their

27   vehicles). Information regarding current owners and lessees can also be obtained

28   through third-party administrators.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### 2.    Numerosity

A proposed class of at least forty members presumptively satisfies the numerosity requirement.  *Tait v. BSH Home Appliances Corp.,* 289 F.R.D. 466, 479 (C.D. Cal. Dec. 20, 2012) (citations omitted).  Defendant has confirmed that as of May 26, 2016 there are 252,706 class vehicles. (TZD Ex. 32.)  Accordingly, TMS has stipulated that the numerosity requirement is satisfied.

### 3.    Commonality

Commonality is satisfied when there are questions of law or fact common to the class.  Proof of commonality under rule 23(a) is "less rigorous" than the related preponderance standard under Rule 23(b)(3).  *Hanlon v. Chrysler*, 150 F.3d 1011, 1019-1020 (9th Cir. 1998).  Plaintiffs need show only that there is one common question and that the determination "of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke."  *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011).  For purposes of Rule 23(a)(2), even a single common question will do. *Id*. at 2556 (citation omitted); *Vietnam Veterans of America v. C.I.A.,* 288 F.R.D. 192, 212-13 (N.D. Cal. 2012) (finding that the Ninth Circuit recently recognized that "commonality only requires a single significant question of law or fact") (citations omitted).

This Court already has determined, with respect to the named Plaintiffs, that "there are triable issues regarding the existence of a design defect that causes the foul odor at issue, and whether such odors are material."  (MSJ Order at 7.)  These issues apply to the Class as a whole and are sufficient to satisfy the commonality requirement.

Indeed, in automobile-defect cases, commonality is often found when the most significant question concerns the existence of a defect.  *See e.g., Edwards v. Ford Motor Co*., 603 F. App'x 538, 540 (9th Cir. 2015) ("[C]ommonality is satisfied when '[t]he claims of all prospective class members involve the same alleged defect, covered by the same warranty, and found in vehicles of the same

1   make and model.'") (quoting *Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d

2   11168, 1172 (9th Cir. 2010).)  In *Wolin*, the Ninth Circuit held that commonality

3   is satisfied, where, as here, the common questions are 1) whether a defect exists,

4   2) whether defendant knew about the defect, 3) whether defendant concealed the

5   defect, and 4) whether that conduct violated consumer protection laws.  617 F.3d

6   at 1172. With respect to Plaintiffs' claims for breach of implied warranty, the

7   common question is whether the alleged design defect renders the vehicle

8   unmerchantable. As set forth above, all of these questions are susceptible to

9   common proof, and common evidence will be used to prove each of these

10  elements on a class-wide basis.

11        Other courts have reached the same conclusion. *See e.g., Edwards*, 603 F.

12  App'x at 540 ("[C]ommonality is satisfied when '[t]he claims of all prospective

13  class members involve the same alleged defect, covered by the same warranty, and

14  found in vehicles of the same make and model.'"); *Doyle*, 2014 WL 7690155, at

15  *16, *rev'd on other grounds*, 663 F. App'x 576 (finding commonality satisfied

16  where Plaintiff identifies common issues including "whether there is a defect,

17  whether there was a duty to disclose the defect, whether it poses an unreasonable

18  safety risk, whether Chrysler knew or should have known of that defect, whether

19  Chrysler concealed the existence of a defect, and whether any of these actions

20  amount to a violation of the statues underlying Plaintiffs' claims); *Chamberlan v.*

21  *Ford Motor Co.*,402 F.3d 952, 962 (9th Cir. 2005) (common failure to disclose the

22  existence of an engine defect); *Parkinson v. Hyundai Motor Am.*, 258 F.R.D. 580,

23  595-96 (C.D. Cal. Dec. 12, 2008) (common contention regarding clutch flywheel

24  system defect); *Hanlon*, 150 F.3d 1019-1020 (finding commonality satisfied by

25  alleged defectively designed rear liftgate latch).

26        Further, TMS itself has addressed the HVAC Defect as a common problem

27  by instituting a uniform maintenance and remediation protocol to address HVAC

28  odor in the Class Vehicles, which alone is sufficient to establish commonality.

1  *See, e.g.*, *Edwards*, 603 F. App'x at 541 ("[B]y providing classwide relief through

2  its notice and repair program, Ford has acknowledged that a single class defect

3  exists.").

### 4.    Typicality

5  Typicality is satisfied "when each class member's claim arises from the

6  same course of events, and each class member makes similar legal arguments to

7  prove the defendants' liability." *Rodriguez v. Hayes*, 591 F.3d 1105, 1122 (9th

8  Cir. 2010) (citations omitted); *see also Ellis v. Costco Wholesale Corp.*, 657 F.3d

9  970, 984 (9th Cir. 2011).  Class members' interests and claims need not be

10  identical to the Plaintiffs' to satisfy typicality, if, as here, their claims are based on

11  the same legal theory.  *Id.*  "Typicality under Rule 23 is a permissive requirement

12  and requires only that Plaintiffs' claims be 'reasonably co-extensive, not'

13  substantially identical.'" *In re Yahoo Mail Litig.*, 308 F.R.D. 577, 593 (N.D. Cal.

14  2015) (citation omitted).  Thus, a plaintiff's claims are typical under Rule 23(a)(3)

15  where they and "other class members have been injured by the same course of

16  conduct." *Id.*

17  Here, TMS' uniform failure to disclose the HVAC Defect at the time of sale

18  or lease or before constitutes a common course of conduct relevant to all putative

19  Class Members, and Plaintiffs' common injury – that the undisclosed HVAC

20  Defect caused them to overpay for their Class Vehicles – is typical of the Class.

21  *Id.* at 594 (citation omitted) ("Rule 23(a)(3) focuses on 'the *defendants' conduct*

22  and plaintiffs' legal theory.'") (emphasis added).  In other words, Plaintiffs'

23  claims, like those of the putative Class, are all based on the purchase of a Class

24  Vehicle equipped with an HVAC system that TMS failed to disclose was defective

25  at the time of sale or lease. *See In re Toyota Motor Corp. Unintended Acceleration

26  Mktg., Sales Practices, & Prods Liab. Litig.*, 2012 WL 7802852, at *2-3 (C.D.

27  Cal. Dec. 28, 2012) (claims, including those of the named plaintiffs, arose from a

28  common automobile defect and uniform deceptive conduct);

1    There are no individual issues or "unique defense[s]" that would threaten to

2    become the focus of the litigation.  *Hanon v. Dataproducts Corp.*, 976 F.2d 497,

3    508 (9th Cir. 1992).  As set forth below, Plaintiff Ortega does not seek to

4    represent the Class as to the implied warranty claim.  Indeed, this Court's MSJ

5    ruling that there are no triable issues of material fact as to Plaintiff Ortega's claim

6    for implied warranty (Dkt. No. 81 at 6) effectively precludes any argument

7    regarding that "individual issue" as to Ms. Ortega.  Summary judgment as to

8    Plaintiff Ortega's implied warranty claim does not make Ms. Ortega or her

9    remaining claims atypical.

10    With respect to the factual circumstances underlying Plaintiffs' legal

11    theories, the claims of both named Plaintiffs are the same as those of the Class.

12    Both Plaintiffs purchased Class Vehicles that had a defective HVAC system at the

13    time of purchase, and neither Plaintiff was informed of the HVAC System's

14    unreasonable propensity to emit noxious odors at or before the time of sale.  (TZD

15    Exs. 33-35.)

16    Because TMS' uniform failure to disclose the HVAC Defect forms the basis

17    of Plaintiffs' action on behalf of themselves and the Class, Plaintiffs' claims are

18    typical of the class.  *Hanon*, 976 F.2d at 508 ("The test of typicality 'is whether

19    other members have the same or similar injury, whether the action is based on

20    conduct which is not unique to the named plaintiffs, and whether other class

21    members have been injured by the same course of conduct.'") (citation omitted).

22         **5.    Adequacy**

23    The final requirement under Rule 23(a) is that "the representative parties

24    will fairly and adequately protect the interests of the class."  In the Ninth Circuit,

25    courts use a two-prong test to determine if the adequacy requirement is met: 1)

26    whether the plaintiffs and their counsel "have any conflicts of interest with other

27    class members"; and 2) whether the plaintiffs and their counsel will "prosecute the

28    action vigorously on behalf of the class."  *Hanlon v. Chrysler Corporation*, 150

1    F.3d 1011, 1020 (9th Cir. 1998).  Both requirements are satisfied here.  *See Loritz*
2    *v. Exide Techs*., No. 2:13-CV-02607-SVW-E, 2015 WL 6790247, at *6 (C.D. Cal.
3    July 21, 2015) ("All that is necessary is a 'rudimentary understanding of the
4    present action and ... a demonstrated willingness to assist counsel in the
5    prosecution of the litigation.'") (citations omitted).

6         Because summary judgment has been granted as to Plaintiff Ortega for
7    breach of implied warranty, Plaintiffs seek only to appoint Plaintiff Salas as the
8    class representative for this claim.  With this qualification, Plaintiffs seek the same
9    remedies as the Class, based on the same harm suffered as a result of TMS' failure
10   to disclose the HVAC Defect at the time of sale or lease.  Both Plaintiffs have
11   actively participated in this litigation to support their claims by producing
12   documents, providing written discovery responses, providing their vehicles for
13   inspection, and sitting for deposition.  (TZD Exs. 34 and 35.)  Finally, because
14   their claims are well-aligned with those of the Class, there is no risk to absent
15   Class members that Plaintiffs will be "preoccupied with defenses unique to
16   [them]."  *Backus v. ConAgra Foods, Inc*., No. C 16-00454 WHA, 2016 WL
17   7406505, at *5 (N.D. Cal. Dec. 22, 2016) (quoting *Hanon*, 976 F. 2d at 508).

18        Plaintiffs have also retained highly qualified and competent counsel with
19   significant experience litigating class actions, successfully certifying numerous
20   class actions by way of contested motions in state and federal court and
21   negotiating settlements that were finally approved totaling tens of millions of
22   dollars on behalf of hundreds of thousands of Class Members.  (TZD Ex. 36.)

23        As the history of this case reveals, Plaintiffs' counsel have been diligently
24   prosecuting the action with vigor sufficient to meet the adequacy requirements
25   under Rule 23(a)(4) and Rule 23(g), defeating motions to dismiss and a motion for
26   summary judgment.  (Dkt. Nos. 38, 79, 81.)  They engaged in extensive pre-filing
27   research to identify underlying systemic problems in the HVAC system, TMS'
28   repair policies and practices, and its failure to disclose the HVAC Defect.  Since

1    filing, Plaintiffs' counsel retained experts with experience in analyzing automotive

2    defects and class wide damages, (*see* TZD Exs. 2 and 3; TZD Ex. 37) and have

3    engaged in extensive discovery to understand and master issues affecting

4    Plaintiffs and the Class.  Discovery has included multiple depositions of TMS

5    representatives, interrogatories and requests for production of documents, and a

6    thorough review of TMS' responses.  Plaintiffs' counsel has committed significant

7    resources to this case and will continue to do so through trial.

8              **B.    TMS' Position:  Plaintiffs Have Not Satisfied Rule 23(a)**

9              Plaintiffs ignore the appropriate standard for class certification.  *First*,

10   Plaintiffs bear the ***evidentiary burden*** of showing that Rule 23 requirements are

11   met; they cannot rely upon the pleadings or speculation.  *Dukes*, 564 U.S. at 350.

12   *Second*, this Court must conduct a "rigorous analysis" to determine whether

13   Plaintiffs have satisfied their evidentiary burden.  *Comcast Corp. v. Behrend*, 569

14   U.S. 27, 33–34 (2013).  *Third*, determining class certification must take into

15   account TMS' due process "entitle[ment] to litigate its statutory [or other]

16   defenses to individual claims." *Dukes*, 564 U.S. at 367.  *Fourth*, this Court must

17   resolve factual disputes relevant to the Rule 23 requirements, *Ellis v. Costco*

18   *Wholesale Corp.*, 657 F.3d 970, 984 (9th Cir. 2011), which "frequently" entail an

19   overlap with the merits of Plaintiffs' claims.  *Behrend,* 569 U.S. at 33–34.

20             Plaintiffs ignore these governing principles.  Their class certification theory

21   rests upon the sole premise that because some of Plaintiffs' individual claims

22   survived summary judgment, a class should be certified.  But Plaintiffs present no

23   common proof of their class claims; they ignore the individualized issues that

24   preclude certification; they fail to address the elements of their claims in any

25   meaningful way; and they offer no trial plan.  They have not met their burden.

26             **1.    Plaintiffs Cannot Show Commonality Because Each Claim**

27                    **Requires Individualized Inquiries**

28             "'What matters to class certification . . . is not the raising of common

1    'questions'—even in droves—but, rather the capacity of a class[-]wide proceeding

2    to generate common *answers* apt to drive the resolution of litigation.'" *Dukes*,

3    564 U.S. at 350 (citation omitted).  In making this determination, courts evaluate

4    the requirements of each claim and defense.  *Abdullah v. U.S. Sec. Assocs., Inc.*,

5    731 F.3d 952, 957 (9th Cir. 2013).  Common answers will not drive the resolution

6    of this litigation.

### (a)  No Common Evidence Supports Plaintiffs' Implied Warranty Claims

9    To establish a breach of implied warranty of merchantability under

10   California law, Plaintiffs must demonstrate (1) a "'fundamental defect that renders

11   the product unfit for its ordinary purpose,'" *Tietsworth v. Sears,* 720 F. Supp. 2d

12   1123, 1142 (N.D. Cal. 2010); (2) the defect is "substantially certain to result in

13   malfunction during the useful life of the product," *Am. Honda Motor Co.*, 199 Cal.

14   App. 4th at 1375; and (3) the defect was a "substantial factor in causing the

15   plaintiff's harm," *Andrade v. Pangborn Corp.*, No. C 02–3771 PVT, 2004 WL

16   2480708, at *23–24 (N.D. Cal. Oct. 22, 2004).

17   As this Court confirmed, analyzing the foregoing elements requires

18   weighing individualized facts about the severity of any HVAC odor and its impact

19   on the use of any particular Class Vehicle.  MSJ Order at 6.  An individual who

20   experiences momentary HVAC odor, like Plaintiff Ortega, has no claim; whereas,

21   an individual like Plaintiff Salas, who experiences lingering odor and has to drive

22   with his windows cracked, may have a claim.  *Id.*

23   Despite this Court's decision, Plaintiffs try to certify their implied warranty

24   claims based on purportedly common evidence about whether a "latent defect,"

25   with the "likelihood of emitting noxious odors," existed at the time of sale.  Mot.

26   at 38.  But this theory fails.  It is contrary to California law, which requires that

27   the defect-related problem be "substantially certain" to arise.  *Birdsong v. Apple,*

28   *Inc.*, 590 F.3d 955, 959 (9th Cir. 2009).  Moreover, Plaintiffs offer no common

1   evidence on this issue or the key elements of their claims.  Plaintiffs have done no

2   class-wide sampling of HVAC odor in Class Vehicles, and the undisputed

3   evidence is that HVAC odor arises in only a small fraction of Class Vehicles.

4   Opp. at 14; *see, e.g.*, *Torres v. Nissan N. Am. Inc.*, No. CV15-03251, 2015 WL

5   5170539, at *5 (C.D. Cal. Sept. 1, 2015) ("individual questions about whether a

6   defect is substantially certain to occur predominate").

7       Likewise, Plaintiffs do not pinpoint a specific defective design element that

8   causes HVAC odor.  Nor can they, given the numerous causes of HVAC odor and

9   because the design of the HVAC systems materially differ in ways that impact the

10   existence and severity of HVAC odor.  Opp. at 14-17.  Thus, proof of a defect in

11   one Class Vehicle will not establish a defect in another Class Vehicle.  *See*

12   *Cholakyan v. Mercedes-Benz, USA, LLC*, 281 F.R.D. 534, 552, 554 (C.D. Cal.

13   2012) (denying certification because plaintiff failed "to identify a single system

14   causing the water leaks" and "there is substantial design variation").  Thus, no

15   class based on Plaintiffs' breach of implied warranty claims may be certified.

16       **(b)**    **No Common Evidence Supports Plaintiffs' UCL And**

17         **CLRA Claims**

18       To succeed on a UCL or CLRA claim, Plaintiffs must demonstrate the

19   existence of a defect, a duty to disclose that defect, and either exposure to the

20   alleged omission (for the UCL claim) or reliance on that omission (for the CLRA

21   claim).  *See, e.g.*, *Wilson v. Hewlett-Packard Co.*, 668 F. 3d 1136, 1142–43 (9th

22   Cir. 2012); *Daniel v. Ford Motor Co.*, 806 F.3d 1217, 1225 (9th Cir. 2015) ("An

23   essential element for a fraudulent omission claim is actual reliance."); *Ono v.*

24   *Head Racquet Sports USA, Inc.*, No. 13–4222, 2016 WL 6647949, at *10 (C.D.

25   Cal. Mar. 8, 2016) (class members must be "'actually exposed to the business

26   practices at issue'").  Also, for a CLRA claim, the alleged omission "must cause

27   the alleged injury." *Stearns v. Ticketmaster Corp.*, 655 F.3d 1013, 1022 (9th Cir.

28   2011).  Here, individualized issues predominate as to each element.

1
2

**(i)** **There is No Common Evidence of a Uniform Design Defect**

3     As described above (Opp. at 15-17), the differences in design among the

4 Class Vehicles and Plaintiffs' inability to identify a specific component uniformly

5 causing improper drainage, organic growth, and HVAC odor in all Class Vehicles

6 preclude certification of Plaintiffs' UCL and CLRA claims as a matter of law.

7 *Grodzitsky v. Am Honda Motor Co.*, No. 2:12–cv–01142, 2014 WL 718431, at

8 *6–7 (C.D. Cal. Feb. 19, 2014) (denying class certification because plaintiffs

9 failed to provide evidence "supporting the contention that the materials are the

10 same throughout the Class Vehicle[s]"); *Butler v. Porsche Cars N. Am., Inc.*, No.

11 16-CV-2042-LHK, 2017 WL 1398316, at *9 (N.D. Cal. Apr. 19, 2017) (applying

12 rule); *Cholakyan*, 281 F.R.D. at 552 (same).

13
14

**(ii)** **There is No Common Evidence of a Duty to Disclose**

15     Both the Ninth Circuit and this Court have recognized that an omission

16 claim under the UCL or CLRA fails if the defect manifests ***after*** the warranty

17 period for a customer and the problem poses no safety issue. *See, e.g., Wilson*,

18 668 F.3d at 1141–42 (dismissing failure to disclose UCL and CLRA claims); Dkt.

19 38 at 13 (recognizing principle). [4]  This is because there is no duty to disclose a

20 non-safety related defect to a buyer who purchases a product that works as

21 warranted during the warranty period.  *Id.*; *see Daugherty v. Am. Honda Motor*

22 *Co.*, 144 Cal. App. 4th 824, 838 (2006) (applying rule).[5]

23

24     [4] TMS reserves its position that no duty to disclose exists absent a safety
25 issue.  *See Williams v. Yamaha Motor Co. Ltd.*, 851 F.3d 1015, 1025 (9th Cir.
2017).

26     [5] Notwithstanding Plaintiffs' suggestion that a broad duty to disclose exists
whenever a defendant has "exclusive knowledge" of material facts (Mot. at 39),
27 the Ninth Circuit has held that "'[a] manufacturer's duty to consumers is limited
to its warranty obligations absent either an affirmative misrepresentation or a
28 safety issue.'"  *Wilson*, 668 F.3d at 1141.  Regardless, there is no common

1     Here, Plaintiffs' UCL and CLRA claims are not susceptible to class-wide

2   proof because there is no evidence of any health hazard (*i.e.*, mold) associated

3   with the HVAC system of a single Class Vehicle, much less for all Class Vehicles.

4   Opp. at 18.  Nor do Plaintiffs provide any class-wide evidence showing that

5   HVAC odor arose during the warranty period (which itself differs depending on

6   whether the vehicle is purchased used or new).  DLS Exs. 52–53, 55.  Thus,

7   whether there was a duty to disclose will hinge upon Class Vehicle-specific facts

8   concerning whether and when the HVAC odor arose.  This defeats certification.

9     Plaintiffs rely primarily upon *Wolin v. Jaguar Land Rover North America,*

10  *LLC*, 617 F.3d 1168 (9th Cir. 2010), to argue that whether a problem from a defect

11  actually arises is "not a prerequisite to class certification."  Mot. at 38.  *Wolin* is

12  distinguishable.  It did not address California law, *Wolin,* 617 F.3d at 1173, and it

13  did not hold that the questions of whether and when a defect-related problem

14  arises are *irrelevant* to class certification; it merely rejected the argument "that

15  automobile defect cases can categorically never be certified as a class" due to low

16  defect manifestation rates.  *Wolin,* 617 F.3d at 1173; *see Torres,* 2015 WL

17  5170539, at *4–5.  Moreover, *Wolin* involved a tire-related defect that presented a

18  safety concern and, thus, the *Wolin* court did not have to address individualized

19  issues regarding a duty to disclose.  Here, by contrast, because the evidence ***does***

20  ***not*** demonstrate a safety issue, whether a duty to disclose exists depends on

21  individualized facts about whether or not HVAC odor arose for a Class Vehicle

22  during the warranty period.  In fact, nearly all of the cases cited by Plaintiffs are

23  inapposite "tire defect" cases that—unlike this case—involved a safety hazard.

24  *See, e.g.*, *Daniel*, 806 F.3d at 1221 (alignment defect that leads to tire wear and

25

26  _____
    evidence that TMS had exclusive knowledge of facts "not known to" class

27  members, given that the potential for HVAC odor was disclosed in the owners'
    manuals of the Class Vehicles and is a well-known industry-wide issue.  Opp. at

28  14, 19-21.

safety hazards); *Keegan v. Am. Honda Co., Inc.,* 284 F.R.D. 504, 512 (C.D. Cal. 2012) (same); *see also Tait v. BSH Home Appliances Corp.,* 289 F.R.D. 466, 488–89 (C.D. Cal. 2012) (existence of safety hazard irrelevant to certification analysis because alleged problems occurred within warranty period).

Moreover, unlike *Wolin* and the other cases Plaintiffs rely upon, their very damages model highlights the importance of an individualized assessment of whether HVAC odor has arisen in any particular Class Vehicle.  Plaintiffs contend that each class member is entitled to the average cost of "countermeasures" to address HVAC odor in each Class Vehicle for ten years.  Mot. at 45; TZD Ex. 37 (Ex. A at 3).  This model, therefore, makes the presence of HVAC odor necessary and critical to whether any putative class member has a claim for a remedy (DLS Ex. 5 at 117–120)—an individualized factual issue for which there is no common proof.

### (iii)   There is No Common Evidence Regarding the Cause of Any HVAC Odor

To succeed on their UCL and CLRA claims, as pled, there must be some connection between the alleged defect and HVAC odor.  SAC ¶¶ 128, 145; *Williams v. Yamaha Motor Co.*, 851 F.3d 1015, 1026 (9th Cir. 2017) (defect must cause alleged safety issue); *Stearns*, 655 F.3d at 1022, 1024 (CLRA requires "actual injury" caused by practice).  Plaintiffs have confirmed that their odor theory is based on: (a) the presence of organic "contamination" in HVAC systems; and (b) ensuing odor.  Mot. at 1.  There is no common evidence capable of establishing either element.

Plaintiffs' expert concedes that HVAC odor can be affected by numerous factors that differ for each Class Vehicle, apart from the alleged defect.  Opp. at 14-15.  In addition, there is no common evidence of any mold or odor-causing organic growth across Class Vehicles—not even in Plaintiffs' vehicles.  Thus, for those Class Vehicles that experience HVAC odor, Plaintiffs' defect theory

1  requires examining each Class Vehicle for the presence of organic growth and

2  whether it caused the alleged odor. *See Cholakyan*, 281 F.R.D. at 552 (denying

3  certification because no common evidence on "crucial question that must be

4  answered [as to] why each class member's vehicle experienced water leaks").

5              **(iv)   There is No Common Evidence of Exposure or**

6                       **Materiality**

7          The UCL requires proof that "members of the public are likely to be

8  deceived" by the alleged omission. *Berger v. Home Depot USA, Inc.*, 741 F.3d

9  1061, 1068 (9th Cir. 2014). The CLRA requires a "showing of reliance," *Davis-*

10 *Miller v. Automobile Club of So. California*, 201 Cal. App. 4th 106, 125 (2011),

11 including "that the defendant's nondisclosure was an immediate cause of the

12 plaintiff's injury-producing conduct." *Daniel*, 806 F.3d at 1225; *see, e.g.*, *In re*

13 *Vioxx Class Cases*, 180 Cal. App. 4th 116, 129 (2010) ("[I]f the issue of

14 materiality or reliance is a matter that would vary from consumer to consumer, the

15 issue is not subject to common proof[.]").

16         Both claims require, at a minimum, that the class be "exposed to the

17 allegedly false advertising at issue." *Davis-Miller,* 201 Cal. App. 4th at 124–25;

18 *see also Berger*, 741 F.3d at 1068. For an omission, this requires not only an

19 understanding of what the disclosure is and how it would have been made, but

20 also a showing that class members were exposed to uniform information at the

21 time of purchase and that they would have been aware of the disclosure that

22 purportedly should have been made. *Butler*, 2017 WL 1398316, at *10.

23         Plaintiffs contend their UCL and CLRA claims can be certified because the

24 "likelihood of deception" standard is objective and because an "inference" of

25 "reliance" exists across the class so long as the statement or omission is

26 "material." Mot. at 40. But this Court and the Ninth Circuit have ***rejected*** both

27 arguments. The Ninth Circuit has made clear that the "question of likely

28 deception does not automatically translate into a class-wide question," *Berger*,

1    741 F.3d at 1068, particularly when class members have different levels of

2    knowledge and were not uniformly exposed to the alleged representation or

3    omission.  *See Ono*, 2016 WL 6647949, at *10.  Similarly, in "class actions

4    involving the UCL . . . and the CLRA, 'an inference of reliance arises as to the

5    class' only when 'material misrepresentations have been made ***to the entire***

6    ***class***[.]'"  *Id.* at *10 (emphasis added) (citation omitted).

7            Applying these principles, this Court recently denied certification of UCL

8    and CLRA claims in a false marketing case because there was no class-wide proof

9    that all class members were exposed to the same alleged misrepresentations,

10   because consumers had different levels of knowledge and sophistication regarding

11   the product at issue, and because there was no class-wide evidence to show the

12   materiality of the representations to all consumers.  *Id.* at *10–12.  The same logic

13   applies to omission-based claims, where "the question of which consumers relied

14   and which purchased their vehicles fully aware of the potential [defect-related]

15   issues poses uniquely individualized questions that are not amenable to common

16   proof."  *Torres*, 2015 WL 5170539, at *5; *see also Mazza,* 666 F.3d at 596

17   (reversing certification because despite omissions, class members were exposed to

18   "disparate information" about alleged defect); *Butler,* 2017 WL 1398316, at *10

19   (applying principle); *Philips v. Ford Motor Co.*, No. 14–CV–02989-LHK, 2016

20   WL 7428810, at *15 (N.D. Cal. Dec 22, 2016) (same).

21           That is precisely the case here.  Information about the possibility of HVAC

22   odor was disclosed in owners' manuals, and, thus, "it would require extensive

23   individualized inquiries to know which class members had the opportunity to read

24   these portions of the owner's manuals before purchasing their vehicles."  *Philips*,

25   2016 WL 7428810, at *15.  This alone defeats certification.  *Id.*  In addition, class

26   members relied upon varied sources of information before purchasing their Class

27   Vehicles, and knowledge about the potential for HVAC odor in the Class Vehicles

28   (and throughout the industry) was readily available through these sources,

1    including Internet postings, online forums, word-of-mouth, service bulletins, and

2    others.  Keller Decl. ¶¶ 25–38, 62–74.  Thus, because class members were

3    exposed to different statements about the potential for HVAC odor and had

4    differing levels of knowledge about this issue, there can be no common proof of

5    deception or inference of reliance.  *See, e.g., Torres*, 2015 WL 5170539, at *5

6    (denying certification of omission-based UCL and CLRA claims because of

7    predominating individualized issues due to "proliferation of news about the

8    defective transmission" and "information readily available on the internet").

9          In fact, there is no way of showing through common proof whether any

10   class member even would have been aware of—much less would have assigned

11   any weight to—any additional disclosure regarding HVAC odor.  Plaintiffs'

12   motion does not identify where, by whom, or how the alleged defect should have

13   been disclosed, what specific information TMS failed to disclose, or even what

14   materials or information class members viewed (or conversations they had) prior

15   to lease or purchase—which will vary significantly.  *See Butler*, 2017 WL

16   1398316, at *10 (denying certification on this basis).  For example, Plaintiff Salas

17   testified that the additional disclosure should have been made on "the website for

18   the actual ad that they had for the vehicle that [he] purchased," yet many class

19   members did not use the Internet for car information prior to their purchase and,

20   thus, would never have seen such a disclosure.  Keller Decl. ¶ 58.  Moreover,

21   Professor Keller's unrebutted testimony explains that because HVAC odor is an

22   industry-wide issue and because consumers value many different attributes of

23   vehicles and vary in their perceptions and responses to HVAC odor, any

24   additional disclosure from TMS about HVAC odor would not have mattered to

25   many class members.  *Id.* ¶¶ 62–89.  Because there is no evidence of class-wide

26   exposure and no presumption of reliance, establishing this element requires

27   individualized inquiries.  *Torres*, 2015 WL 5170539, at *5.

28

| | |
|---|---|
| 1 | **(c)    The Unjust Enrichment Claims Cannot Be Certified** |
| 2 | Under California law, "'[u]njust [e]nrichment' does not describe a theory of |
| 3 | recovery, but an effect:  the result of a failure to make restitution ***under*** |
| 4 | ***circumstances where it is equitable to do so***."  *Melchior v. New Line Prods., Inc.,* |
| 5 | 106 Cal. App. 4th 779, 793 (2003) (emphasis added). |

As a general matter, "common questions [of fact] ***will rarely, if ever***, predominate an unjust enrichment claim."  *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1274 (11th Cir. 2009) (emphasis added).  This is because, as this Court recognized, each claim turns on individualized facts about the equities concerning each transaction.  *Ono*, 2016 WL 6647949, at *15; *see also Berger*, 741 F.3d at 1070 (applying principle to deny certification of unjust enrichment claim); *see also* 1 McLaughlin on Class Actions § 5:60 (9th ed.) ("[t]he majority view is that unjust enrichment claims usually are not amenable to class treatment").

Here, Plaintiffs make no effort to address how the elements of their unjust enrichment claim can be demonstrated with common proof.  For each individual class member transaction, the trier of fact would need to evaluate whether the class member has received full value for the Class Vehicle purchase; what the class member knew about HVAC odor at the time of the purchase; whether any additional disclosure would have reached the class member and, if so, whether it would have impacted her purchasing decision; whether HVAC odor has arisen in the Class Vehicle, and, if so, whether it did so before or after the warranty expired; and whether HVAC odor in the Class Vehicle was caused by the alleged defect.  These equities are transaction-specific and cannot be considered, much less resolved, on a class-wide basis.  *See Torres*, 2015 WL 5170539, at *6.

**V.    CERTIFICATION UNDER RULE 23(b)(3)**

    **A.    Plaintiffs' Position: Rule 23(b)(3) Requirements Are Satisfied**

        **1.    Predominance**

Under Rule 23(b)(3) plaintiffs must show that "the questions of law or fact

1  common to class members predominate over any questions affecting only

2  individual class members." Class claims need not be identical.

3       Plaintiffs' claims will turn, in whole or in part, on common questions and

4  evidence regarding 1) whether the HVAC Defect is common to all Class Vehicles,

5  2) whether TMS knew about and failed to disclose the HVAC Defect, 3) the

6  likelihood of TMS' omission to deceive a reasonable consumer, 4) TMS' failure

7  to remedy the HVAC Defect at no cost to the Class, 5) whether Plaintiffs and the

8  Class are entitled to equitable relief, 6) whether the class vehicles were

9  unmerchantable, and 7) whether, as a result of TMS' conduct, Plaintiffs and the

10  Class are entitled to damages. There are no individual issues that "swamp" the

11  common issues in this case, particularly here, where Plaintiffs' theory is based on

12  a latent design defect. *See, e.g.*, *Tait v. BSH Home Appliances Corp.*, 289 F.R.D.

13  466, 479 (C.D. Cal. 2012).

14       Further, the Class can be certified without any inquiry as to whether the

15  defect manifested in the Class Vehicles or the extent to which it has manifested.

16  As the Ninth Circuit has clearly noted, "proof of the manifestation of a defect is

17  not a prerequisite to class certification." *Wolin*, 617 F.3d at 1173-1174). The

18  Ninth Circuit reiterated this point in *Baker v. Microsoft Corp*., 797 F.3d 607, 610-

19  611 (9th Cir. 2015), *cert. granted in part*, 136 S. Ct. 890 (2016), and *rev'd and*

20  *remanded on other grounds*, 137 S. Ct. 1702 (2017) ("Proof of a defect's

21  manifestation, therefore, while relevant to the merits and measure of damages, "is

22  not a prerequisite for class certification."). *See also Keegan*, 284 F.R.D. at 524

23  (certification was proper even though "some vehicles have not yet manifested

24  premature or excessive . . . wear").

25       *Tait v. BSH Home Appliances Corp, supra,* which also involves a failure to

26  disclose a defect that caused foul odors and where the court found that

27  predominance was satisfied, is directly on point:

28       As in *Wolin* and *In re Whirlpool*, Plaintiffs' theory of liability is that they

1
2
3
4
5
6
7

overpaid for a product because Defendant never warned consumers that the product had a defective design, namely, the Washer's propensity to develop BMFO [Bacteria Mildew Foul Odor]. As *Wolin* and *In re Whirlpool* make clear, Plaintiffs need only prove that Defendant's products had a common design and the design created a *propensity* for the products to develop an undesirable condition; Plaintiffs need not prove that every product *actually* developed this undesirable condition. Plaintiffs need not prove that the undesirable condition – here – BFMO- *actually* developed in every product because the harm for which Plaintiffs sue is not the *actual manifestation* of BFMO, but for the Defendant's *failure to disclose* the Washers' *propensity* to develop BFMO. Thus, Defendant's arguments and evidence about alternative explanations for the actual manifestation of BFMO in Plaintiffs' Washers is simply a red herring.

8    *Tait, supra*, 289 F.R.D. at 479.

9              **(a)    Common Issues Predominate with respect to the UCL**
10                      **and CLRA Statutory Claims and Unjust Enrichment**

11   A duty to disclose arises if a defendant has "exclusive knowledge of

12   material facts not known to the plaintiff." *Collins v. eMachines, Inc.*, 202 Cal.

13   App. 4th 249, 255-56 (2011) (citing *LiMandri v. Judkins*, 52 Cal. App. 4th 326,

14   337 (1997)). Plaintiffs claim that TMS violated the CLRA and the UCL by failing

15   to disclose the HVAC Defect. Generalized evidence shows that the HVAC Defect

16   manifests within the warranty period. Section III(A)(3), *supra*. Furthermore, this

17   Court has found that "the 'safety-related' requirement is inapplicable where a

18   defect arises during the warranty period." (Order Denying Toyota's Motion to

19   Dismiss Plaintiffs' FAC, Dkt. No. 38 at p. 14-15.) Here, based on the common

20   proof described, this Court can resolve on a class-wide basis that TMS had a duty

21   to disclose the HVAC Defect in the Class Vehicles.

22   Individual factors do not affect the ultimate question of whether the Class

23   Vehicles were sold with a defective HVAC system. Differences in the design of

24   the HVAC system that may be asserted by TMS, such as automatic versus manual

25   controls, are immaterial and unrelated to the design specifications of the

26   evaporator housing and related components. The HVAC Defect lies in the design

27   of the HVAC unit – not its controls - and is susceptible to proof by generalized

28   evidence.

Further, common issues relating to materiality, causation, and reliance predominate. Under the CLRA, the standard for causation and reliance is an objective one, susceptible to generalized proof on a class basis. Causation and an "inference of reliance" for the Class "can be shown as to the entire class by proving materiality." *Keegan v. American Honda Co., Inc.,* 284 F.R.D. 530, 531 (C.D. Cal. 2012). Because purchasing preferences need not be considered on an individual basis, materiality can be determined under the CLRA on a class-wide basis by using the objective "reasonable consumer standard." *See e.g., Daniel v. Ford Motor Co.*, 806 F.3d 1217, 1225 (9th Cir. 2015) "an omission is material if a reasonable consumer 'would attach importance to its existence or nonexistence in determining his choice of action in the transaction in question'") (quoting *In re Tobacco II Cases*, 46 Cal. 4th 298 (2009)).  Furthermore, in an omissions-only case where, as here, the omission is material, reliance can be inferred.  *Id*. at 1225.

In this case, the HVAC Defect is clearly material, as evidenced by the TMS' considerable efforts to mitigate foul odors.  Section III(A)(4), *supra*.  Further, the categorization of countermeasures as regular "maintenance" shows that TMS expected the odors about which Plaintiffs and the Class complained both to manifest and to recur.  Accordingly, causation for the Class' common injury is established by the materiality of the omission, giving rise to a presumption of reliance without individualized proof.  *Stearns v. Ticketmaster Corp*., 655 F.3d 1013, 1022-23 (9th Cir. 2011) (citations omitted).  Unlike a case where individual evidence may be required to determine if each class member saw the same *misrepresentation*, Plaintiffs' theory is based on TMS' uniform *omissions* regarding the HVAC Defect.  Therefore, there is no reason to depart from the presumption of reliance in this case.

Similarly, there are no individual determinations as to deception, reliance, or injury for restitution under the UCL's fraudulent prong, as Plaintiffs need only show, based on an objective standard, that members of the public are "likely to be

1    deceived" by TMS' conduct.  *In re Tobacco II Cases*, 46 Cal. 4th 326, 312, 326

2    (2009); *see also Massachusetts Mutual Life Insurance Co. v. Superior Court*, 97

3    Cal. App. 4th 1282, 1292–93 (2002) ("[P]laintiffs satisfy their burden of showing

4    causation as to each by showing materiality as to all."). In *Keegan*, for example,

5    the court explained that "a violation of the UCL can be proved with common

6    evidence regarding the nature of the design defect in question, the likely effect of

7    the defect on class vehicles, its likely impact on vehicle safety, what [a defendant]

8    knew or did not know, and what it disclosed or did not disclose to consumers." *Id*.

9    at 534.  Unlike common law fraud, the focus in the UCL claim is on TMS'

10   conduct, not Class Members' reactions. *See, e.g., Parkinson v. Hyundai Motor*

11   *Am.*, 258 F.R.D. 580, 596 (C.D. Cal. 2008) (predominance satisfied as to all three

12   UCL prongs in case involving defectively designed and uniformly used clutch

13   flywheel.)  Indeed, the inference of reliance based on materiality is an objective

14   test that "renders claims under the UCL, FAL and CLRA ideal for class

15   certification because they will not require the court to investigate 'class members'

16   individual interaction with the product.' [citations omitted]…  For this reason,

17   district courts in California routinely certify consumer class actions arising from

18   violations of the CLRA, FAL and CLRA." *Tait,* 289 F.R.D. at 480.

19          Plaintiffs' unjust enrichment claim should similarly be certified, as it is

20   based on the same common evidence regarding TMS' failure to disclose and the

21   same common request for return of the benefit conferred on TMS through fraud.

22   *See Astiana v. Hain Celestial Grp., Inc*., 783 F.3d 753, 762 (9th Cir. 2015) ("[A]

23   court may 'construe the cause of action as a quasi-contract claim seeking

24   restitution.'") (citation omitted).

25                    **(b)     Common Issues Predominate Plaintiffs' Claim for**

26                              **Breach of Implied Warranty Under Song Beverly and**

27                              **Mag-Moss**

28          An implied warranty of merchantability guarantees that consumer goods are

1   "fit for the ordinary purposes for which such goods are used."  Cal. Civ. Code

2   1791.1(a).  A vehicle fit for the ordinary purpose of providing transportation is

3   one that can do so "in safe condition and substantially free of defects."  *Isip v.*

4   *Mercedes-Benz USA, LLC*, 155 Cal. App. 4th 19, 27 (2007).  *The proper focus for*

5   *this analysis is the condition of the product at the time of sale*.  As noted in *Mexia*

6   *v. Rinker Boat Co*., 174 Cal. App. 4th 1297, 1305-06 (2009), "[i]n the case of a

7   latent defect, a product is rendered unmerchantable, and the warranty of

8   merchantability is breached, by the existence of the unseen Defect, not by its

9   subsequent behavior."

10      That the Court granted summary judgment as to Plaintiff Ortega's

11   individual breach of implied warranty claim does not negate the claim as to the

12   entire Class.  Because an implied warranty claim requires an *objective standard*

13   and because Plaintiffs' theory is grounded in a defective design, determining

14   whether the HVAC Defect rendered the Class Vehicles unmerchantable is

15   "susceptible of common proof."  *Tait,* 289 F.R.D. at 485; *Keegan,* 284 F.R.D. at

16   537.  As demonstrated above, at the time of sale or lease, every Class Vehicle had

17   the same HVAC system with the same latent defect and was sold with the same

18   likelihood of emitting noxious odors, subjecting Class Members to the same

19   potential safety risks.  Plaintiffs' implied warranty claims rest on the premise that

20   the HVAC Defect was inherent and present in all the Class Vehicles when they

21   left TMS' factory and that the HVAC Defect was the same in each Class Vehicle.

22   This is sufficient to show that common questions predominate as to this claim.

23      Whether or not the HVAC Defect manifests and the extent of such

24   manifestation has no bearing on certification of the breach of implied warranty.

25   *See e.g., Keegan* 284 F.R.D. at 536 ("Applying *Wolin*… the court cannot discern

26   why, at the class certification stage, plaintiffs must adduce evidence that a defect

27   is substantially certain to arise in all class vehicles during the vehicles' useful

28   life.")  Regardless, common evidence will resolve the "substantial certainty"

1   question in one stroke as to the entire Class.  If the HVAC Defect is substantially

2   certain to result in foul odors, as Plaintiffs have alleged and can prove, Plaintiffs

3   will prevail; if not, the implied warranty claim will fail.  The breach of implied

4   warranty claim, therefore, is susceptible of common proof and should be certified.

5       As Plaintiffs' Mag-Moss claim is premised on violation of the California

6   implied warranty claim, the Mag-Moss claim also should be certified.

7                    **(c)    Damages Are Calculable on a Class-Wide Basis**

8       Damages in this case are capable of measurement on a class-wide basis

9   under *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1433 (2013).  Moreover,

10   Plaintiffs' damages' theory matches their theory of liability.  *See Lindell v.*

11   *Synthes USA*, 2014 WL 841738, at *14 (E.D. Cal. March 4, 2014) ("[*Comcast*]"

12   reiterated a fundamental focus of the Rule 23 analysis: The damages model must

13   be capable of determination by tracing the damages to the plaintiff's theory of

14   liability."). Plaintiffs' damages model need not be perfect nor "precisely correct."

15   *See Vaccarino v. Midland Nat'l Life Ins. C*o., 2014 WL 572365, at *10-13 (C.D.

16   Cal. Feb. 3, 2014) ("Comcast requires that courts determine whether damages are

17   susceptible of classwide measurement, not whether that measurement is precisely

18   correct.").  Moreover, "so long as the damages can be attributed to [Plaintiffs']

19   theory or liability, damage calculations for individual class members do not defeat

20   certification." *Lindell*, 2014 WL 841738, at *14 (noting that "[p]ost *Comcast*, the

21   Ninth Circuit has reiterated this black letter rule."); *Leyva v. Medline Indus., Inc*.,

22   716 F.3d 510, 514 (9th Cir. 2013) ("[T]he amount of damages is invariably an

23   individual question and does not defeat class action treatment.").

24       According to the *Reference Guide on Estimation of Economic Damages*

25   ("Damages Guide"),[6] published by the National Academy of Sciences in

26

27   ───────────────
    [6] Allen, Mark A., *et al.*, "Reference Guide on Estimation of Economic
28   Damages," *Reference Manual on Scientific Evidence*, 3rd Ed., The National
    Academy of Sciences, 425-502 (2011), *available at*

1   cooperation with the Federal Judicial Council, the goal of damages measurement

2   is to find the plaintiff's loss of economic value from the defendant's harmful act,

3   which includes the quantification of the reduction in economic value. (Damages

4   Guide at 429.) The measurement quantifies "the difference between the value the

5   plaintiff would have received if the harmful event had not occurred and the value

6   the plaintiff has or will receive, given the harmful event." (*Id*. at 430.)

7   Furthermore, such damages are traditionally calculated "without reference to

8   uncertainty about outcomes in the but-for scenario. Outcomes are taken as

9   actually occurring if they are the expected outcome and as not occurring if they

10  are not expected to occur. This approach may overcompensate some plaintiffs and

11  undercompensate others." (Damages Guide at 461.) Such variance is not

12  sufficient to invalidate a proposed model.

13          In this case, Plaintiffs' expert, forensic accountant Susan Thompson, bases

14  her analysis on Plaintiffs' contention that Class members "were damaged because,

15  when they purchased their vehicles, they bargained for a vehicle that did not

16  contain a known HVAC design defect, which is not what they received." (TZD

17  Ex. 37, Ex. A at 1.) The model proffered by Ms. Thompson measures Plaintiffs'

18  "hypothetical value in the but-for scenario," (Damages Guide at 432), tying

19  Plaintiffs' damages to their theory of liability based on the existence of the HVAC

20  Defect at the point of sale that TMS failed to disclose, on which omission

21  Plaintiffs' and the Class relied.[7] (TZD Ex. 37 at ¶ 8.)

22

23  —————————————
    https://www.fjc.gov/sites/default/files/2015/SciMan3D01.pdf.

24          [7] The Damages Guide defines reliance damages as restoring Plaintiffs "to
    the same position as if the relationship with the defendant or the defendant's
25  misrepresentation (and resulting harm) had not existed in the first place." *Id*. at
    433; *see also Id*. at 435 ("Restitution damages are often the same, from the
26  perspective of quantification, as reliance damages. If the only loss to the
    plaintiff from the defendant's harmful act arises from an expenditure that the
27  plaintiff made that cannot otherwise be recovered, the plaintiff receives
    compensation equal to the amount of that expenditure.")
28

1    As Ms. Thompson explains, "Plaintiffs contend that they were damaged

2 because, when they purchased their vehicles, they bargained for a vehicle that did

3 not contain a known HVAC design defect, which is not what they received.

4 Plaintiffs further contend that they are entitled to a payment in the amount of the

5 average cost of continuous, ongoing repairs to the HVAC system needed to abate

6 the HVAC odor." (TZD Ex. 37, Ex. A at 3.)  Under a benefit-of-the-bargain

7 theory, therefore, "damages are calculable by computing the average cost of the

8 parts and labor required to make the repairs necessary to remediate the HVAC

9 defect." (TZD Ex. 37 at ¶ 7.)

10    In simple terms, under Plaintiffs' theory, each Class member was injured *at*

11 *the time of sale* by purchasing a Class vehicle with the HVAC Defect.  Because

12 the HVAC Defect cannot be fixed, damages are calculable in the amount of the

13 average cost to mitigate foul HVAC odors for the estimated life of the vehicle.

14 Such compensation, whether based on repairs or countermeasures, would put

15 Class Members in the position they would have been had the vehicles been defect-

16 free by calculating the cost to make the vehicles conform to the value Plaintiffs

17 and the Class thought they were getting in the price tendered. (TZD Ex. 37 at ¶

18 9.)

19    Plaintiffs model compensates each Class Member for the same amount

20 based on the uniform, economic harm suffered at point of sale as a result of TMS'

21 misconduct. *See Comcast*, 133 S. Ct. at 1435 ("The first step in a damages study is

22 the translation of the legal theory of the harmful event into an analysis of the

23 economic impact of that event.").  The methodology Ms. Thompson proposes is

24 quite straightforward: damages are "the average cost of the repairs" multiplied by

25 "the average estimated life of the vehicle which is estimated to be 10 years." (TZD

26 Ex. 37, Ex. A at 4.)  Ms. Thompson assumes that remediation of the HVAC

27 Defect will be required annually for every Class Vehicle based on the TSB

28 published by TMS that recommends annual "maintenance" of the subject HVAC

1   system using the various countermeasures.  (TZD Ex. 37 ¶ 6.)  Her model relied

2   further on a presumed 10-year vehicle life, consistent with combined original

3   factory and extended warranty coverage, as well as warranties offered by other car

4   manufacturers.[8]  Depending on the reliability of the data available, additional

5   variables include repairs TMS regularly makes to mitigate or remediate foul

6   HVAC odors.  (TZD Ex. 37, Ex. A at 4) (utilizing data from a TMS repairs

7   database.)

8        Class Members believed they were getting a defect-free vehicle; Ms.

9   Thompson's model compensates them for amount they overpaid based on that

10  reliance, which is the cost of repairs and countermeasures that TMS identified and

11  either performed or recommended as maintenance to recur at regular intervals

12  over the life of the vehicle.

13       If for whatever reason the foregoing approach is rejected, Plaintiffs' expert

14  also proffers an alternative methodology:  for class members who paid to

15  remediate effects of the HVAC Defect, the measure of the damages is the out of

16  pocket costs they incurred, "calculable based on class members' receipts or

17  invoices for [the same] HVAC defect-related repairs."  (TZD Ex. 37, Ex. A at 6.)

18  Such a calculation could easily and conservatively be limited to the charcoal filter

19  and evaporator cleaning and/or sanitizing "maintenance" that TMS recommends.

20  (TZD Ex. 37 at ¶ 6.)

21       It is important to note that the lack of reliable or sufficient data from TMS

22  regarding pricing is not sufficient to render Plaintiffs' damages model too

23  speculative or contingent.  Plaintiffs' expert provides a *methodology* to assign a

24  value to the Class based on the fact that Class Members did not get the defect-free

25       _____

26       [8] For example, in one exhaustive study by automotive expert Steven Lang
     and statistician Nick Larivere called the Long-Term Quality Index (LTQI), the
27  average mileage for the life of a Toyota Camry is 145,496 miles.  Birken, Emily
     Guy, "6 Cars You Can Drive (Almost) Forever," *Wise Bread* (April 16, 2015) at
28  http://www.wisebread.com/6-cars-you-can-drive-almost-forever.

1    vehicle for which they bargained.  If and when TMS provides information to

2    determine the actual cost to replace the defective HVAC system with one that is

3    defect-free, or if TMS provides information sufficient to determine the actual

4    costs (parts and labor) to replace high performance charcoal filters every 3-12

5    months and clean the evaporator or "refresh" the air conditioning annually, those

6    units of measure can be applied class-wide to calculate damages more precisely.

7    (TZD Ex. 37., Ex. A at 6.)

8         Concerns raised by TMS' experts that focus on whether foul HVAC odors

9    are or will be present in the Class vehicles entirely miss the point of the benefit of

10   the bargain theory, which measures damages *at the time of sale*. (TZD Ex. 37 at ¶

11   10.)  As Ms. Thompson explained clearly and succinctly, her proposed model

12   assigns a uniform value to the benefit lost to Class Members in the bargain with

13   TMS *at the point of sale*, not the average costs to remediate the HVAC Defect

14   subsequently incurred over time.  *See, e.g., Pulaski & Middleman, LLC v. Google,*

15   *Inc*., 802 F.3d 979, 989 (9th Cir. 2015), *cert. denied*, 136 S. Ct. 2410, 195 L. Ed.

16   2d 780 (2016) (damages are "based on what a purchaser would have paid at the

17   time of purchase had the purchaser received all the information" and "need not

18   account for benefits received after purchase"); *In re Toyota Motor Corp*., 790 F.

19   Supp. 2d 1152, 1163 (C.D. Cal. 2011) ("A vehicle with a defect is worth less than

20   one without a defect.").

21            **2.    A Class Action is Superior**

22        Because the central issues in this case turn on TMS' uniform conduct and a

23   common defect, resolution on a classwide basis will "achieve economies of time,

24   effort, and expense, and promote...uniformity of decision as to persons similarly

25   situated, without sacrificing procedural fairness or bringing about other

26   undesirable results." *Amchem Prods v. Windsor*, 521 U.S. 591, 615 (1997)

27   (internal quotations and citation omitted).

28

1

2

### B.   TMS' Position: Plaintiffs' Proposed Rule 23(b)(3) Class of California Consumers Fails for Many Reasons

3

4

5

6

7

To satisfy Rule 23(b)(3), Plaintiffs must demonstrate that: (1) "questions of law or fact common to class members predominate over any questions affecting only individual members[;]" and (2) "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy," including that proceeding as a class is manageable.  *Id.*  These requirements are not met here.

8

### 1.   Individualized Issues Predominate

9

10

11

12

13

14

15

16

The Supreme Court has stressed that the predominance test is "far more demanding" than the commonality requirement.  *Amchem Prods. Inc. v. Windsor*, 521 U.S. 591, 623–624 (1997).  "[I]f the main issues in a case require the separate adjudication of each class member's individual claim or defense, a Rule 23(b)(3) action would be inappropriate."  *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1190 (9th Cir. 2001) (internal citation omitted).  This requires the Court to look at the "elements of the claims at issue and the evidence the parties plan to marshal in support of their positions[.]"  *Ono*, 2016 WL 6647949, at *9.

17

18

### (a)   Individualized Issues Override Any Common Ones for Each Claim

19

20

21

22

23

24

25

26

27

28

As explained in Section IV.B.1, with respect to the core elements of Plaintiffs' claims, a fact-finder will be required to make at least the following individualized determinations unique to each Class Vehicle and class member:  (1) what HVAC system design was utilized in the Class Vehicle (*see Cholakyan*, 281 F.R.D. at 552); (2) whether the Class Vehicle has HVAC odor and, if so, whether it arose before or after the warranty expired (*see Torres,* 2015 WL 5170539, at *5); (3) whether the alleged defect caused the HVAC odor (*see Cholakyan*, 281 F.R.D. at 552); (4) whether the class member knew about the potential for HVAC odor when leasing or purchasing the Class Vehicle (*see Philips*, 2016 WL 7428810, at *15); (5) whether the class member would have been exposed to

1    and/or relied upon any additional disclosure from TMS (*see Butler*, 2017 WL

2    1398316, at *10); (6) whether the Class Vehicle is fit for its ordinary purpose of

3    providing transportation (*see* MSJ Order); and (7) whether retention of any money

4    received by TMS would be unjust under the circumstances (*see Torres*, 2015 WL

5    5170539, at *5).

6         Further, TMS has the due process right to defend itself by introducing

7    individualized evidence of these issues at any trial.  *See Dukes*, 564 U.S. at 367

8    (recognizing this right in reversing grant of certification); *Barnes v. Am. Tobacco

9    Co.*, 161 F.3d 127, 147–49 (3d Cir. 1998) (affirming denial of class certification in

10   part because of individualized issues concerning how defendants intended to

11   defend plaintiffs' claims).  Plaintiffs offer no plan as to how these individualized

12   issues can be addressed in one class trial.  Because individualized determinations

13   will overrun Plaintiffs' claims, the proposed Rule 23(b)(3) class fails.

**(b)    Individualized Issues Predominate the Calculation of
Class-Wide Damages**

16        Plaintiffs must present a damages model showing that "damages are

17   susceptible of measurement across the entire class for purposes of Rule 23(b)(3)"

18   and "measure only those damages attributable to" Plaintiffs' theory of liability.

19   *Comcast,* 133 S. Ct. at 1433.  Failure to do so ***requires*** denial of class

20   certification.  *See, e.g., Doyle v. Chrysler Grp., LLC*, 663 F. App'x 576, 579 (9th

21   Cir. 2016) (applying rule); *Philips*, 2016 WL 7428810, at *22–23 (applying rule).

22        Plaintiffs cannot satisfy their *Comcast* burden.  They complain that class

23   members overpaid or would not have purchased their Vehicles because of the

24   alleged defect.  Mot. at 46; SAC ¶ 19.  But Plaintiffs' damages expert did not

25   measure the amount of any alleged overpayment at the point of sale or how

26   purchasers would have reacted to an additional disclosure.  Instead, Ms.

27   Thompson did a basic ***post-sale*** math exercise—that is, after ***assuming*** that

28   HVAC odor would manifest in each Class Vehicle for each class member (DLS

1   Ex. 50 at 117–120), Ms. Thompson estimated the "average" cost of implementing

2   various post-sale "countermeasures" to try to abate HVAC odor; she then

3   multiplied this number by ten, because it purports to represent the average life of

4   the Class Vehicles. *Id.* at 106.  Her method, among other things, improperly

5   compensates class members who have not experienced HVAC odor, who

6   experience HVAC odor from something other than the alleged defect, and/or who

7   retain their vehicles for less than ten years.  Strombom Decl. ¶¶ 36–42, 49–51.

8        Plaintiffs repeatedly claim that Ms. Thompson calculates "benefit of the

9   bargain" damages (Mot. at 44-45), but a benefit of the bargain theory identifies the

10  "difference in fair market value (i.e. the amount that a willing buyer and willing

11  seller would both accept) between the product as represented and the product

12  actually received." *Saavedra v. Eli Lilly & Co.*, No. 2:12-CV-9366-SVW, 2014

13  WL 7338930, at *4 (C.D. Cal. Dec. 18, 2014).  Ms. Thompson admits she did not

14  calculate this difference.  DLS Ex. 50 at 136 (conceding that her calculations do

15  not measure what California class members purportedly overpaid for any Class

16  Vehicle).  She did not measure (1) the market price of any Class Vehicle; (2) the

17  value of any Class Vehicle actually received; (3) the perceived value of the

18  alleged defect on the Class Vehicle; or (4) the price any class member would have

19  paid for the Class Vehicle had an additional disclosure been made.  Opp. at 21-22.

20  She did not even address the costs of fixing the alleged underlying defect as

21  opposed to countering any purported odor.  *Id.*  Her model has nothing to do with

22  benefit of the bargain damages—which simply cannot be calculated on a class-

23  wide basis here.  Strombom Decl. ¶¶ 26–35.  In fact, Ms. Thompson concedes that

24  the perceived value of any Class Vehicle with the alleged defect—which she

25  admits is critical to a benefit of the bargain damages model—will vary among

26  class members.  DLS Ex. 50 at 105-106.

27        Moreover, Ms. Thompson's damages model is unreliable because the core

28  assumptions underlying her damages model are wrong.  As described above, there

1    is no evidence that HVAC odor will arise in every Class Vehicle, much less that

2    all HVAC odor is or will be caused by the alleged defect.  As a result, class

3    members who experience no HVAC odor would be compensated for

4    countermeasures to address a non-existent problem.  DLS Ex. 50 at 120–21.

5    Likewise, Ms. Thompson improperly assumes that all class members should get an

6    average cost of countermeasures over ten years to address HVAC odor, regardless

7    of whether the Class Vehicle is leased (and for how long), when the Class Vehicle

8    is sold, or if and when any HVAC odors arises.  Strombom Decl. ¶¶ 46–51; DLS

9    Ex. 50, at 120-121, 127-128, 139-143.  This makes no sense.

10           Recognizing the fatal flaws in their damages model, Plaintiffs propose an

11   alternative:  looking at individualized receipts to compensate "class members who

12   paid to remediate effects of the HVAC defect."  Mot. at 46-47.  But this is not a

13   class-wide approach at all and would require detailed individualized proof.  And

14   requiring the production of individualized receipts for each prior service measure

15   would result in thousands of mini-trials requiring individualized liability and

16   damages inquiries, such as whether the receipts relate to HVAC odor, and, if so,

17   whether it was caused by the alleged defect.  Strombom Decl. ¶¶ 74–78.  Because

18   Plaintiffs have failed to provide a damages methodology that matches their benefit

19   of the bargain theory, no Rule 23(b)(3) class can be certified.

20                    **(c)**     **Individualized Issues Predominate Regarding TMS'**

21                            **Affirmative Defenses**

22           In addition to lacking predominance, "the presence of defenses unique to a

23   particular class member precludes certification on representativeness and

24   typicality grounds."  *Gartin v. S & M NuTec LLC*, 245 F.R.D. 429, 441 (C.D. Cal.

25   2007).  Here, for example, some class members will be subject to mandatory

26   arbitration provisions contained in their financing, leasing, and extended warranty

27   contracts.  This defense is not hypothetical.  One California putative class member

28   already has been compelled to arbitrate claims regarding HVAC odor because his

1    Platinum Vehicle Services Agreement with Toyota contained a mandatory

2    arbitration clause.  DLS Ex. 45, 46.  This inquiry will need to be repeated for

3    every class member.  *See, e.g.*, *Pablo v. ServiceMaster Glob. Holdings Inc.*, No. C

4    08-03894 SI, 2011 WL 3476473, at *2–3 (N.D. Cal. Aug. 9, 2011) (Rule 23(b)(3)

5    was not met because of inference that "significant number" or applicants signed

6    arbitration agreement); *see Guzman v. Bridgepoint Educ., Inc.*, 305 F.R.D. 594,

7    612 (S.D. Cal. 2015) (applying principle).[9]

8              **2.    A Class Action is Not a Superior Way of Proceeding**

9          Plaintiffs cannot demonstrate "that a class action is superior to other

10   available methods for fairly and efficiently adjudicating the controversy." Fed. R.

11   Civ. P. 23(b)(3).  Plaintiffs do not even attempt to address the Rule 23(b)(3)(A)

12   factors, which alone warrants denial of their motion.  Mot. at 48.  Nonetheless, the

13   Rule 23(b)(3)(A) factors show why no class can be certified.

14         *First*, when "each class member has to litigate numerous and substantial

15   separate [individualized] issues to establish his or her right to recover individually,

16   a class action is not 'superior.'"  *Zinser*, 253 F.3d at 1192 (citations omitted).  The

17   predominating individualized issues here, discussed *supra*, would require mini-

18   trials and render any class trial unmanageable.

19         *Second*, in the Ninth Circuit, a "class action is [only] the superior method

20   for managing litigation if no realistic alternative exists." *Valentino v. Carter-

21   Wallace, Inc.*, 97 F.3d 1227, 1234–35 (9th Cir. 1996).  That is not the case here.

22   Class members have an interest in bringing individual cases, and there is no need

23   to concentrate all claims in this forum.  Fed. R. Civ. P. 23(b)(3)(A)-(C).  If HVAC

24   odor impacts their Class Vehicle in any meaningful way, they will seek to redress

25   it, and they have multiple incentives to do so in individual actions.  Both the UCL

26   and CLRA allow for attorneys' fees.  Class members also can seek broader relief,

27   ───────────────
28         [9] Other affirmative defenses including whether class members paid or
     leased their Vehicle with full knowledge of HVAC odor.

1  including re-purchase of their Class Vehicle, through California lemon law claims;

2  they may even do so through alternative dispute resolution processes, like

3  arbitration, that provide quicker and more immediate and fulsome relief.  Indeed,

4  as Plaintiffs point out, individuals who actually have an issue with HVAC odor

5  have sought relief by pursuing lemon law claims in arbitration. Mot. at 10.  There

6  is no need for a class action. *Zinser,* 253 F.3d at 1191.

7  **VI.    CERTIFICATION UNDER RULE 23(b)(2)**

8      **A.    Plaintiffs' Position: The Requirements Are Satisfied**

9      In a well-reasoned Order Re: Motion to Dismiss (Dkt. 79), this Court

10  sustained Plaintiffs' claims for equitable or injunctive relief.  The Court expressly

11  rejected TMS' argument that they should be dismissed because Plaintiffs have an

12  adequate remedy at law.  The Court noted that "Plaintiffs allege that the design

13  defect at issue in this case is said to cause the HVAC to emit noxious and foul

14  odors for which there is apparently no permanent fix. *Thus, monetary relief alone*

15  *will not mitigate the odor consumers will be forced to endure while they own the*

16  *class vehicles*.  Toyota, however, has some solutions to help mitigate the odor

17  which plaintiffs seek to have implemented on the class vehicles.  This factor

18  arguably supports the irreparable harm element." *Id*. at 3 (emphasis added).

19  Further, after carefully reviewing the language and purposes of the relevant

20  statutes, the Court was "satisfied that the equitable remedies plaintiffs seek are

21  additional cumulative remedies permitted by the statutory claims asserted in the

22  SAC." *Id*.

23      Moreover, the *availability* of damages does not make them *adequate* as a

24  matter of law.  Equitable relief is appropriate here, where the evidence confirms

25  that TMS considers the HVAC Defect to be a permanent and irreparable problem,

26  such that Class Members will continue to suffer and TMS will continue to benefit

27  as a result of its misconduct.

28      Based on the foregoing, Plaintiffs seek to certify an equitable relief or

1   injunctive relief class under Rule 23(b)(2). Further, Plaintiffs seek an order to 1)

2   compel TMS to offer, under warranty, the countermeasures that TMS has

3   identified but for which Toyota currently is forcing Class Members to pay out of

4   pocket, including Park Fresh Logic, or, alternatively, that TMS issue a

5   maintenance program for 8 years to cover all maintenance required to mitigate

6   effects of the HVAC Defect, and 2) compel TMS to identify countermeasures

7   identified by TMS as "repairs," rather than "maintenance." *Id*. at 2.  As with the

8   Rule 23(b)(3) analysis, at the certification stage for Rule 23(b)(2), the Court need

9   only decide whether Plaintiffs' equitable relief allegations are susceptible to

10  common, class-wide proof, which they are.

### 1.        Plaintiffs Satisfy the Rule 23(b)(2) Requirements

12      Rule 23(b)(2) allows for class treatment when defendant "has acted or

13  refused to act on grounds that apply generally to the class, so that final injunctive

14  relief or corresponding declaratory relief is appropriate respecting the class as a

15  whole." *In re Yahoo Mail Litigation*, 308 F.R.D. 577, 598 (N.D. Cal. 2015).  The

16  requirements for Rule 23(b)(2) certification are more relaxed than (b)(3)

17  certification and are satisfied in this case.  "Unlike Rule 23(b)(3), a plaintiff does

18  not need to show predominance of common issues or superiority of class

19  adjudication to certify Rule 23(b)(2) class." *Id*.  "In contrast to Rule 23(b)(3)

20  classes, "the focus is not on the claims of individual class members but rather

21  whether [defendant] has engaged in a common policy." *Id*.

22      Under Rule 23(b)(2), "even if some members have not been injured by the

23  challenged practice, a class may nevertheless be appropriate" as long as "Plaintiffs

24  complain of a pattern or practice that is generally applicable to the class as a

25  whole." *Id* at 600.  In *Yahoo*, *supra*, the court expressly rejected defendant's

26  argument that certification under Rule 23(b)(2) is inappropriate just because some

27  class members may not be entitled to relief.  The court noted that defendant's

28  arguments "miss the point of Rule 23(b)(2)," which is "to seek uniform relief from

Page 54

1   a practice applicable to the entire Class." *Id*. at 599.  Further, the ascertainability
2   requirement does not apply to Rule 23(b)(2) classes.  *Id.* at 597-598 ("If relief is
3   granted, the defendants are legally obligated to comply, and it is usually
4   unnecessary to define with precision the persons entitled to enforce compliance.")

5       The Rule 23(b)(2) requirements are satisfied.  Here, Plaintiffs seek uniform
6   relief from practices applicable to the entire Class, namely, from TMS' failures to
7   disclose the HVAC Defect and to provide, under warranty, the countermeasures
8   that it has already identified.  This is sufficient to satisfy Rule 23(b)(2).

9       Plaintiffs maintain that this Court can certify both Rule 23(b)(2) and (b)(3)
10   classes.  However, to the extent that there is any perceived conflict in seeking both
11   forms of relief or if the Court is not inclined to certify a damages class under Rule
12   23(b)(3), Plaintiffs' request to certify a Rule 23(b)(2) class is in the alternative.

### 2.     A Nationwide Class Should be Certified Under Rule 23(b)(2)

15       Not only is certification of an equitable relief class under Rule 23(b)(2)
16   appropriate, a nationwide class should be certified applying California law.
17   Alternatively, Plaintiffs seek certification of a California-only subclass as to
18   Plaintiffs' equitable relief claims under Rule 23(b)(2).

19       Under *Mazza v. Am. Honda Motor Co*., 666 F.3d 581, 589 (9th Cir. 2012),
20   in order to satisfy the due process and choice of law requirements, "the class
21   action proponent bears the initial burden to show that California has significant
22   contacts or significant aggregation of contacts to the claims of each class
23   member."  "Once the class action proponent makes this showing, the burden shifts
24   to the other side to demonstrate that foreign law, rather than California law, should
25   apply to class claims."  *Id*. at 590.

26       TMS has contacts with California sufficient to warrant the application of
27   California law as constitutionally appropriate.  Plaintiff alleges that "at all relevant
28   times, Defendant was and is engaged in the business of designing, manufacturing,

constructing, assembling, marketing, distributing, and selling automobiles and motor vehicle components in California." (Dkt. 52, SAC ¶ 42.)  TMS is incorporated in California and only recently relocated its headquarters out of state. The Class Vehicles were manufactured and tested here, the design defect arose here, and all decisions regarding marketing and sales, including TMS' failures to disclose the alleged defect, occurred here.  California courts have held that "the state where the injury occurs has a 'predominant interest' in applying its law." *Rutledge v. Hewlett-Packard Co*., 238 Cal. App. 4th 1164 (2015) (citation omitted).  *See also Wershba v. Apple Computer, Inc.*, 91 Cal. App. 4th 224, 242 (2001) ("California's consumer protection laws are among the strongest in the country.").  In similar circumstances, courts have held that plaintiffs have met their initial burden to show constitutionally sufficient contacts with California. *See e.g., Mazza*, 666 F.3d at 591; *Clothesrigger, Inc. v. GTE Corp.*, 191 Cal. App. 3d 605 (1987) (application of California law constitutionally permissible where defendant's principal offices were in California and the allegedly fraudulent misrepresentations emanated from California).

The burden now shifts to TMS to demonstrate that that the interests of other state's laws are greater than California's interests.

### B. TMS' Position: Plaintiffs' Rule 23(b)(2) Classes for Injunctive Relief Fail for Additional Reasons

#### 1. Rule 23(b)(2) is Inapplicable Because Plaintiffs Predominantly Seek Monetary Relief

Rule 23(b)(2) is inapplicable when damages are the primary relief sought and declaratory relief is merely incidental. *See Dukes*, 564 U.S. at 360.  Courts have repeatedly held that when a plaintiff seeks a mandatory injunction requiring or laying the foundation for the payment of money, the class claims must be analyzed under Rule 23(b)(3).  *Philips*, 2016 WL 7428810, at *25 (applying rule); *Herskowitz v. Apple, Inc.*, 301 F.R.D. 460, 481–82 (N.D. Cal. 2014) (denying

motion to certify Rule 23(b)(2) class because "Plaintiffs' proposed injunction" for a refund program "is practically indistinguishable from an order that Apple pay Plaintiffs money"); *Cholakyan*, 281 F.R.D. at 561 (denying certification of claim for mandatory injunction requiring car manufacturer to initiate reimbursement program because Rule 23(b)(2) inapplicable).

Plaintiffs' injunctive relief class is simply a way to force TMS to pay money.  Plaintiffs want to compel TMS to "cover"—and, therefore, pay—for certain countermeasures to address HVAC odors.  Mot. at 54-55; *see McVicar*, 2015 WL 4945730, at *15 (denying (b)(2) class because "the request seems to be disguising a true request for future monetary payouts in the event of future product failures"); *Lucas v. Breg, Inc.*, 212 F. Supp. 3d 950, 972 (S.D. Cal. 2016) (denying (b)(2) class because "the central focus of this suit is monetary relief").  Thus, certification under (b)(2) is inapplicable as a matter of law.

Plaintiffs do not cite a ***single*** decision permitting (much less certifying) a Rule 23(b)(2) class based upon their thinly disguised damages relief.  The lone case cited by Plaintiffs did not involve payment for a product, but the alleged improper interception and scanning of emails, where injunctive relief was sought "to obtain a class member's consent."  *In re Yahoo Mail Litig.*, 308 F.R.D. 577, 600 (N.D. Cal. 2015).  That decision does not support a Rule 23(b)(2) class here.

## 2.    The Proposed Class is Not Cohesive

A Rule 23(b)(2) class also fails because the proposed class is not cohesive. *See Grodzitsky*, 2014 WL 718431, at *3 (Rule 23(b)(2) requires a "showing of cohesiveness of class claims"); *see also Barraza v. C. R. Bard Inc.,* No. CV16-01374-PHX-DGC, 2017 WL 3976720, at *16 (D. Ariz. Sept. 11, 2017) (discussing case law and noting that at least six Circuit Courts of Appeal have imposed a cohesive requirement for a Rule 23(b)(2) class).  Indeed, "courts have held that . . . a class under Rule 23(b)(2) must not be overrun with individual issues."  *Sweet v. Pfizer*, 232 F.R.D. 360, 374 (C.D. Cal. 2005).

1    Here, the same individualized issues that preclude commonality under

2 (b)(3) also make a (b)(2) class inappropriate.  Plaintiffs do not address the

3 cohesiveness requirement.  Mot. at 53-56.  Plaintiffs' request for injunctive relief

4 flows from their UCL, CLRA, and implied warranty claims, yet class members are

5 differently situated and their claims are overrun by individualized issues.  Some

6 may have HVAC odor, while the vast majority do not.  Still others were aware of

7 HVAC odor when they purchased their Class Vehicles, while others were not.

8 Some have had measures taken to address HVAC odor, while others have not.

9 Some class members may want monetary relief, rather than the implementation of

10 "countermeasures" that Plaintiffs concede do not address the alleged defect and

11 may not fully eliminate HVAC odor.  *See Philips,* 2016 WL 7428810, at *25.

12 Plaintiffs cannot show class-wide cohesion.

13          **3.     A Nationwide Rule 23(b)(2) Injunctive Relief Class Fails for**

14                **the Additional Reason That the Differing Laws of All Fifty**

15                **States Will Apply**

16    Plaintiffs contend that California law can apply to a nationwide class for

17 injunctive relief.  Mot. at 55-56.  Plaintiffs' contention is foreclosed by the Ninth

18 Circuit's decision in *Mazza.*  California law may be applied on a class-wide basis

19 only if "'the interests of other states are not found to outweigh California's

20 interest in having its law applied.'"  *Mazza*, 666 F.3d at 590.  Applying

21 California's "governmental interest test," the Ninth Circuit concluded that there

22 was great variation between the consumer protection laws of the various states;

23 that California had an attenuated interest in applying its law to residents in foreign

24 states; and "that each class member's consumer protection claim should be

25 governed by the consumer protection laws of the jurisdiction in which the

26 transaction took place."  *Id.* at 594.  Thus, even though the manufacturer

27 defendant was headquartered in California and manufactured the allegedly

28 defective vehicles there, the Ninth Circuit reversed the grant of certification of a

1    nationwide class applying California law.  *Id.*; *see also Grodzitsky*, 2014 WL

2    718431, at *9–10 (applying rule).

3            Applying *Mazza*, it is clear California law cannot be applied nationwide.

4    *First*, as reflected in the attached appendices, the laws of the states differ markedly

5    as to consumer protection (Appendix A), breach of warranty (Appendix B), and

6    unjust enrichment (Appendix C) claims.  *See, e.g.*, *Martinelli v. Johnson &*

7    *Johnson*, No. 2:15-CV-01733-MCE-DB, 2017 WL 2257171, at *6 (E.D. Cal. May

8    23, 2017) (denying certification because of material differences); *Darisse v. Nest*

9    *Labs, Inc.*, No. 5:14-CV-01363-BLF, 2016 WL 4385849, at *12 (N.D. Cal. Aug.

10   15, 2016) (same); *Gustafson v. BAC Home Loans Servicing, LP*, 294 F.R.D. 529,

11   548 (C.D. Cal. 2013) (same).  *Second*, as *Mazza* recognized, the law of each state

12   where the transaction took place has an interest in applying its law to protect its

13   customers.  *Id.* at 592–593.  *Third*, California has an "attenuated interest" in

14   applying its law to out-of-state consumers of allegedly defective automobiles

15   (which, unlike *Mazza,* were not even manufactured in California); thus, the law of

16   the state where each class member was injured—that is, where the Class Vehicle

17   was purchased—has the most significant relationship and will apply.

18           In fact, Plaintiffs **concede** that "the state where the injury occurs has a

19   '***predominant interest***' in applying its law."  Mot. at 56 (emphasis added).  This is

20   fatal to their nationwide Rule (b)(2) class, because that injury only occurred where

21   each class member purchased the Class Vehicle in purported reliance on the

22   alleged omission or where any HVAC odor occurred.  *Mazza,* 666 F.3d at 593–94;

23   *see also McCann v. Foster Wheeler LLC,* 48 Cal. 4th 68, 94 n.12 (2010). This

24   choice-of-law determination will vary by class member and will require the

25   application of different laws.  Because the differing laws of all fifty (50) states

26   will apply to the claims of the class members, different legal issues will arise for

27   each class member and no nationwide class can be certified.  *See, e.g.*, *Mazza*, 667

28   F.3d at 596; *see also In re Yahoo Mail Litig.*, 308 F.R.D. 577, 602 (N.D. Cal.

1    2015) (denying nationwide Rule 23(b)(2) injunctive relief class because of choice

2    of law problems); *Grodzitsky,* 2014 WL 718431, at *9–10 (applying rule).

3    Plaintiffs offer no trial plan to show how these many different legal rules and

4    requirements could be addressed.  *Zinser*, 253 F.3d at 1189 (9th Cir. 2001)

5    ("Because Zinser seeks certification of a nationwide class for which the law of

6    forty-eight states potentially applies, she bears the burden of demonstrating 'a

7    suitable and realistic plan for trial of the class claims.'").

8    **VII.   CERTIFICATION UNDER RULE 23(C)(4)**

9        **A.    Plaintiffs' Position: A Liability-Only Class Can Be Certified**

10        If, for any reason, the Court finds that the Rule 23(b)(3) requirements are

11    not satisfied, Plaintiffs seek to certify a liability-only class under Rule 23(c)(4).

12    Rule 23(c)(4) provides that "[w]hen appropriate, an action may be brought or

13    maintained as a class action with respect to particular issues."  In the wake of

14    *Comcast*, numerous courts have held that a liability only class should be certified

15    under Rule 23(c)(4), for example, in the absence of a showing of predominance on

16    the issue of damages. *See, e.g., Butler v. Sears, Roebuck & Co.,* 727 F.3d 796, 801

17    (7th Cir. 2013) ("a class action limited to determining liability on a class-wide

18    basis, with separate hearings to determine – if liability is established – the

19    damages of individual class members . . . is permitted by Rule 23(c)(4) and will

20    often be the sensible way to proceed").

21        This case is particularly suitable for Rule 23(c)(4) treatment, particularly if

22    Plaintiffs' class-wide damages model is not sustained.  The evidence will establish

23    Plaintiffs and the Class' claims as to liability.  Once liability has been adjudicated

24    as to the Class, a procedure can be crafted to resolve individual damages.  *See,*

25    *e.g.*, *Houser v. Pritzker*, 28 F. Supp. 3d 222, 254 (S.D.N.Y. 2014) (after finding

26    that if the defendant's misconduct "caused a uniform injury to all members of the

27    liability class… the Court has the tools to handle any management difficulties that

28    may arise at the remedial phase of this litigation.").

1
2

### B.     TMS' Position: There is No Basis to Certify a "Liability-Only" Class Under Rule 23(c)(4)

3
4
5
6
7
8

A Rule 23(c)(4) "liability-only" class is not exempt from the requirements of Rule 23(a) and (b).  *See Amador v. Baca*, No. 2:10–CV–01649, 2016 WL 6804910, at *3 (C.D. Cal. July 27, 2016) ("Ninth Circuit's approval of Rule 23(c)(4) classes does not obviate the need to meet the requirements of Rules 23(a) and (b)."); *Tasion Commc'ns, Inc. v. Ubiquiti Networks, Inc.*, 308 F.R.D. 630, 632–33, 643 (N.D. Cal. 2015) (applying rule).

9
10
11
12
13

In addition, the Ninth Circuit has made clear that Rule 23(b)(2) should be reserved for the rare situation where certification would "significantly advance the resolution of the underlying case." *Valentino*, 97 F.3d at 1229–30 (vacating the Rule 23(c)(4) certification order); *see also Rahman v. Mott's LLP*, 693 F. App'x 578, 580 (9th Cir. 2017) (affirming denial of Rule 23(c)(4) class).

14
15
16
17
18
19
20
21
22

Without any analysis, Plaintiffs claim that a "liability-only" class can be certified.  Mot. at 60-61.  But as TMS has demonstrated, no common evidence demonstrates "liability" on any claim.  Individualized assessments are required of, among other things, the HVAC system design, whether HVAC odor exists and when the odor arose, the nature and severity of that odor, what caused that odor, each class member's level of knowledge of HVAC odor, if any, prior to leasing or buying the Vehicle, and whether an additional disclosure would have mattered.  At a minimum, TMS would be entitled to defend itself at any class trial by raising these individualized issues with each class member.

23
24
25
26
27
28

Nor would there be an efficiency in certifying a Rule 23(c)(4) class.  Even after a liability-only trial, this Court would have to hold individualized damages trials for each of the thousands of putative class members.  For instance, even if Plaintiffs could prove some sort of common defect in a class trial, multiple separate juries would have to decide, in the context of each class member's claim, whether a defect caused that person to experience HVAC odor and whether that

1  person was aware of the potential for HVAC odor at the time of purchase or lease.

2  This defeats the efficiency of a class action—this Court would have to oversee

3  innumerable *additional* trials and do *more work*.  Not only would certification fail

4  to eliminate the need to resolve predominating individual issues, but Plaintiffs'

5  proposed bifurcation raises significant Seventh Amendment concerns.  *See In the*

6  *Matter of Rhone–Poulenc Rorer, Inc.,* 51 F.3d 1293, 1300 (7th Cir. 1995)

7  (denying issue certification over Seventh Amendment concerns raised by

8  subsequent jury having to reevaluate facts ascertained by first jury).

9       For these reasons, courts routinely deny Rule 23(c)(4) classes.  *See, e.g.*,

10  *Saavedra*, 2014 WL 7338930, at *10; *Rahman v. Mott's LLP*, No. 13-CV-03482,

11  2014 WL 6815779, at *9 (N.D. Cal. Dec. 3, 2014), *aff'd*, 693 F. App'x 578 (9th

12  Cir. 2017); *In re ConAgra Foods, Inc.*, 302 F.R.D. 537, 581 (C.D. Cal. 2014).

13  This Court should do the same.

14  **VIII.  PLAINTIFFS' EVIDENTIARY OBJECTIONS**

15       **A.      Plaintiffs' Position: TMS' Expert Testimony is Inadmissible**

16       It is well-settled that to be admissible, expert testimony must be not only

17  reliable, but also helpful to resolve an issue in the case.  *Daubert v. Merrell Dow*

18  *Pharmaceuticals, Inc.*, 509 U.S. 579, 589-91 (1993).  Furthermore, such testimony

19  should be excluded where its potential "probative value is substantially

20  outweighed by the 'danger of unfair prejudice, confusion of the issues, or

21  misleading the jury.'" *Id*. at 595. As set forth below, TMS' expert testimony

22  should be excluded on both grounds.

23            **1.      TMS' Expert Testimony Regarding Mold Should Be**

24                 **Excluded**

25       In denying TMS' motion for summary judgment, this Court noted that

26  "Plaintiffs' theory 'is that the HVAC system in Plaintiffs' vehicles is defectively

27  designed and the defective design is responsible for the noxious smell from the

28  HVAC system in Plaintiffs' vehicles, regardless of whether mold was found on

1    the evaporator surfaces in Plaintiffs' vehicles on the day of inspection.'  Their

2    theory is not premised on the presence of mold."  (MSJ Order at 9, fn. 11.)

3         TMS has proffered the expert testimony of Jeffrey Hicks that fungi were not

4    causing the foul odors of which Plaintiffs complain on the day he tested their

5    vehicles.  (TZD Ex. 38 at 17.)  TMS also proffered the expert testimony of Robert

6    Kuhn, whose analysis relies in large part of Mr. Hicks' testimony, that

7    "[Plaintiffs' expert's] theory and report concerning alleged HVAC odors or mold

8    in the named Plaintiffs' vehicles, or any 2012 to 2015 Toyota Camry, have no

9    factual or scientific basis whatsoever."  (TZD Ex. 8 at 6.)  Neither TMS nor its

10   experts refute Plaintiffs' assertion that the health risks of mold are a matter of

11   public record.  Similarly, neither Mr. Kuhn nor Mr. Hicks testified that mold does

12   not present a health risk or offered an opinion as to what level constitutes a risk in

13   the passenger cabin of any vehicle, let alone the Class Vehicles.

14        Accordingly, Plaintiffs move to exclude Mr. Hicks' testimony in its entirety

15   and Mr. Kuhn's testimony to the extent it relies on Mr. Hicks' testimony and/or

16   focuses on mold, on the grounds that it is not relevant and will not help the trier of

17   fact to understand the evidence or to determine a fact in issue.  *Daubert*, 508 U.S.

18   at 589-91.  Further, Mr. Hicks' testimony regarding the presence of mold in the

19   subject HVAC system is based on facts or data insufficient to justify his

20   conclusions as to the HVAC Defect in either Plaintiff's vehicle and as to the

21   alleged design flaw that makes the system prone to the excessive accumulation of

22   condensation.  Fed. R. Evid. 702.  Both Plaintiffs' vehicles were tested during the

23   summer months in Southern California with relatively low humidity; Mr. Hicks

24   measured both temperature and humidity but offered no analysis regarding rates of

25   condensation specific to the HVAC Defect.  (TZD Ex. 38 at 9, tables 3, 7.)

26              **2.    TMS' Expert Testimony Regarding Damages Should Be**

27                     **Excluded**

28        TMS has also proffered testimony from several experts (Wysocki, Keller,

1   Strombom) to support its argument that damages cannot be calculated on a class-
2   wide basis.  However, all their opinions presuppose a damages calculation based
3   on a theory of expected utility concerning consumers' preferences as to choices
4   with uncertain outcomes (*i.e.* whether and how HVAC odors manifest), not the
5   benefit-of-the-bargain model that Plaintiffs posit.  Not only is such testimony
6   irrelevant to Plaintiffs' claims, any potential probative value is substantially
7   outweighed by the danger of unfair prejudice, confusion of the issues, or
8   misleading the jury.

9       As discussed above, Plaintiffs' model assigns a uniform monetary value to
10  the HVAC Defect, which is common to the Class Vehicles and existed in each at
11  the point of sale. Every Class Member overpaid by this amount. *See* Section
12  V.A.1.c, *supra*. At its most conservative, calculations would simply utilize as
13  variables the countermeasures TMS has recommended, namely the higher
14  performance charcoal filter and an evaporator cleaner. (*See, e.g.*, TZD Ex. 39
15  ("[S]ince [TMS] does not specifiy [sic] a procedure we do not have a labor time,
16  and "[t]here is no cleaning procedure TSB."); TZD Ex. 40 (A "field fix" for
17  HVAC odor complaints would have included Park Fresh Logic, a charcoal filter,
18  and some form of cleaning.))  The opinions of Mr. Keller and Mr. Wysocki are
19  simply not relevant to that analysis or those calculations.

20      Mr. Keller opines about consumer behavior related to car-purchasing
21  decisions and considers the uncertainty of various outcomes, which is only
22  relevant to a damages theory based on expected utility, not Plaintiffs' theory based
23  on benefit of the bargain.  (*See* TZD Ex. 41 at ¶ 10 ("I have been asked by counsel
24  for Toyota to evaluate consumer car-buying behavior in order to assess whether
25  consumers who make up the proposed Class would have uniformly reacted to and
26  would have been uniformly impacted by an affirmative disclosure from Toyota
27  regarding the HVAC system.").)  Mr. Wysocki's testimony similarly ignores
28  Plaintiffs' focus on the HVAC Defect.  He opines instead on Class Members'

1   varying reactions to smell, all of which would occur subsequent to purchase, and

2   his analysis is premised on the same theory of expected utility. (*See* TZD 42 at 1

3   ("I was retained by counsel for Toyota Motor Sales, U.S.A., Inc. to assess whether

4   all or even a majority of proposed class members would share the same olfactory

5   (odor) perceptions stated by [Plaintiffs].").)  Accordingly, their respective reports

6   and opinions should be excluded.

7          In his sur-rebuttal, TMS' expert Dr. Bruce Strombom agrees that a benefit-

8   of-the-bargain analysis measures "the difference in the fair market value of the

9   product as represented and its value as sold, or as delivered." (TZD Ex. 43.) He

10  also cites the TSB on which Ms. Thompson relies, referring specifically to TMS'

11  recommendation to install a charcoal filter and /or perform an evaporator cleaning

12  service.  (TZD Ex. 44 at 5.)  The rest of his analysis, however, mischaracterizes

13  what is required by a benefit-of-the-bargain methodology.  For example, he states

14  that Ms. Thompson's report "does not establish, that the Putative Class *actually*

15  suffered any benefit of the bargain damages at the time of initial vehicle purchase

16  or lease."  (*Id*. at 4 fn. 12)  Yet, as noted above, "Plaintiffs contend that they were

17  damaged because, when they purchased their vehicles, they bargained for a

18  vehicle that did not contain a known HVAC design defect, which is not what they

19  received." (TZD Ex. 37 at ¶ 5.)  The existence of the undisclosed HVAC Defect at

20  point of sale *is* the *actual* damage suffered.

21         Without challenging the approach, Dr. Strombom simply asserts that "the

22  'average cost…to repair the HVAC Defect over the average life span of the

23  vehicle" is not the right *measure* to assign to the value of the HVAC Defect. (TZD

24  Ex. 44 at 11.)  That he disagrees with Ms. Thompson is expected, and his

25  argument both ignores TMS' specific failure to disclose the HVAC Defect and

26  relies on the testimony of Mr.  Keller, whose own opinions about what Class

27  Members could have known about HVAC odor, rather than the actual HVAC

28  Defect that Plaintiffs allege, are highly speculative and about which he claims no

1   specific expertise.  *Id*.  Thus, Dr. Strombom also assumes incorrectly that the

2   manifestation of HVAC odor subsequent to purchase, not the existence of the

3   HVAC Defect at point of sale, is at issue.  *Id*. at 12.  As a result, the probative

4   value of his testimony is substantially outweighed by the danger of unfair

5   prejudice, confusion of the issues, or misleading the jury.

### B.      TMS' Position: Plaintiffs' Expert Testimony is Inadmissible

7           The Ninth Circuit requires a rigorous *Daubert* analysis at class certification.

8   *Ellis*, 657 F.3d at 982.  Expert testimony must be excluded unless: (i) the expert is

9   qualified; (ii) the testimony fits the case and will assist the jury; and (iii) the

10  testimony is reliable.  Fed. R. Evid. 702; *Daubert,* 509 U.S. at 591.  TMS' expert

11  testimony passes this standard; Plaintiffs' expert testimony does not.

### 1.      Plaintiffs' Challenges to TMS' Expert Opinions Are Meritless

14          *Mr. Hicks and Mr. Kuhn*.  Plaintiffs challenge Mr. Hicks' opinions—that

15  there is no mold or related health risk—on the basis that they are not relevant and

16  are unreliable.  This is incorrect.  Plaintiffs allege that the purported defect may

17  cause mold and pose "an unreasonable health risk," SAC ¶¶ 2-3, and continue to

18  make that assertion in this motion.  Mot. at 12.  The class-wide presence of mold,

19  therefore, is directly relevant to whether there is common evidence of a defect or

20  safety risk.  Nor do Plaintiffs seriously challenge Mr. Hicks' methodology, which

21  is unassailable.  Hicks Decl. ¶ 13–26.  Mr. Hicks' opinion is admissible.

22          For the same reasons, Plaintiffs' attack on Mr. Kuhn's reliance on data

23  gathered by Mr. Hicks fails.  *See O2 Micro Int'l Ltd. v. Monolithic Power Sys.,*

24  *Inc.*, 420 F. Supp. 2d 1070, 1088 (N.D. Cal. 2006), *aff'd*, 221 F. App'x 996 (Fed.

25  Cir. 2007) (an expert may "rely on facts or data relied upon by experts in the

26  particular field in forming opinions or inferences upon the subject . . . .").

27          *Dr. Wysocki*.  Plaintiffs contend that Dr. Wysocki's opinions are irrelevant

28  to damages, but this is a red herring because his opinions pertain directly to

1   liability—namely, the subjective perception of HVAC odor, which shows that

2   individualized issues predominate as to the merchantability of a particular Class

3   Vehicle and whether any additional disclosure would have been material to any

4   particular class member.  Dr. Wysocki's opinions are admissible.

5       *Dr. Keller.*  Plaintiffs do not challenge Dr. Keller's qualifications or the

6   reliability of his findings.  Instead, in a ***single sentence***, Plaintiffs claim that Mr.

7   Keller's testimony is irrelevant to their damages "theory based on benefit of the

8   bargain."  Mot. at 64-65.  But Plaintiffs do not identify what specific part of his

9   report they seek to exclude, and for good reason:  Dr. Keller's report addresses

10  many critical issues besides damages, including the absence of class-wide

11  exposure, materiality, and fact of injury.  Moreover, while portions of Dr. Keller's

12  report also address damages, that testimony directly rebuts why the damages

13  theory ***pled*** by Plaintiffs in their SAC—that Plaintiffs would not have purchased

14  and/or overpaid for their Class Vehicles—cannot be calculated on a class-wide

15  basis, in part, because of individualized car-shopping behavior and the

16  individualized nature by which final car prices are negotiated.  TZD Ex. 41 at ¶¶

17  87–92; Keller Decl. ¶¶ 90–95.  While Plaintiffs criticize Dr. Keller's testimony for

18  doing an "expected utility" analysis, his unrebutted testimony addresses why the

19  very legal theory that Plaintiffs pled is not susceptible to class treatment.[10]

20      *Dr. Strombom*.  Plaintiffs agree that Dr. Strombom (who holds a Ph.D. in

21  economics) is qualified to give his opinion and recites the appropriate standard,

22  yet claim that his report "mischaracterizes what is required by a benefit-of-the-

23  bargain methodology."  Mot. at 65-66.  Quite the opposite is true:  Dr. Strombom

24  explains why Ms. Thompson has done no such analysis, given that she measures

25  nothing about the value of the alleged defect at the time of the purchase or lease of

26  any Class Vehicle and simply calculates the average costs of post-transaction

27  _____

[10] Notably, Dr. Keller's report was disclosed at the same time as Ms.
28  Thompson's report and, thus, addresses the theory alleged in Plaintiffs' pleading.

1    "countermeasures" to address HVAC odor (and not even the defect itself).  TZD

2    Ex. 44 at 8–11; Strombom Decl. ¶¶ 26–35.  Mr. Strombom's report then goes on

3    to address the numerous flaws and incorrect assumptions that render Ms.

4    Thompson's report unreliable, including its failure to consider the many

5    individualized inquiries that preclude a class-wide "benefit-of-the-bargain"

6    damages model in this case.  TZD Ex. 44 at 12–26; Strombom Decl. ¶¶ 36–78.

7    Dr. Strombom's opinion both supports TMS's *Daubert* challenge to Ms.

8    Thompson and rebuts Plaintiffs' damages theory.

9                    **2.    Mr. Okçuoğlu's Common Defect Opinion Should Be**

10                          **Excluded**

11          Unlike summary judgment, the admissibility inquiry at class certification

12    focuses on the reliability of the methodology underlying Mr. Okçuoğlu's ***class-***

13    ***wide*** opinion.  *Grodzitsky,* 2015 WL 2208184, at *4, shows why Mr. Okçuoğlu's

14    common defect opinion cannot meet that standard.  There, plaintiffs' expert

15    opined that the vehicle's window regulators were "insufficiently strong and prone

16    to premature and repeated failure."  *Id.*  But plaintiffs' expert only examined ten

17    regulators, performed no testing, and had no data showing systematic failures due

18    to the alleged defect, as opposed to other causes.  *Id.*  He also failed to show that

19    the regulators were made of "the same or meaningfully similar materials" and to

20    fully consider the design differences.  *Id.* at *5–6.  Based on these and other

21    problems, the court excluded the expert's class-wide defect opinion.  *Id.* at *6.

22          The same flaws are present in Mr. Okçuoğlu's common defect opinion.  As

23    set forth in Section III.B.4, Mr. Okçuoğlu fails to identify a uniform and particular

24    defect, instead suggesting no fewer than sixteen possibly defective design

25    elements.  He visually examined only three 2014 and 2015 model year Camrys

26    and only one HVAC system—a sample size insufficient to fashion a class-wide

27    opinion, particularly given the different HVAC designs across the Vehicles.  *See,*

28    *e.g.*, *Am. Honda Motor Co. v. Allen,* 600 F.3d 813, 818 (7th Cir. 2010) (expert

1  excluded where test conducted on one vehicle was extrapolated to fleet of

2  vehicles).  He observed no improper drainage, mold (on which he is unqualified to

3  provide an opinion), or odor in the three Class Vehicles he examined.  Worse, he

4  fails to consider differences among the Class Vehicles' HVAC systems and offers

5  no data that they systematically produce HVAC odor—much less any odor caused

6  by the alleged defect, as opposed other factors.  *See Bruce v. Harley-Davidson*

7  *Motor Co., Inc.*, No. CV 09–9588, 2012 WL 769604, at *5 (C.D. Cal. Jan. 23,

8  2012) (expert excluded because he did not "consider[]" and "test[]" "other

9  possible causes"); *In re Ford Tailgate Litig.,*11-cv-02953-RS, 2015 WL 7571772,

10  at *7 (N.D. Cal. Nov. 25, 2015) (same and no evidence establishing causal

11  relationship in defect theory); *see* Kuhn Decl. ¶¶ 54–104 (detailing deficiencies in

12  Mr. Okçuoğlu's methodology).  Mr. Okçuoğlu's common defect opinion is

13  unreliable and should be excluded.

14          **3.     Ms. Thompson's Damages Opinion Should Be Excluded**

15          As described in detail above, Ms. Thompson's damages opinion should be

16  excluded because it does not fit this case.  Despite using the phrase "benefit of the

17  bargain," her report and new equally flawed declaration (TZD Ex. 37) do not

18  actually measure "benefit of the bargain" damages.  Opp. at 21-22, 40-51; *see*

19  *Philips,* 2016 WL 7428810, at *25–26 (excluding expert damages testimony

20  because it did not "follow the model" described and did not fit liability theory).

21          In addition, Ms. Thompson's methodology is unreliable because it

22  improperly assumes that HVAC odor will manifest in all Class Vehicles;

23  improperly compensates owners for the costs of countermeasures for ten years,

24  even if those class members never experienced HVAC odor, their lease expires, or

25  they sell their Class Vehicles; and improperly fails to measure the cost of repairing

26  the actual alleged HVAC defect itself.  Opp. at 21-22, 49-51.  And despite giving

27  an opinion on the average cost of HVAC odor countermeasures over a 10-year

28  period, Ms. Thompson did no analysis of what it actually costs for HVAC

1  maintenance over time (DLS Ex. 50 at 126–127); did no research to support a 10-

2  year ownership period (*id.* at 65, 130–131); lumped together many different

3  HVAC-odor countermeasures with many different costs to reach her class-wide

4  average (*id.* at 152–158); and used a single unreliable spreadsheet for her analysis.

5  Strombom Decl. ¶¶ 36–64.

6       Lastly, Ms. Thompson is not qualified to give her opinions.  She is an

7  accountant, not an economist.  DLS Ex. 50 at 81.  She has no specialized expertise

8  with respect to the automobile industry, pricing, or the economics of automotive

9  repairs.  *Id.* at 88–90.  And she is not aware of the components of HVAC systems,

10  the types of countermeasures that form the basis for her opinion, or what class

11  members paid for the Class Vehicles.  *Id.* at 96–101, 112, 153–158.

12  **IX.  CONCLUSION**

13      **A.  Plaintiffs' Position**

14      For the foregoing reasons, Plaintiffs' Motion for Class Certification should

15  be granted.

16      **B.  TMS' Position**

17      For the foregoing reasons, Plaintiffs' Motion should be denied in full.

18

19  Dated:  December 6, 2017        Respectfully submitted,

20

21          Capstone Law APC

22

23      By: _____

24       Jordan L. Lurie
     Tarek H. Zohdy

25       Cody R. Padgett
     Karen L. Wallace

26       Attorneys for Plaintiffs Alfred Salas and
     Gloria Ortega

27

28

JOINT BRIEF RE: PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

1

Dated:  December 1, 2017          MORGAN, LEWIS & BOCKIUS LLP

2

3                                  By  /s/ David L. Schrader
                                       David L. Schrader
4                                      Esther K. Ro
                                       *Attorneys for Defendant*
5                                      TOYOTA MOTOR SALES, U.S.A., INC.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

JOINT BRIEF RE: PLAINTIFFS' MOTION FOR CLASS CERTIFICATION