1
2
3
4
5
6
7

**UNITED STATES DISTRICT COURT**

8
**CENTRAL DISTRICT OF CALIFORNIA**

9

10
| | |
|---|---|
| ALFRED SALAS, et al. | ) |
11 | | ) |
| Plaintiffs, | ) |
12 | | ) |
| v. | ) |
13 | | ) |
| TOYOTA MOTOR SALES, U.S.A., INC., | ) |
14 | et al. | ) |
| | ) |
15 | Defendants. | ) |

Case No. CV 15-8629 FMO (Ex)

**ORDER RE: MOTION FOR CLASS CERTIFICATION**

16

17       Having reviewed all the briefing filed with respect to Plaintiffs' Motion for Class Certification

18  (Dkt. 88, "Motion"), the court finds that oral argument is not necessary to resolve the Motion, see

19  Fed. R. Civ. P. 78; Local Rule 7-15; Willis v. Pac. Mar. Ass'n, 244 F.3d 675, 684 n. 2 (9th Cir.

20  2001), and concludes as follows.

21                                    **BACKGROUND**

22       On October 21, 2016, Alfred Salas ("Salas") and Gloria Ortega ("Ortega") (collectively,

23  "plaintiffs"), on behalf of themselves and all others similarly situated, filed the operative Second

24  Amended Complaint ("SAC") against Toyota Motor Sales, U.S.A., Inc. ("Toyota" or "defendant")

25  asserting claims for: (1) violations of California's Consumers Legal Remedies Act ("CLRA"), Cal.

26  Civ. Code §§ 1750, et seq.; (2) violations of California's Unfair Competition Law ("UCL"), Cal. Bus.

27  & Prof. Code §§ 17200, et seq.; (3) breach of implied warranty pursuant to California's Song-

28  Beverly Consumer Warranty Act ("Song Beverly Act"), Cal. Civ. Code §§ 1790-1795.8; (4) breach

1  of implied warranty pursuant to the Magnuson-Moss Warranty Act, 15 U.S.C. §§ 2301, et seq.;

2  and (5) unjust enrichment.  (See Dkt. 52, SAC at ¶¶ 77-100).  Plaintiffs allege that the Toyota

3  Camry XV50 vehicle, for model years 2012 through 2015, has a "uniform and widespread defect

4  in the Heating, Ventilation, and Air Conditioning ('HVAC') system" that "cause[s], among other

5  problems, emissions of noxious and foul odors from debris and contamination in the HVAC

6  system, as well as possible growth of mold."[1]  (Id. at ¶¶ 1-3, 51-52).

7          On September 29, 2017, the court granted in part and denied in part defendant's motion

8  for summary judgment, granting it with respect to Ortega's implied warranty claims.  (See Dkt. 81,

9  Court's Order of September 29, 2017 ("MSJ Order") at 9).  The summary judgment motion was

10  denied in all other respects.  (Id.).

11          Plaintiffs seek an order certifying the following classes or subclasses pursuant to Rule 23

12  of the Federal Rules of Civil Procedure:[2]

13                  Rule 23(b)(2):  a California-only . . . class consisting of all persons in

14                  California who purchased or leased a 2012-2015 Toyota Camry XV 50 model

15                  vehicle from an authorized Toyota dealer and still own or lease their vehicles.

16                  ["23(b)(2) Class"][3]

17

18                  Rule 23(b)(3):  (1) A California-only class consisting of all persons in

19                  California who purchased or leased a 2012-2015 Toyota Camry XV 50 model

20                  vehicle from an authorized Toyota dealer; (2) a California CLRA sub-class

21                  consisting of all members of the California class who are "consumers" within

22                  the meaning of California Civil Code § 1761(d).  ["23(b)(3) Class"]

23  _____

24          [1] Capitalization, quotation marks, punctuation, and emphasis in record citations may be altered
without notation.

25          [2] All "Rule" references are to the Federal Rules of Civil Procedure unless otherwise indicated.

26
27          [3] Plaintiffs initially sought to certify a nationwide class for equitable relief under Rule 23(b)(2),
(see Dkt. 88, Joint Brief Re: Plaintiffs' Motion for Class Certification ("Joint Br.") at 5), but
subsequently withdrew that request.  (See Dkt. 90, Plaintiffs' Supplemental Memorandum in

28  Support of Class Certification ("Plfs' Supp. Memo") at 1 n. 1).

Rule 23(c)(4):  a class consisting of all persons in California who purchased or leased a 2012-2015 Toyota Camry XV 50 model vehicle from an authorized Toyota dealer.[4]  ["23(c)(4) Class"]

(Dkt. 88, Joint Br. at 5).

## LEGAL STANDARD

The court has "broad discretion to determine whether a class should be certified, and to revisit that certification throughout the legal proceedings before the court." United Steel, Paper & Forestry, Rubber Mfg. Energy, Allied Indus. & Serv. Workers Int'l Union, AFL-CIO, CLC v. ConocoPhillips Co., 593 F.3d 802, 810 (9th Cir. 2010).  The court need only form a "reasonable judgment" on each certification requirement "[b]ecause the early resolution of the class certification question requires some degree of speculation[.]" Gable v. Land Rover N. Am., Inc., 2011 WL 3563097, *3 (C.D. Cal. 2011) (internal quotation marks omitted).

Rule 23 permits a plaintiff to sue as a representative of a class if:

(1) the class is so numerous that joinder of all members is impracticable;

(2) there are questions or law or fact common to the class;

(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

(4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).  Courts refer to these requirements by the following shorthand: "numerosity, commonality, typicality and adequacy of representation[.]" Mazza v. Am. Honda Motor Co., 666 F.3d 581, 588 (9th Cir. 2012).  In addition to fulfilling the four prongs of Rule 23(a), the proposed class must meet at least one of the three requirements listed in Rule 23(b).  See Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 345, 131 S.Ct. 2541, 2548 (2011).

---

[4]  Plaintiffs seek certification of the 23(c)(4) in the alternative should the court decline to certify the Rule 23(b)(2) and Rule 23(b)(3) classes.  (See Dkt. 88, Joint Br. at 5).

Rule 23 requires the party seeking class certification to "affirmatively demonstrate . . . compliance with the Rule[.]" Dukes, 564 U.S. at 350, 131 S.Ct. at 2551. A court must conduct a "rigorous" class certification analysis. Id. at 351, 131 S.Ct. 2551 (internal quotation marks omitted). On occasion, this analysis "will entail some overlap with the merits of the plaintiff's underlying claim[,]" and "sometimes it may be necessary for the court to probe behind the pleadings[.]" Id. at 350-51, 131 S.Ct. 2551 (internal quotation marks omitted). However, courts must remember that "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage." Amgen Inc. v. Conn. Ret. Plans & Tr. Funds, 568 U.S. 455, 466, 133 S.Ct. 1184, 1194-95 (2013); see id., 133 S.Ct. 1195 ("Merits questions may be considered to the extent – but only to the extent – that they are relevant to determining whether the Rule 23 prerequisites . . . are satisfied."); Ellis v. Costco Wholesale Corp., 657 F.3d 970, 983 n. 8 (9th Cir. 2011) (The district court must examine the merits of the underlying claim "only inasmuch as it must determine whether common questions exist; not to determine whether class members could actually prevail on the merits of their claims. . . . To hold otherwise would turn class certification into a mini-trial.") (citations omitted)

## DISCUSSION

I.    RULE 23(a) REQUIREMENTS.

Toyota does not directly address plaintiffs' arguments regarding the Rule 23(a) requirements of numerosity, typicality, or adequacy of representation.[5] (See, generally, Dkt. 88, Joint Br.). It only challenges whether plaintiff has satisfied the Rule 23(a) commonality requirement. (See id. at 28-37).

A.    Numerosity.

A putative class may be certified only if it "is so numerous that joinder of all members is impracticable[.]" Fed. R. Civ. P. 23(a)(1). Although impracticability does not hinge only on the

---

[5] Given the Ninth Circuit's decision in Briseno v. ConAgra Foods, Inc., 844 F.3d 1121 (9th Cir.), cert. denied, 138 S.Ct. 313 (2017), in which the Ninth Circuit explained that "Rule 23 does not impose a freestanding administrative feasibility prerequisite to class certification[,]" id. at 1126, the court does not address plaintiffs' argument regarding ascertainability.

1   number of members in the putative class, joinder is usually impracticable if a class is "large in

2   numbers[.]"  See Jordan v. Cty. of Los Angeles, 669 F.2d 1311, 1319 (9th Cir.), vacated on other

3   grounds by Cty. of Los Angeles v. Jordan, 459 U.S. 810 (1982) (class sizes of 39, 64, and 71 are

4   sufficient to satisfy the numerosity requirement).  "As a general matter, courts have found that

5   numerosity is satisfied when class size exceeds 40 members[.]"  Slaven v. BP Am., Inc., 190

6   F.R.D. 649, 654 (C.D. Cal. 2000); see Tait v. BSH Home Appliances Corp., 289 F.R.D. 466, 473-

7   74 (C.D. Cal. 2012).  Because defendant has confirmed that as of May 2016, 252,706 Class

8   Vehicles had been sold to authorized dealerships in California, (see Dkt. 88, Joint Br. at 23;

9   Evidentiary Appendix Regarding Plaintiffs' Motion for Class Certification, ("Joint Appx."), Exh. 32

10   at 195-96[6]), the court finds that the putative class is sufficiently numerous.

11        B.     Commonality.

12        Commonality is satisfied if "there are common questions of law or fact common to the

13   class."  Fed. R. Civ. P. 23(a)(2).  It requires plaintiffs to demonstrate that their claims "depend

14   upon a common contention . . . [whose] truth or falsity will resolve an issue that is central to the

15   validity of each one of the claims in one stroke."  Dukes, 564 U.S. at 350, 131 S.Ct. at 2551; see

16   also Wolin v. Jaguar Land Rover N. Am., LLC, 617 F.3d 1168, 1172 (9th Cir. 2010) (The

17   commonality requirement demands that "class members' situations share a common issue of law

18   or fact, and are sufficiently parallel to insure a vigorous and full presentation of all claims for

19   relief.") (internal quotation marks omitted).  "The plaintiff must demonstrate the capacity of

20   classwide proceedings to generate common answers to common questions of law or fact that are

21   apt to drive the resolution of the litigation."  Mazza, 666 F.3d at 588 (internal quotation marks

22   omitted).  "This does not, however, mean that every question of law or fact must be common to

23   the class; all that Rule 23(a)(2) requires is a single significant question of law or fact."  Abdullah

24   v. U.S. Sec. Assocs., Inc., 731 F.3d 952, 957 (9th Cir. 2013), cert. denied, 135 S.Ct. 53 (2014)

25   (emphasis and internal quotation marks omitted); see Mazza, 666 F.3d at 589.  Proof of

26

27   _____

28        [6] Citations to the Joint Appendix are to the page numbers located on the bottom center of the
     exhibits, unless otherwise indicated.

1  commonality under Rule 23(a) is "less rigorous" than the related preponderance standard under

2  Rule 23(b)(3).  See Mazza, 666 F.3d at 589 (characterizing commonality as a "limited burden[,]"

3  stating that it "only requires a single significant question of law or fact[,]" and concluding that it

4  remains a distinct inquiry from the predominance issues raised under Rule 23(b)(3)); Hanon v.

5  Chrysler Corp., 150 F.3d 1011, 1019-20 (9th Cir. 1998).  "The existence of shared legal issues

6  with divergent factual predicates is sufficient, as is a common core of salient facts coupled with

7  disparate legal remedies within the class."  Hanon, 150 F.3d at 1019.

8        As an initial matter, the court notes that in addressing commonality under Rule 23(a)(2),

9  Toyota commingles the Rule 23(a)(2) and Rule 23(b)(3) requirements and case law, as well as

10 plaintiffs' arguments, rather than focusing only on the more permissive commonality requirement.[7]

11 (See Dkt. 88, Joint Br. at 28-37).  Thus, the court will address the majority of Toyota's arguments

12 in connection with its discussion of Rule 23(b)(3).  Here, the court will address Toyota's contention

13 that there is no common evidence of a uniform design defect or the cause of any HVAC odor.

14 Toyota asserts that "the differences in design among the Class Vehicles and Plaintiffs' inability to

15 identify a specific component uniformly causing improper drainage, organic growth, and HVAC

16 odor in all Class Vehicles precludes certification of Plaintiffs' UCL and CLRA claims as a matter

17 of law[,]" (Dkt. 88, Joint Br. at 31), as well as plaintiffs' implied warranty claims.  (See id. at 29-30).

18 Plaintiffs respond that "[d]ifferences in the design of the HVAC system that may be asserted by

19 [Toyota], such as automatic versus manual controls, are immaterial and unrelated to the design

20

21        [7] For instance, in addressing commonality under Ruler 23(a)(2), Toyota cites Torres v. Nissan

22 N. Am. Inc., 2015 WL 5170539, *5 (C.D. Cal. 2015) for the proposition that "individual questions
   about whether a defect is substantially certain to occur predominate[.]"  (Dkt. 88, Joint Br. at 30).

23 But as can be seen by the quoted language, the court was analyzing predominance under Rule
   23(b)(3), not commonality under Rule 23(a)(2).  Toyota also cites to this court's decision in Ono

24 v. Head Racquet Sports USA, Inc., 2016 WL 6647949 (C.D. Cal. 2016).  (See Dkt. 88, Joint Br.
   at 35).  The cited portions of the Ono decision, however, relate to the predominance requirement,

25 which the court found plaintiff had failed to satisfy.  See Ono, 2016 WL 6647949, at *9-*15.
   Indeed, the court found that the plaintiff in Ono had satisfied Rule 23(a)(2).  See id. at *9 ("With

26 such common evidence, a number of elements of a number of plaintiff's claims can be proven on

27 a classwide basis, and that is all Rule 23(a)(2) requires.").  Aside from citations to case law
   addressing Rule 23(b)(3), Toyota also referred to and addressed plaintiffs' arguments regarding

28 predominance in its Rule 23(a)(2) commonality section.

specifications of the evaporator housing and related components.  The HVAC Defect lies in the design of the HVAC unit – not its controls – and is susceptible to proof by generalized evidence." (Id. at 39).

Plaintiffs' expert, Murat Okcuoglu ("Okcuoglu"), opined that the design of the HVAC system in the Class Vehicles "lack efficient drainage and contain nooks and crevices that can form ideal habitats for biological matter growth[,]" that the "warm, humid, dark crevices present inside this HVAC system may harbor organic matter[,]" and that the "foam material design used around the evaporator also has several crevices and inherent porosity that may harbor moisture and growth." (Joint Appx., Exh. 2 ("Okcuoglu Rebuttal Report") at 22-23).  Okcuoglu further opined that "the steps at the bottom of the evaporator housing create obstacles for efficient drainage and the sharp corners create crevices for contaminants." (Id. at 23).  Moreover, "[t]he minimal drain slope of the sump section under the evaporator housing does not allow for efficient drainage of water" that "is not only essential for minimizing moisture but also necessary to help clean and flush contaminants with the condensed water." (Id.; see also id. at 27-28).  He concluded that the defective design allows condensing water to accumulate, "naturally present organic contaminants to be trapped, kept moist and cultivate organic matter[,. . . causing] strong unpleasant fumes and odors[.]" (Joint Appx., Exh. 3 ("Okcuoglu Initial Report") at 42).  Finally, as plaintiffs point out, Toyota's expert, Robert Kuhn ("Kuhn"), agreed that the design of the HVAC system in the Subject Vehicles is the same for every Class Vehicle. (See Dkt. 88, Joint Br. at 8; Joint Appx., Exh. 4 ("Kuhn Depo.") at 70).  Thus, the differences identified by Kuhn do not affect the design defect identified by plaintiffs. (See Dkt. 88, Joint Br. at 8; see also Joint Appx., Exh. 2 (Okcuoglu Rebuttal Report) at 18 (stating that the HVAC systems "differ only on remote control and post-treated air ducting details" and that the HVAC systems in all Class Vehicles "share the evaporator and housing design where the organic matter is accumulated and cultivated")).  As plaintiffs state, "two of the design elements [Toyota] identifies were changes implemented to mitigate offensive HVAC odor, and one exacerbates the problem." (Dkt. 90, Plfs' Supp. Memo at 6).  In short, under the circumstances here, the court is not persuaded that any variances identified by Toyota in the HVAC systems of

1   the Class Vehicles preclude class certification.[8]  See, e.g., Philips v. Ford Motor Co., 2016 WL

2   7428810, *10 (N.D. Cal. 2016) (rejecting similar argument in connection with the typicality

3   requirement)

4        The cases relied on by Toyota are either distinguishable or unpersuasive.  For example,

5   in Grodzitsky v. Am. Honda Motor Co., 2014 WL 718431 (C.D. Cal. 2014), plaintiffs alleged that

6   vehicles sold by Honda contained defective window regulators, see id. at *1, and identified the

7   defect variably throughout the litigation.  See id. at *1 & *4.  The court noted that "all versions of

8   the defect alleged [were] that given the mechanical structure of the regulators, the materials used

9   for certain components may not be strong enough to prevent the regulators from failing."  Id. at

10  *5.  However, defendant showed that the relevant components were not necessarily made from

11  the same materials throughout the vehicles at issue.  Id.  Unlike Grodzitsky, here the alleged

12  HVAC defect is based on its design, not the materials used.  Whether the regulators at issue in

13  Grodzitsky were "strong enough" would no doubt depend on the materials used.  Additionally,

14  Grodzitsky involved a purported defect in "[o]ver one-hundred different vehicle model and model-

15  year variations[.]"  Id. at *1.  By contrast, this case involves only the Toyota Camry XV50 model

16  (for years 2012 through 2015).  (See Dkt. 88, Joint Br. at 5).

17       Cholakyan v. Mercedez-Benz, USA, 281 F.R.D. 534 (C.D. Cal. 2012) also does not aid

18  Toyota since in that case, the court found that the plaintiff failed to show commonality because

19  "despite his efforts to identify a 'water management system' in the class vehicles, the evidence that

20  ha[d] been adduced show[ed] that th[e] so-called 'system' [was] in fact an amalgamation of many

21  different vehicle parts.  There [was] no evidence that the[] disparate parts [were] conceptually part

22  of a single system or physically connected to one another in any material way."  Id. at 552; see

23  also id. at 554 (additionally finding that "the parties adduce[d] evidence that there [was] substantial

24  _____

25       [8]  Toyota seeks to exclude Okcuoglu's expert opinion regarding a common defect.  (See Dkt.
     88, Joint Br. at 68-69).  Toyota contends that his class-wide defect opinion is flawed because he

26   failed to identify a uniform and particular defect, and inspected only three Toyota Camry XV 50
     vehicles and one HVAC system.  (See id. at 68).  Okcuoglu's inspection of three vehicles and one

27   HVAC system – of the one model at issue – as well as his observations, go to the weight of his
     testimony, not its admissibility.  But in any event, as discussed above, the differences identified

28   by Kuhn do not affect the design defect identified by Okcuoglu.

1    design variation among the class vehicles").  That is not the case here as plaintiffs have identified

2    and proffered expert evidence regarding the cause of the odor, i.e., the HVAC system.  See id.

3    at 553 ("In other cases involving alleged vehicle defects, plaintiffs have identified a single part or

4    unified system within the vehicle as the alleged source of the problems.").  The court in Butler v.

5    Porsche Cars N. Am., Inc., 2017 WL 1398316 (N.D. Cal. 2017), another case on which Toyota

6    relies, addressed the existence of a classwide defect under the predominance prong and found

7    the plaintiff failed to show that common issues predominated regarding the existence of a defect.

8    See id. at *6-*7, *9.  Not only did the Butler plaintiff, who did not produce an expert to opine about

9    the nature of the alleged defect, rely "almost exclusively" on a preliminary and ambiguous report

10   prepared by the defendant's employee, see id. at *7, more significantly for purposes of this case,

11   the defendant produced unrebutted evidence that the defect was the "result of a 'unique'

12   manufacturing abnormality, not a design defect."  Id. at *7-*8.  Again, that is not the case here, as

13   plaintiffs' expert opined that the HVAC system is defectively designed.  Nor does Toyota attribute

14   the odor issue to a manufacturing defect.  (See, generally, Dkt. 88, Joint Br.).

15        In short, the court finds commonality satisfied given that the "claims of all prospective class

16   members involve the same alleged defect . . . found in vehicles of the same make and model."

17   Wolin, 617 F.3d at 1172 (noting that plaintiffs easily satisfied the commonality requirement in an

18   auto defect class action).  Here, there are several questions of fact and law that are common to

19   the class, including:  whether a defect exists in the Toyota Camry XV 50, whether Toyota knew

20   about it, whether Toyota concealed the defect, whether Toyota violated consumer protection

21   statutes as a result, and whether the alleged defect rendered the Toyota Camry XV 50

22   unmerchantable.  See, e.g., Edwards v. Ford Motor Co, 603 F.Appx. 538, 540 (9th Cir. 2015)

23   ("The district court correctly concluded that whether a defect existed and whether Ford had a duty

24   to disclose the defect were both questions common to the class under Rule 23(a)(2).").  These

25   common questions of law and fact are susceptible to common proof – that is, testimony by

26   plaintiffs and their expert regarding the existence of an HVAC defect – the "truth or falsity" of which

27   "will resolve an issue that is central to the [claims'] validity[.]"  Dukes, 564 U.S. at 350, 131 S.Ct.

28   at 2552; see also Keegan v. Am. Honda Motor Co., Inc., 284 F.R.D. 504, 524 (C.D. Cal. 2012)

("The fact that some vehicles have not yet manifested premature or excessive tire wear [due to the defect] is not sufficient, standing alone, to defeat commonality.").

    C.    Typicality.

    Typicality requires a showing that "the claims or defenses of the representative parties are typical of the claims or defenses of the class[.]" Fed. R. Civ. P. 23(a)(3). The purpose of this requirement "is to assure that the interest of the named representative aligns with the interests of the class." Wolin, 617 F.3d at 1175 (internal quotation marks omitted). "The requirement is permissive, such that representative claims are typical if they are reasonably coextensive with those of absent class members; they need not be substantially identical." Just Film, Inc. v. Buono, 847 F.3d 1108, 1116 (9th Cir. 2017) (internal quotation marks omitted). "The test of typicality is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." Wolin, 617 F.3d at 1175 (internal quotation marks omitted). The typicality requirement is "satisfied when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." Stearns v. Ticketmaster Corp., 655 F.3d 1013, 1019 (9th Cir. 2011), cert. denied, 566 U.S. 962 (2012), abrogated on other grounds in Comcast Corp. v. Behrend, 569 U.S. 27, 133 S.Ct. 1426 (2013) (internal quotation marks omitted).

    Toyota did not challenge or otherwise oppose this factor. (See, generally, Dkt. 88, Joint Br.). In any event, the court finds that it is satisfied because plaintiffs' claims are based on the same facts, an alleged HVAC defect in the Toyota Camry XV 50 that Toyota failed to disclose, and the same legal and remedial theories as the claims of the rest of the class members.

    D.    Adequacy of Representation.

    Rule 23(a)(4) permits certification of a class action if "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). The Ninth Circuit uses a two-prong test to determine whether the representative parties meet this standard: "(1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?"

1  Ellis, 657 F.3d at 985 (internal quotation marks omitted).  "Adequate representation depends on,

2  among other factors, an absence of antagonism between representatives and absentees, and a

3  sharing of interest between representatives and absentees."  Id.  The adequacy of counsel is also

4  considered under Rule 23(g).

5        Again, defendant does not contest this factor.  (See, generally, Dkt. 88, Joint Br.).  In any

6  event, the court finds that neither class counsel nor the named plaintiffs have any conflicts of

7  interest with class members, and that counsel and the named plaintiffs have established that they

8  will prosecute the action vigorously on behalf of the classes.  (See id. at 26-28; Joint Appx., Exh.

9  36 (firm resume)).

10  II.      RULE 23(b)(3) REQUIREMENTS.

11        Certification under Rule 23(b)(3) is proper "whenever the actual interests of the parties can

12  be served best by settling their differences in a single action."  Hanon, 150 F.3d at 1022 (internal

13  quotation marks omitted).  Fed. R. Civ. P. 23(b)(3) requires two different inquiries, specifically a

14  determination as to whether (1) "questions of law or fact common to class members predominate

15  over any questions affecting only individual members[;]" and (2) "a class action is superior to other

16  available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).

17        A.      Predominance.

18        "Though there is substantial overlap between [the Rule 23(a)(2) commonality test and the

19  Rule 23(b)(3) predominance test], the 23(b)(3) test is far more demanding[.]"[9]  Wolin, 617 F.3d at

20  1172 (internal quotation marks omitted).  "The Rule 23(b)(3) predominance inquiry tests whether

21  proposed classes are sufficiently cohesive to warrant adjudication by representation."  Amchem

22  Prods., Inc. v. Windsor, 521 U.S. 591, 623, 117 S.Ct. 2231, 2249 (1997).  "This calls upon courts

23  to give careful scrutiny to the relations between common and individual questions in a case."

24  Tyson Foods, Inc. v. Bouaphakeo, 136 S.Ct. 1036, 1045 (2016).  "The predominance inquiry asks

25  whether the common, aggregation-enabling, issues in the case are more prevalent or important

26  ——————————————

27        [9]  Given the substantial overlap between Rule 23(a) and Rule 23(b)(3), and to minimize
   repetitiveness, the court hereby incorporates the Rule 23(a) discussion set forth above.  See supra
28  at § I.B.

than the non-common, aggregation-defeating, individual issues.  When one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members." Id. (citations and internal quotation marks omitted); see Wang v. Chinese Daily News, Inc., 737 F.3d 538, 545 (9th Cir. 2013) ("The predominance analysis under Rule 23(b)(3) focuses on the relationship between the common and individual issues in the case and tests whether the proposed classes are sufficiently cohesive to warrant adjudication by representation.") (internal quotation marks omitted); In re Wells Fargo Home Mortg. Overtime Pay Litig., 571 F.3d 953, 957 (9th Cir. 2009) (The "focus is on the relationship between the common and individual issues.") (internal quotation marks omitted).  The class members' claims do not need to be identical.  See Local Joint Exec. Bd. of Culinary/Bartender Trust Fund v. Las Vegas Sands, Inc., 244 F.3d 1152, 1163 (9th Cir.), cert. denied, 534 U.S. 973 (2001) (allowing "some variation" between class members); Abdullah, 731 F.3d at 963 (explaining that "there may be some variation among individual plaintiffs' claims") (internal quotation marks omitted).  The focus is on whether the "variation [in the class member's claims] is enough to defeat predominance under Rule 23(b)(3)." Local Joint Exec. Bd. of Culinary/Bartender Trust Fund, 244 F.3d at 1163; see Blackie v. Barrack, 524 F.2d 891, 902 (9th Cir. 1975), cert. denied, 429 U.S. 816 (1976) ("[C]ourts have taken the common sense approach that the class is united by a common interest in determining whether defendant's course of conduct is in its broad outlines actionable, which is not defeated by slight differences in class members' positions[.]").

The court now turns to the elements of the claims at issue to determine whether common questions of law or fact predominate.  See Abdullah, 731 F.3d at 957 (Where a plaintiff's claims arise under state law, the court must "look[] to state law to determine whether the plaintiffs' claims – and [defendant's] affirmative defenses – can yield a common answer that is 'apt to drive the resolution of the litigation.'") (quoting Dukes, 564 U.S. at 350, 131 S.Ct. at 2551); Erica P. John Fund, Inc. v. Halliburton Co., 563 U.S. 804, 809, 131 S.Ct.  2179, 2184 (2011) ("Considering

1  whether questions of law or fact common to class members predominate begins . . . with the

2  elements of the underlying cause of action.") (internal quotation marks omitted).

3            **1.    UCL and CLRA Claims**.

4            The UCL prohibits "unfair competition," broadly defined as "any unlawful, unfair or

5  fraudulent business act or practice[.]"  Cal. Bus. & Prof. Code § 17200; see Cel-Tech Commc'ns,

6  Inc. v. L.A. Cellular Tel. Co., 20 Cal.4th 163, 180 (1999).  The CLRA prohibits particular "unfair

7  methods of competition and unfair or deceptive acts or practices" in transactions for the sale or

8  lease of goods to consumers.  Cal. Civ. Code § 1770(a); see Daugherty v. Am. Honda Motor Co.,

9  Inc., 144 Cal.App.4th 824, 833 (2006).  Unlawful practices include "[r]epresenting that goods or

10 services have . . . characteristics . . . [and] benefits . . . which they do not have[,]" Cal. Civ. Code

11 § 1770(a)(5), and "[r]epresenting that goods . . . are of a particular standard, quality, or grade . .

12 . if they are of another."  Id. at § 1770(a)(7).  Fraudulent omissions are actionable under both the

13 CLRA and the UCL.  See Daugherty, 144 Cal.App.4th at 835 ("[A] claim may be stated under the

14 CLRA in terms constituting fraudulent omissions[.]"); Daniel v. Ford Motor Co., 806 F.3d 1217,

15 1225 (9th Cir. 2015) ("Daniel I") ("Fraudulent omissions are actionable under both [the CLRA and

16 UCL]."); Collins v. eMachines, Inc., 202 Cal.App.4th 249, 255-56 (2011) (identifying four

17 circumstances under which a duty to disclose arises in omission cases).

18            "Unlike common-law fraud claims that focus on the victim's reliance or damages, the UCL

19 focuses on the perpetrator's behavior: 'to state a claim under . . . the UCL . . . it is necessary only

20 to show that members of the public are likely to be deceived.'"  Berger v. Home Depot USA, Inc.,

21 741 F.3d 1061, 1068 (9th Cir. 2014), abrogated on other grounds by Microsoft Corp. v. Baker, 137

22 S.Ct. 1702 (2017) (quoting In re Tobacco II Cases, 46 Cal.4th 298, 312 (2009)).  "Actual

23 falsehood, the perpetrator's knowledge of falsity, and perhaps most importantly, the victim's

24 reliance on the false statements – each of which are elements of common-law fraud claims – are

25 not required to show a violation of California's UCL."  Id.  "However, the question of likely

26 deception does not automatically translate into a class-wide question."  Berger, 741 F.3d at 1068;

27 see also Stearns, 655 F.3d at 1020 ("We do not, of course, suggest that predominance would be

28 shown in every California UCL case.").  Rather, "class certification of UCL claims is available only

1  to those class members who were actually exposed to the business practices at issue." Berger,

2  741 F.3d at 1068; Stearns, 655 F.3d at 1020-21.

3      Analysis under California's CLRA is similar.  To establish a CLRA claim, the plaintiff must

4  show that:  (1) the defendant's conduct was deceptive; and (2) that the deception caused plaintiff

5  to be harmed.  Stearns, 655 F.3d at 1022; see In re Vioxx Class Cases, 180 Cal.App.4th 116, 129

6  (2009).  In the class context, a CLRA claim "requires each class member to have an actual injury

7  caused by the unlawful practice."  Stearns, 655 F.3d at 1022; Edwards, 603 F.Appx. at 541.  As

8  with UCL claims, courts often find predominance satisfied in CLRA cases because "causation, on

9  a classwide basis, may be established by materiality, meaning that if the trial court finds that

10 material misrepresentations have been made to the entire class, an inference of reliance arises

11 as to the class[.]"  Tait, 289 F.R.D. at 480 (internal quotation marks and emphasis omitted)

12 (collecting cases).  "If the misrepresentation . . . is not material as to all class members, the issue

13 of reliance would vary from consumer to consumer and the class should not be certified."  Stearns,

14 655 F.3d at 1022-23 (internal quotation marks omitted); see also In re Vioxx Class Cases, 180

15 Cal.App.4th 116, 129 (2010) ("[I]f the issue of materiality or reliance is a matter that would vary

16 from consumer to consumer, the issue is not subject to common proof, and the action is properly

17 not certified as a class action.").

18      Thus, in class actions involving the UCL and the CLRA, "an inference of reliance arises as

19 to the class" only when "material misrepresentations have been made to the entire class[.]"  In re

20 Vioxx Class Cases, 180 Cal.App.4th at 129; see also Philips, 2016 WL 7428810, at *15 (applying

21 rule to omissions case); Keegan, 284 F.R.D. at 530 (stating rule in auto defect omissions case).

22      Toyota contends that "individualized issues predominate as to each element" of plaintiffs'

23 UCL and CLRA claims.[10]  (See Dkt. 88, Joint Br. at 30).  Toyota asserts that whether the HVAC

24 odor manifested during the warranty period cannot be shown through common evidence such that

25

26  _____

27      [10]  As noted above, Toyota addressed plaintiffs' arguments regarding predominance under the
commonality section.  With respect to Toyota's contention that there is no common evidence of
28  a uniform design defect, (see Dkt. 88, Joint Br. at 31), the court addressed and rejected that
contention above.  See supra at § I.B.

1    a duty to disclose will hinge upon Class Vehicle-specific facts.[11]  (See Dkt. 88, Joint Br. at 32).

2    However, "proof of a manifestation of a defect is not a prerequisite to class certification." Wolin,

3    617 F.3d at 1173.  Further, that Wolin did not address California law, as defendant notes, (see

4    Dkt. 88, Joint Br. at 32), does not undermine its applicability to this case.  Indeed, several courts

5    have applied Wolin to class actions involving the UCL and CLRA.  See, e.g., Tait, 289 F.R.D. at

6    479 (relying on Wolin in case involving washing machines alleged to have a defective design that

7    resulted in their propensity to develop biofilm, mold, mildew, bacteria and foul odors); Keegan, 284

8    F.R.D. at 529 ("While it is true that Wolin addressed the substantive law of Michigan and Florida,

9    not California law, the Ninth Circuit's application of Rule 23(b) did not turn on the substantive law

10   at issue.  Indeed, the court's discussion of predominance and superiority makes almost no

11   reference to the substantive law underlying plaintiffs' claims[.]").

12        Toyota also argues that there is no common evidence regarding the cause of the HVAC

13   odor.  (See Dkt. 88, Joint Br. at 33-34).  It contends that Okcuoglu "concedes that HVAC odor can

14   be affected by numerous factors that differ for each Class Vehicle, apart from the alleged defect[,]"

15   including driver behavior.[12]  (Id.).  However, Wolin rejected a similar argument.  See Wolin, 617

16   F.3d at 1173 ("Land Rover argues that the evidence will demonstrate that the prospective class

17   members' vehicles do not suffer from a common defect, but rather, from tire wear due to individual

18   factors such as driving habits and weather.  Thus, according to Land Rover, the district court

19   correctly decided not to certify a class because appellants failed to prove that their tires wore

20   prematurely due to a defect.  However, we have held that proof of the manifestation of a defect

21   _____

22        [11] Toyota argues that there is no common evidence of a duty to disclose.  (See Dkt. 88, Joint
     Br. at 31-33).  According to Toyota, the UCL and CLRA claims are not susceptible to class-wide

23   proof because there is no evidence of any health hazard (e.g., mold) associated with the HVAC
     system of a single Class Vehicle, much less all Class Vehicles.  (See id. at 32).  However,

24   plaintiffs' claims do not rely on the existence of mold.  (See Dkt. 81, MSJ Order at 9 n. 11).

25        [12] Toyota cites Cholakyan in support of this contention.  (See Dkt. 88, Joint Br. at 34).  As

26   discussed above, the plaintiff in Cholakyan failed to identify a single system or show that disparate
     parts were physically connected to one another in a material way that would permit plaintiff to

27   show a uniform defect that caused the complained-of water leaks.  See 281 F.R.D. at 552.  That
     is not the case here where plaintiffs have identified the HVAC system as the cause of the mold-like

28   odor.

1  is not a prerequisite to class certification."); see also In re Arris Cable Modem Consumer Litig., 327

2  F.R.D. 334, 361-62 (N.D. Cal. 2018) ("Defendant argues that because it would be difficult to

3  determine whether any particular incidence of slowness that a user experiences is actually

4  attributable to the Modem, as opposed to some other network element, common questions do not

5  predominate.  However, the Ninth Circuit's decision in Wolin defeats this argument."); id. at 362

6  ("Individual factors may affect class members' Internet performance, but these individual factors

7  do not affect the ultimate question whether the Modems were sold with latency defects.").  While

8  there may be "some evidence that [moldy-like odor] has a number of causes, the fact that the

9  existence of alternative causes for [the odor] may make it difficult for plaintiffs to prove materiality

10  . . . does not demonstrate a lack of predominance."  Keegan, 284 F.R.D. at 531.

11  　　　Next, Toyota asserts that there is no common evidence of exposure or materiality.  (See

12  Dkt. 88, Joint Brief at 34-36).  According to Toyota, the information about the possibility of HVAC

13  odor was disclosed in the owner's manual for the Class Vehicle, which is available on Toyota's

14  website, and "thus it would require extensive individualized inquiries to know which class members

15  had the opportunity to read these portions of the owner's manuals before purchasing their

16  vehicles."  (Id. at 35); Joint Appx., Exh. C (Hare Decl.) at ¶ 4; id., Exh. 54 ((exemplars)).

17  　　　Plaintiffs respond that "[i]t is hard to see how an 'owner's' manual can disclose anything to

18  prospective purchasers . . . [since b]y the time the owner or lessee receives the owner's manual,

19  it is too late and the disclosure too little."  (Dkt. 90, Plfs' Supp. Br. at 9-10).  The court agrees.

20  Barry Hare, an employee of Toyota, who manages the "Technical Analysis Group," states that the

21  manuals "accompany Toyota vehicles at the time of their initial retail sale."  (Joint Appx., Exh. C

22  (Hare Decl.) at ¶ 4).  As such, they were provided after the purchase, and not prior to a

23  consumer's decision to purchase the vehicle.  Although Toyota states that the owner's manual is

24  "available online," (see Dkt. 88, Joint Br. at 20; Joint Appx., Exh. C (Hare Decl.) at ¶ 4), it gives

25  no indication when the manuals were first made available online.  (See, generally, id.).  Nor does

26  Toyota explain why it is reasonable to believe that a prospective purchaser of an automobile would

27  review the owner's manual prior to purchasing the vehicle.  In order for Toyota's disclosure theory

28

16

to be valid, Toyota must establish that, in considering whether to buy a car, the average consumer reviews the owner's manual prior to purchasing a car.

Moreover, even assuming it was reasonable for a consumer to review the owner's manual on the internet prior to purchasing a car, that would not defeat predominance here, because the milktoast language of the purported disclosure is insufficient:  "During use, various odors from inside and outside the vehicle may enter into and accumulate in the air conditioning system.  This may then cause odor to be emitted from the vents."  (See Joint Appx., Exh. 54 (2012 Owner's Manual) at 739; see also id. (2013 Owner's Manual) at 741 (same); id. (2014 Owner's Manual) at 743 (same); id. (2015 Owner's Manual) at 745 (same)).  In any event, whether Toyota made a sufficient disclosure in the owner's manual for the Toyota Camry XV 50 vehicle is a common question that can be answered on a classwide basis.

Toyota also contends that there is no common evidence "showing that all class members were presented with the same information at the time of purchase," and that such a showing cannot be made "because different car-buying consumers seek information from many different sources, such as consumer reports, websites, and dealer representatives."  (Dkt. 88, Joint Br. at 19, 35-36) (citing Joint Appx., Exh. G (Keller Decl.) at ¶¶ 25-50).  According to Toyota, plaintiffs do "not identify where, by whom, or how the alleged defect should have been disclosed, what specific information [Toyota] failed to disclose, or even what materials or information class members viewed (or conversations they had) prior to lease or purchase – which will vary greatly."  (Dkt. 88, Joint Br. at 36 ) (citing Butler, 2017 WL 1398316, at *10).[13]  However, in an omissions

---

[13]  Toyota's reliance on Butler is misplaced and instead undermines its contention.  In that case, the court explained that "some class members were likely not exposed to a Porsche representation with omissions, and would likely not have been aware of a disclosure from Porsche had a disclosure been made" because "Plaintiff's proposed class definition include[d] individuals who purchased a Class Vehicle from an authorized Porsche dealership, in addition to individuals who purchased a used Class Vehicle from a third party in a private sale."  Butler, 2017 WL 1398316, at *11.  Indeed, the Butler court noted that "[i]n general, district courts have found exposure and reliance to be 'amenable to class wide resolution' in CLRA and UCL omission based cases where, for example, all members of the class 'interacted with an authorized . . . dealer prior to purchase,' and thus all class members would have 'been aware of a disclosure' from [defendant] about the defect at the point of sale."  Id. at *10.

case such as this, where plaintiffs contend that they and the class members purchased or leased their vehicles from an authorized dealer, (see Dkt. 88, Joint Br. at 5) (setting forth proposed Rule 23(b)(3) class definition), the Ninth Circuit has found this to be sufficient to show that a class member would have been aware of a disclosure had it been made by the defendant's authorized dealer.  See Daniel I, 806 F.3d at 1226 ("Plaintiffs presented evidence that they interacted with and received information from sales representatives at authorized Ford dealerships prior to purchasing their Focuses.  This is sufficient to sustain a factual finding that Plaintiffs would have been aware of the disclosure if it had been made through Ford's authorized dealerships."); Daniel II, 2016 WL 8977932, at *8 ("With respect to whether one would have been aware of the omitted information, the Ninth Circuit has held in this case that interacting with an authorized Ford dealer prior to purchase is sufficient to show that one would have been aware of a disclosure.  Because plaintiff's class includes only purchasers of new Focuses who, presumably, interacted with authorized Ford dealers prior to purchase, that inquiry, too, is amenable to class-wide resolution.") (citing Daniel I, 806 F.3d at 1225); see also Baranco v. Ford Motor Co., 294 F.Supp.3d 950, 967-68 (N.D. Cal. 2018) ("Plaintiff Nicolau alleges she purchased her vehicle from an authorized Ford dealership[.]  Though she does not specifically allege that she received information or promotional information from Ford or its agents at the dealerships, the Court can plausibly draw an inference in her favor that she could have received such information had Ford publicized the defect through the dealer, as it is highly improbable that she purchased her vehicle from a dealership without any exchange of information whatsoever (or at least an opportunity for such an exchange.")).  Indeed, here, as in Keegan, "all class members received the same information from defendant[] regarding the purported defect – which is to say, no information[.]"  Keegan, 284 F.R.D. at 533.

In short, the court finds that plaintiffs have met their burden of showing that common questions of fact and law predominate over individuals ones with respect to the UCL and CLRA claims.

### 2.    Breach of Implied Warranty Claims.

The Song-Beverly Act provides that "every sale of consumer goods that are sold at retail in [California] shall be accompanied by the manufacturer's and the retail seller's implied warranty

1  that the goods are merchantable[,]" Cal. Civ. Code § 1792, which means, as relevant here, that

2  the goods "[a]re fit for the ordinary purposes for which such goods are used." § 1791.1(a)(2).

3  "The core test of merchantability is fitness for the ordinary purpose for which such goods are

4  used." Isip v. Mercedes-Benz USA, LLC, 155 Cal.App.4th 19, 26 (2007).  With respect to the

5  subject vehicle, the warranty of merchantability is met if the vehicle is "in safe condition and

6  substantially free of defects[.]"[14] Id.

7         Toyota asserts that plaintiffs' implied warranty claims cannot be certified because this court

8  has already found that the elements require weighing individualized facts about the severity of any

9  HVAC odor and its impact on the use of any particular Class Vehicle.  (See Dkt. 88, Joint Br. at

10 29) (citing Dkt. 81, MSJ Order at 6).  It also asserts that common evidence about whether a latent

11 defect with the likelihood of emitting noxious odors existed at the time of sale cannot support class

12 certification because California law requires that defect-related problems be "substantially certain"

13 to arise.  (Dkt. 88, Joint Br. at 29) (citing Birdsong v. Apple, Inc, 590 F.3d 955, 959 (9th Cir. 2009)).

14 Toyota's assertions are unpersuasive.

15        While plaintiffs will need to prove that the HVAC Defect is substantially certain to result in

16 the odors emanating from the HVAC system, the court is persuaded that this issue is susceptible

17 to common classwide proof.[15]  Indeed, if plaintiffs cannot make such a showing, their implied

18 warranty claims will fail.  See, e.g., Keegan, 284 F.R.D. at 537 ("[I]f defendants can demonstrate

19 that the design specification requiring 1.5 degrees of negative camber is not 'substantially certain'

20 to result in the excessive and premature tire wear about which plaintiffs complain, they will prevail.

21 If plaintiffs, on the other hand, can demonstrate that the specification is substantially certain to

22 result in premature and excessive tire wear that renders the vehicles unfit for driving, they will

23

24      [14] "Claims under the Magnuson-Moss [] Act stand or fall with . . . express and implied warranty

25 claims under state law."  Daniel I, 806 F.3d at 1227 (internal quotation marks omitted).

26      [15] As one court recognized, "[s]ince Am. Honda, district courts are divided as to whether
   determining class certification of a breach of implied warranty under California law requires a class
27 representative plaintiff to demonstrate, with evidence, an inherent defect which is 'substantially
   certain to result in malfunction during the useful life of the product.'"  Victorino v. FCA US LLC,
28 2018 WL 2967062, *12 (S.D. Cal. 2018).

1    prevail.  The breach of implied warranty claim is therefore susceptible of common proof, and the

2    court will certify the implied warranty claim for class treatment."); Victorino, 2018 WL 2967062, at

3    *13 ("Plaintiff's allegation of a common defect present in all Class Vehicles at the time of purchase

4    and that the defect will likely occur at some point during the lifetime of the class vehicles

5    demonstrate predominance of common issues on the claim of breach of implied warranty. . . .

6    Defendant's argument that predominance is not met due to the individual questions arising to

7    determine whether the Class Vehicles are merchantable is without merit."); Miller v. Fuhu, 2015

8    WL 7776794 (C.D. Cal. 2015) (rejecting defendants' argument that common questions of fact and

9    law did not predominate with respect to plaintiff's warranty claims because the alleged defect "has

10   not manifested in the majority of Nabi tablets, an individualized inquiry will be required to

11   determine whether each prospective plaintiff has an actionable claim for breach of warranty" and

12   that such claims "will require individualized proof that each class member's product malfunctioned

13   within the warranty period and that each class members product malfunctioned to a sufficiently

14   serious degree to constitute a breach applicable warranties").  In short, the court finds that

15   plaintiffs have met their burden of showing that common issues predominate with respect to the

16   breach of implied warranty claims.

17                    **3.    Unjust Enrichment**.

18           In California, the elements of an unjust enrichment claim are "the receipt of a benefit and

19   the unjust retention of the benefit at the expense of another."  Peterson v. Cellco P'ship, 164

20   Cal.App.4th 1583, 1593 (2008) (internal quotation and alteration marks omitted).  "This equitable

21   test does not turn merely on the transfer of money or other benefits from one party to another –

22   it requires injustice."  Berger, 741 F.3d at 1070; see Doe I v. Wal-Mart Stores, Inc., 572 F.3d 677,

23   684 (9th Cir. 2009) ("The fact that one person benefits another is not, by itself, sufficient to require

24   restitution. The person receiving the benefit is required to make restitution only if the

25   circumstances are such that . . . it is unjust for the person to retain it.") (internal quotation marks

26   and emphasis omitted).  For the reasons set forth above, see supra at §§ II.A.1-2, the court finds

27   that class certification is appropriate with respect to this claim since it is based on the same

28   common evidence regarding Toyota's failure to disclose the HVAC Defect.  See Brickman v. Fitbit,

                                                    20

1   Inc., 2017 WL 5569827, *7 (N.D. Cal. 2017) ("In light of all of the fact commonalities discussed

2   above, plaintiffs' quasi-contract/unjust enrichment claims are suited to certification.  [Defendant's]

3   passing mention of Berger v. Home Depot USA, Inc., 741 F.3d 1061 (9th Cir. 2014), is . . . entirely

4   off point.").

5       **4. Damages**.

6      Toyota asserts that individualized issues predominate with respect to the calculation of

7   classwide damages, and that plaintiffs "cannot satisfy their Comcast burden."  (Dkt. 88, Joint Br.

8   at 49-51; see also id. at 21-22).

9      Under Comcast, "plaintiffs must be able to show that their damages stemmed from the

10   defendant's actions that created the legal liability."  Pulaski & Middleman, LLC v. Google, Inc., 802

11   F.3d 979, 987-88 (9th Cir. 2015), cert. denied, 136 S.Ct. 2410 (2016) (internal quotation marks

12   omitted); see Just Film, Inc., 847 F.3d at 1120 (same).  "To satisfy this requirement, plaintiffs must

13   show that 'damages are capable of measurement on a classwide basis,' in the sense that the

14   whole class suffered damages traceable to the same injurious course of conduct underlying the

15   plaintiffs' legal theory."  Just Film, Inc., 847 F.3d at 1120 (quoting Comcast, 133 S.Ct. at 1433-35).

16   The Ninth Circuit has emphasized that uncertain damages calculation should not defeat

17   certification.  Leyva v. Medline Indus., Inc., 716 F.3d 510, 513-14 (9th Cir. 2013).  "[T]he fact that

18   the amount of damage may not be susceptible of exact proof or may be uncertain, contingent or

19   difficult of ascertainment does not bar recovery."  Pulaski, 802 F.3d at 989.

20      Here, plaintiffs' theory of liability is that plaintiffs and the putative class members were

21   harmed at the time of sale or lease by defendant's failure to disclose the HVAC Defect.  (See Dkt.

22   88, Joint Br. at 44-45).  According to plaintiffs, had they and members of the class "known about

23   the defects at the time of sale or lease, [they] would not have purchased or leased the Class

24   Vehicles or would have paid less for them."  (Dkt. 52, SAC at ¶¶ 19, 125, 139).  Plaintiffs' expert,

25   Susan Thompson ("Thompson"), explained in her report that "Plaintiffs contend they were

26   damaged because when they purchased their vehicles, they bargained for a vehicle that did not

27   contain known HVAC defects, but that is not what they received[,]" (Exh. 37 (Expert Report of

28   Susan K. Thompson) ("Thompson Report") at 250); (see also id. at 248), and that they are

"entitled to a payment in the amount of the average cost of continuous, ongoing repairs to the HVAC system needed to abate the HVAC odor." (Id. at 250). Relying on a benefit of the bargain theory, Thompson opines that because the HVAC Defect cannot be fixed, (id. at 249-50), "[t]he measure of damages would be a payment in the amount of the average costs of the parts, labor, and sublet required to repair the HVAC Defect over the average life span of the vehicle." (Id. at 251). Such damages are "calculable by computing the average costs of the parts and labor required to make the repairs necessary to remedy the HVAC defect." (Id. at 248-49; see id. at 251 (average costs determined by utilizing defendant's repair database)). According to Thompson, the total damages amount is the average cost of repairs ($313) multiplied by the average estimated life of the vehicle (10 years).[16] (Id. at 251).

Toyota's arguments, for the most part, tend to go to the merits of plaintiffs' claims.[17] (See Dkt. 88, Joint Br. at 49-51). Such arguments, however, do not undermine plaintiffs' damages model which is consistent with plaintiff's theory of liability.[18] Unlike in the cases relied upon by Toyota, plaintiffs are not seeking damages based on an "expected utility" theory that assigns $0

---

[16] Thompson also proposes an out-of-pocket methodology for class members that have paid to remediate the effects of the HVAC odor. (See Exh. 37 at 253) ("Reimbursement of out of pocket costs incurred by class members for repairs to mitigate HVAC odor are calculable based on class members' receipts or invoices for HVAC defect-related repairs.").

[17] For instance, Toyota argues that Thompson's model is unreliable because its core assumptions are wrong since there is no evidence that the HVAC odor will arise in every Class Vehicle or that the odor is or will be caused by the alleged defect. (See Dkt. 88, Joint Br. at 50-51). Toyota adds that "Thompson improperly assumes that all class members should get an average cost of countermeasures over ten years to address HVAC odor, regardless of whether the Class Vehicle is leased (and for how long), when the Class Vehicle is sold, or if and why any HVAC odors arise." (Id. at 51). Toyota also argues that the benefit of the bargain theory "identifies the 'difference in fair market value (i.e. the amount that a willing buyer and a willing seller would both accept) between the product as represented and the product actually received[,]'" (id. at 50) (quoting Saavedra v. Eli Lilly & Co., 2014 WL 7338930, *4 (C.D. Cal. 2014), but Thompson did not calculate this difference. (See id.; Joint Appx., Exh. 50 (Thompson Depo.) at 682). Rather, Thompson used the average costs of repairs to arrive at an amount that would represent such differences.

[18] Toyota's contention that Thompson's model is improper because it is based on countering any purported odor rather than the costs of fixing the alleged underlying defect, (see Dkt. 88, Joint Br. at 50), is without merit since Thompson noted, and Toyota does not dispute, that there is no permanent fix for the HVAC Defect.

value to the defective HVAC system, see Philips, 2016 WL 7428810, at *20-22, nor do they seek a "full refund" under the benefit of the bargain model.  See Nguyen, 2018 WL 1831857, *5-*7.  For instance, in Nguyen, plaintiff's expert utilized a benefit of the bargain damages model, and set damages equal to the cost to replace the defective component with a working one, "on the theory that this is equal to the difference between the value Nissan represented (a vehicle with a working [component]), and the value class members received (a vehicle with a defective [component])." Id. at *5.  The court rejected this model because if a class member received the proffered amount to replace the defective component, but also "derived value from the defective [component] – be it by selling it, repurposing it, or simply driving a ways before replacing it – the class member will have received the full benefit of the bargain and the monetary value of the defective part."  Id. According to the court, the plaintiff's damages model erred "in assuming that all consumers would discount the amount they would be willing to pay for the vehicle by the full replacement costs of a [component] even though the consumer received some value from the defective [component]." Id.

But that is not the case here.  Plaintiffs are not seeking the costs of a replacement HVAC system, but simply "the amount of the average costs of the parts, labor, and sublet required to repair the HVAC Defect over the average life span of the vehicle."  (Joint Appx., Exh. 37 (Thompson Report) at 251).  Indeed, the court in Nguyen distinguished Falco v. Nissan N. Am. Inc., 2016 WL 1327474 (C.D. Cal. 2016), stating that "[t]he damages model approved in Falco awarded class members the cost to repair the allegedly defective part instead of the cost to replace it[, which] mitigate[d] concerns that class members will receive a windfall, because it sets damages equal to the amount necessary to make a defective part serviceable, rather than the amount necessary to procure an entirely new part." Nguyen, 2018 WL 1831857, at *7; see Falco, 2016 WL 1327474, at *12 ("By receiving restitution in the amount of average repairs, the class would be getting the benefit of their bargain because they would be put in the same position they would have been had the car not been sold with the defective timing chain system — it is the cost necessary to make the vehicles conform to the value Plaintiffs thought they were getting in the price tendered."); Pulaski, 802 F.3d at 989 ("The calculation need not account for benefits received

1   after purchase because the focus is on the value of the service at the time of purchase.  Instead,

2   in calculating restitution under the UCL . . . the focus is on the difference between what was paid

3   and what a reasonable consumer would have paid at the time of purchase without the fraudulent

4   or omitted information.").

5          That being said, the court will consider at the appropriate time whether to bifurcate the trial

6   into a liability and a damages phase to mitigate potential concerns regarding damages and injured

7   class members.  See 4 Newberg on Class Actions, § 11:6, at 21 (5th ed. 2014) ("Courts have . .

8   . uniformly held that individual damage issues should not defeat class certification. [¶]  However,

9   to say that is one thing, to try the case another.  Courts have employed either issue certification

10  (certifying only the question of liability for class treatment) or bifurcation (separating liability from

11  damages and trying liability first, then damages) as the means to effectuate the goal of aggregated

12  treatment."); see, e.g., Tyson Foods, 136 S.Ct. at 1050 (recognizing that bifurcation could resolve

13  problems regarding uninjured class members).

14                    **5.    Other Predominance Issues**.

15         Toyota contends that individualized issues predominate regarding its affirmative defenses,

16  specifically its affirmative defense that "some class members will be subject to mandatory

17  arbitration provisions contained in their financing, leasing, and extended warranty contracts." (Dkt.

18  88, Joint Br. at 51) (citing Exhs. 45-46).  However, Toyota does not state when such provisions

19  came into effect and how many class members would be subject to them.  (See, generally, id.).

20  Under the circumstances, the court is not persuaded that such provisions preclude class

21  certification.  See, e.g., Ehret v. Uber Techs., Inc., 148 F.Supp.3d 884, 902 (N.D. Cal. 2015)

22  (finding that whether an absent class member is bound by an arbitration agreement could be dealt

23  with on a class wide basis); see also Tyson Foods, 136 S.Ct. at 1045 ("The predominance inquiry

24  asks whether the common, aggregation-enabling, issues in the case are more prevalent or

25  important than the non-common, aggregation-defeating, individual issues.  When one or more of

26  the central issues in the action are common to the class and can be said to predominate, the

27  action may be considered proper under Rule 23(b)(3) even though other important matters will

28

have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members.") (citations and internal quotation marks omitted).

B.      Superiority.

"[T]he purpose of the superiority requirement is to assure that the class action is the most efficient and effective means of resolving the controversy." Wolin, 617 F.3d at 1175 (internal quotation marks omitted).  To determine superiority, the court must look at

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
>
> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
>
> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
>
> (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3).

Of the four superiority factors outlined by Rule 23(b)(3), defendant appears to dispute only the class interests in individually controlling the prosecution of separate actions and whether the case is manageable as a class action.  (See Dkt. 88, Joint Br. at 47-48); see Fed. R. Civ. P. 23(b)(3)(A) & (D).  As to Rule 23(b)(3)(A), "[w]here recovery on an individual basis would be dwarfed by the cost of litigating on an individual basis, this factor weighs in favor of class certification." Wolin, 617 F.3d at 1175.  In cases where a number of individuals seek only to recover relatively small sums, "[c]lass actions may permit the plaintiffs to pool claims which would be uneconomical to bring individually." Local Joint Exec. Bd. of Culinary/Bartender Trust Fund, 244 F.3d at 1163 (further finding that "[i]f plaintiffs cannot proceed as a class, some – perhaps most – will be unable to proceed as individuals because of the disparity between their litigation costs and what they hope to recover") (internal quotation marks and alteration omitted).  Toyota contends that "class members have an interest in bringing individual cases[, and i]f HVAC odor impacts their Class Vehicle in any meaningful way, they will seek to redress it, and they have multiple incentives to do so in individual actions [since both] the UCL and CLRA allow for

1  attorney's fees." (See Dkt. 88, Joint Br. at 52-53).  However, Toyota ignores the disparity between

2  litigation costs (particularly expert costs) and recovery in vehicle defect cases.  With respect to

3  23(b)(3)(D), "[f]ailure to certify an action under Rule 23(b)(3) on the sole ground that it would be

4  unmanageable is disfavored, and should be the exception rather than the rule." In re Live Concert

5  Antitrust Litig., 247 F.R.D. 98, 148 (C.D. Cal. 2007) (internal quotation marks omitted); Fraser v.

6  Wal-Mart Stores, Inc., 2014 WL 7336673, *8 n. 5 (E.D. Cal. 2014) ("[The] Ninth Circuit, along with

7  at least seven other circuits, has held that there is a presumption against dismissing a class action

8  on manageability grounds or that such dismissals are typically disfavored"); see also In re: Visa

9  Check/MasterMoney Antitrust Litig., 280 F.3d 124, 140 (2d Cir. 2001).  The court finds no reason

10  to create an exception here.

11  III.    RULE 23(b)(2) CLASS.

12         In addition to the Rule 23(b)(3) Class, plaintiffs seek to certify a Rule 23(b)(2) Class, defined

13  as "all persons in California who purchased or leased a 2012-2015 Toyota Camry XV 50 model

14  vehicle from an authorized Toyota dealer and still own or lease their vehicles."  (Dkt. 88, Joint Br.

15  at 5, 53-55).

16         A Rule 23(b)(2) class may be maintained if "the party opposing the class has acted or

17  refused to act on grounds that apply generally to the class, so that final injunctive relief or

18  corresponding declaratory relief is appropriate respecting the class as a whole[.]"  This provision

19  applies "only when a single injunction or declaratory judgment would provide relief to each

20  member of the class.  Dukes, 564 U.S. at 360, 131 S.Ct. at 2557.  "It does not authorize class

21  certification when each individual class member would be entitled to a different injunction or

22  declaratory judgment against the defendant."  Id.  "Similarly, it does not authorize class

23  certification when each class member would be entitled to an individualized award of monetary

24  damages. "  Id. at 360-61, 131 S.Ct. 2557.  Under the circumstances here, it is unnecessary for

25  the court to address whether certification under Rule 23(b)(2) is appropriate here since the court

26  is certifying a class under Rule 23(b)(3).

27                                              **CONCLUSION**

28         Based on the foregoing, IT IS ORDERED THAT:

1.  Plaintiffs' Motion for Class Certification **(Document No. 88)** is **granted**.  The court will certify the Rule 23(b)(3) Class defined as

(1) A California-only class consisting of all persons in California who purchased or leased a 2012-2015 Toyota Camry XV 50 model vehicle from an authorized Toyota dealer; (2) a California CLRA sub-class consisting of all members of the California class who are "consumers" within the meaning of California Civil Code § 1761(d).

2.  The court hereby appoints Alfred Salas and Gloria Ortega (with exception as to the implied warranty claims) as the representatives of the certified class.

3.  The court hereby appoints Capstone Law APC as class counsel.

Dated this 27th day of March, 2019.


                                                              /s/
                                                    Fernando M. Olguin
                                                    United States District Judge